ARNALL GOLDEN GREGORY LLP
171 17th Street N.W.
Suite 2100
Atlanta, Georgia 30363
Telephone: (404) 873-8500
Facsimile: (404) 873-8501
Darryl S. Laddin (DL-5130)
Frank N. White
Zachary D. Wilson

*Counsel for Sprint Nextel Corporation*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x

In re:

TERRESTAR NETWORKS, INC., *et al.*,

               Debtors.

Chapter 11
Case No. 10-15446 (SHL)
(Jointly Administered)

---------------------------------------------------------------x

SPRINT NEXTEL CORPORATION,

               Plaintiff,

v.

U.S. BANK NATIONAL ASSOCIATION,
in its capacity as Indenture Trustee and
Collateral Agent for the 15.0% Senior
Secured Payment-In-Kind Notes due 2014,

               Defendant.

Adv. Pro. No. _____

---------------------------------------------------------------x

## COMPLAINT FOR DECLARATORY RELIEF

Plaintiff, Sprint Nextel Corporation ("**Sprint Nextel**"), through undersigned counsel, brings this Complaint against U.S. Bank National Association, in its capacity as Indenture

Trustee and Collateral Agent for the 15.0% Senior Secured Payment-In-Kind Notes due 2014 ("**U.S. Bank**"), and respectfully shows the Court as follows:

**NATURE OF ACTION**

1. By this action, Sprint Nextel seeks a declaration regarding the priority, scope, validity and enforceability of any security interests granted by Terrestar Networks, Inc. ("**TSN**") and certain of its affiliates in licenses, authorizations, waivers, permits and other related regulatory approvals (collectively, the "**FCC Licenses**") granted by the Federal Communications Commission (the "**FCC**") and the proceeds and value derived from the FCC Licenses. This adversary proceeding is an express challenge to the stipulations and admissions contained in ¶ 4 of the DIP Financing Order (as hereinafter defined).

2. Pursuant to a Security Agreement (as hereinafter defined), TSN and its affiliates purported to grant a security interest in the FCC Licenses and any proceeds thereof to Defendant U.S. Bank National Association as Collateral Agent for the Senior Secured Noteholders (as defined herein). A present, justiciable dispute exists as to the priority, scope, validity, and enforceability of the liens purportedly granted by the Security Agreement.

3. Applicable law prohibits the grant of a security interest in the FCC Licenses, and any pre-petition lien on the proceeds of the FCC Licenses does not attach to any proceeds or value derived from the FCC Licenses after the filing of the bankruptcy cases by TSN and its affiliates.

4. Resolution of the parties' dispute will promote judicial economy and the interests of justice, and from the perspective of Sprint Nextel, result in a legal and equitable basis for establishing priority to the assets of certain of the Debtors' estates in the Bankruptcy Case (as hereinafter defined).

## JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334. Venue of this proceeding is proper under 28 U.S.C. § 1409. This adversary proceeding relates to the chapter 11 cases jointly administered under the style *In re TerreStar Networks, Inc., et al.*, Case No. 10-15446 (SHL) (the "**Bankruptcy Case**"). The following entities are Debtors in the jointly administered Bankruptcy Case: TerreStar New York Inc.; TerreStar Networks Inc.; Motient Communications Inc.; Motient Holdings Inc.; Motient License Inc.; Motient Services Inc.; Motient Ventures Holding Inc.; MVH Holdings Inc.; TerreStar License, Inc.; TerreStar National Services Inc.; TerreStar Networks Holdings (Canada) Inc.; TerreStar Networks (Canada) Inc.; and 0887729 B.C. Ltd. (collectively, the "**Debtors**").

6. This is a core proceeding within the meaning of 28 U.S.C. § 157(b). Sprint Nextel consents to the entry of a final order or judgment by a bankruptcy judge in this proceeding.

## PARTIES

7. Sprint Nextel is a corporation organized under the laws of Kansas, with its principal place of business in Overland Park, Kansas. As described in more detail herein, Sprint Nextel is a creditor of the Debtors. Pursuant to the Final Order: (I) Authorizing Debtors to Obtain Postpetition Financing; (II) Authorizing the Debtors to Use Cash Collateral; and (III) Granting Adequate Protection to Prepetition Secured Parties (the "**DIP Financing Order**") entered in the Bankruptcy Case on November 18, 2010, this Court expressly recognized that Sprint Nextel has standing to bring the claims asserted in this adversary proceeding.

8. Upon information and belief, defendant U.S. Bank is a national banking association chartered under the laws of the United States of America and is an insured depository

institution (as defined in section 3 of the Federal Depository Insurance Act). U.S. Bank is named as a defendant solely in its capacity as Indenture Trustee and Collateral Agent for the holders of the Senior Secured Notes (as defined herein).

## STATEMENT OF FACTS

### A. The Debtors' FCC Licenses and Related Obligations.

9. Collectively, the Debtors and their affiliates, including non-bankruptcy parent TerreStar Corporation, are a provider of mobile satellite services ("**MSS**"). To provide MSS, the Debtors obtained various licenses and authorizations from the FCC. The FCC Licenses include a license (the "**S-Band License**") to use 20 MHz of spectrum in the 2 GHz spectrum band (commonly known as the "**S-Band**").

10. The S-Band spectrum utilized by the Debtors has not always been available for use by MSS providers. Starting in the late 1990s, the FCC began assigning certain portions of spectrum (or "band") for the use of MSS operators and their anticipated MSS systems. The band was already occupied by unrelated Broadcast Auxiliary Service ("**BAS**") entities (consequently known as "**BAS Incumbents**"). The BAS Incumbents, most of which were television broadcasters, used integrated transmitters, receivers, and related equipment for electronic newsgathering to provide programming such as breaking news, live sports, and real-time weather information. The FCC designated certain other spectrum to which the BAS Incumbents would be relocated to clear the bands designated for MSS operations. Pursuant to a longstanding spectrum management policy of the FCC, the FCC held that MSS operators such as the Debtors had to bear the costs required to move the BAS Incumbents to the new band (this process is generally referred to as the "**BAS Relocation**"). The relocation of the BAS Incumbents to the new band would result in clearance of those portions of the spectrum where the BAS Incumbents

previously operated and make that spectrum available for use by the entering MSS operators, like the Debtors.

11. To prevent "free riders" if a later entrant came into the band after the band had been cleared of BAS Incumbents by an earlier entrant, the FCC required that the later entrant pay a *pro rata* share of the costs expended to clear that portion of the spectrum. This arrangement was intended to comport with the FCC's long-standing spectrum management policy that the costs for moving incumbents into other portions of the band should be borne by the entrant that utilizes and enjoys the benefit of that portion of the cleared spectrum.

12. The Debtors' obligation to complete the BAS Relocation was described as follows in the annual report for the fiscal year ended December 31, 2007 of Terrestar Corporation, the Debtors' publicly-traded non-bankruptcy parent corporation:

> In the United States, our operations at the 2GHz MSS S-band are subject to successful relocation of existing broadcast auxiliary service ("BAS") licensees and other terrestrial licensees in the band. Costs associated with spectrum clearing could be substantial.

*See* Terrestar Corporation, Form 10-K dated March 31, 2008, at p. 20 (attached hereto as **Exhibit A**).

### B. The Liens Provided to the Senior Secured Noteholders.

13. U.S. Bank is the Indenture Trustee under an Indenture (together with any amendments, supplements or modifications thereto, the "**Indenture**") dated as of February 14, 2007, among TSN, as issuer, the guarantors from time to time a party thereto, and U.S. Bank as Indenture Trustee, pursuant to which TSN issued $500,000,000 aggregate principal amount of its 15% Senior Secured PIK Notes due 2014 (the "**Senior Secured Notes**").

14. Pursuant to a security agreement dated February 14, 2007 (the "**Security Agreement**"), among TSN, as issuer, and TerreStar National Services Inc. and TerreStar License

5

Inc., as guarantors, in favor of U.S. Bank, as Collateral Agent for the holders of the Senior Secured Notes (the "**Senior Secured Noteholders**"), TSN, TerreStar National Services Inc. and TerreStar License Inc. purported to grant a lien upon certain of their assets.

15. When describing the security interests purportedly granted by TSN and its affiliates, the Security Agreement provided as follows:

> [S]uch security interest does not include at any time any FCC License to the extent (but only to the extent) that at such time the Collateral Agent may not validly possess a security interest directly in the FCC License pursuant to applicable Federal law . . . but such security interest does include at all times all proceeds of the FCC Licenses, and the right to receive all monies, consideration and proceeds derived from or in connection with the sale, assignment, transfer, or other disposition of the FCC Licenses.

*See* Security Agreement, at § 3(f) (attached as **Exhibit B**).

### C. The Basis for Sprint Nextel's Claims Against the Debtors

16. Sprint Nextel is not an MSS licensee; rather it provides land-based mobile wireless services. In 2004, in circumstances unrelated to the BAS Relocation mandated by the FCC for MSS providers, Sprint Nextel began to address certain complaints of interference between commercial wireless providers, like Sprint Nextel, and public safety communications[1] operations, largely due to the close proximity of their licensed operations.

17. By an order issued in 2004, the FCC addressed the increasing amounts of interference experienced by public safety communications systems in the 800 MHz spectrum band. *Improving Public Safety Communications in the 800 MHz Band; Consolidating the 800*

---

[1] "Public safety communications" is a term of art and is defined in 47 U.S.C. § 337(f). Public safety communications include communications among police officers, ambulances, fire departments, or other first responders.

*and 900 MHz Industrial/Land Transportation and Business Pool Channels*, Report and Order, Fifth Report and Order, Fourth Memorandum Opinion and Order, and Order, 19 FCC Rcd. 14969 (2004) ("*800 MHz Order*").

18. The FCC's *800 MHz Order* called for the reconfiguration of the 800 MHz band to create newly designed contiguous blocks of public safety spectrum placed with sufficient separation from other radio and cellular radio operations. To facilitate this reconfiguration, Sprint Nextel agreed to relinquish certain of its own 800 MHz spectrum and to accept certain other 800 MHz reconfiguration responsibilities in return for the FCC granting Sprint Nextel new spectrum in the 1.9 GHz band.

19. In connection with Sprint Nextel's reconfiguration responsibilities for 800 MHz, the FCC obligated Sprint Nextel to relocate the BAS Incumbents in the 1990-2025 MHz band to new channels above 2025 MHz, thereby clearing the 1990-2025 MHz band for new, non-BAS use. By clearing the entire 1990-2025 MHz channel block, Sprint Nextel was clearing not only spectrum for its own use at 1990-1995 MHz, but also clearing spectrum for use by MSS operators at 2000-2020 MHz.

20. To account for differences in the value of the 800 MHz spectrum relinquished by Sprint Nextel and the value of the 1.9GHz spectrum that Sprint Nextel would be receiving in exchange, the *800 MHz Order* requires that Sprint Nextel make a payment to the FCC equal to (A) the amount by which the value of the spectrum acquired exceeded the value of the relinquished spectrum minus (B) the costs incurred by Sprint Nextel in connection with the reconfiguration of the 800 MHz spectrum and the BAS Relocation (less any amounts reimbursed by subsequent entrants into the S-Band as described below). The total costs incurred by Sprint

Nextel in the reconfiguration will more than offset the amount by which the value of the spectrum acquired exceeded the value of the relinquished spectrum.

21. Pursuant to the relocation plan mandated in the *800 MHz Order*, Sprint Nextel would be the "first entrant" into this cleared 1990-2025 MHz band. Under nearly two decades of FCC's rules and policies, subsequent entrants are required to reimburse the first entrant into a band for a *pro rata* portion of the band relocation costs. These rules are to ensure that subsequent entrants would not be "free riders," that could unfairly force the initial entrant to assume the entire cost of clearing the band.

22. Consistent with FCC rules and policies, Sprint Nextel asked that the FCC require subsequent MSS operators moving into the vacated 2000 – 2020 MHz band to pay their *pro rata* share of Sprint Nextel's cost of clearing that spectrum for the MSS systems. The FCC applied its historic reimbursement policies to the BAS relocation proceeding and granted Sprint Nextel's request. In particular, the FCC ordered that Sprint Nextel could require reimbursement from subsequently entering MSS operators for their share of Sprint Nextel's costs in clearing the BAS spectrum on a *pro rata* basis according to the amount of spectrum each MSS system is assigned. *800 MHz Order*, ¶ 261.

23. On June 25, 2008, Sprint commenced a lawsuit against TSN and another MSS provider in the United States District Court for the Eastern District of Virginia (Case No. 1:08-cv-651) to enforce its right to reimbursement of the costs incurred in the BAS Relocation (the "**Reimbursement Litigation**"). The Reimbursement Litigation was stayed after the Virginia District Court referred certain issues to the FCC for clarification.

24. On June 12, 2009, pursuant to the referral from the Virginia District Court, the FCC issued an order and a Further Notice of Proposed Rulemaking providing further rulings

with respect to the BAS Relocation proceeding. *Improving Public Safety Communications in the 800 MHz Band; Consolidating the 800 and 900 MHz Industrial/Land Transportation and Business Pool Channels*, Report and Order and Order and Further Notice of Proposed Rulemaking, 24 FCC Rcd 7904 (2009) ("***2009 Order and FNPRM***").

25. On September 29, 2010, the FCC issued its final decision with respect to the referral from the Virginia District Court and the related rulemaking. *Improving Public Safety Communications in the 800 MHz Band; Consolidating the 800 and 900 MHz Industrial/Land Transportation and Business Pool Channels*, Fifth Report and Order, Eleventh Report and Order, Sixth Report and Order, and Declaratory Ruling, FCC 10-179 (2010) ("***2010 Declaratory Ruling and Order***"). A copy of the *2010 Declaratory Ruling and Order* is attached as **Exhibit C**.

26. The *2010 Declaratory Ruling and Order* affirmed many of the findings and tentative conclusions of the FCC's *2009 Order and FNPRM* and rejected arguments asserted by the Debtors and the other MSS operator in the S-Band to avoid the reimbursement obligation. Specifically, the FCC stated: "Terrestar's argument is based on a fundamental misreading of the Commission's orders. . . . [I]t was not reasonable for TerreStar to believe that it would escape all BAS relocation costs. We find that fairness as well as our well-established cost sharing principles dictate that all of the new entrants should bear the burden of the increased cost and complexity of the BAS transition and not just Sprint Nextel." *2010 Declaratory Ruling and Order*, ¶ 27.

27. The FCC further recognized that to allow MSS operators to evade their reimbursement obligations would be contrary to public policy when it stated: "One of the important underlying principles of the relocation policy is that licensees that ultimately benefit from the spectrum cleared by the first entrant shall bear the cost of reimbursing the first entrant

for the accrual of that benefit. We are concerned that were we to stray from the traditional application of the *Emerging Technologies* relocation policy, future licensees might be unwilling or unable to assume the burden and cost of clearing spectrum quickly if they were unsure of the likelihood that they will be reimbursed by other new entrants." *Id.* at ¶ 41.

28. In the *2010 Declaratory Ruling and Order*, the FCC made the following conclusions:

- An MSS operator "enters the band" for purposes of triggering reimbursement obligations to Sprint Nextel when the MSS operator certifies under its required operational milestone that its satellite is operational. *Id.* at ¶ 42.

- The entities directly liable for the reimbursement obligation to Sprint Nextel include not only the corporate entity holding the FCC system license, but all other entities directly involved in, in control of, or otherwise integrated into the operation of the MSS system as affiliates or part of a common enterprise. *Id.* at ¶¶ 29, 33-36.

- Sprint Nextel is entitled to reimbursement of the BAS Relocation expenses prior to the true-up of expenses incurred by Sprint Nextel in connection with reconfiguration of the 800 MHz band. *Id.* at ¶¶ 60, 67.

- To preclude new entrants from evading the payment of the reimbursement obligation by entering into transactions with third parties, if a new entrant seeks to assign its license to a third party, the assignor and assignee will be jointly and severally liable for the reimbursement obligation. *Id.* at ¶ 63.

- A party liable for the reimbursement obligation cannot dispute the amounts owed as claimed by Sprint Nextel unless the party is able to provide an independent estimate of the costs in question and present evidentiary support to demonstrate that their calculation is reasonable and made in good faith. *Id.* at ¶ 69.

29. The Debtors certified that their satellite was operational in August, 2009 and, therefore, are liable to Sprint Nextel pursuant to the *2010 Declaratory Ruling and Order*.

30. Sprint Nextel completed the BAS Relocation on July 15, 2010. Sprint Nextel incurred approximately $750 million in costs associated with the BAS Relocation. The Debtors' *pro rata* share of the BAS Relocation Costs specific to its portion of the spectrum is more than $100 million.

### D. The Bankruptcy Cases.

31. On October 19, 2010 (the "**Petition Date**") the Debtors each filed a petition for relief under chapter 11 of the Bankruptcy Code, thereby commencing their respective chapter 11 cases. The Debtors are managing their properties and operating their businesses as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. The chapter 11 cases are being jointly administered for procedural purposes.

32. On November 18, 2010 the Court entered the DIP Financing Order. The DIP Financing Order expressly recognizes that Sprint Nextel has standing to bring this adversary proceeding to challenge the liens on the FCC Licenses and proceeds thereof purportedly granted to U.S. Bank as Collateral Agent for the Senior Secured Noteholders.

33. On November 5, 2010, the Debtors filed a Disclosure Statement for the Debtors' Joint Chapter 11 Plan (the "**Disclosure Statement**") [Docket No. 83] and the Joint Chapter 11 Plan (the "**Plan**") [Docket No. 82]. The Plan proposes to distribute substantially all of the Debtors' aggregate value, in the form of New Common Stock and Rights Offering Preferred Stock, to the Senior Secured Noteholders. The distribution scheme created by the Plan is premised on the existence of valid, perfected security interests in the FCC Licenses and any proceeds thereof.

34. Sprint Nextel disputes the validity and enforceability of the liens on the FCC Licenses and proceeds thereof purportedly granted to U.S. Bank as Collateral Agent for the Senior Secured Noteholders. Because Sprint Nextel has direct claims against each entity that comprises the Debtors' MSS system, including the entity that holds the FCC Licenses, Sprint Nextel's recovery in the Bankruptcy Case will increase if the liens in the FCC Licenses or the proceeds thereof are declared invalid or subordinate to the claims owed to Sprint Nextel.

35. U.S. Bank claims that the liens are valid and enforceable security interests in the FCC Licenses.

36. Accordingly, a present, justiciable dispute exists as to the scope, validity and enforceability of the liens purportedly granted by the Security Agreement, and this dispute must be decided either prior to, or contemporaneously with, issues related to confirmation of the Plan.

37. A complete and final determination of whether liens purportedly granted by the Security Agreement are valid and enforceable security interests in the FCC Licenses is not readily obtainable in another form of action or proceeding. A declaration concerning the issues raised in this Complaint will not constitute an advisory opinion.

**FIRST CLAIM FOR RELIEF**
**DECLARATORY JUDGMENT PURSUANT TO 28 U.S.C. § 2201 THAT THE**
**PURPORTED PRE-PETITION LIENS IN THE FCC LICENSES ARE INVALID**

38. Sprint Nextel repeats and realleges the allegations contained in paragraphs 1 through 37 as if fully restated herein.

39. Section 301 of the Federal Communications Act states that the Government maintains control of the airwaves by giving permission "for the use of such channels, but not the ownership thereof." 47 U.S.C. § 301. Similarly, Section 310 prohibits the "transfer[,] assign[ment], or dispos[al] of [an FCC license] in any manner, voluntarily or involuntarily, directly or indirectly, or by transfer of control of any corporation holding such permit or license, to any person except upon application to the [FCC] . . . ." 47 U.S.C. § 310 (d). Because there is no underlying property right in an FCC license, a licensee cannot legally grant a security interest in the license itself to a lender. *See, e.g., In re Ridgely Communications, Inc.*, 139 B.R. 374, 376 (Bankr. D. Md. 1992) ("The general policy of the F.C.C. is that a lender/creditor may not perfect a security interest in a broadcast license.").

40. A present, justiciable controversy exists regarding whether the liens purportedly granted pursuant to the Security Agreement granted enforceable security interests in the FCC Licenses.

41. This Court is authorized to resolve this dispute pursuant to 11 U.S.C. § 506 and Fed. R. Bankr. P. 7001(2).

42. Sprint Nextel is entitled to a declaration that the Senior Secured Noteholders do not have a valid security interest in the FCC Licenses.

### SECOND CLAIM FOR RELIEF
### DECLARATORY JUDGMENT PURSUANT TO 28 U.S.C. § 2201 THAT ANY PURPORTED LIENS ON THE PROCEEDS OF THE FCC LICENSES DOES NOT ATTACH TO PROCEEDS OR VALUE GENERATED BY THE FCC LICENSES POST-PETITION

43. Sprint Nextel repeats and realleges the allegations contained in paragraphs 1 through 42 as if fully restated herein.

44. The Security Agreement purports to grant a security interest not only in the FCC Licenses but also in any proceeds of the FCC Licenses.

45. Pursuant to applicable law, a lien on proceeds or value generated by the FCC Licenses does not attach until such proceeds are generated. No such proceeds were generated by the FCC Licenses prior to the Petition Date, and therefore, as of the Petition Date, no lien in the proceeds of the FCC Licenses had attached.

46. Pursuant to 11 U.S.C. § 552, a pre-petition secured lender has a lien on post-petition proceeds generated by the sale of property only if the lender also had a lien on the property that was sold. Because no valid security interest existed in the FCC Licenses prior to the Petition Date, 11 U.S.C. § 552 provides that any pre-petition lien on proceeds of the FCC Licenses does not attach to any post-petition of the FCC Licenses.

47. A present, justiciable controversy exists regarding whether the pre-petition liens in the proceeds of the FCC Licenses purportedly granted pursuant to the Security Agreement attach to any proceeds or value derived from the FCC Licenses after the filing of the Bankruptcy Cases.

48. This Court is authorized to resolve this dispute pursuant to 11 U.S.C. § 506 and Fed. R. Bankr. P. 7001(2).

49. Sprint Nextel is entitled to a declaration that the pre-petition liens in the proceeds of the FCC Licenses purportedly granted pursuant to the Security Agreement do not attach to any proceeds or value derived from the FCC Licenses after the filing of the Bankruptcy Cases.

**THIRD CLAIM FOR RELIEF**
**DECLARATORY JUDGMENT PURSUANT TO 28 U.S.C. § 2201 THAT THE EQUITIES OF THE CASE PREVENT ANY PURPORTED LIENS ON THE PROCEEDS OF THE FCC LICENSES FROM ATTACHING TO PROCEEDS OR VALUE GENERATED BY THE FCC LICENSES POST-PETITION**

50. Sprint Nextel repeats and realleges the allegations contained in paragraphs 1 through 49 as if fully restated herein.

51. As an alternative to the Second Cause of Action, Sprint Nextel requests a declaration that the equities of the case prevent any purported liens on the proceeds of the FCC Licenses from attaching to proceeds or value generated by the FCC Licenses post-petition.

52. Pursuant to 11 U.S.C. § 552(b)(1), even if the purported pre-petition liens on the proceeds of the FCC Licenses do attach to proceeds or value generated by the FCC Licenses post-petition, the Court is authorized to order otherwise based on the equities of the case.

53. It would be inequitable for the liens provided for the benefit of the Senior Secured Noteholders to attach to the proceeds or value generated by the FCC Licenses after the bankruptcy cases were filed. By completing the BAS Relocation, Sprint Nextel conferred a substantial benefit upon the Debtors. Absent the efforts and cost incurred by Sprint Nextel, the

Debtors would not be able to utilize the S-Band spectrum, and the value of the FCC Licenses would be significantly less. Moreover, to force Sprint Nextel to shoulder the entire costs of the BAS Relocation would be contrary to the public interest. It would be inequitable, and against the public interest, for the Senior Secured Noteholders to reap the benefits of the efforts of Sprint Nextel.

54. Accordingly, even if a lien could be granted in any interest of the Debtors in the FCC Licenses or the proceeds thereof, under the equities of this case, that lien should not attach to any proceeds or value derived from the FCC Licenses post-petition.

55. A present, justiciable controversy exists regarding whether the equities of the case should invalidate any lien on the FCC Licenses or the proceeds thereof purportedly granted pursuant to the Security Agreement.

56. This Court is authorized to resolve this dispute pursuant to 11 U.S.C. § 506 and Fed. R. Bankr. P. 7001(2).

57. Sprint Nextel is entitled to a declaration that even if a lien could be granted in any interest of the Debtors in the FCC Licenses or the proceeds thereof, under the equities of this case, that lien does not attach to any proceeds or value derived from the FCC Licenses post-petition.

## FOURTH CLAIM FOR RELIEF
## DECLARATORY JUDGMENT PURSUANT TO 28 U.S.C. § 2201 REGARDING PRIORITY OF LIENS

58. Sprint Nextel repeats and realleges the allegations contained in paragraphs 1 through 57 as if fully restated herein

59. As a further alternative to the Second Cause of Action and the Third Cause of Action, Sprint Nextel requests a declaration that to the extent any pre-petition lien granted to U.S. Bank attaches to proceeds or value generated by the FCC Licenses after the filing of the Bankruptcy Cases, then any such lien is subordinate to the claim of Sprint Nextel.

60. Under Article 9 of the Uniform Commercial Code as adopted by the State of New York, a secured party can obtain no greater interest in collateral than the debtor itself holds in the collateral. Similarly, under 11 U.S.C. § 506(a)(1), a claim is secured only to the extent of the estate's interest in the applicable property.

61. The Debtors' ability to use the FCC Licenses is subject to the requirement that they complete the BAS Relocation themselves, or alternatively, reimburse Sprint Nextel for their *pro rata* share of costs incurred by Sprint Nextel to complete the BAS Relocation.

62. Accordingly, to the extent a lien could be granted in any interest of the Debtors in the FCC Licenses or the proceeds thereof, that lien would also be subject to the reimbursement obligation owed to Sprint.

63. In addition, applicable law recognizes that security interests in FCC Licenses are prohibited because to allow such interests would interfere with the FCC's regulation of such licenses. Allowing secured lenders to obtain liens in FCC Licenses or the proceeds thereof without requiring that such liens be subordinate to obligations imposed by the FCC on the holder of such licenses would similarly interfere with the FCC's regulation of licenses and the public policy expressed by the FCC in the *2010 Declaratory Ruling and Order*.

64. A present, justiciable controversy exists regarding whether the lien on the FCC Licenses or the proceeds thereof purportedly granted pursuant to the Security Agreement is subordinate to the claim of Sprint Nextel.

65. This Court is authorized to resolve this dispute pursuant to 11 U.S.C. § 506 and Fed. R. Bankr. P. 7001(2).

66. Sprint Nextel is entitled to a declaration that the lien on the FCC Licenses or the proceeds thereof purportedly granted pursuant to the Security Agreement is subordinate to the claim of Sprint Nextel.

**PRAYER FOR RELIEF**

WHEREFORE, Sprint Nextel requests a judgment against U.S. Bank:

1. Declaring that the Senior Secured Noteholders do not hold valid and enforceable security interests in any of the FCC Licenses;

2. Declaring that the any purported pre-petition liens on the proceeds of the Debtors' FCC Licenses either (a) do not attach to proceeds or value generated by the FCC Licenses post-petition as a matter of law, (b) do not attach to proceeds or value generated by the FCC Licenses post-petition under the equities of this case, or (c) are subordinate to the reimbursement claim of Sprint Nextel; and

3. Such other and further relief as the Court deems just and proper.

Dated: December 17, 2010

                                      ARNALL GOLDEN GREGORY LLP

                                      */s/Darryl S. Laddin*
                                      Darryl S. Laddin (DL-5130)
                                      Frank N. White
                                      Zachary D. Wilson
                                      171 17th Street, NW
                                      Suite 2100
                                      Atlanta, Georgia 30363
                                      Phone: (404) 873-8500
                                      Fax: (404) 873-8501
                                      E-mail: dladdin@agg.com

                                      Attorneys for Sprint Nextel