# EXHIBIT B

EX-10.2 3 dex102.htm U.S. SECURITY AGREEMENT, DATED AS OF FEBRUARY 14, 2007

Exhibit 10.2

Execution Copy

## U.S. SECURITY AGREEMENT

SECURITY AGREEMENT dated as of February 14, 2007, among TerreStar Networks Inc., a Delaware corporation (the "Issuer"), and any entities that may become Guarantors in the future under the Indenture (as defined below) (the foregoing, collectively, the "Grantors") in favor of U.S. Bank National Association, as the trustee and collateral agent for the Holders under the Indenture referred to below (in such capacity, together with its successors in such capacity, the "Collateral Agent").

The Grantors and U.S. Bank National Association, as trustee, are parties to an Indenture dated as of February 14, 2007 (as modified and supplemented and in effect from time to time, the "Indenture"), providing, subject to the terms and conditions thereof, for purchase by the Holders of the Notes (as defined in the Indenture) issued by the Issuer and a guarantee by the Guarantors of the obligations as described in Article 10 of the Indenture.

To induce said Holders to purchase the Notes under the Indenture and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Grantors have agreed to pledge and grant a security interest in the Collateral (as hereinafter defined) as security for the Secured Obligations (as hereinafter defined). Accordingly, the parties hereto agree as follows:

**Section 1. Definitions, Etc.**

1.01. Terms Generally. Terms used herein and not otherwise defined herein are used herein as defined in the Indenture.

1.02. Certain UCC Terms. The terms "Accounts," "Chattel Paper," "Commercial Tort Claims," "Deposit Accounts," "Document," "Electronic Chattel Paper," "Equipment," "General Intangible," "Goods," "Instrument," "Inventory," "Investment Property," "Letter of Credit Rights," "Payment Intangible," "Proceeds" and "Software" have the respective meanings ascribed thereto in Article 9 of the NYUCC. The term "Securities Account" has the meaning ascribed thereto in Article 8 of the NYUCC.

1.03. Additional Definitions. In addition, as used herein:

"Arianespace Agreement" means the Launch Services Agreement dated November 8, 2006, between the Issuer and Arianespace, a company organized under the laws of France.

"ATC License" means the Second Amended and Restated Intellectual Property Assignment and License Agreement dated as of November 21, 2006 and effective as of October 1, 2006 by and between ATC Technologies, LLC, a Delaware limited liability company, and the Issuer.

"Cash Deposit Account" means account number 7900296 maintained with SunTrust Bank.

"Collateral" has the meaning ascribed thereto in Section 3.

(g) <u>Commercial Tort Claims</u>. Annex 5 sets forth a complete and correct list of all Commercial Tort Claims of the Grantors in existence on the date hereof.

**Section 3. Collateral.** As collateral security for the prompt payment in full when due (whether at stated maturity, by acceleration or otherwise) of the Secured Obligations, each of the Grantors hereby pledges and grants to the Collateral Agent for the ratable benefit of the Holders, a security interest in all of such Grantor's right, title and interest in the following, whether now owned or hereafter acquired by such Grantor and whether now existing or hereafter coming into existence and wherever located (all of the following being collectively referred to herein as "<u>Collateral</u>"):

(a) all Accounts, Instruments, Documents, Chattel Paper (whether tangible or electronic), Inventory, Equipment, Goods, Letter of Credit Rights, Payment Intangibles, Software and other General Intangibles (including, without limitation, the Motient Funding Agreement, the Transfer Agreements, the ATC License, the Hughes License, the Satellite Construction Agreement, the Arianespace Agreement, the SBN Agreement and the Nevada Site Hosting Agreement);

(b) all Investment Property, including all Pledged Equity;

(c) all IP Collateral, and the right to recover for past, present and future infringements or misappropriations thereof and all other rights of any kind whatsoever accruing thereunder or pertaining thereto;

(d) all Payment Intangibles, Software and all other General Intangibles whatsoever not covered by the preceding clauses of this Section 3;

(e) all Commercial Tort Claims arising out of the events described in Annex 5;

(f) all FCC License Rights, whether now owned or held or hereafter acquired or held by a Grantor, including all FCC Licenses, including, without limitation, the right to receive monies, proceeds, or other consideration in connection with the sale, assignment, transfer, or other disposition of any FCC Licenses, the proceeds from the sale of any FCC Licenses or any goodwill or other intangible rights or benefits associated therewith, including without limitation all right of each Grantor to (A) transfer, assign or otherwise dispose of its rights, title and interests, if any, under or in respect of such FCC Licenses, (B) exercise any rights, demands and remedies against the lessor, licensor or other parties thereto, and (C) all rights of such Grantor to receive proceeds of any insurance, indemnities, warranties, guaranties or claims for damages in connection therewith; provided, that such security interest does not include at any time any FCC License to the extent (but only to the extent) that at such time the Collateral Agent may not validly possess a security interest directly in the FCC License pursuant to applicable Federal law, including the Communications Act of 1934, as amended, and the rules, regulations and policies promulgated thereunder, as in effect at such time, but such security interest does include at all times all proceeds of the FCC Licenses, and the right to receive all monies, consideration and proceeds derived from or in connection with the sale, assignment, transfer, or other disposition of the FCC Licenses;