# EXHIBIT C

Westlaw.

51 Communications Reg. (P&F) 839, 2010 WL 3806390 (F.C.C.)

H
51 Communications Reg. (P&F) 839, 2010 WL 3806390 (F.C.C.)

Federal Communications Commission (F.C.C.)

Fifth Report and Order, Eleventh Report and Order, Sixth Report and Order, and Declaratory Ruling
*1 IN THE MATTER OF IMPROVING PUBLIC SAFETY COMMUNICATIONS IN THE 800 MHZ BAND

WT Docket No. 02-55

CONSOLIDATING THE 800 AND 900 MHZ IN-DUSTRIAL/LAND TRANSPORTATION AND BUSINESS POOL CHANNELS AMENDMENT OF PART 2 OF THE COMMIS-SION'S RULES TO ALLOCATE SPECTRUM BE-LOW 3 GHZ FOR MOBILE AND FIXED SER-VICES TO SUPPORT THE INTRODUCTION OF NEW ADVANCED WIRELESS SERVICES, IN-CLUDING THIRD GENERATION WIRELESS SYSTEMS

ET Docket No. 00-258

AMENDMENT OF SECTION 2.106 OF THE COMMISSION'S RULES TO ALLOCATE SPEC-TRUM AT 2 GHZ FOR USE BY THE MOBILE SATELLITE SERVICE

ET Docket No. 95-18
FCC 10-179

Adopted: September 29, 2010

Released: September 29, 2010

By the Commission: Commissioner Clyburn approv-ing in part; concurring in part and issuing a state-ment.

I. INTRODUCTION
1. With this order and declaratory ruling, we con-clude our longstanding efforts to relocate the Broad-cast Auxiliary Service (BAS) from the 1990-2110 MHz band to the 2025-2110 MHz band, freeing up 35 megahertz of spectrum in order to foster the de-velopment of new and innovative services that can provide mobile broadband and nationwide communi-cations capabilities. This decision in particular ad-dresses the outstanding matter of Sprint Nextel Cor-poration's (Sprint Nextel) inability to agree with Mo-bile Satellite Service (MSS) operators in the band on the sharing of the costs to relocate the BAS incum-bents. To date, Sprint has shouldered the entire cost of this relocation, which was completed on July 15, 2010.[FN1]

2. To resolve this important issue, we apply the Commission's time-honored relocation principles for emerging technologies previously adopted for the BAS band to the instant relocation process, where delays and unanticipated developments have left am-biguities and misconceptions among the relocating parties. These principles have been a fundamental part of the Commission's past efforts to unlock value and promote investment through the relocation proc-ess. In the end, we balance the responsibilities for and benefits of relocating incumbent BAS operations among all the new entrants in the different services that will operate in the band.

II. BACKGROUND
3. Through this proceeding, the Commission has sought to relocate BAS licensees to a more spectrally efficient band plan and make spectrum available for other uses, while fairly distributing the relocation costs among the new users. Because the path leading to this Fifth Report and Order, Eleventh Report and Order, Sixth Report and Order, and Declaratory Rul-ing (Report and Order and Declaratory Ruling) has been especially complex, we only summarize the history of this proceeding here to the extent relevant in the instant deliberation.[FN2]

4. In 2000, the Commission determined that BAS licensees in the 1990-2110 MHz band could, through the use of new digital equipment, operate wholly within the smaller 2025-2110 MHz band.[FN3] New licensees would then be able to use the 1990-2025 MHz band to provide new and innovative services to the public. Originally, the entire 35-megahertz block

was to be used for MSS uplink operations, but in 2003 the Commission reallocated 15 megahertz of that spectrum for use by new terrestrial applications. In 2004, Nextel (now Sprint Nextel) was awarded a license to use five megahertz of the 15-megahertz terrestrial allocation. Advanced Wireless Services (AWS) entities, which will be licensed at a future date, will use the remaining 10 megahertz.[FN4] The current band plan is set forth below.

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

**\*2** 5. Consistent with the relocation principles first established in the Commission's *Emerging Technologies* proceeding,[FN5] each new entrant has had an independent responsibility to relocate incumbent BAS licensees. Sprint Nextel, which is receiving its spectrum in conjunction with a separate realignment of the 800 MHz band to resolve interference problems with public safety licensees, was required to finish the relocation of BAS incumbents by August 9, 2010. The MSS entrants' obligation to relocate BAS incumbents has been in place since 2000.

6. One of the most challenging aspects of this proceeding has been how to apportion cost-sharing responsibilities for the relocation of the incumbents among new entrants. When the band was originally to be used exclusively for MSS operations, the Commission established a right of MSS entrants who incurred relocation expenses to seek reimbursement from later entrants, consistent with established *Emerging Technologies* cost sharing principles.[FN6] When the Commission subsequently permitted Sprint Nextel to operate in the band, the Commission had to account for Sprint Nextel's obligations in the separate realignment of the 800 MHz band. As part of the 800 MHz proceeding, Sprint Nextel is required to make an "anti-windfall" payment to the U.S. Treasury if the value of the five megahertz of former BAS spectrum and the paired spectrum at 1910-1915 MHz Sprint Nextel is receiving is greater than the costs associated with the 800 MHz realignment and of the BAS transition. Sprint Nextel will pay any monies owed to the U.S. Treasury as part of a "true-up" that was originally scheduled to be accomplished within six months of the end of the 36 month 800 MHz transition period.[FN7] The Commission also decided that Sprint Nextel would be "entitled to seek *pro rata* reimbursement" from MSS and AWS entrants that

"enter the band" prior to the end of the 800 MHz 36-month reconfiguration period.[FN8] However, if Sprint Nextel receives cost sharing reimbursement from the MSS or AWS entrants, that amount is to be deducted from the costs it can claim credit for as BAS relocation expenses against the 800 MHz anti-windfall payment - i.e., it is not entitled to "double dip."[FN9]

7. In the time since the Commission adopted cost sharing procedures for Sprint Nextel, MSS, and AWS in the BAS band, many of the assumptions underlying those procedures have changed. Sprint Nextel did not complete the BAS relocation by the original September 7, 2007 date, and the date was subsequently extended to February 8, 2010 and then further extended to August 9, 2010 for 28 specific BAS markets.[FN10] While the two MSS entrants were expected to have operational satellites either before or close to the end of the 36-month 800 MHz transition period, both obtained extensions of the milestone dates by which they were to certify their systems as operational. New DBSD Satellite Services G.P. (DBSD) (formerly New ICO Satellite Services G.P.) launched its satellite in April 2008 and met its operational milestone in May 2008. TerreStar Networks Inc. (TerreStar) launched its satellite in July 2009 and met its operational milestone in August 2009. Similarly, the 800 MHz transition has been subject to delays. The 36-month 800 MHz transition deadline was established as June 26, 2008, although the transition is still ongoing.[FN11] The original true-up has been delayed four times and is currently scheduled to occur by December 31, 2010, but it may be delayed further and could occur before the 800 MHz realignment is complete.[FN12] The expected relocation costs for the 800 MHz transition are so large that Sprint Nextel does not now expect to make an anti-windfall payment.[FN13]

**\*3** *8.* Despite the fact that all BAS incumbents have now been relocated, no cost sharing payments have been made to date. Instead, Sprint Nextel and the MSS entrants have disputed, in multiple forums, their respective cost-sharing responsibilities.[FN14] Also, for the ten megahertz of the 2 GHz BAS spectrum (1995-2000 MHz and 2020-2025 MHz) that has been reallocated for use by future AWS-2 licensees, the Commission has not yet adopted service rules or issued licenses in the band. Thus, while we address certain AWS-2 cost sharing issues herein, we note that other matters will be addressed in the AWS-2

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

service rules proceeding.[FN15]

9. In the June 2009 BAS R&O extending the BAS transition deadline to February 8, 2010, the Commission took a number of actions to address the effects of the delay on the MSS entrants. Previously, the MSS entrants were prevented from beginning operations until all the operations of the BAS incumbents in the 30 largest markets and fixed BAS links in all markets had been relocated (the "top 30 market" rule).[FN16] Because relocation of the last of the 30 largest markets was not expected until the end of the relocation process, this rule effectively delayed the commencement of commercial MSS until the entire BAS transition was complete despite the fact that BAS had been relocated in many areas of the country. The Commission eliminated this rule to allow the MSS entrants to begin operations on a primary basis in markets where BAS had been relocated while it retained the underlying responsibility for MSS to relocate BAS.[FN17]

10. In the June 2009 Further Notice that accompanied the June 2009 R&O, we proposed to clarify and modify the cost sharing requirements for the 2 GHz BAS band because the circumstances surrounding the BAS transition were very different than what was expected when the cost sharing requirements were adopted. The June 2009 Further Notice also sought comment on whether further rule modifications were necessary to ensure completion of the BAS relocation process and whether new entrants should be allowed to begin unencumbered operations in the band before all BAS operations are relocated.[FN18]

11. Both DBSD and TerreStar oppose many of our proposals that would clarify and modify the cost sharing requirements consistent with the Emerging Technologies principles. TerreStar argues that the BAS transition has been untraditional since the beginning, and therefore does not need to follow the Emerging Technologies model.[FN19] DBSD observes that the BAS transition was designed to vary from Emerging Technologies principles by the need for market-by-market clearing, the need to accommodate nationwide entry by MSS entrants, and the unique circumstances surrounding Sprint Nextel's acquisition of spectrum in the band.[FN20] Sprint Nextel supports the Commission's decision to reaffirm its longstanding Emerging Technologies relocation policies and to propose clear, transparent procedures for implementing the reimbursement obligations of new entrants.[FN21] Sprint Nextel claims that requiring the MSS entrants to abide by their cost sharing obligations is fully supported by Commission precedent and is necessary to ensure the continued integrity of the Commission's relocation policies.

*4 12. In May 2009, DBSD filed for protection from its creditors under Chapter 11 of the U. S. Bankruptcy Code.[FN22] The bankruptcy filing included New DBSD Satellite Services G.P (i.e. DBSD), which holds authorizations to provide MSS, as well as a number of affiliated companies, but does not include ICO Global Communications (holdings) Ltd. (ICO Global), the parent company of DBSD and all of the other affiliates.[FN23] In response to the June 2009 Further Notice, DBSD filed for a stay of the rulemaking proceeding, citing Section 362(a) of the Bankruptcy code.[FN24] DBSD claims that this proceeding directly involves Sprint's attempt to obtain possession of or recover property from DBSD's estate and, consequently, is subject to the automatic stay. Sprint Nextel opposes DBSD's petition, noting that the stay applies to actions taken against a particular debtor or its property and not to a rulemaking proceeding that instead generally applies to everyone.[FN25] In addition, Sprint Nextel claims that DBSD's parent corporation, ICO Global, continues to have a cost sharing responsibility regardless of the bankruptcy filing of DBSD.[FN26] The Commission has not previously acted on DBSD's request for stay. The bankruptcy court confirmed DBSD's reorganization plan in October 2009, but DBSD has not yet emerged from bankruptcy.[FN27] DBSD has filed for a transfer of control of its authorizations and licenses to the reorganized company.[FN28]

### III. DISCUSSION

13. This Report and Order and Declaratory Ruling addresses disputes regarding sharing the cost of relocating the 2 GHz BAS incumbents. The Commission chose to include a Further Notice of Proposed Rulemaking with the June 2009 R&O to address issues that have arisen because of the unanticipated circumstances surrounding the BAS transition and which require modification of our cost sharing rules. The instant Report and Order addresses those issues. However, a number of disputes that have arisen in this proceeding involve requirements that were established when the current BAS relocation scheme was adopted in 2004. We address these disputes in a De-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

claratory Ruling.

14. We also address in the Report and Order DBSD's petition to stay this rulemaking proceeding, citing Section 362(a) of the Bankruptcy Code,[FN29] as well as DBSD's argument that the proposed cost sharing requirements would be impermissibly retroactive.[FN30]

**A. Declaratory Ruling**
15. The parties have raised arguments that are based on their interpretations of the existing obligation of MSS entrants to reimburse Sprint Nextel upon entering the band and the cost-sharing obligation an MSS entrant holds for the BAS relocation. We address these matters, *sua sponte*, by declaratory ruling because they involve matters of Commission policy that are related to but were not the subject of the *June 2009 Further Notice*.

**1. Termination Date of the Cost Sharing Obligations**
*5 16. The *June 2009 Further Notice* proposed that the cost sharing obligation between Sprint Nextel and MSS and AWS would follow traditional *Emerging Technologies* policies, *i.e.*, the obligation to share costs among new entrants would continue to the BAS sunset date (December 9, 2013).[FN31]

17. DBSD claims that the proposed cost sharing requirements upset the balance of interests among MSS, Sprint Nextel, and BAS embodied in the current requirements by shifting the risks of delay and expense in relocating BAS from Sprint Nextel to the MSS entrants.[FN32] DBSD believes that June 26, 2008 (the date previously established as the deadline of the still ongoing 36-month 800 MHz transition) should be retained for determining the MSS entrants' reimbursement obligations.

18. TerreStar argues that the Commission, in its previous decisions, exempted MSS entrants who enter the band after the end of the 800 MHz 36-month reconfiguration period from any obligation to share in the BAS transition costs. TerreStar claims that, if the proposed rules are adopted, it would go from its position of owing no relocation costs under the current rules to owing 100 percent of the *pro rata* cost of the BAS relocation expenses.[FN33] TerreStar argues that Sprint Nextel was responsible for the delays in the BAS transition,[FN34] and that equitable factors support not requiring TerreStar to pay a *pro rata* share of the BAS relocation expenses.[FN35] Given the pivotal role that Sprint Nextel has played in development and execution of the plan for relocating BAS incumbents, TerreStar believes that Sprint Nextel should have to bear all or a substantial portion of the financial consequences of the delay in the BAS transition.

19. Sprint Nextel supports the Commission's tentative conclusion in the *June 2009 Further Notice* to de-link the new entrant reimbursement period from the 800 MHz reconfiguration period or the 800 MHz true-up.[FN36]

20. We conclude that the MSS entrants erroneously argue that their obligation to reimburse Sprint Nextel expired if they did not enter the band by June 26, 2008. As we explained in the *June 2009 Further Notice*, the most logical and appropriate interpretation of the 800 MHz orders is that MSS and AWS entrants have an obligation to share in the cost of relocating the BAS incumbents if they enter the band prior to the completion of the 800 MHz realignment or true-up.[FN37] Because the 800 MHz realignment is ongoing and the true-up has not occurred, the MSS and AWS entrants continue to have an obligation to share in the cost of the BAS transition once they enter the band. Under the Commission's current rules, this obligation will continue until either the end of the 800 MHz realignment or the 800 MHz true-up occurs.[FN38]

21. The Commission originally decided to relocate the 2 GHz BAS incumbents to make way for MSS in 1997.[FN39] At that time the MSS entrants were expected to occupy the entire spectrum being vacated by BAS. The Commission required that "all steps necessary for clearing the 1990-2025 MHz band for MSS operations will be borne by MSS operators."[FN40] The Commission reinforced this decision in 2000 in adopting a plan for the MSS operators to relocate BAS.[FN41] All MSS entrants that entered the band prior to the band sunset date were expected to share in the band clearing costs.[FN42] These obligations for the MSS entrants to relocate the BAS incumbents and for all of the MSS entrants to share in the relocation cost were based on the Commission's long-standing *Emerging Technologies* principles which had been applied in previous band clearings.[FN43] This obligation of the MSS operators to relocate the BAS incumbents was not eliminated

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

when the Commission later reallocated some of the BAS spectrum for non-MSS licensees.[FN44]

*6 22. When the Commission imposed the obligation to relocate the BAS incumbents on Sprint Nextel in 2004, it explicitly kept in place the obligation for the MSS entrants to relocate the BAS incumbents and to share in the cost of Sprint Nextel's relocation efforts.[FN45] The Commission stated in the *800 MHz R&O* that "Nextel is entitled to seek *pro rata* reimbursement of eligible clearing cost incurred during the 36-month reconfiguration period from MSS licensees that enter the band prior to the end of that period."[FN46] The 36-month reconfiguration period to which the *800 MHz R&O* links the MSS entrants' obligation is the period during which the 800 MHz reconfiguration was expected to be completed. Therefore, under the *800 MHz R&O* the MSS operators have an obligation to share in the BAS relocation costs if they enter the band prior to the completion of the 800 MHz band reconfiguration. The reimbursement obligation of the future AWS entrants in the band is defined in a similar way.[FN47] In 2005, the Commission, in denying a request to end the MSS cost sharing obligation earlier than scheduled, stated that the MSS entrants cost sharing obligation was tied to the 800 MHz true-up period.[FN48] Under the *800 MHz R&O* the 800 MHz reconfiguration true-up is scheduled to occur within six months of the end of the 800 MHz reconfiguration.[FN49]

23. The 800 MHz reconfiguration has taken far longer than expected and is not yet complete. The true-up has been postponed several times and is currently scheduled for December 31, 2010.[FN50] According to the Commission's orders, the MSS and AWS entrants' obligation to reimburse Sprint Nextel for BAS relocation costs expires either at the end of the 800 MHz band reconfiguration or at the 800 MHz true-up. Because neither of these events has occurred, the MSS and AWS entrants continue to have an obligation to reimburse Sprint Nextel for the BAS relocation cost it has incurred. We note that there was ambiguity as to whether the reimbursement obligations expire at the conclusion of the 800 MHz reconfiguration or at the true-up. Because the Report and Order adopts a different date to terminate the new entrants' cost sharing obligation, there is no reason for us to resolve this ambiguity here.[FN51]

24. The MSS entrants point to language in the *800*

*MHz R&O* stating that "Nextel is entitled to seek *pro rata* reimbursement of eligible clearing costs incurred during the 36-month reconfiguration period from MSS licensees that enter the band prior to the end of that period"[FN52] to support their claim that their cost sharing obligations ended if they did not enter the band by June 26, 2008 - the original end date of the 800 MHz 36-month reconfiguration period. We reject their position, which is based on a narrow, interpretation of this language in the *800 MHz R&O* and, moreover, is unreasonable. The current cost sharing requirements must be interpreted in view of the purpose of the *800 MHz R&O* in establishing a mechanism by which the new entrants' cost sharing obligations to Sprint Nextel could end prior to the band sunset date. The goal of the *800 MHz R&O* clearly was not to provide a benefit to the MSS entrants. When the *800 MHz R&O* was adopted the Commission expected one and possibly both the MSS entrants to have operational satellites prior to the end of the 36-month period.[FN53] This is why the Commission gave Sprint Nextel the option to pursue cost sharing from the MSS entrants even though it could instead have chosen to receive credit for the same BAS relocation costs against the anti-windfall payment.[FN54] Consequently, the rationale for allowing the termination of the MSS and AWS entrants' cost sharing obligation to Sprint Nextel prior to the December 2013 sunset date must be viewed not as providing a means for the MSS entrants to avoid paying BAS relocation expenses, but instead as providing administrative efficiency in the accounting process surrounding the calculation of the anti-windfall payment. In light of the continuing 800 MHz reconfiguration process, application of the June 26, 2008 date would both fail to provide any practical administrative benefits and would undermine the larger principle that MSS entrants must pay their *pro rata* share of the BAS relocation costs to the extent that they enter the band before the 800 MHz rebanding or true up is compete. Accordingly, the MSS entrants' arguments that their cost-sharing obligations expired on June 26, 2008 are not persuasive and we reject the MSS entrants' contention that they would owe nothing under the current cost-sharing requirements.

*7 25. The path that the Commission has followed in extending the 800 MHz realignment beyond the original 36-month period further illustrates that the Commission has had no intention of relieving the MSS entrants of their cost sharing obligation. The Commission has never officially extended the 36-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

month 800 MHz transition period. Instead, the Commission's Public Safety and Homeland Security Bureau, acting on delegated authority, has issued numerous waivers of the deadline to Sprint Nextel and other 800 MHz licensees.[FN55] None of these waiver orders addresses the MSS entrants' cost sharing obligations. The Commission's prior orders extending the BAS transition deadlines have likewise not modified the cost sharing obligations of the parties regarding the 2 GHz BAS relocation. The Commission in the *800 MHz R&O* clearly intended to allow Sprint Nextel to recover BAS relocation costs from the MSS entrants. Considering the great cost of the BAS relocation, if the Commission had intended to upend the BAS relocation cost sharing scheme by eliminating the MSS entrants' obligation prior to the end of the 800 MHz transition, it would have affirmatively stated this in one of the numerous orders adopted after the *800 MHz R&O*. To imply, as the MSS entrants do, that the Commission would have made a decision of this magnitude by silence is unreasonable.

26. DBSD's arguments that not terminating the MSS entrants' cost sharing obligation on June 26, 2008 upsets the balance the Commission struck between the MSS entrants and Sprint Nextel and that Sprint Nextel assumed the risk of delays in the BAS transition are not convincing. As we stated in the *June 2009 Further Notice*, nothing in the text of the relevant orders suggests that the Commission limited the time in which Sprint Nextel could seek reimbursement in order to provide MSS entrants with a benefit.[FN56] While the Commission did expect Sprint Nextel to complete the BAS transition in a timely manner, it does not follow that the delay in the transition should financially benefit MSS at the expense of Sprint Nextel. As we have previously concluded, "the record illustrates many valid reasons why Sprint Nextel was unable to achieve timely relocation of the BAS incumbents."[FN57] We recognize the hardships suffered by DBSD when it was unable to access its spectrum once its satellite became operational. However, Sprint Nextel, which undertook the responsibility to clear all 35 MHz of the BAS spectrum, has also been unable to access its 5 MHz block due to the relocation delays. Given the unanticipated complexities of the BAS transition, we do not believe it is appropriate to penalize the party who has undertaken the difficult task of band clearing at the expense of those who will also receive the benefit of the cleared spectrum - particularly when the BAS relocation had been moribund for the four years that MSS entrants had

the sole responsibility to clear BAS. In the absence of Sprint Nextel, the MSS entrants most likely would have experienced similar complexities and delays in relocating BAS incumbents while also having to shoulder a financial obligation far more burdensome than any cost sharing obligation they may have to Sprint Nextel.[FN58]

*8 27. We likewise reject TerreStar's argument that equitable factors support not requiring TerreStar to pay a *pro rata* share of the BAS relocation costs. TerreStar bases its arguments on the unfairness of having to pay relocation costs because of its lack of culpability for the delays in the BAS relocation and the unjustness of upsetting its settled "expectation" in not having to pay any BAS relocation costs. At heart, TerreStar's argument is based on a fundamental misreading of the Commission's orders. From 2000, the MSS entrants had an obligation to relocate the BAS incumbents before they could begin operations.[FN59] The 2004 *800 MHz R&O* did not remove this obligation and specifically provided that Sprint Nextel could pursue cost sharing from the MSS entrants.[FN60] While events associated with the 800 MHz relocation could serve to extinguish this obligation, it was far from certain that MSS entrants would actually escape the cost-sharing requirement.[FN61] The beginning date of the 36-month reconfiguration period was not a firm date. The *800 MHz R&O* and later *2005 MO&O* did not clarify how the new entrants' reimbursement obligations would be affected if the 800 MHz band reconfiguration was not complete within 36 months and the true-up was delayed. Moreover, while spectrum relocation efforts often suffer from unexpected delays, in this case those delays did not result in changes to the licensees' relocation obligations and the original MSS relocation obligation therefore remained in force. Thus, it was not reasonable for TerreStar to believe that it would escape all BAS relocation costs.[FN62] We find that fairness as well as our well-established cost sharing principles dictate that all of the new entrants should bear the burden of the increased cost and complexity of the BAS transition and not just Sprint Nextel.[FN63]

## 2. Liability of MSS Affiliates

28. As noted above, in 2008 Sprint Nextel filed a claim against New ICO Services, G.P. (now renamed New DBSD Satellite Services, G.P.) and TerreStar Networks, Inc. (TerreStar) in the United States District Court for the Eastern District of Virginia seeking

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

reimbursement for BAS relocation costs.[FN64] The court denied motions to dismiss filed by New ICO Satellite Services, G.P. (New ICO) and TerreStar and instead referred the claims to the Commission on primary jurisdiction grounds.[FN65] The court is holding the case in abeyance to allow the Commission to clarify the BAS relocation cost sharing rules, including the definition of when an operator has entered the band and thereby triggered an obligation to reimburse Sprint Nextel for its BAS relocation costs. We have addressed the referred issues about the BAS cost sharing rules in the Report and Order, *infra*.

29. While the referred questions were pending before the Commission, New DBSD Satellite Services, G.P., along with several affiliated companies, filed for bankruptcy.[FN66] Sprint Nextel's recovery of any reimbursement claim against the bankrupt debtors will be governed by the proceedings in the bankruptcy court, rather than by this Commission or in the district court case initiated by Sprint Nextel. In this proceeding, however, Sprint Nextel has asserted in numerous record submissions that ICO Global Communications (Holdings) Ltd. ("ICO Global"), the ultimate parent of each of the bankrupt debtors, is also liable to Sprint Nextel for the BAS relocation cost reimbursement because ICO Global had control over its subsidiaries and was part of the enterprise that entered the 2 GHz MSS band.[FN67] In light of the district court's expression of interest in the views of the Commission, we discuss below the liability of MSS entities to Sprint Nextel for BAS relocation cost reimbursement under our relocation orders.[FN68]

*9 30. *Legal Standard for Affiliate Liability.* As an initial matter, we observe that the unique history of the 2 GHz MSS band demonstrates that the MSS entrants to which liability attaches cannot logically be a closed set of nominal licensees. The Commission established a processing round as the vehicle for making spectrum available for use in the United States, and opened the processing round to both U.S. and non-U.S. applicants. Under these procedures, a Letter of Intent (LOI) could be filed by a non-U.S.-licensed satellite operator requesting that the Commission "reserve" spectrum for that system, in anticipation of earth station applications filed in the future to access the non-U.S.-licensed satellite system.[FN69] In 2000, when the Commission adopted final procedures for reallocation of the 2 GHz band, it also established rules by which the MSS entrants - which at

that time were merely applicants for a reservation of or assignment of spectrum - would relocate the BAS incumbents.[FN70] In 2001, the Commission reserved spectrum for use by the ICO and TerreStar 2 GHz MSS systems, which are the current MSS entrants.[FN71] The Commission required entities seeking to operate non-U.S. licensed MSS systems to serve the U.S. market to demonstrate compliance with satellite construction milestones (as were applicants seeking U.S. licenses). In 2004, when the Commission first required Sprint Nextel to relocate the BAS incumbents, the Commission also reiterated that the MSS entrants' separate relocation obligation continued and that the MSS entrants were obligated to reimburse Sprint Nextel for the BAS relocation costs.[FN72] In sum, the regulatory framework for MSS entrants was structured from the outset to accommodate entry by satellite systems that were authorized outside the United States and not just entry by U.S. licensees for U.S.-based earth stations that communicate with those satellites.

31. Sprint Nextel argues that ICO Global and its subsidiaries acted jointly as a single enterprise to meet the Commission's regulatory requirements in undertaking the extensive and complex variety of actions necessary to build, launch and operate a 2 GHz satellite system. In Sprint Nextel's view, ICO Global and its various subsidiaries together constitute an "entrant" under the Commission's orders, and each component part of the enterprise is liable for the BAS relocation cost reimbursement obligation to Sprint Nextel.[FN73] In response, ICO Global argues that it has no independent reimbursement obligation to Sprint Nextel. ICO Global acknowledges that prior to 2005 it may have operated along with its subsidiaries as a unitary enterprise, but that since a 2005 restructuring, it has been merely an investor in DBSD without power to direct or control the license-holding subsidiary, which was at all times a separate corporation in form and substance. ICO asserts that the restructuring significantly curtailed ICO's ability to control or direct the operations of DBSD.[FN74]

*10 32. Resolution of whether or not ICO Global is liable to Sprint Nextel for BAS relocation cost reimbursement depends on factual determinations concerning ICO Global's activities in connection with the North American MSS operations of its subsidiaries. The record in this proceeding is not complete with respect to the extent of ICO Global's involvement in

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

the North American satellite operations, particularly after the 2005 reorganization.[FN75] Accordingly, we limit ourselves to clarifying the type of conduct that may support a finding that affiliates acting together comprise a single MSS "entrant" in the 2 GHz band. Although we refer to facts surrounding ICO Global's operations that would be relevant to this analysis, we do not reach a conclusion concerning ICO Global's liability.

33. We fully recognize that there may be sound business reasons for adopting various corporate structures and engaging in affiliate transactions,[FN76] and that "[i]t is a general principle of corporate law deeply ingrained in our economic and legal systems that a parent corporation (so-called because of control through ownership of another corporation's stock) is not liable for the acts of its subsidiaries."[FN77] Absent powerful countervailing considerations, we do not interfere with legitimate business transactions that assign rights and responsibilities among legally separate entities. At the same time, the Commission and the courts have long stated that "[w]here the statutory purpose could . . . be easily frustrated through the use of separate . . . entities, the Commission is entitled to look through corporate form and treat the separate entities as one and the same for purposes of regulation."[FN78] We have treated affiliated entities collectively where necessary to ensure compliance with the Communications Act and Commission policies and regulations. In the enforcement context, for example, the Commission has imposed a monetary forfeiture on a parent corporation for rule violations by a wholly owned subsidiary.[FN79] In other enforcement actions, the Commission has looked to the financial status of affiliates in deciding whether to reduce the amounts of monetary forfeitures imposed on corporations holding Commission licenses.[FN80] The Commission has also prevented common carriers from evading regulatory requirements by setting up non-common carrier subsidiary corporations to enter other types of businesses.[FN81] When licensing use of radio spectrum, the Commission has treated applications from affiliated entities as if the same applicant had filed them.[FN82]

34. In each of these situations the Commission examined facts unique to the particular relationships among the entities at issue to support a finding that they should be considered a single enterprise for a particular regulatory purpose. This inquiry is distinct

from the standards for "piercing the corporate veil" or finding an "alter ego" under common law.[FN83] At common law, a parent corporation may only be held liable for the actions of its subsidiaries upon a showing of fraud, or where the formalities of separate corporate structure have been so disregarded that the two corporations have operated as one or have held themselves out to the public as without regard to separate corporate identities.[FN84] Although the presence of the factors supporting veil piercing or an alter ego finding can also be relevant to determining enterprise liability, enterprise liability does not seek to make a parent corporation liable for the actions of its subsidiary, but rather recognizes in appropriate cases that the parent is liable for its *own* actions as part of the overall enterprise that it has created and operated.[FN85] We also note that other regulatory agencies have developed standards for determining when affiliated companies should be treated as an integrated enterprise for purpose of enforcing regulatory goals.[FN86]

*11 35. Applying these principles to the question of whether enterprise liability exists for MSS entrants in the 2 GHz band, we look to factors beyond the traditional indicia of legal separateness and the formalities of corporate independence when determining whether entities should be liable under the Commission's rules and orders addressing the 2 GHz MSS band. Such factors could include, for instance: whether members of the alleged enterprise act for or on behalf of one another in furtherance of a common regulatory or business goal of entering the 2 GHz MSS band; whether different members hold different assets and provide different services, each of which is necessary to or helpful in achieving the unified goal of providing 2 GHz satellite services; whether the parent company directs or coordinates the interrelationship between or the operation of the subsidiaries to facilitate the unified regulatory or business goal of entering the band and providing 2 GHz satellite services; whether the alleged enterprise presents itself to the Commission and the public as a unified entity with respect to the development or operation or both of its MSS satellite services business; and what legitimate arrangements the members of the alleged enterprise have among themselves concerning the allocation of rights and responsibilities relating to band entry.

36. As noted, ICO Global essentially acknowledges that it and its various subsidiaries operated as a single

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

enterprise with respect to entering the MSS band in the period prior to July 2005.[FN87] Indeed, there is substantial record evidence that, under the test described above, ICO Global and its predecessors acted as part of a single enterprise with respect to its North American satellite operations before 2005. ICO Global and its various subsidiaries worked together as a single enterprise in, for instance, seeking a reservation of spectrum from the Commission for satellite services. DBSD's predecessor, ICO Services Ltd. (ICO Services), filed its original LOI to reserve 2 GHz spectrum in 1997. ICO Services's statement in the LOI that it was wholly owned by and acting as the authorized representative of ICO Global Communications (Holdings) Ltd. (the original ICO Global), reflects that ICO Services was not itself planning to build and launch a satellite.[FN88]

37. The original ICO Global and its subsidiaries entered bankruptcy in 1999.[FN89] New ICO Global Communications (Holdings) Ltd. (New ICO Global) acquired the assets of the original ICO Global out of bankruptcy in 2000.[FN90] In 2001, the Commission reserved 2 GHz MSS spectrum in the name of ICO Services, but the Commission Order granting the application referred to both ICO Services and its parent New ICO Global.[FN91] Over the years ICO Global and its subsidiaries went through a number of corporate reorganizations.[FN92] Each of these changes was presented to the Commission as a *pro forma* change that did not alter actual control of the nominal holder of the spectrum reservation. New ICO Global, ICO Global, and ICO Services also made filings with the Commission on a seemingly interchangeable basis before July 2005.[FN93]

**\*12 38.** *Dispute Over the Legal Significance of ICO Global's 2005 Reorganization.* In 2005 ICO Global placed all of its North American operations under a subsidiary, ICO North America (now DBSD North America). The fundamental factual question going to ICO Global's liability is whether after the 2005 restructuring ICO Global remained a part of a unitary enterprise which developed and deployed an MSS system for the mutual benefit of the enterprise.[FN94] ICO Global contends that "[t]he separate businesses of ICO Global and DBSD - and DBSD's self-sufficiency since 2005 - refute any contention that ICO Global should be considered part of a common entity, along with DBSD, engaged in the MSS business."[FN95] According to ICO Global, "DBSD was

independently funded by outside investors, who provided more than $600 million for DBSD's MSS effort" and that DBSD has "relied on its own resources to construct launch and operate its GEO satellite without any assistance from ICO Global."[FN96] ICO Global further contends that after the 2005 reorganization, the "costs of the MSS operation, including the costs of relocating BAS licensees, were and are a liability of DBSD, and were disclosed to DBSD's outside investors[.]"[FN97] ICO Global also maintains that there is no "equitable basis for imposing liability on [ICO Global] for BAS relocation costs" because it "was never nor will ever be a 'beneficiary' of Sprint's band clearing activities" and never used nor will use the BAS spectrum "now that it has lost its 2005 investment in DBSD (valued at more than $800 million in 2005) as a result of DBSD's bankruptcy."[FN98]

39. Sprint responds that the "facts demonstrate that ICO Global continued and continues to function as part of a common enterprise with DBSD after its 2005 reorganization despite ICO Global's contentions to the contrary."[FN99] Sprint Nextel asserts, for example, that ICO Global retained a 99.8 per cent ownership interest in ICO NA after 2005 (although that interest could be diluted to 56% at the option of the parties who invested in DBSD in 2005);[FN100] ICO Global continues to control ICO NA by being able to elect a majority of its board of directors;[FN101] "the majority, if not the totality of ICO Global's workers are 'dual employees' with its subsidiaries" who "provide a broad range of critical services to and on behalf of its subsidiaries as part of the MSS system[;]"[FN102] and ICO Global's Senior Vice President provided necessary milestone certifications for the MSS system.[FN103]

40. There is a fundamental factual question going to ICO Global's liability. The materials submitted by ICO Global and Sprint Nextel in this declaratory ruling proceeding, though, are limited to the ones that the parties believe best support their own viewpoint. Because this declaratory ruling proceeding has not involved adversarial discovery, ICO Global and Sprint Nextel may have refrained from presenting documents, within their control, that complicate or cast doubt on the version of events they espouse. In short, we have no assurance that all relevant information regarding this issue is before us. For that reason, and in light of Sprint Nextel's decision to pursue this issue in the courts where a full record will be avail-

able to the parties through civil discovery, we have limited our declaratory ruling to articulating the standards to be used in determining enterprise liability under the Communications Act and our cost-sharing orders for the BAS band.[FN104]

**B. Fifth Report and Order in WT Docket 02-55, Eleventh Report and Order in ET Docket 00-258, and Sixth Report and Order in ET Docket 95-18**
*13 41. We now address, by Report and Order, the remaining issues that arise from the *2009 Further Notice*. Of those issues raised in the *June 2009 Further Notice*, matters relating to cost-sharing requirements between new entrants are the most complex and drew the most comment in the record. We conclude that the best course of action is to clarify and modify the cost sharing requirements, as appropriate, to address the ambiguity or lack of definition in the current requirements to correspond to the stated purposes and structure of the cost sharing principles set forth in the *800 MHz R&O*, as well as to balance the responsibilities for and benefits of relocating incumbent BAS operations among all the new entrants in the band in a way that is consistent with the Commission's relocation policies set forth in the *Emerging Technologies* proceeding. One of the important underlying principles of the relocation policy is that licensees that ultimately benefit from the spectrum cleared by the first entrant shall bear the cost of reimbursing the first entrant for the accrual of that benefit.[FN105] We are concerned that were we to stray from the traditional application of the *Emerging Technologies* relocation policy, future licensees might be unwilling or unable to assume the burden and cost of clearing spectrum quickly if they were unsure of the likelihood that they will be reimbursed by other new entrants.

42. In this Report and Order we conclude that:
• Any new entrant who "enters the band" before the band sunset date of December 9, 2013 will be required to reimburse the entrant who relocated the BAS incumbents a *pro rata* share of the relocation costs;
• MSS entrant has or will "enter the band" when it certifies that its satellite is operational for purposes of meeting the operational milestone of its authorization;
• An AWS entrant will "enter the band" on the date that the grant of its long-form application becomes a final action;

• An MSS entrant's cost sharing obligation will continue to be limited to a *pro rata* share of the cost of relocating BAS incumbents in the thirty largest markets and all fixed BAS markets.
• Once a new entrant has entered the band, but no later than the sunset date, Sprint Nextel may provide the new entrant with the required documentation and request payment, after which the new entrant will have thirty days to submit its reimbursement to Sprint Nextel.

43. There were a number of additional issues raised in the *June 2009 Further Notice* such as sharing of spectrum between MSS and unrelocated BAS incumbents,[FN106] MSS relocation obligations through the end of the BAS relocation process,[FN107] and changes to the interference protection status of the BAS incumbents prior to relocation or the band sunset date.[FN108] Because the conclusion of the BAS transition has made these issues moot, we do not need to address them further.

**1. Termination Date of the Cost Sharing Obligations**
*14 44. As we explained above in the accompanying declaratory ruling, the MSS and AWS entrants have an obligation to reimburse Sprint Nextel for a portion of the costs of relocating the BAS incumbents if they enter the band prior to either the end of the 800 MHz reconfiguration or the 800 MHz true-up.[FN109] Because the timing of either of these events is presently unknown, the new entrants are in a state of uncertainty as to their financial obligation.[FN110] We believe that all of the parties will be served by adopting a date certain for extinguishing cost-sharing obligations - the band sunset date of December 9, 2013. This will harmonize our relocation requirements for the BAS band with the relocation rules for other bands that were based on our *Emerging Technologies* principles. The MSS entrants argue that the cost sharing requirements for this band have departed from the *Emerging Technologies* principles in a number of ways and argue that we should not follow the principles in regard to their cost sharing obligations. While we have made departures from the *Emerging Technologies* procedures, those limited departures were made because of the unique features of the BAS transition. However, where circumstances do not require some deviation from *Emerging Technologies*, we shall adhere closely to these time-tested principles to balance the interest of incumbent licensees, new en-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

trants who relocate incumbents, and new entrants who benefit from the band clearing. In this case, because the main reason for allowing early termination of the new entrants' cost-sharing obligation no longer applies - *i.e.* Sprint Nextel will probably not be taking credit for all of its BAS relocation costs against the anti-windfall payment - there is no compelling reason to end the cost sharing when the new entrants any earlier than the band sunset date. Consequently, any new entrant that enters the band before December 9, 2013 will be required to reimburse the entrant who relocated BAS incumbents a *pro rata* share of the relocation costs, subject to the limitations discussed further below.

45. We will leave in place the current band sunset date of December 9, 2013, despite the request by Sprint Nextel to adjust the date until 2015.[FN111] The original sunset date, September 6, 2010, was subsequently extended to December 9, 2013 because only limited negotiations had taken place between the BAS incumbents and the MSS entrants.[FN112] The sunset date is a vital component of our *Emerging Technologies* policies because, among other things, it specifies the date upon which unrelocated incumbents become secondary and it provides a length of time for incumbent licensees to transition from the band. Now, because the BAS relocation has been completed, there is no need to change the sunset date to 2015. While Sprint Nextel is correct that AWS licensees may not enter the band by the current sunset date, the Commission's goal in choosing the sunset date is not to provide the entrant who relocates incumbents with a greater likelihood of receiving cost sharing from later entrants. When Sprint Nextel undertook the responsibility to relocate the BAS incumbents as a result of the *800 MHz R&O*, it knew the timing of the band sunset and the uncertainties of the entrance of AWS licensees.

## 2. Definition of "Enter the Band"
**\*15** 46. The "enter the band" terminology was used in the *800 MHz R&O* and *AWS Sixth R&O* to denote when the new entrants would incur an obligation to reimburse Sprint Nextel for a *pro rata* share of the cost of relocating the BAS incumbents, but neither order defined the term.[FN113] The *June 2009 Further Notice* proposed that an MSS entrant would be deemed to have "entered the band" when its satellite becomes operational under its authorization milestone.[FN114] For an AWS entrant, the *June 2009 Fur-*

*ther Notice* proposed that it would "enter the band" either upon grant of the long form applications for its license or when it activates a base station in an AWS license area that overlaps a cleared designated market area (DMA).[FN115]

47. Neither MSS entrant addressed the proposed definition of "enter the band" in their comments in response to the *June 2009 Further Notice*.[FN116] Sprint Nextel supports the Commission's tentative conclusion that the MSS entrants will "enter the band" and therefore incur a relocation obligation when they meet their operational milestones.[FN117] For the AWS entrants, Sprint Nextel argues that they should be considered to "enter the band" upon grant of their long-form applications because this would be easy to administer and would eliminate any incentive for them to delay initiation of service.[FN118]

48. Because the *800 MHz R&O* and subsequent Commission orders have not defined how the new entrants "enter the band" to trigger a cost sharing obligation, we look to our prior *Emerging Technologies* proceedings for clarification. This is fitting because the relocation plan for MSS licensees to relocate the BAS incumbents was based on the *Emerging Technologies* policies,[FN119] the relocation plan by which Sprint Nextel is relocating BAS is "sufficiently similar to the BAS relocation plan the FCC adopted for MSS entrants,"[FN120] and the plan for AWS entrants is modeled on policies from the *Emerging Technologies* proceedings.[FN121] As the Commission explained in the *June 2009 Further Notice*, for previous band clearings performed under the *Emerging Technologies* policies, a later entrant is generally required to share in the cost that an earlier entrant has incurred in relocating an incumbent if the subsequent entrant would have caused interference to the incumbent licensees.[FN122] The test used to determine if interference would have been caused to the incumbent licensees is usually not based on a rigorous interference analysis, but instead on an easy to administer test such as a proximity test or line-of-sight test.[FN123]

49. We conclude that an MSS entrant will "enter the band" and therefore incur a cost sharing obligation when it certifies that its satellite is operational for purposes of meeting its operational milestone.[FN124] We believe that this definition is the one that most naturally follows from our *Emerging Technologies*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

policies. As we previously determined, we do not believe in general that the MSS entrants may operate without causing interference to the BAS incumbents.[FN125] Consequently, once the MSS satellites are operational, they would have the potential for causing interference to the incumbent BAS operations. As stated above, in previous *Emerging Technologies* band clearings, the later entrant becomes responsible for reimbursing the earlier entrants' relocation cost when the later entrant is in the position to cause interference to the incumbent licensees prior to their relocation. As with the tests used in previous band clearings, the definition we adopt here is easy to apply and not subject to contention. Also, the test is in keeping with the nature of the BAS service. As we have noted, BAS is a highly integrated nationwide service in which simple link-by-link relocation is not possible. Because of the nationwide nature of MSS and nationwide nature of BAS, we do not believe a market-by-market or system-by-system test for incurring cost sharing liability would be practical or appropriate.[FN126]

*16 50. The AWS entrants require a different definition of "enter the band." As proposed in the *June 2009 Further Notice*, we will trigger an AWS entrants' cost sharing obligation upon final grant of the long form application for each of their licenses. This requirement has the advantage of ease of administration, and conforms to our overall *Emerging Technologies* policies. Once the AWS entrant's long form application has been granted, signifying the issuance of a license, the AWS entrant will be in the position to roll out service and benefit from Sprint's relocation of the BAS incumbents. This approach is preferable to the alternate definition of "enter the band" proposed in the *June 2009 Further Notice*: triggering the AWS entrants' cost sharing obligation upon activation of a base station in an AWS license area that overlaps a cleared market (DMA). While the latter definition is arguably more analogous to the rules followed in previous band clearings,[FN127] incumbent clearing typically *began after* the emerging technology(s) was licensed. By comparison, all of the BAS incumbents will be cleared prior to AWS licensing. Accordingly, we conclude that an AWS entrant will "enter the band" on a license-by-license basis on the date that the grant of each long-form application becomes a final action. Sprint Nextel's right to seek reimbursement from an AWS licensee that enters the band prior to the sunset date is limited to an AWS licensee's proportional share of the costs incurred in

the BAS clearance, on a *pro rata* basis according to the amount of spectrum that each licensee is assigned in the 1990-2025 MHz band.[FN128] We intend to adopt specific cost sharing rules for AWS in the 1995-2000 MHz and 2020-2025 MHz bands when we adopt service rules which define the licensing scheme for these bands.[FN129]

### 3. Limitations on MSS Cost Sharing Obligations
51. In the *June 2009 Further Notice*, we proposed that MSS cost sharing obligation to Sprint Nextel would continue to be limited to the top 30 markets by population and all fixed BAS links.

52. Both TerreStar and DBSD support the Commission's proposal to continue to limit the MSS entrants' cost sharing obligation to the cost of relocating the top thirty markets and all fixed BAS links.[FN130] Both DBSD and TerreStar suggest various other means to mitigate their cost sharing obligation, which we discuss below.[FN131] Sprint Nextel argues that MSS entrants should be responsible for paying a share of the BAS relocation cost for all markets instead of just the thirty largest markets and all fixed BAS links.[FN132]

53. We are affirming the tentative conclusion in the *June 2009 Further Notice* and retaining the limit on the cost sharing obligation of the MSS entrants to a *pro rata* share of relocating BAS in the top thirty markets and all fixed BAS links, an exception to the general cost sharing principles that was clearly established in the 2004 *800 MHz R&O*.

*17 54. In the *800 MHz R&O*, the costs for which the MSS entrants had to reimburse Sprint Nextel were limited to a *pro rata* share of relocating the top 30 markets and fixed BAS links because these were the BAS incumbents that the MSS entrants had to relocate before they could begin operations. The MSS-BAS relocation plan allowed the MSS entrants to begin operations before relocating all the BAS incumbents to allow them to spread the cost of the BAS transition over a period of time.[FN133] In adopting the plan for Sprint Nextel to relocate BAS in 2004, the Commission desired to continue to provide MSS entrants with the benefit of not having to incur the entire cost of their *pro rata* share of the BAS transition before commencing operations. The Commission was aware that this would provide a benefit to the MSS entrants by reducing their total cost outlay compared to what it would have been if they had relocated all

51 Communications Reg. (P&F) 839, 2010 WL 3806590 (F.C.C.)                                                     Page 13

the BAS incumbents and later received cost sharing from other new entrants to the band. However, the Commission thought this was an "appropriate balance that is not unreasonably burdensome on Nextel or MSS licensees."[FN134] No party has raised objection to this conclusion on reconsideration.

55. Both MSS entrants argue that the reasons for supporting the Commission decision to limit the MSS cost sharing obligation remain valid, i.e., the MSS entrants were not required to relocate non-fixed links outside the top 30 markets before beginning operation and they are still not required to do so.[FN135] On the other hand, Sprint Nextel notes that the Commission based this limitation on the circumstances in existence in 2004, when MSS entrants were not permitted to begin operations until BAS in the top thirty markets had been relocated, and now that the top 30 market rule has been repealed this reason is no longer valid.[FN136] Sprint Nextel argues that because the MSS entrants benefit equally from the clearing of any BAS market by not having to coordinate with the BAS incumbents, they should be responsible for contributing to the cost of clearing all markets. Furthermore, Sprint Nextel claims that capping the MSS entrants' cost sharing obligation in this way is contrary to the Commission's *Emerging Technologies* policies and would reward MSS entrants for doing virtually nothing.

56. We conclude that even with the changed circumstances surrounding the BAS relocation, the most appropriate course is to retain the current cost sharing obligations for MSS entrants. On the one hand, we agree with Sprint Nextel that the limitation on MSS cost sharing was adopted at a time when expectations were quite different. When the Commission decided to limit the MSS cost sharing obligation to the top 30 markets and all fixed links, it also expected that Sprint Nextel would be able to take a credit for the remaining band clearing costs, including the spectrum that would be used by MSS in the remaining markets. The benefit to MSS entrants of reducing their band clearing costs was not expected to be a burden on Sprint Nextel. Now, it appears likely that Sprint Nextel will be solely responsible for clearing the spectrum in the vast majority of the BAS markets for the benefit of its competitors without the ability to receive credit for all of these costs in the 800 MHz true-up. On the other hand, our decision to limit the MSS entrants' obligation in this way was unambigu-

ously established in the *800 MHz R&O*. As a result, the MSS entrants cannot be faulted for relying on this provision as they constructed and launched their satellites and planned to deploy their services. Although we recognize that the parties have conflicting interests at stake, this requirement was clearly established from the outset and we decline to reverse it now, where all parties involved have been aware of their respective rights and obligations and presumably structured their activities accordingly. Thus, we believe that the best course is to retain the requirement that the MSS entrants are required to reimburse Sprint Nextel for a *pro rata* share of the cost of clearing the top thirty markets and all fixed BAS facilities, regardless of market size.

*18 57. TerreStar claims that equitable factors argue for limiting the MSS entrants' reimbursement obligation to the expenses Sprint Nextel incurred before September 7, 2007 because if Sprint Nextel had completed the BAS relocation by the end of the BAS 30-month relocation period there would have been no relocation expenses incurred after this date.[FN137] As we discussed above, we are not persuaded that equitable factors support allowing TerreStar or DBSD to escape paying a *pro rata* share of the BAS relocation costs. Furthermore, the MSS entrants have suffered little harm from the delays in the BAS relocation. DBSD's satellite was certified operational in May 2008, and TerreStar's satellite was not certified operational until July 2009. In March 2008, the Commission ordered Sprint Nextel to adjust the BAS relocation schedule to accommodate DBSD's and TerreStar's plans to begin tests of their satellite services in specified markets,[FN138] and the *June 2009 BAS R&O* eliminated restrictions that had prevented DBSD and TerreStar from beginning operations. The Commission has taken steps to minimize the impact that delays in the transition would have on DBSD and TerreStar's plans to begin operations, and we conclude that there is no reason to reduce their cost sharing obligations further.

58. DBSD points out that a portion of DBSD's satellite life has passed without the opportunity to earn revenue, and argues that the Commission should adopt measures to mitigate the burdens MSS is facing, such as reducing the amount DBSD will owe to compensate for the delays DBSD has faced in providing commercial operations by depreciating the relocation reimbursement amount and capping the total

amount owed.[FN139] We reject DBSD's suggestion that the amount that the MSS entrants owe for BAS relocation be depreciated from when Sprint Nextel signed frequency relocation agreements with the BAS incumbents.[FN140] Depreciation has been part of the cost sharing formulas used in a number of previous band clearings under the *Emerging Technologies* policies.[FN141] However, depreciation was not part of the MSS-BAS relocation plan adopted in 2000. Instead, later entering MSS entrants were required to reimburse earlier entrants on a *pro rata* basis according to the amount of spectrum each licensee is assigned.[FN142] The subsequent *800 MHz R&O* also did not include depreciation, but instead based the MSS entrants' share of the relocation cost on a *pro rata* share of the spectrum they would receive. We also observe that the BAS relocation has not been the result of nonperformance or lack of effort on the part of Sprint Nextel. We find that there is no reason to disturb this well-established policy at this late date.

59. We also reject DBSD's suggestion that cost caps be applied to the BAS relocation costs.[FN143] Cost caps that limit the costs for which a later entrant must reimburse another new entrant for relocating incumbents have been used in a number of previous band clearings - specifically when relocating fixed microwave links.[FN144] In those cases the incumbents were providing point-to-point service where system configuration and relocation costs were well understood and similar enough in each situation so as to make the types of generalizations that are necessary to set caps.[FN145] That is not the case for BAS systems, which are unique complex systems built over a period of years. We have no basis on the record before us with which to could even determine the appropriate size of a cap for the BAS relocation cost. In addition, as discussed below, Sprint Nextel had substantial incentives to minimize relocation costs and, moreover, there are suitable safeguards to prevent cost inflation.

**\*19** 60. Finally, we will not limit Sprint Nextel's ability to seek reimbursement from MSS entrants to only those expenses it cannot receive credit against the 800 MHz anti-windfall payment, as suggested by TerreStar.[FN146] In the *800 MHz R&O*, we gave Sprint Nextel the option to either obtain reimbursement from the MSS entrants or receive credit against the anti-windfall payment (but not both in order to prevent Sprint Nextel from obtaining double credit

for the same expense). This is because it is well established "that the licensees that ultimately benefit from the spectrum cleared by the first entrant shall bear the cost of reimbursing the first entrant . . ."[FN147] Since 2000 the MSS entrants have had an obligation to relocate the BAS incumbents and this band-clearing obligation was not removed by the *800 MHz R&O*. After the *800 MHz R&O* was adopted, TerreStar argued that the MSS entrants should be relieved of their reimbursement obligation because Sprint Nextel would be receiving credit for its relocation costs in the 800 MHz true-up. We rejected that argument because we saw "no benefit in a proposal that would relieve an MSS licensee from paying its established BAS relocation obligation simply because [Sprint] Nextel will be receiving credit for relocation costs at the end of the 800 MHz band reconfiguration process."[FN148] We reject TerreStar's proposal here for similar reasons.[FN149]

### 4. Payment Issues

61. In the *June 2009 Further Notice*, we proposed that a new entrant not begin operations until it has reimbursed the earlier entrant that relocated BAS incumbents for the new entrant's *pro rata* share of the relocation costs for all transitioned BAS markets or, alternately, in the case of MSS, for those markets in which the MSS entity chooses to operate. We sought comment on different approaches for determining when payment would be due by either a new MSS or AWS entrant, documentation that should be shared when a reimbursement claim is made, and other relevant issues. We also tentatively concluded that Sprint Nextel may not both receive credit in the 800 MHz true-up and receive reimbursement from the MSS and AWS entrants for the same costs.[FN150]

62. We adopt a policy affirming the tentative conclusion made in the *June 2009 Further Notice* that Sprint Nextel may not both receive credit in the 800 MHz true-up and receive reimbursement from the MSS and AWS entrants for the same costs. This has been the rule since the cost sharing requirements were adopted in the *800 MHz R&O*, and is necessary to prevent Sprint Nextel from receiving an unjustified windfall, and no party has objected to this conclusion. We believe that this requirement will be easy to implement. If the true-up occurs after Sprint Nextel has received reimbursement from one or more of the other new entrants, the *800 MHz R&O* requires that the Sprint Nextel report to the 800 MHz Transition

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Administrator the amount received from the other entrants.[FN151] As a result, the Transition Administrator will ensure that Sprint Nextel does not receive credit against any potential windfall payment for costs for which it has received reimbursement. If the true-up occurs prior to Sprint Nextel receiving reimbursement from another entrant, we will require Sprint Nextel to inform the other entrant of the expenses for which it has received credit in the 800 MHz true-up prior to receiving reimbursement. The other entrant will not be obligated to reimburse Sprint Nextel for what would otherwise be its share of those particular expenses. These requirements should insure, in the interest of fairness, that Sprint Nextel does not make a double recovery.

**\*20** 63. The principle that Sprint Nextel is not entitled to make a double recovery also applies to reimbursements it receives from among the new entrants. We recognize that multiple new entrants may have an interest in the same portion of the relocated BAS spectrum because, for example, entrants change business structure or assign their licenses. Accordingly, we specify that Sprint Nextel is not entitled to obtain reimbursement from a new entrant for relocation costs that Sprint Nextel has already received from another new entrant. Thus, if a new entrant assigns its license to a third party after the new entrant has reimbursed Sprint Nextel, we would reject a claim that the assignee is responsible for reimbursing Sprint Nextel for that same relocation expense.[FN152] The converse also holds: an assignee would be considered a new entrant and is responsible for unpaid cost sharing associated with a particular portion of the spectrum. However, to the extent that a new entrant seeks to assign its license to a third party prior to satisfying its reimbursement obligation, the assignor and assignee would be jointly and severally liable for the reimbursement costs until paid.[FN153] This approach is both consistent with the overarching *Emerging Technologies* principles and also furthers the public interest by preventing Sprint Nextel from receiving an unjustified windfall while precluding new entrants that incurred a reimbursement obligation from evading the payment of that obligation by entering into transactions with third parties.

64. As for when Sprint Nextel should be reimbursed by the other new entrants for its BAS relocation cost, we will not adopt either of the proposals on which we sought comment in the *June 2009 Further No-*

*tice.*[FN154] Both of the proposals would have required the establishment of multiple payment deadlines and the calculation of relocation costs on a market-by-market basis. None of the commenting parties supported either of these proposals, and all of the parties addressing this issue support having a single deadline.[FN155] In the interest of ease of implementation, we conclude that specific reimbursement deadlines tied to the conclusion of the BAS transition would be more appropriate than a series of deadlines for different markets that depend on when each of the markets transition.

65. We conclude that the reimbursement deadline for a new MSS or AWS entrant will be based on when the new entrant has "entered the band." Once the new entrant has entered the band, but no later than the sunset date, Sprint Nextel may provide the new entrant with the required documentation and request payment (as discussed further below). The new entrant will then have thirty days to submit its reimbursement to Sprint Nextel, unless, as described below, the parties agree to different terms (such as an installment plan).[FN156] This approach avoids complexities of administering separate deadlines for each market and provides certainty to the parties.

**\*21** 66. DBSD argues that MSS entrants should be able to make payments under an installment payment plan.[FN157] DBSD believes that requiring a significant lump-sum payment will create an unwarranted hurdle to MSS operators introducing commercial service.[FN158] Sprint Nextel opposes allowing MSS entrants to make payments using an installment plan because this would make Sprint Nextel a creditor of the MSS entrants.[FN159] We will not require, nor will we object if parties agree to, an installment payment plan for BAS relocation reimbursement. We recognize that the lack of a revenue stream means that MSS and AWS entrants may have limited financial resources to satisfy their cost-sharing reimbursement obligation at the time when it is due.[FN160] But, as Sprint Nextel has noted, an installment plan carries some risk to the party owed payment.[FN161] Further, because none of the parties has suggested what form an installment payment plan should take - *i.e.,* at what intervals payments should be made and for what length of time - we have no record on which to adopt a specific installment payment plan. Instead, we encourage the parties interested in making installment payments to use the 30-day payment window to ne-

gotiate an appropriate installment payment plan. Nevertheless, if no installment plan is agreed upon, a new entrant must pay the full cost sharing amount in one payment at the reimbursement deadline.

67. We see no reason to link the payment of new entrants' cost sharing obligations to the true-up as the MSS entrants have suggested. When the *800 MHz R&O* was adopted in 2004, the BAS relocation cost sharing was linked to the true-up because the 800 MHz band reconfiguration and BAS relocation were expected to be completed relatively close in time and Sprint Nextel was expected to take credit for at least some of the BAS relocation costs in the 800 MHz true-up. Now, the BAS relocation is complete, while the end date of the 800 MHz band reconfiguration remains uncertain. The true-up, currently scheduled to occur by December 31, 2010, may be postponed further given that the 800 MHz band reconfiguration will likely not be complete by that date. Accordingly, we do not think it would be prudent to introduce the uncertainty associated with the true-up date to the payment date of the BAS cost sharing, especially given that we have prohibited Sprint Nextel from both claiming credit for BAS relocation costs against the anti-windfall payment and receiving cost sharing payments from new entrants for the same costs.

68. As we proposed in the *June 2009 Further Notice*, we will require that Sprint Nextel share with any other entrant from whom it seeks reimbursement its relocation cost as documented in its annual audit as provided to the transition administrator.[FN162] In addition, we will require Sprint Nextel to produce copies of third-party audited statements of expenses associated with the BAS relocation. We will further require Sprint Nextel to produce copies of the frequency relocation agreements that it has made with any BAS incumbent for which it is seeking cost sharing.[FN163] As discussed above, the new entrant will have 30 days, unless other terms are agreed upon, to make its reimbursement payment after Sprint Nextel has provided this documentation.[FN164]

**\*22** 69. The MSS entrants have requested the ability to examine and contest individual expenses while Sprint Nextel has expressed concern that the MSS entrants are merely trying to delay or limit their cost sharing obligations.[FN165] The fact that the new entrants from which Sprint Nextel requests cost sharing will have copies of the frequency relocation agree-

ments and third party audited expense statements will help ensure that the relocation costs are legitimate. Moreover, in negotiating the frequency relocation agreements, Sprint Nextel had every reason to keep the frequency relocation costs low because it would be paying the portion of the cost associated with its 5 megahertz of spectrum, faces uncertainty as to whether any AWS licensees will enter the band in time to share in the costs, is limited to MSS contributions for only the top 30 markets and all fixed links, and now is unlikely to obtain credit for these costs against the anti-windfall payment. With regard to disputes that may arise with either MSS entrants or future AWS entrants, we note that parties have several options to resolve disputes that may arise including mediation, arbitration, or pursuing civil remedies in the court system. Parties contesting a specific cost sharing obligation shall provide evidentiary support to demonstrate that their calculation is reasonable and made in good faith; specifically, they are expected to exercise due diligence to obtain the information necessary to prepare an independent estimate of the relocation costs in question.[FN166]

70. We do not adopt the proposal in the *June 2009 Further Notice* to allow Sprint Nextel to recover relocation costs associated with all 20 megahertz of MSS spectrum from a single MSS entrant.[FN167] Sprint Nextel supports the Commission's proposal because it will help ensure it is fully reimbursed for its efforts, rather than continuing to carry the burden for MSS operators that attempt to avoid their reimbursement obligations.[FN168] Sprint Nextel also argues that each MSS operator should be responsible for funding the entire MSS share and notes that there is a true-up mechanism by which the MSS operators can settle among themselves after the BAS transition is complete. TerreStar responds that giving Sprint Nextel this right would unfairly shift the risk of collection of BAS relocation expenses from Sprint Nextel, who took the risk when it agreed to pay up front for the BAS relocation, to MSS operators.[FN169] DBSD argues that there is no reasonable basis for adopting the proposal because both MSS operators have launched satellites and will have access to their respective portion of the band.[FN170]

71. In reaching our decision, we observe that the Commission's *Emerging Technologies* policies allow an earlier entrant who has relocated incumbents from spectrum that benefits a later entrant to recover costs

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

51 Communications Reg. (P&F) 839, 2010 WL 3806390 (F.C.C.)

from the later entrant. The amount that the earlier entrant could recover has always been based on the amount of the later entrant's spectrum that the earlier entrant has cleared.[FN171] In addition, there has never been any guarantee to a band clearing entrant that it will receive cost sharing because later new entrants might not incur a band clearing responsibility before the sunset date. We conclude that we should not depart from these traditional *Emerging Technologies* policies. While doing so might shift risk from the band clearing party, we cannot conclude that desire to balance the interests of all parties necessitates such action. In addition, we must recognize that the cost sharing obligations of the MSS entrants are complicated by the DBSD bankruptcy proceeding. For these reasons, we will keep the cost sharing obligations of each MSS entrant to Sprint Nextel separate and distinct.

**\*23** 72. As to future AWS entrants, we adopt rules consistent with the tentative conclusion the Commission made in the *June 2009 Further Notice* that the future AWS licensees that enter the band prior to the sunset date will be responsible for reimbursing Sprint Nextel for relocating the BAS incumbents, less any BAS relocation costs for which Sprint Nextel had received credit against the anti-windfall payment. This conclusion is consistent with our past actions in this proceeding and with our traditional *Emerging Technologies* policies. However, as we noted in the *June 2009 Further Notice*, determining how to apportion the relocation cost among the future AWS licensees will have to wait until the licensing scheme for the AWS licensees is adopted.[FN172] Apportioning the cost among the AWS licensees will depend on whether the licenses are issued for geographic areas or on a nationwide basis, whether the geographic boundaries of AWS licenses coincide with BAS markets, how much spectrum each licensee is assigned, and the extent to which Sprint Nextel takes credit for some of the BAS relocation cost in the 800 MHz true-up. We intend to adopt specific cost sharing rules, consistent with this Order, to govern the cost-sharing process between Sprint Nextel and AWS entrants in the 1995-2000 MHz and the 2020-2025 MHz bands, when we adopt service rules which define the licensing scheme for these bands.

73. In the *June 2009 Further Notice*, the Commission sought comment on what actions it should take if MSS entrants fail to make the required reimbursement payments.[FN173] Sprint Nextel argues that failure of an MSS entrant to pay its cost sharing obligation in a timely fashion should automatically result in the suspension of its right to operate and suspension of its license if the failure to pay continues.[FN174] TerreStar responds that the Commission has ample means to penalize licensees under its rules and that any failure to make payments should be addressed based on the facts and circumstances at play.[FN175] We will adopt no specific policies or procedures as to how we should proceed if later new entrants fail to reimburse an earlier entrant for the cost of relocating BAS incumbents as required. Instead, we will address complaints regarding failure to make required payments that are filed before the Commission through our existing enforcement mechanisms.[FN176]

### 5. The Automatic Stay of <u>Section 362 of the Bankruptcy Code</u>

74. DBSD has filed a petition to stay the rulemaking proposed in the *June 2009 Further Notice* on the grounds that the rulemaking must be automatically stayed under <u>Section 362(a) of the Bankruptcy Code, 11 U.S.C. § 362(a)</u>.[FN177] DBSD claims that the automatic stay provision of the Bankruptcy Code applies here because the rulemaking directly involves Sprint Nextel's band-clearing reimbursement claims against DBSD, and because Sprint Nextel is using the proceeding to attempt to obtain possession of property from DBSD's estate. Sprint Nextel opposes DBSD's petition. It claims that the *June 2009 Further Notice* is not an adjudication of a dispute between DBSD and Sprint Nextel, and notes that the law has long recognized a difference between rulemaking and adjudication for purposes of the automatic stay.[FN178] We find DBSD's arguments misplaced, and deny its petition for stay.

**\*24** 75. The automatic stay of the Bankruptcy Code, <u>11 U.S.C. § 362(a)</u>, essentially bars actions against the debtor to recover a pre-petition claim against the bankruptcy estate or to obtain possession or exercise control over property of the estate. The regulatory exception to the automatic stay, <u>11 U.S.C. § 362(b)(4)</u>, excepts from the automatic stay actions taken pursuant to a government unit's or organization's police or regulatory powers, including enforcement of a judgment other than a money judgment.[FN179] The fundamental purpose of the regulatory exception to the automatic stay is to enable regulatory agencies to continue to develop and enforce

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

the laws entrusted to them.[FN180] Debtors may not frustrate "necessary governmental functions by seeking refuge in bankruptcy court."[FN181] Pursuant to the regulatory exception, government agencies may adopt and enforce regulatory orders against debtors in bankruptcy, including but not limited to holding hearings and actually setting the amount of liability for violating a regulatory order, but the agency must file a claim in the bankruptcy court in order to collect on a monetary judgment or fine that it adopts and may not take independent steps to demand or seek payment from the debtor outside of the bankruptcy court's claim process.[FN182]

76. The *June 2009 Further Notice*, which focused on clarifying the cost-sharing and reimbursement obligations set forth in prior Commission orders, was designed to further the Commission's long stated public policy goals of efficient management of the radio spectrum.[FN183] The *June 2009 Further Notice*, therefore, falls squarely within the regulatory exception to the automatic stay. DBSD's arguments to the contrary are without merit. The declaratory ruling, which includes matters of Commission policy related to but not subject to the *June 2009 Further Notice*, likewise fits the regulatory exception: the Commission has no pecuniary interest in the outcome and is acting in the public interest for a public purpose.

77. Based on the legal standards above, we agree with Sprint Nextel that the general rulemaking proceeding is not subject to the automatic stay merely because one of the parties to the rulemaking is a debtor in a bankruptcy case. As Sprint Nextel notes, this rulemaking has resulted in the promulgation or clarification of rules that will apply to all parties in the 1990-2025 MHz band.[FN184] This Report and Order and Declaratory Ruling applies to a variety of entrants, including TerreStar (an MSS licensee that is not in bankruptcy), and future licensees of AWS services.[FN185] Regardless of DBSD's bankruptcy, the Commission can, and must, take regulatory steps to clarify the cost sharing and reimbursement obligations of these entities.[FN186] The Commission's ability to perform its regulatory functions would be impeded if it were to halt its proceedings whenever a regulated entity that might be affected by a Commission order or rulemaking proceeding goes into bankruptcy.[FN187]

**\*25** 78. Nor is there any basis to exclude the DBSD debtors from the effects of this Report and Order and

Declaratory Ruling merely because it *may* result in a financial impact on one or more of those parties.[FN188] Moreover, under the well-established principles of the regulatory exception to the automatic stay, a regulatory body can implement its public policies, and even adopt orders directed at particular industry participants, without violating the automatic stay so long as the regulatory body does not seek to enforce a money judgment outside of the bankruptcy claims process.[FN189]

79. We reject DBSD's contention that the regulatory exception does not apply because, according to DBSD, the *June 2009 Further Notice* will effectively adjudicate or resolve the reimbursement dispute between Sprint Nextel and DBSD.[FN190] The express purpose of this Report and Order and Declaratory Ruling is to further the policy goals of promoting more efficient use of spectrum and permitting the introduction of new services. This Report and Order and Declaratory Ruling promotes the general regulatory policies of the Commission, but does not seek to determine the pecuniary interest of any individual debtor or creditor. The rulemaking and declaratory ruling apply to a variety of industry participants, not just to DBSD, and are applicable to all similarly situated entities. Moreover, the final result of this Report and Order and Declaratory Ruling is not a judgment for or against Sprint Nextel on its particular reimbursement claims. Now that the obligations are clarified, it is up to Sprint Nextel to pursue its claims. With respect to the DBSD bankruptcy, any proceedings by Sprint Nextel on a claim for monetary recovery against a debtor in the DBSD bankruptcy case is a matter for the Bankruptcy Court and is not addressed in this Report and Order and Declaratory Ruling. Thus, the Commission's rulemaking and issuance of a declaratory ruling have remained within the limits of the regulatory exception to the automatic stay.

80. In addition, the results of this Report and Order and Declaratory Ruling meet both the pecuniary purpose and public policy tests limiting the regulatory exception. With respect to the pecuniary purpose test, the Commission is acting solely in its regulatory capacity and has no creditor interest in the DBSD bankruptcy case or in the outcome of the Sprint Nextel-DBSD dispute. The Commission has not filed a claim in the DBSD case and has affirmatively represented to the Bankruptcy Court that it has no pecuniary in-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

terest in the case. In addition, based on Sprint Nextel's public filings, Sprint Nextel has represented to both the Commission and the Bankruptcy Court that Sprint Nextel's band clearing costs are high enough that it does not expect to have to make an anti-windfall payment as set forth in the *800 MHz Order*, so that Sprint Nextel will likely have no further payment obligation to the U.S. Government.[FN191] In short, Sprint Nextel's obligations to the U.S. Treasury will not likely be affected by the outcome of this proceeding. Thus, the pecuniary purpose test is satisfied and there is no impediment to the Commission's exercise of its regulatory powers under Section 362(b)(4).

**\*26 81.** The Commission's actions here also meet the "public policy" test.[FN192] The Commission's actions are not designed to protect the claim of Sprint Nextel or any other creditor against the DBSD bankruptcy estates. Clarifying the cost-sharing and reimbursement obligations associated with clearing the band for new entrants is an essential part of the Commission's implementation of its prior orders. Any benefit to individual industry participants will be wholly incidental to the Commission's stated purpose, and "outweighed" by the Commission's clearly stated public policy purpose.

*82.* In arguing that the automatic stay should apply to this rulemaking, DBSD points out that this rulemaking involves specific reimbursement claims that Sprint Nextel has filed in the Eastern District of Virginia against DBSD.[FN193] That court has stayed its proceeding under the primary jurisdiction doctrine and referred pending claims "to the Federal Communications Commission for resolution."[FN194] Although the court has referred the claims to us for "resolution," we emphasize that the actions we take here are not an adjudication of the claims that Sprint Nextel, DBSD, and TerreStar have raised in that court proceeding. Instead, we clarify our relocation rules to assist the parties, as well as the court, in determining the responsibilities of each party in the ongoing BAS relocation

## 6. Retroactivity

83. DBSD argues that the cost sharing requirements proposed in the *June 2009 Further Notice* would be impermissibly retroactive.[FN195] In addition, ICO Global argues, in an *ex parte* letter, that defining it now as an "entrant" or a "licensee" would impermis-

sibly impose retroactive liability.[FN196] Sprint Nextel responds to DBSD that the proposed requirements would not be retroactive because they would not alter the MSS operators' obligations.[FN197] In addition, Sprint Nextel answers ICO Global's retroactivity argument by asserting that when an agency clarifies that a given rule applies to certain types of parties, such a clarification does not have any impermissibly retroactive effect.[FN198]

84. As indicated above, the question about cost sharing requirements that we are resolving on the rulemaking side of this proceeding involves when the MSS entrants' obligation to share the costs of BAS relocation ends, not whether they are under such an obligation. On the declaratory ruling side of the proceeding, we explained that under the requirements set out in the *800 MHz Order*, the MSS operators incur a cost sharing obligation if they enter the band before the 800 MHz band reconfiguration or true-up process is complete. Once incurred, the operator's reimbursement obligation continues until discharged by payment or cut off by intervening events. Because the 800 MHz rebanding process has unfolded in unexpected ways, the precise timing and nature of the triggering events that would cut off these obligations was unspecified, and, under these circumstances, the exact dates that the MSS operators' ongoing payment obligations would terminate were not set.

**\*27 85.** To the extent our clarification of the triggering events for termination of the payment obligations constitutes a new or modified rule, it would be considered primarily retroactive only if it changed the past legal consequences of past actions.[FN199] This clarification, however, has worked no change in the legal consequences (*i.e.,* incurrence of the reimbursement obligation) of the MSS operators' past actions (*i.e.,* entering the band). Moreover, the clarification does not change how the MSS operators would have been treated if the band reconfiguration had proceeded according to plan. Since it did not, however, the circumstances that would have relieved the MSS operators of their payment obligations did not come about, leaving them with these obligations intact and the manner of their termination (other than for payment) unspecified. In taking action now to establish a firm date in the future (December 9, 2013) that will cut off the MSS operators' cost sharing obligations, we are acting prospectively.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

86. Also on the declaratory ruling side of this proceeding, we explain how the term "entrant" as used in prior Commission orders and regulations is applicable to BAS relocation costs. We do not make any determination concerning the correct application of our decision to particular parties.

**IV. PROCEDURAL MATTERS**

87. The Final Regulatory Flexibility Analysis, required by the Regulatory Flexibility Act, *see* 5 U.S.C. § 604, is contained in Appendix A.

**V. ORDERING CLAUSES**

88. Accordingly, IT IS ORDERED, that, pursuant to Sections 4(i), 301, 303(c), 303(f), 303(g), 303(r), 303(y), and 332 of the Communications Act of 1934, as amended, 47 U.S.C. §§ 154(i), 301, 303(c), 303(f), 303(g), 303(r), 303(y), and 332, this Fifth Report and Order, Eleventh Report and Order, Sixth Report and Order IS ADOPTED and will become effective 30 days after publication in the Federal Register.

89. IT IS FURTHER ORDERED that, pursuant to Sections 4(i), 301, 303(c), 303(f), 303(g), 303(r), 303(y), and 332 of the Communications Act of 1934, as amended, 47 U.S.C. §§ 154(i), 301, 303(c), 303(f), 303(g), 303(r), 303(y), and 332, this Declaratory Ruling IS ADOPTED and will be effective upon release.

**\*28** 90. IT IS FURTHER ORDERED that the Petition for Stay filed by New DBSD Satellite Services G.P. IS DENIED.

91. IT IS FURTHER ORDER that the Commission SHALL SEND a copy of this Fifth Report and Order, Eleventh Report and Order, Sixth Report and Order, and Declaratory Ruling in a report to be sent to Congress and the General Accounting Office pursuant to the Congressional Review Act, *see* 5 U.S.C. § 801(a)(1)(A).

FEDERAL COMMUNICATIONS COMMISSION

Marlene H. Dortch
Secretary

FN1. Completion of the Broadcast Auxiliary Transition, Letter from Sprint Nextel, Inc., WT Docket No. 02-55, ET Docket No. 00-258 and ET Docket No. 95-18, filed July 15, 2010.

FN2. For a more detailed discussion of the 1990-2110 MHz band see, for example, Improving Public Safety Communications in the 800 MHz Band, WT Docket No. 02-55, ET Docket No. 00-258, ET Docket No. 95-18, *Memorandum Opinion and Order and Further Notice of Proposed Rulemaking*, 23 FCC Rcd 4393 ¶¶ 3-28 (2008) (*BAS Relocation MO&O*). For additional background information see also Improving Public Safety Communications in the 800 MHz Band, *Report and Order and Order and Further Notice of Proposed Rulemaking*, WT Docket No. 02-55, ET Docket No. 00-258 and ET Docket No. 95-18, 24 FCC Rcd 1904 ¶¶ 5-23 (2009) (*June 2009 R&O, Order, and Further Notice*, respectively).

FN3. The Commission had previously determined to reallocate the 1990-2025 MHz BAS spectrum to MSS in 1997.

FN4. The 10 megahertz to be used by future AWS licensees consists of two 5 megahertz blocks, each of which is paired with spectrum that is not part of this proceeding. Specifically, the 1995-2000 MHz band is paired with the 1915-1920 MHz band and the 2020-2025 MHz band is paired with the 2175-2180 MHz band. Amendment of Part 2 of the Commission's Rules to Allocate Spectrum Below 3 GHz for Mobile and Fixed Services to Support the Introduction of New Advanced Wireless Services, including Third Generation Wireless Systems, ET Docket No. 00-258, ET Docket No. 95-18, *Sixth Report and Order, Third Memorandum Opinion and Order, and Fifth Memorandum Opinion and Order*, 19 FCC Rcd 20720 ¶¶ 41, 46 (2004) (*AWS Sixth R&O*).

FN5. *See* Redevelopment of Spectrum to Encourage Innovation in the Use of New Telecommunications Technologies, ET Docket No. 92-9, *First Report and Order and Third Notice of Proposed Rule Making*, 7 FCC Rcd 6886 (1992); *Second Report and Order*, 8 FCC Rcd 6495 (1993); *Third Report and Order and Memorandum Opinion and Order*, 8 FCC Rcd 6589 (1993); *Memorandum Opinion and Order*, 9 FCC Rcd 1943 (1994); *Second Memorandum Opinion and Order*, 9 FCC Rcd 7797 (1994); *aff'd Ass'n of Public Safety Communications Officials-Int'l, Inc. v. FCC*, 76 F.3d 395 (D.C. Cir. 1996) (collectively, "*Emerging Technologies* proceeding").

FN6. Pursuant to these principles, an earlier entrant

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

to a band who relocated incumbents can receive reimbursement from a later entrant for a portion of the band clearing costs. *See Emerging Technologies* proceeding. *See also* Amendment to the Commission's Rules Regarding a Plan for Sharing the Costs of Microwave Relocation, WT Docket No. 95-157, *First Report and Order and Further Notice of Proposed Rule Making*, 11 FCC Rcd 8825 (1996) (*Cost Sharing First R&O*); *Second Report and Order*, 12 FCC Rcd 2705 (1997); Amendment of Section 2.106 of the Commission's Rules to Allocate Spectrum at 2 GHz for use by the Mobile Satellite Service, ET Docket No. 95-18, *Second Report and Order and Second Memorandum Opinion and Order*, 15 FCC Rcd 12315 ¶¶ 67-69 (2000) (*MSS Second R&O*).

FN7. Improving Public Safety Communications in the 800 MHz Band, WT Docket No. 02-55, ET Docket No. 00-258, ET Docket No. 95-18, *Report and Order, Fifth Report and Order, Fourth Memorandum Opinion and Order, and Order*, 19 FCC Rcd 14969 ¶¶ 12, 330 (2004) (*800 MHz R&O*) as amended by Erratum, DA 04-3208, 19 FCC Rcd 19651 (2004), and Erratum, DA 04-3459, 19 FCC Rcd 21818 (2004).

FN8. *Id* ¶ 261; *AWS Sixth R&O* at ¶ 72. Sprint Nextel's right to receive reimbursement from MSS is limited to the costs of clearing the top thirty markets and all fixed BAS facilities, regardless of market size, based on an MSS entrant's *pro rata* share of the 1990-2025 MHz spectrum. *800 MHz R&O* at ¶ 261.

FN9. *800 MHz R&O* at ¶¶ 261, 329-330.

FN10. *June 2009 R&O* at ¶ 31; Improving Public Safety Communications in the 800 MHz Band, WT Docket No. 02-55, ET Docket No. 00-258, ET Docket No. 95-18, *Order*, 25 FCC Rcd 1294 (OET 2010). Sprint Nextel relocated the last BAS market on July 15, 2010. *See* note 1, *supra*.

FN11. The thirty-six month period began with the release of a public notice announcing the start of the negotiation period in the first National Public Safety Public Advisory Committee (NPSPAC) region. Wireless Telecommunications Bureau Announces that 800 MHz Band Reconfiguration Will Commence June 27, 2005, in the NSPAC Regions Assigned to Wave 1 and Specifies 800 MHz Reconfiguration Benchmark Compliance Dates, *Public Notice*, WT Docket No.

02-55, 20 FCC Rcd 9961 (WTB 2005); *see also 800 MHz R&O* at ¶¶ 28, 201, 347. Under this schedule, the true-up was to occur by December 26, 2008. The Commission has since granted individual 800 MHz licensees waivers of the rebanding deadline but has not modified the completion date.

FN12. Improving Public Safety Communications in the 800 MHz Band, WT Docket 02-55, *Fourth Memorandum Opinion and Order, 23 FCC Rcd 18512 ¶ 12 (2008) (800 MHz Fourth MO&O); Order, 24 FCC Rcd 8410 ¶ 7 (PSHSB 2009); Order, 24 FCC Rcd 14642 (PSHSB 2009); Order, DA 10-1190 (PSHSB June 29, 2010)*. The Commission declined to postpone the true-up until the conclusion of all rebanding as Sprint had requested. The Commission stated that in light of the fact that Sprint believes that it will avoid the need to make any windfall payment because of the extent of the relocation costs it will have expended (*i.e.*, since these costs will exceed the value by which its holdings increased as a result of the exchange of spectrum in the rebanding proceeding), Sprint could reach the break-even point before rebanding is complete, at which time there would presumably be no need to delay the true-up. *800 MHz Fourth MO&O* at ¶ 11.

FN13. Letter from Sprint Nextel, WT Docket 02-55, filed June 25, 2008, 7 n.24. The Commission valued the 1.9 GHz spectrum that Sprint is receiving as worth $4.86 billion, and the spectrum Sprint is giving as worth $2.059 billion. *800 MHz R&O* at ¶ 297; Improving Public Safety Communications in the 800 MHz Band, WT Docket No. 02-55, ET Docket No. 00-258, ET Docket No. 95-18, *Supplemental Order and Order on Reconsideration*, 19 FCC Rcd 25120 ¶ 36 (2004). The difference - $2.801 billion - is to be further reduced by Sprint Nextel's band clearing and relocation costs to determine the amount of the anti-windfall payment. The Commission noted in the 800 MHz R&O that Sprint estimated that its combined band clearing and relocation costs would be $2.184 billion. *800 MHz R&O* at ¶ 306. Thus, at that time, it was expected that Sprint Nextel would be required to make an anti-windfall payment.

FN14. *See, e.g.*, Complaint to Enforce Orders of the Federal Communications Commission, *Sprint Nextel v. New ICO Satellite Services G.P.*, Case No. 1:08 cv651 (E.D.Va. filed June 25, 2008); *Order* (issued Aug. 29, 2008) (seeking *pro rata* reimbursement of

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

its BAS relocation costs from the MSS entrants and staying all proceedings pending further decision by the Commission, respectively); Letters from TerreStar Networks and New ICO Satellite Services G.P., and Sprint Nextel, WT Docket No. 02-55, ET Docket No. 00-258, ET Docket No. 95-18, filed September 8, 2008, September 9, 2008, and October 8, 2008, respectively. In addition, in comments addressing a request by Sprint Nextel, MSTV, NAB, and SBE to extend the BAS transition deadline to February 7, 2010, ICO, TerreStar, and Sprint Nextel all addressed the cost sharing issues.

FN15. See *June 2009 Further Notice* at ¶ 70. These issues include such matters as how to allocate reimbursement rights and responsibilities among individual AWS licensees, and how to account for reimbursement costs if licenses are not issued in all AWS markets.

FN16. *MSS Second R&O* at ¶¶ 29-33, 39 (2000); 47 C.F.R. §§ 74.690(e)(1)(i), 78.40(f)(1)(i) (2008). The 213 BAS markets are based on Nielsen Designated Market Areas (DMAs). Although there are 210 DMAs in the United States, three additional areas - Guam, Puerto Rico, and the U.S. Virgin Islands - have been treated as though they were DMAs for purposes of relocation.

FN17. The top 30 market rule was eliminated thirty days after publication of the *June 2009 R&O* in the Federal Register. *June 2009 R&O* at ¶¶ 39, 119; 74 Fed. Reg. 29607 (June 23, 2009).

FN18. Comments were filed by New DBSD Satellite Services G.P. (DBSD), TerreStar Networks (TerreStar), Sprint Nextel, and the Association for Maximum Service Television (MSTV) and the National Association of Broadcasters (NAB).

FN19. Comments of TerreStar Networks Inc., WT Docket 02-55, ET Docket 00-258, ET Docket 95-18, July 14, 2009 at 7-8 (*TerreStar Comments*). In previous filings TerreStar had maintained that the extension of the deadline for completing the BAS transition did not change the June 26, 2008 date for ending its cost-sharing obligation to Sprint Nextel and that extending this cutoff date would reward Sprint Nextel for its inadequate relocation efforts. Comments of TerreStar Networks Inc., WT Docket No. 02-55, ET Docket No. 00-258, ET Docket No. 95-18, filed

March 9, 2009 at 11.

FN20. Reply Comments of New DBSD Satellite Services G.P., WT Docket 02-55, ET Docket 00-258, ET Docket 95-18, filed July 24, 2009 at 8-9 (*DBSD Reply*).

FN21. Comments of Sprint Nextel Corp., WT Docket No. 02-55, ET Docket No. 00-258, ET Docket No. 95-18, July 14, 2009 at 1-5 (*Sprint Comments*)

FN22. 11 U.S.C. § 1101 *et seq.*

FN23. The DBSD affiliates in bankruptcy are: DBSD North America Inc., 3421554 Canada Inc., DBSD Satellite Management LLC, DBSD Satellite North America Ltd., DBSD Satellite Services G.P., DBSD Satellite Services Ltd., DBSD Services Ltd., New DBSD Satellite Services G.P., and SSG UK Ltd.

FN24. 11 U.S.C. § 362(a). New DBSD Satellite Services G.P. Petition for Stay, WT Docket 02-55, ET Docket 00-258, and ET Docket 95-18, filed July 14, 2009 (*DBSD Petition*).

FN25. Opposition of Sprint Nextel Corp. to the Petition for Stay Filed by New DBSD Satellite Services G.P., WT Docket 02-55, ET Docket 00-258, ET Docket 95-18, filed July 24, 2009 at 3 (*Sprint Opposition*).

FN26. Reply Comments of Sprint Nextel Corp., WT Docket No. 02-55, ET Docket No. 00-258, ET Docket No. 95-18, July 24, 2009 at 2-3 (*Sprint Reply*).

FN27. *Bench Decision on Confirmation*, DBSD North America, Inc., Case No. 09-13061 (REG) (Bankr. S.D.N.Y. issued Oct. 26, 2009).

FN28. Application for Transfer of Control, New DBSD Satellite Services G.P., Debtor-in-Possession, IBFS No. SAT-T/C-20091211-00144, filed Dec. 11, 2009.

FN29. *DBSD Petition*; Comments of New DBSD Satellite Services G.P., WT Docket 02-55, ET Docket 00-258, ET Docket 95-18, filed July 14, 2009 at 3-9 (*DBSD Comments*); *DBSD Reply* at 2-3.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN30. *DBSD Comments* at 9-13; *DBSD Reply* at 3-5.

FN31. The sunset date is the date (December 9, 2013) on which incumbents revert to secondary status if they have not been relocated from the band. 47 C.F.R. §§ 74.690(e)(6), 78.40(f)(6).

FN32. *DBSD Comments* 13-19; *DBSD Reply* at 5-9.

FN33. *TerreStar Comments* at 8-9. TerreStar maintains that it did not enter the band by June 26, 2008 and, as a result, would not be responsible for any BAS relocation cost under the current rules.

FN34. *Id.* at 17. TerreStar claims that Sprint Nextel has taken no responsibility for the delays in the BAS transition despite the fact that it developed the relocation timetable and maintained that the relocation could be completed before the MSS entrants needed to begin service. Reply Comments of TerreStar Networks, WT Docket 02-55, ET Docket 00-258, ET Docket 95-18, July 24, 2009 at 6 (*TerreStar Reply*).

FN35. TerreStar cites many factors, including that the Commission would have been less likely to approve Sprint Nextel's proposal to relocate BAS and obtain access to 2 GHz spectrum if it had believed that the BAS relocation schedule would conflict with the needs of MSS, *TerreStar Comments* at 10; that Sprint could have no reasonable expectation of recouping BAS relocation expenses from TerreStar when the current relocation rules were adopted in 2004 because TerreStar was not expected to bring its satellite system into operation until after the June 26, 2008 cutoff date, *id.* at 11; that TerreStar and its investors had a justifiable expectation that TerreStar would not need to reimburse Sprint for BAS relocation expenses, *id.*; and that Sprint Nextel and the broadcasters were to blame for the initial lack of progress in the BAS transition and Sprint Nextel grossly underestimated the overall cost of both the BAS and 800 MHz transitions, *id.* at 15-16.

FN36. *Sprint Comments* at 5-8.

FN37. *June 2009 Further Notice* at ¶ 80.

FN38. In the accompanying Report and Order we modify the cutoff date of the new entrants' obligation to coincide with the band sunset date, as proposed in the *June 2009 Further Notice.* See *infra*, section III.B.1.

FN39. Amendment of Section 2.106 of the Commission's Rules to Allocate Spectrum at 2 GHz for use by the Mobile Satellite Service, ET Docket No. 95-18, *First Report and Order and Further Notice of Proposed Rulemaking,* 12 FCC Rcd 7388 ¶ 30 (1997) (*MSS First R&O*).

FN40. *Id.* at ¶ 33.

FN41. *MSS Second R&O* at ¶¶ 29-33.

FN42. *Id.* at ¶¶ 53, 67.

FN43. *See* note 5, *supra.*

FN44. Amendment of Section 2.106 of the Commission's Rules to Allocate Spectrum at 2 GHz for use by the Mobile Satellite Service, ET Docket No. 95-18, ET Docket No. 00-258, IB Docket No. 01-185, *Third Report and Order and Third Memorandum Opinion and Order,* 18 FCC Rcd 23638 ¶¶ 8-9 (2003) (*MSS Third R&O*).

FN45. *800 MHz R&O* at ¶¶ 261, 264, 270.

FN46. *Id.* at ¶ 261.

FN47. *AWS Sixth R&O* at ¶ 72.

FN48. Improving Public Safety Communications in the 800 MHz Band, WT Docket No. 02-55, ET Docket No. 00-258, ET Docket No. 95-18, *Memorandum Opinion and Order,* 20 FCC Rcd 16015 ¶ 113 (2005) (*800 MHz MO&O*).

FN49. The 800 MHz true-up will occur no later than six months after the end of the 800 MHz reconfiguration period. During the 800 MHz true-up Sprint Nextel will provide the 800 MHz Transition Administrator with an accounting of the funds spent to reconfigure the 800 MHz band and relocate the BAS incumbents as well as any reimbursement of relocation costs it receives from other new entrants. Sprint Nextel will make an anti-windfall payment for the spectrum it is receiving, if required. *800 MHz R&O* at ¶¶ 329-330.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN50. *See* note 12, *supra*.

FN51. The Report and Order concludes that the MSS and AWS-2 entrants have an obligation to share in the BAS relocation cost if they enter the band prior to the December 9, 2013 band sunset date. Consequently, the question of whether the previous orders established the cost sharing termination date as either the end of the 800 MHz transition or the 800 MHz true-up is moot. *See* paragraph 44, *infra*.

FN52. *800 MHz R&O* at ¶ 261.

FN53. The *800 MHz R&O* did not specify the actual date on which the 36-month reconfiguration period would end. Instead, the thirty-six month period was to begin with the release of a public notice announcing the start of the negotiation period in the first NPSPAC region. *800 MHz R&O* at ¶¶ 28, 201, 347. Thus, from the beginning the June 26, 2008 date was not a firm date, but instead depended on the circumstances of the 800 MHz reconfiguration process.

FN54. Prior to Sprint Nextel receiving spectrum in the band and assuming the responsibility for the BAS relocation, the MSS entrants were fully responsible for sharing in the cost of the BAS relocation. The *800 MHz R&O* provided Sprint Nextel the option of taking credit for its BAS relocation costs against the anti-windfall payment because the Commission had concerns that the MSS entrants would enter the band or relocate the BAS incumbents. In 2004 when the *800 MHz R&O* was adopted, the MSS entrants had had the responsibility to relocate BAS since 2000 and had made no progress. If the MSS and AWS entrants were still absent when the true-up took place, Sprint Nextel would be expected to use the unreimbursed BAS relocation costs it had incurred to offset its anti-windfall payment. DBSD argues that Sprint Nextel will have the opportunity to avoid an anti-windfall payment to the U.S. Treasury for its relocation costs. *DBSD Reply* at 5-6. The value of the spectrum that Sprint Nextel is receiving that was used in calculating the anti-windfall payment was based on the estimated value of vacant spectrum. Thus, allowing credit for the BAS relocation cost was intended to bring the amount Sprint Nextel was paying in line with the value of the spectrum. In order for Sprint Nextel to receive the "benefit" of taking a credit, it would first have to spend the money on relocating incumbents.

FN55. *See* note 11, *supra*.

FN56. *June 2009 Further Notice* at ¶ 80. DBSD cites a sentence in the *800 MHz R&O* where we state that "limiting the amount of Nextel's reimbursement in this manner strikes an appropriate balance" as supporting its argument that not terminating its cost-sharing obligation on June 26, 2008 upsets the "balance" between the parties. *800 MHz R&O* at ¶ 261. However, this sentence refers to our decision to limit the relocation cost for which Sprint Nextel could seek reimbursement from MSS entrants to relocating BAS in the top 30 markets and all fixed BAS links.

FN57. *BAS Relocation MO&O* at ¶ 31; *See also June 2009 R&O* at ¶ 29.

FN58. For example, the MSS entrants would have had to finance the relocation of BAS operations in the top 30 markets before they could begin operations and establish a revenue stream; subsequently pay to relocate BAS in the markets above the top 30; and risk AWS entrants not entering the band in time to pay a share of the relocation costs.

FN59. *MSS Second R&O* at ¶¶ 22-33.

FN60. *800 MHz R&O* at ¶ 261.

FN61. An MSS entrant could have escaped the cost sharing obligation if the 800 MHz reconfiguration had been completed within the thirty-six month period, the true-up had occurred, and the MSS entrant had not yet entered the band. However, the 800 MHz reconfiguration continues and the true-up has not yet occurred.

FN62. Moreover, TerreStar is not the only party that can claim to have had its expectations upset. For example, Sprint Nextel has faced much higher relocation costs and a longer than expected delay in receiving access to its spectrum and the BAS incumbents have had to undergo a much longer and more complex process than they expected.

FN63. TerreStar's equitable argument is not helped by the fact that it has faced relatively few consequences from the delay in the BAS transition. TerreStar did not have an operational satellite until July

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

2009. The *June 2009 R&O* allowed TerreStar to begin operations and offer commercial services even though the BAS transition has not been completed. The only hardship TerreStar has faced is the requirement to coordinate with BAS in unrelocated markets during the relatively short period between when its satellite was launched and the BAS transition was completed.

FN64. Complaint to Enforce Orders of the Federal Communications Commission, *Sprint Nextel v. New ICO Satellite Services G.P.*, Case No. 1:08cv651 (E.D.Va. filed June 25, 2008).

FN65. *Sprint v. New ICO Satellite Services, G.P.*, Case No. 1:08cv651 (E.D. Va. Aug. 29, 2008).

FN66. *DBSD North America, Inc.*, Case No. 09-13061 (REG) (Jointly Administered) (Bankr. S.D.N.Y. filed May 15, 2009). The debtors are DBSD North America, Inc.; 3421554 Canada Inc; DBSD Satellite Management, LLC; DBSD Satellite North America Limited; DBSD Satellite Services G.P.; DBSD Satellite Services Limited; DBSD Services Limited; New DBSD Satellite Services G.P.; and SSG UK Limited.

FN67. *See, e.g., Sprint Reply* at 2-3; *Ex parte letter*, Sprint Nextel Corp., WT Docket No. 02-55, ET Docket No. 00-258, ET Docket No. 95-18, filed Aug. 6, 2010; *Ex parte letter*, Sprint Nextel Corp., WT Docket No. 02-55, ET Docket No. 00-258, ET Docket No. 95-18, filed Sept. 10, 2010.

FN68. In discussing the cost sharing obligation for BAS relocation costs in previous orders, the Commission has interchangeably used the terms "entrant," "licensee," or "operator" to refer to the entity having the cost sharing obligation. For example, the 2004 *800 MHz R&O* states that "the first entrant may seek reimbursement from subsequently entering licensees" and in the same paragraph that "Nextel's right to seek reimbursement from any MSS entrant entering . . ." will be limited to cost of clearing the top 30 markets and fixed links. *800 MHz R&O* at ¶ 261. The use of these alternative terms reflects that the Commission did not necessarily limit cost sharing liability to the license-holding entity alone. For consistency, we use the term "entrant" in the following discussion of the liability issue.

FN69. *See* Amendment of the Commission's Regulatory Policies to Allow Non-U.S. Licensed Space Stations to Provide Domestic and International Satellite Service in the United States, IB Docket No. 96-111, CC Docket No. 93-23, *Report and Order*, 12 FCC Rcd 24094 ¶¶ 184-85 (1997) (providing a detailed discussion of the procedures under which foreign-licensed satellite systems may provide service in the United States).

FN70. *MSS Second R&O* at ¶¶ 29-37; *See also MSS First R&O* at ¶ 33 (first establishing the requirement to relocate BAS incumbents).

FN71. ICO Services Ltd. Letter of Intent to Provide Mobile-Satellite Service in the 2 GHz Bands, File No. 188-SAT-LOI-97, IBFS Nos. SAT-LOI-19970926-00163, SAT-AMD-20000612-00107, SAT-AMD-20001103-00155, *Order*, 16 FCC Rcd 13762 (Int'l Bur. and OET 2001) (*2001 ICO Order*); TMI Communications and Company, Ltd. P'ship Letter of Intent to Provide Mobile-Satellite Service in the 2 GHz Bands, File No. 189-SAT-LOI-97, IBFS Nos. SAT-LOI-19970926-00161, SAT-AMD-20001103-00158, *Order*, 16 FCC Rcd 13808 (Int'l Bur 2001). The name in which the spectrum reservation was listed in the Commission's records was subsequently changed to an affiliated company, TerreStar Networks, LLC. TMI Communications and Company, Ltd. P'ship, and TerreStar Networks, LLC, File Nos. SAT-ASG-20021211-00238, SAT-AMD-20061127-00143, *Order*, 22 FCC Rcd 8602 (Int'l Bur. 2007).

FN72. *800 MHz R&O* at ¶¶ 250, 261.

FN73. *See e.g., ex parte letter*, Sprint Nextel Corporation, WT Docket No. 02-55, ET Docket No. 00-258, ET Docket No. 95-18, filed July 27, 2010. Sprint Nextel recognizes that DBSD and a number of its affiliates have filed for bankruptcy protection, and Sprint Nextel is not seeking reimbursement from those debtors apart from the proceedings in the bankruptcy court. *See, e.g.* Letter from John H. Culver III to Yosef J. Reimer, dated Sept. 3, 2010 (included as part of *ex parte* submission, Sprint Nextel Corporation, WT Docket No. 02-55, ET Docket No. 00-258, ET Docket No. 95-18, filed Sept. 3, 2010).

FN74. *Ex parte letter*, ICO Global Communications (Holdings) Ltd., WT Docket No. 02-55, ET Docket

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

No. 00-258, ET Docket No. 95-18, filed Sept 1, 2010 at 1; *ex parte letter*, ICO Global Communications (Holdings) Ltd., WT Docket No. 02-55, ET Docket No. 00-258, ET Docket No. 95-18, filed Sept. 3, 2010 at 2-3.

FN75. ICO Global called to the Commission's attention its 2005 reorganization in an *ex parte* filing submitted after the close of the formal pleading cycle and at a late point in the Commission's decisional process. *Ex parte letter*, ICO Global Communications (Holdings) Ltd., WT Docket No. 02-55, ET Docket No. 00-258, ET Docket No. 95-18, filed Sept 1, 2010 at 2. Since then, Sprint Nextel and ICO Global have submitted extensive reply and rebuttal *ex parte* filings to the Commission. *See, e.g., ex parte letter*, Sprint Nextel Corporation, WT Docket No. 02-55, ET Docket No. 00-258, ET Docket No. 95-18, filed Sept. 3, 2010 (containing materials from DBSD's bankruptcy proceeding); *Ex parte letter*, ICO Global Communications (Holdings) Ltd., WT Docket No. 02-55, ET Docket No. 00-258, ET Docket No. 95-18, filed Sept. 3, 2010 (containing 31 separate attachments that include investor memoranda, DBSD business plans, and letters pertaining to satellite insurance and development).

FN76. For example, a corporation may adopt a particular structure or contractual arrangement to decrease tax liability or make itself more attractive to investors.

FN77. *United States v. Bestfoods*, 524 U.S. 51, 61 (1998).

FN78. *Gen. Tel. Co. of the S.W. v. United States*, 449 F.2d 846, 854 (5th Cir. 1971). *See also Capital Tel. Co., Inc. v. FCC*, 498 F.2d 734 (D.C. Cir. 1974) (Commission correctly treated individual and corporation he controlled as the same entity and granted only one license); *Accord Mansfield Journal Co (FM) v. FCC*, 180 F.2d 28, 37 (D.C. Cir. 1950) (although two newspapers were separate corporations, with separate editorial staffs, and located in communities over fifty miles apart, the Commission correctly denied applications of both corporations where record showed that one family owned all of the stock in both corporations and that the owners took active part in the control and policy formulation of the newspapers); *Schenley Distillers Corp. v. United States*, 326 U.S. 432, 437 (1946) ("The fact that sev-

eral corporations are used in carrying on the business does not relieve them of their several statutory obligations more than it relieves them of the taxes severally laid upon them"); *Transcontinental Gas Pipe Line Corp. v. FERC*, 998 F.2d 1313, 1321-22 (5th Cir. 1993) (FERC correctly looked behind corporate forms and treated the parent and subsidiaries as a single entity where parent pipeline set up subsidiaries to sell gas at prices at which the parent could not legally sell).

FN79. Liability of Federated Publications, Inc., Former Owner of WMRI, Inc., Licensee of WMRI (AM and FM) for Forfeiture, *Memorandum Opinion and Order*, 7 FCC 2d 522 ¶ 4 (1967) ("Where absolute control over a subsidiary licensee corporation resides in a parent, the parent must be prepared to assume full responsibility for the operation of the station in accordance with the Communications Act.").

FN80. *See SM Radio Inc., Order on Review*, 23 FCC Rcd 2429 (2008); Radio X Broadcasting Corp., *Memorandum Opinion and Order*, 21 FCC Rcd 12209 ¶ 18 (2006); KASA Radio Hogar, Inc., *Memorandum Opinion and Order*, 17 FCC Rcd 6256 (2002); A-O Broadcasting, *Memorandum Opinion and Order*, 20 FCC Rcd 756 (2005).

FN81. Petition by Telecable Corp. to Stay Construction or Operation of a CATV System in Bloomington and Normal Ill. by G.T.&E. Communications Inc., *Decision*, 19 FCC 2d 574 ¶¶ 31-32 (1969); Petition by Manatee Cablevision Inc. to Stay Construction and Operation of a CATV Distribution Facility in Manatee County Fla. by Gen. Tel. System, *Decision*, 22 FCC 2d 841 ¶¶ 52-58 (1970); Comark Cable Fund III v. Northwestern Indiana Tel. Co., *Memorandum Opinion and Order*, 3 FCC Rcd 3096 (1988); *see also* Application of Gen. Tel. & Electronics Corp. to Acquire Control of Telenet Corp. and its wholly-owned subsidiary, Telenet Communications, *Memorandum Opinion and Order*, 72 FCC 2d 91 (1979).

FN82. *Capital Tel. Co., Inc. v. FCC*, 498 F.2d 734 (D.C. Cir. 1974) (individual paging license applicant and affiliated corporate applicant treated as a single entity and granted only one license); Service Electric Co., *Memorandum Opinion and Order*, 77 FCC 2d 986 (1980) (Commission did not renew microwave licenses because separate cable company owned by

same person had violated rules); Pattersonville Tel. Co., Schenectady, N.Y., Memorandum Opinion and Order, 34 FCC 2d 258 ¶ 8 (1972). See also, e.g., 47 C.F.R.§ 1.2110(b)(2) (aggregation of affiliate interests for purpose of determining applicant's compliance with designated entity eligibility requirements); Applications of AT&T Inc. and Centennial Communications Corp. For Consent to Transfer Control of Licenses, Authorizations, and Spectrum Leasing Arrangements, Memorandum Opinion and Order, 24 FCC Rcd 13915 ¶ 46 (2009) (when examining transaction applications for potential competitive concerns, Commission attributes spectrum holdings of any affiliate that holds a ten percent or greater interest).

FN83. See Sabine Towing & Transp. Co., Inc. v. Merit Ventures, Inc., 575 F. Supp. 1442, 1446-48 (E.D. Tx 1983) (listing factors for piercing corporate veil). See also Douglas and Shanks, Insulation from Liability Through Subsidiary Corporations, 39 YALE L.J. 193 (1929) (seminal article by William O. Douglas).

FN84. See Horton, Liability of Corporation for Torts of Subsidiary, 7 A.L.R.3d 1343, 1349 (1966) ("Ordinarily, a corporation which chooses to facilitate the operation of its business by employment of another corporation as a subsidiary will not be penalized by a judicial determination of liability for the legal obligations of the subsidiary").

FN85. See United States v. Bestfoods, 524 U.S. at 64-67 (a parent corporation can be liable for its own activities as an "operator" of a facility disposing of hazardous waste even if it is not derivatively liable for the actions of its subsidiary though piercing the corporate veil). In Bestfoods, the Court concluded that Congress had not, by its silence in the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), indicated an intent to abrogate traditional common law protections for separate corporations, and thus the Court predicated liability on a factual showing that the parent was the in fact the operator of the facility or acted directly with respect to the disposition of hazardous waste. 524 U.S. at 61-62. In contrast, the Communications Act mandates that the Commission regulate in the public interest, giving the Commission broad discretion to regulate the allocation of spectrum. The courts have recognized that these powers allow the Commission to look past corporate forms without having to meet the traditional requirements of piercing the corporate veil when necessary to accomplish the Commission's broad mandate. See, e.g., Capital Tel. Co., Inc. v. FCC, 498 F.2d 734, 738 (D.C. Cir. 1974) ("[W]e need not pause to consider whether Capital would be Bakal's alter ego under the strict standards of the common law alter ego doctrine which would apply in a tort or contract action. The contest in this case is over a license in a regulated industry and the applicable standard appears in the statute, not in court decisions involving civil suits."); Mansfield Journal Co. (FM) v. FCC, 180 F.2d 28, 37 (D.C. Cir. 1950) ("While these two newspapers were separate corporations, with separate editorial staffs, and located in communities over fifty miles apart, the record shows that one family owns all of the stock in both corporations and that the owners took very active part in the control and policy formulation of the newspapers. We think the Commission was entitled to ascertain, and base its findings upon, the true locus of control.").

FN86. See e.g. Zale Corp. & Corrigan-Republic, Inc. v. FTC, 473 F.2d 1317 (5th Cir. 1973) (Fifth Circuit upheld FTC finding that "the integrated operation, interlocking directorate and unified advertising [of a parent corporation and its affiliates] strongly militate for finding the enterprise to be the appropriate subject for the Commission's order and for application of the exceptions to recognition of separate corporate entities where to do so frustrates a statutory policy"); Transcontinental Gas Pipe Line Corp. v. FERC, 998 F.2d 1313, 1321 (5th Cir. 1993) (upholding Federal Energy Regulatory Commission decision finding parent and affiliate liability under the National Gas Act based on a determination that the companies operated as a single entity); Pearson v. Component Technology Corp., 247 F.3d 471, 485-87 (3d Cir. 2001) (discussing application of National Labor Relations Board (NLRB) and Department of Labor four part integrated enterprise test for determining liability under Worker Adjustment and Retraining Notification Act); Radio & Television Broad. Techs. Local Union 1264 v. Broadcast Serv. of Mobile, 380 U.S. 255, 256 (1965) (per curiam) (in determining whether party's gross receipts are sufficient to establish NLRB jurisdiction over labor dispute, NLRB may consider gross receipts of affiliates under integrated enterprise theory).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN87. *Ex parte letter*, ICO Global Communications (Holdings) Ltd., WT Docket No. 02-55, ET Docket No. 00-258, ET Docket No. 95-18, filed Sept 3, 2010. ICO Global points to July 2005 as the month in which ICO Global and DBSD started maintaining separate bank accounts, financial statements, budgets and insurance policies. *Id.* at 3. *See also ex parte letter*, ICO Global Communications (Holdings) Ltd., WT Docket No. 02-55, ET Docket No. 00-258, ET Docket No. 95-18, filed Sept 1, 2010.

FN88. *See* ICO Services Ltd. Letter of Intent, File No. 188-SAT-LOI-97, IBFS File No. SAT-LOI-19970926-00163, filed Sept. 26, 1997. Most of the statements made in the LOI were made in the name of the group of ICO companies including ICO Global, rather than just on behalf of ICO Services.

FN89. *See* Letter, ICO Services Ltd., File No. 188-SAT-LOI-97, filed Sept. 27, 1999.

FN90. Letter, File No. 188-SAT-LOI-97, filed May 17, 2000; Amendment to ICO's Letter of Intent to Provide Mobile Satellite Service To, From, and Within the U.S. Markets Within the 2 GHz MSS Frequency Bands 1990-2025 MHz and 2165-2200 MHz, File No. SAT-LOI-19970926-00163, filed June 12, 2000. New ICO Global later changed its name to ICO Global Communications (Holdings) Ltd.

FN91. *2001 ICO Order* at ¶¶ 1, 4 n. 13, n.16 and n.17, 9, 30 and 31. Likewise in 2003, an order of the International Bureau recited that ICO Global had "through subsidiaries" obtained an LOI grant for provision of MSS in the United States in the 2 GHz band. Applications of Mobile Communications Holdings, Inc. and ICO Global Communications (Holdings) Ltd. for Transfer of Control, File Nos. SAT-T/C-20020719-00104, SAT-T/C-20020718-00114, SAT-MOD-20020719-00105, SAT-MOD-20020719-00103 *Memorandum Opinion and Order, 18 FCC Rcd 1094 ¶ 3 (Int'l Bur. 2003).*

FN92. The nominal holder of the spectrum reservation changed from ICO Services Ltd. to ICO Satellite Services G.P. and then later to Satellite Services Global G.P., which later changed its name to New ICO Satellite Services G.P. (New ICO Services).

FN93. *See ex parte letter*, IB Docket No. 99-81, ET Docket No. 95-18, filed June 14, 2000; *Ex parte letter*, IB Docket No. 99-18, filed March 7, 2001; *Ex parte letter*, IB Docket No. 99-81, filed March 8, 2001; *Ex parte letter*, IB Docket No. 99-18, filed March 23, 2001; *Ex parte letter*, IB Docket No. 99-18, filed May 9, 2001; *Ex parte letter*, IB Docket No. 99-81, filed June 8, 2001; *Ex parte letter*, IB Docket No. 99-81, filed June 20, 2001; Comments of New ICO Global Communications, ET Docket No. 00-258, ET Docket No. 95-18, IB Docket No. 99-81, filed Oct. 22, 2001; *Ex parte letter*, ET Docket No. 95-18, IB Docket No. 99-81, filed Nov. 20, 2001.

FN94. *Cf. In re: Petition by Telecable Corp.,* 19 F.C.C.2d 574, 587 (1969) ( "The critical question, therefore, is whether the conduct of the general system corporations in the light of the relationship which exists among them requires that the legal concept of separate corporate identities be disregarded in order to preserve the integrity of [the statute] and to prevent the respondents from defeating the purpose and objective of the statutory provisions").

FN95. *Ex parte letter*, ICO Global Communications (Holdings) Ltd., WT Docket No. 02-55, ET Docket No. 00-258, ET Docket No. 95-18, filed Sept. 1, 2010 at 3. ICO Global states that it continues to develop a medium earth orbit (MEO) system for the international market while ICO NA has focused on a geosyhronous orbit (GSO) system aimed at the United States.

FN96. *Id.* at 1-2.

FN97. *Id.* at 2.

FN98. *Ex parte letter*, ICO Global Communications (Holdings) Ltd., WT Docket No. 02-55, ET Docket No. 00-258, ET Docket No. 95-18, filed Sept. 3, 2010 at 5-6.

FN99. *Ex parte letter*, Sprint Nextel Corp., WT Docket No. 02-55, ET Docket No. 00-258, ET Docket No. 95-18, filed Sept. 2, 2010 at 2.

FN100. *Ex parte letter*, Sprint Nextel Corporation, WT Docket No. 02-55, ET Docket No. 00-258, ET Docket No. 95-18, filed Sept. 3, 2010 at 1-2.

FN101. *Ex parte letter*, Sprint Nextel Corp., WT Docket No. 02-55, ET Docket No. 00-258, ET

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Docket No. 95-18, filed Sept. 10, 2010 at 2.

FN102. *Ex parte letter*, Sprint Nextel Corp., WT Docket No. 02-55, ET Docket No. 00-258, ET Docket No. 95-18, filed Sept. 1, 2010 at 6.

FN103. *Ex parte letter*, Sprint Nextel Corp., WT Docket No. 02-55, ET Docket No. 00-258, ET Docket No. 95-18, filed Aug. 6, 2010 at 7; *Ex parte letter*, Sprint Nextel Corp., WT Docket No. 02-55, ET Docket No. 00-258, ET Docket No. 95-18, filed July 28, 2010 at 5-6.

FN104. In *Bestfoods* case, the Supreme Court was in a similar position. Having established the principles upon which a parent could be liable as an "operator" of a facility under CERCLA, the Court declined to resolve the factual disputes before it, and remanded the case back to the district court for further proceedings. *See* 524 U.S. at 72-73.

FN105. *See 800 MHz R&O* at ¶ 261.

FN106. *June 2009 Further Notice* at ¶¶ 102-103.

FN107. *Id.* at ¶¶ 106-109.

FN108. *Id.* at ¶¶ 111-113.

FN109. *See* section III.A.1, *supra.*

FN110. Because we do not know when the 800 MHz reconfiguration will be completed, we can not predict whether this change in our cost sharing requirements will make it more or less likely new entrants will have a cost sharing obligation.

FN111. *Sprint Comments* at 7. Although Sprint Nextel agrees that the reimbursement obligation should end at the band sunset date, it seeks to move this date to January 21, 2015, which would be ten years after it commenced relocation activities and consistent with *Emerging Technologies* policies, noting that the MSS entrants previously made no progress on relocating BAS.

FN112. *MSS Third R&O* at ¶¶ 3 & 47.

FN113. *800 MHz R&O* at ¶ 261; *AWS Sixth R&O* at ¶ 72.

FN114. *June 2009 Further Notice* at ¶ 91

FN115. *Id.* at ¶¶ 93-94.

FN116. DBSD has previously claimed that it was not able to enter the band because it could not begin operations until BAS operations in the top thirty markets and all fixed links had been relocated (the *June 2009 R&O* eliminated this rule), even though its satellite was successfully launched and became operational in May 2008. *See Ex parte letter*, New ICO Satellite Services G.P., WT Docket No. 02-55, ET Docket No. 00-258, ET Docket No. 95-18, filed Sept. 9, 2008 at 3 n.11; Opposition to Supplemental Joint Request, New ICO Satellite Services G.P., WT Docket No. 02-55, ET Docket No. 00-258, ET Docket No. 95-18, filed March 9, 2009 at 11-12. TerreStar has stated that it had not entered the band prior to its July 2009 satellite launch because it had not conducted any transmissions in the 2000-2020 MHz spectrum. Reply Comments of TerreStar Networks Inc., WT Docket No. 02-55, ET Docket No. 00-258, ET Docket No. 95-18, filed May 30, 2008 at 15-16.

FN117. *Id.* at 8-10.

FN118. *Id.* at 21.

FN119. Amendment of Section 2.106 of the Commission's Rules to Allocate Spectrum at 2 GHz for use by the Mobile Satellite Service, ET Docket No. 95-18, *Memorandum Opinion and Order and Third Notice of Proposed Rulemaking and Order*, 13 FCC Rcd 23949 ¶¶ m, s (1998); *MSS Second R&O* at ¶ 22; *MSS Third R&O* at ¶¶ 3, 8.

FN120. *800 MHz R&O* at ¶ 252.

FN121. *AWS Sixth R&O* at ¶ 69.

FN122. *June 2009 Further Notice* at ¶ 89.

FN123. *See June 2009 Further Notice* at n.196-97 (listing bands where line-of-sight and proximity test are used to determine cost sharing liability). *But cf. MSS Second R&O* at ¶ 97 and 47 C.F.R. § 101.82(b-c) (basing the cost sharing liability of a later entrant on an engineering analysis of individual links after

concluding that sharing between the fixed microwave incumbents and new MSS entrants was possible based on a link-by-link technical analysis).

FN124. For the 2000-2020 MHz band, an MSS entrant can certify that its satellite is operational upon the occurrence of transmissions between the satellite and an authorized earth station using the 2000-2020 MHz and 2180-2200 MHz bands. *BAS Relocation MO&O* at ¶ 48.

FN125. "BAS and MSS cannot share the spectrum without unacceptable mutual interference." *MSS First R&O* at ¶ 30 (1997). We require MSS entrants to participate in the relocation of BAS or conclusively demonstrate that their proposed systems are capable of sharing with all types of BAS operations. *MSS Second R&O* at ¶ 63.

FN126. As to DBSD's previous argument that it could not have entered the band and incurred a cost sharing obligation while the top 30 market rule was in effect, DBSD's argument is at heart a contention that "beginning operations" for purposes of the top 30 market rule and "enter the band" for purposes of cost sharing with Sprint Nextel are synonymous. This contention is not correct. The top 30 market rule prevented an MSS entrant from "beginning operations" before the top 30 BAS markets and all fixed BAS links have been relocated while the reimbursement obligation is triggered when an MSS entrant "enters the band." The terms should have different meanings because the two rules accomplish different purposes. As originally adopted, the top 30 market rule protected the BAS incumbents in the largest markets from interference from the MSS entrants and envisioned that BAS operations in the rest of the country would have to operate on fewer channels until the time those operations were relocated. The reimbursement rule, which is based on entering the band, requires the MSS entrants to pay for the benefit they receive as a result of the relocation Sprint Nextel is undertaking. Consequently, there is no reason that these terms should have the same meaning.

FN127. In previous band clearings, the later entrant would incur a cost sharing obligation gradually as it built out its system, applying a proximity or line-of-sight test to each incumbent microwave link or BRS system as the new entrant's system was built out.

FN128. *800 MHz R&O* at ¶ 261; *AWS Sixth Report and Order* at ¶ 72.

FN129. *See* Service Rules for Advanced Wireless Services in the 1915-1920 MHz, 1995-2000 MHz, 2020-2025 MHz and 2175-2180 MHz Bands, WT Docket No. 04-356, WT Docket No. 02-353, *Notice of Proposed Rulemaking*, 19 FCC Rcd 19263 (2004) (*AWS-2 NPRM*).

FN130. *TerreStar Comments* at 18-19; *DBSD Comments* at 24-25; *DBSD Reply* at 12.

FN131. *See, e.g., TerreStar Comments* at 18 and 21-22; *TerreStar Reply* at 9-10; *DBSD Comments* at 20-23; *DBSD Reply* at 9-10.

FN132. *Sprint Comments* at 15-19; Reply Comments of Sprint Nextel Corp., WT Docket No. 02-55, ET Docket No. 00-258, ET Docket No. 95-18, July 24, 2009 at 15-16 (*Sprint Reply*).

FN133. *MSS Third R&O* at ¶¶ 40-41.

FN134. *800 MHz R&O* at ¶ 261.

FN135. *TerreStar Comments* at 19; *DBSD Reply* at 12.

FN136. *Sprint Comments* at 15-19.

FN137. *TerreStar Comments* at 17-18.

FN138. *BAS Relocation MO&O* at ¶ 43.

FN139. *DBSD Comments* at 19-23. DBSD certified its satellite as operational prior to June 26, 2008. The BAS relocation delays have prevented DBSD from accessing the spectrum for at least 15 months of its expected 15 years of satellite life.

FN140. *DBSD Comments* at 22.

FN141. 47 C.F.R. §§ 24.243, 27.1164; *Cost Sharing First R&O* at App A ¶ ¶ 8-12; Amendment of Part 2 of the Commission's Rules to Allocate Spectrum Below 3 GHz for Mobile and Fixed Services to Support the Introduction of New Advanced Wireless Services, including Third Generation Wireless Systems, ET

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Docket No. 00-258, WT Docket No. 02-353, *Ninth Report and Order and Order*, 21 FCC Rcd 4473 ¶¶ 75, 115 (2006) (*AWS Ninth R&O*). Sprint Nextel notes that, under *Emerging Technologies* policies, depreciation is not applied to costs a first relocator incurs for clearing spectrum outside its licensed frequency band. *Sprint Reply* at 11.

FN142. *MSS Second R&O* at ¶ 67.

FN143. *DBSD Comments* at 22-23.

FN144. 47 C.F.R. §§ 24.243(b), 27.1164(b), 101.82(e); *Cost Sharing First R&O* at ¶ 74. Cost caps were not used in the relocation of BRS incumbents. *See AWS Ninth R&O* at ¶ 117.

FN145. *AWS Ninth R&O* at ¶ 20.

FN146. *TerreStar Comments* at 18.

FN147. *800 MHz R&O* at ¶ 261.

FN148. *800 MHz MO&O* at ¶ 110. As noted above, Sprint Nextel has indicated that it may not be able to receive credit for these costs.

FN149. The fact that Sprint Nextel may no longer even be able to take credit for its BAS relocation costs because it does not expect to have to make an anti-windfall payment to the U.S. Treasury does not change our analysis. Furthermore, we give no weight to TerreStar's argument that requiring MSS entrants to pay these costs would diminish the funds that they have available to serve the public. This is true for any new entrant who relocates an incumbent, including Sprint Nextel.

FN150. *June 2009 Further Notice* at ¶ 84.

FN151. *800 MHz R&O* at ¶ 330.

FN152. Similarly, were we to permit an MSS entity operating in the 2 GHz band to separate its rights into distinct components (such as by allowing a third party to deploy ATC), we would bar Sprint Nextel from obtaining more than one reimbursement for the same costs from the various new entrants.

FN153. The assignee would be considered a new entrant and jointly and severally liable for unpaid cost sharing associated with a particular portion of the spectrum. Although parties to such transactions may enter into specific agreements between each other with respect to the payment of reimbursement costs, such an agreement will not preclude Sprint Nextel from seeking to collect the appropriate reimbursement from the parties or in any way limit the Commission's authority to take appropriate enforcement action against the parties to the transaction for failure to timely pay their reimbursement obligation. We do not here address whether the Commission may be required to modify application of this joint and several liability rule in particular cases consistent with the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq.*

FN154. *June 2009 Further Notice* at ¶¶ 97-98. One proposal would have tied reimbursement of all then-relocated BAS markets to a later entrant's date of band entry, with additional payments due after each subsequent BAS market transition. The other would have allowed MSS entrants to pay their share of relocation costs only for those markets where they chose to operate and sought comment on how to structure reimbursement for the remaining markets.

FN155. *See, e.g, Sprint Reply* at 12. *TerreStar Comments* at 21-23; *TerreStar Reply* at 9-11; *DBSD Comments* at 20; *DBSD Reply* at 10.

FN156. To avoid potential confusion, we further clarify that, so long as the party who has relocated the incumbents provides the new entrant with the required documentation and requests payment by the sunset date, the sunset date will not serve to extinguish the new entrant's payment obligation that is described in the documentation. If the documentation and payment request is submitted after the sunset date, then operation of the sunset date will end any reimbursement obligation that the new entrant otherwise would have had.

FN157. *DBSD Comments* at 20.

FN158. *Id.*

FN159. *Sprint Reply* at 12; *Sprint Comments* at n.30.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN160. Under the reimbursement plan we are adopting, future AWS entrants may have to satisfy their reimbursement obligation as early as 30 days after grant of their long form application. The amount owed should be known prior to auction, so AWS applicants can take this into account when they file applications and bid for licenses (we expect Sprint Nextel to make these costs available upon reasonable request). Because MSS entrants are only required to reimburse Sprint Nextel a *pro rata* share of the cost of relocating BAS incumbents in the thirty largest markets and all fixed BAS links, their relocation expenses are comparable to the expenses they would have had to incur before beginning operations when the band was solely allocated to MSS.

FN161. This risk is not merely speculative, as DBSD argues that its cost sharing obligation to Sprint Nextel is subject to its bankruptcy proceeding.

FN162. *June 2009 Further Notice* at ¶ 99.

FN163. The MSS entrants are only required to share in the cost of relocation BAS incumbents in the 30 largest markets and all fixed BAS links. *800 MHz R&O* at ¶ 261. Consequently, there is no need for Sprint Nextel to share frequency relocation agreements and expense statements for BAS incumbents in the smaller markets if the BAS incumbents have no fixed links.

FN164. Should the parties mutually agree to the submission of lesser documentation, the 30-day period and payment deadline will take effect as described above.

FN165. *TerreStar Comments* at 21-22; *TerreStar Reply* at 9-11; *DBSD Comments* at 23; *Sprint Reply* at 13-15.

FN166. These dispute resolution procedures for cost sharing among new entrants are consistent with those applicable to MSS and AWS entrants in the 2110-2150 MHz and 2160-2200 MHz bands, which are the bands being cleared of fixed incumbents to accommodate the 2 GHz MSS downlink as well as AWS operations in those bands. *See* 47 C.F.R. § 27.1172.

FN167. *June 2009 Further Notice* at ¶ 87.

FN168. *Sprint Comments* at 19-20; *Sprint Reply* at 16.

FN169. *TerreStar Comments* at 20.

FN170. *DBSD Comments* at 25.

FN171. Even when this band was to be used solely by MSS entrants, later entering MSS operators were only required to reimburse an earlier entrant that cleared spectrum a *pro rata* share of the earlier MSS entrants' band clearing costs, with a final "true-up" designed to ensure that all MSS entrants ultimately paid a proportional share of total expenses. *June 2009 Further Notice* at ¶ 87. Thus, while Sprint Nextel notes the MSS "true-up" feature associated with MSS-to-MSS reimbursement, we conclude that it should not be used to overshadow the *pro rata* aspect of the reimbursement scheme.

FN172. *Id.* at ¶ 88.

FN173. *June 2009 Further Notice* at ¶ 98.

FN174. *Sprint Comments* at 15. Sprint Nextel also notes that it reserves the right to seek recovery in court, separate from Commission proceedings.

FN175. *TerreStar Reply* at 12.

FN176. As is the case in our *Emerging Technologies* proceedings, "we emphasize that we intend to use the full realm of enforcement mechanisms available to us in order to ensure that reimbursement obligations are satisfied." *Cost Sharing First R&O* at ¶ 80.

FN177. *DBSD Petition* at 2; *Also see DBSD Comments* at 3-9.

FN178. *Sprint Opposition* at 2-4; *Also see Sprint Reply* at 2-3.

FN179. 11 U.S.C. § 362(b)(4) exempts from the automatic stay set forth in 11 U.S.C. §§ 362(a)(1), (2),(3), and (6):

the commencement or continuation of an action or proceeding by a governmental unit ... to enforce such governmental unit's or organization's police and regulatory power, including the enforcement of a judgment other than a money

judgment, obtained in an action or proceeding by the governmental unit to enforce such governmental unit's or organization's police or regulatory power.

FN180. The legislative history of 11 U.S.C. § 362(b)(4) is instructive as to the meaning of "police and legislative power." The House Report on the 1978 Bankruptcy Reform Act states:

> paragraph (4) excepts commencement or continuation of actions and proceedings by governmental units to enforce police or regulatory powers. Thus, where a governmental unit is suing a debtor to prevent or stop violation of fraud, environmental protection, consumer protection, safety or similar police or regulatory laws or attempting to fix damages for violation of such law, the action or proceeding is not stayed under the automatic stay.

H.R.Rep. No. 95-595, 95th Cong., 1st Sess. 343 (1977); S.Rep. No. 95-989, 95th Cong., 2d Sess. 51-52, reprinted in 1978 U.S.C.C.A.N. 5787, 5838, 5963, 6299.

FN181. *City of New York v. Exxon Corp.*, 932 F.2d 1020, 1024 (2d Cir. 1991) (quoting *United States v. Seitles*, 106 B.R. 36, 38-40 (S.D.N.Y. 1989); *See also EEOC v. Le Bar Bat, Inc.*, 274 B.R. 66 (S.D. N.Y. 2002) (automatic stay did not apply to EEOC action to prevent employment discrimination).

FN182. *See United States v. Commonwealth Cos., Inc.*, 913 F.2d 518, 522, 523 (8th Cir. 1990) (where an agency is authorized to enforce its rules and laws by setting a fine, the action by the agency to determine the appropriate amount of liability is exempt from the automatic stay, but the agency cannot collect the fine on its own order, but must file a claim in bankruptcy court to seek payment of the monetary amount.). *City of New York v. Exxon Corp*, 932 F.2d at 1025, 1026 (City's action against Chapter 11 debtor under the CERCLA to recover costs of removing hazardous waste from its landfills came within the regulatory exception, but once a judgment has been issued, collection of that judgment must be handled within the claims process of the bankruptcy court); *In re Quinta Contractors, Inc.*, 34 B.R. 129 (Bankr. M.D. Pa. 1983) (proceedings by the Secretary of Labor to establish the amount of the debtor's liability under the Davis-Bacon Act are excepted from the automatic stay).

FN183. *See June 2009 R&O*, at ¶ 2 ("All of the matters addressed herein relate to our fundamental goals of completing the relocation of BAS operations from the 1990-2025 MHz band and providing for the operation of new services on those frequencies").

FN184. *Sprint Opposition* at 6.

FN185. *See Teacher's Ins. & Annuity Assoc. of Am. v. Butler*, 803 F.2d 61, 65 (2d Cir. 1986) (automatic stay does not extend to non-bankrupt co-defendants); *Am. Prairie Constr. Co. v. Hoich*, 560 F.3d 780, 789 (8th Cir. 2009) (same). The rules adopted here apply broadly to all parties, whether or not in bankruptcy. The declaratory ruling also applies to parties whether or not in bankruptcy. For example, the conclusion that under the current rules the new entrants' cost sharing obligation extends to either the conclusion of the 800 MHz reconfiguration or true-up is true for the obligation of all the MSS and AWS entrants. The conclusion concerning affiliate liability applies to all the affiliates of DBSD, including parent company ICO Global, which is not in bankruptcy.

FN186. We note that DBSD claims that discussion in the *June 2009 Further Notice* about how the proposed regulations will apply to Sprint Nextel's claims against DBSD makes clear that the intent is to functionally adjudicate Sprint Nextel's claims against DBSD, and that the *June 2009 Further Notice* is subject to automatic stay regardless of how it is denominated. *DBSD Petition* at 6. We do not find this sweepingly broad construction persuasive.

FN187. Indeed, as Sprint Nextel has argued (*Sprint Reply* at 3-4), the automatic stay under 11 U.S.C. § 362(a) only bars "proceedings against the debtor" or actions to "obtain" or "exercise control" over the property of the bankruptcy estate. The *June 2009 Further Notice* proceeding is not even barred by the automatic stay under the terms of Section 362(a) because it is not focused on the debtor or the debtor's property, but is a general rulemaking proceeding applicable to all similarly situated entities. *See Lacoquille Inv. Co.*, 44 B.R. 731, 732-33 (Bankr. S.D. Fla. 1984) (enactment of a municipal zoning ordinance amendment that arguably adversely affected the use and value of debtor's real property was not barred by the automatic stay because it was exercise of the municipal legislative power, not a judicial

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

or administrative proceeding directed against the debtor or its property); *Albion Disposal, Inc.*, 217 B.R. 394, 406 (W.D.N.Y. 1997) (facially neutral zoning ordinance that barred all landfills from the city did not violate the automatic stay, notwithstanding debtor's claim that the ordinance "targeted" debtor's property).

FN188. DBSD's assumption that the Commission's final order would adopt positions that favor Sprint Nextel was mere speculation. The Commission only made tentative findings in its *June 2009 Further Notice*, and the purpose of the *Further Notice* was to determine whether or not to adopt rules and policies implementing the tentative findings. The outcome was not preordained. *See Bd. of Governors of Fed. Reserve Sys. v. MCorp Fin., Inc.*, 502 U.S. 32, 40-41 (1991) (the "possibility" that the outcome may be unfavorable to the debtor does not justify staying a regulatory enforcement proceeding).

FN189. *See New York v. Mirant New York, Inc.*, 300 B.R. 174, 179-81 (S.D. N.Y. 2003) (regulatory exception to the automatic stay applied to entry of a consent decree requiring the debtor to bring its plant into compliance with Clean Air Act and state environmental laws, notwithstanding the debtor's argument that it would have to expend millions of dollars to comply with state's consent decree).

FN190. *DBSD Petition* at 3.

FN191. Letter from Sprint Nextel, WT Docket 02-55, filed June 25, 2008, at 7 n.24.

FN192. The public policy test distinguishes between proceedings that effectuate public policy and those that adjudicate private rights. *See NLRB v. Edward Cooper Painting, Inc.*, 804 F.2d 934, 942 (6th Cir. 1986).

FN193. *DBSD Petition* at 2.

FN194. *Sprint v. New ICO Satellite Services*, Case No. 1:08cv651 (E.D. Va. Aug. 29, 2008).

FN195. *DSBD Comments* at 9-13; *DBSD Reply* at 3-5.

FN196. *ICO Global August 2 Ex Parte Letter* at 8-10.

FN197. *Sprint Reply* at 17-20.

FN198. *Sprint August 6 Ex Parte Letter* at 3-4.

FN199. *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 219 (1998) (Scalia J. concurring); *Celtronix Telemetry, Inc. v. FCC*, 272 F.3d 585, 588 (D.C. Cir. 2001).

## APPENDIX A

### Final Regulatory Flexibility Analysis

**\*29** 1. As required by the Regulatory Flexibility Act of 1980, as amended (RFA),[FN1] an Initial Regulatory Flexibility Analysis (IRFA) was incorporated in the *Further Notice of Proposed Rule Making* (*FNPRM*).[FN2] The Commission sought written public comment on the proposals in the *FNPRM*, including comment on the IRFA.[FN3] No commenting parties specifically addressed the IRFA. This present Final Regulatory Flexibility Analysis (FRFA) conforms to the RFA.[FN4]

**A. Need for, and Objectives of, the Proposed Rules.**
2. In this Fifth Report and Order, Eleventh Report and Order, and Sixth Report and Order and Declaratory Ruling (collectively, Report and Order), we modify and clarify the Commission's requirements for the new entrants to the 1990-2025 MHz band to share the cost of relocating the incumbent BAS licensees from that band. The BAS incumbents have been removed from the 1990-2025 MHz band to make way for Sprint Nextel, MSS entrants, and future AWS licensees. Sprint Nextel, who will occupy the 1990-1995 MHz spectrum, completed relocation of the BAS incumbents from the band on July 15, 2010. The MSS entrants (DBSD and TerreStar), who will occupy the 2000-2020 MHz spectrum, have both launched satellites. The AWS licenses for the 1995-2000 MHz and 2020-2025 MHz bands have not yet been issued.

3. The cost sharing requirements for the BAS relocation must be modified because circumstances surrounding the relocation have significantly changed since the requirements were adopted. When the current cost sharing requirements were adopted in 2004,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Sprint Nextel was expected to have completed the BAS transition by September 7, 2007; one or both of the MSS entrants was expected to have entered the band and incurred a cost sharing obligation to Sprint; the reconfiguration of the 800 MHz band, which Sprint Nextel was also undertaking, would have been completed by June 26, 2008; and Sprint Nextel was expected to be able to receive credit for the BAS relocation costs not reimbursed by MSS and AWS licenses toward the value of spectrum it was receiving. None of these assumptions has in fact been correct. Furthermore, the current requirements have a number of ambiguities, such as not specifying a standard for determining how MSS and AWS incur a cost sharing obligation to Sprint Nextel and not specifying when reimbursement of BAS relocation expenses is to occur.

4. The Report and Order concludes that Sprint Nextel may not both receive reimbursement for cost sharing from other new entrants and receive credit for the same relocation costs against the value of the spectrum it is receiving. The MSS and AWS entrants can incur a relocation obligation until the band relocation rules sunset on December 9, 2013. The Report and Order further concludes that an MSS entrant will incur an obligation to reimburse Sprint for BAS relocation costs when it certifies that its satellite is operational for purposes of meeting its operational milestone. As for AWS licensees, the Report and Order concludes that AWS entrants will incur a cost sharing obligation upon grant of their long form application for their licenses. The Report and Order decrees that Sprint Nextel may provide a new entrant with documentation of the relocation expenses for which reimbursement is owed only after the new entrant has "entered the band" and therefore incurred a cost sharing obligation. The new entrant will then have thirty days to pay the amount owed Sprint Nextel, unless the parties agree to a different schedule.

*30 5. In addition, the Report and Order concludes that the MSS entrants' reimbursement obligation to Sprint Nextel should continue to be limited to a *pro rata* share of the costs of relocating BAS in the thirty largest markets (by population) and all fixed BAS links. The Report and Order requires Sprint Nextel to share with other new entrants from whom it is seeking reimbursement, information about its relocation cost as documented in its annual external audit and as Sprint Nextel provides to the Transition Administrator of the 800 MHz transition, copies of frequency relocation agreements that it has with any BAS incumbent for which it is seeking cost sharing, and third-party audited statements of expenses associated with the BAS relocation.

**B. Legal Basis.**
6. The proposed action is taken pursuant to Sections 4(i), 301, 303(c), 303(f), 303(g), 303(r), 303(y), and 332 of the Communications Act of 1934, as amended, 47 U.S.C. §§ 154(i), 301, 303(c), 303(f), 303(g), 303(r), 303(y), and 332.

**C. Description and Estimate of the Number of Small Entities to Which the Proposed Rules Will Apply.**
7. The RFA directs agencies to provide a description of and, where feasible, an estimate of the number of small entities that may be affected by the proposed rules, if adopted.[FN5] The RFA generally defines the term "small entity" as having the same meaning as the terms "small business," "small organization," and "small governmental jurisdiction."[FN6] In addition, the term "small business" has the same meaning as the term "small business concern" under the Small Business Act.[FN7] A small business concern is one which: (1) is independently owned and operated; (2) is not dominant in its field of operation; and (3) satisfies any additional criteria established by the SBA.[FN8]

8. The proposed rule modifications will affect the interest of the new entrants to the 1990-2025 MHz band: MSS, Sprint Nextel, and future AWS entrants to the band.

9. *MSS.* There are two MSS operators in the 1990-2110 MHz band. These operators will provide services using the 2000-2020 MHz portion of the band. The SBA has developed a small business size for Satellite Telecommunications, which consist of all companies having annual revenues of less than $15 million.[FN9] Neither of the two MSS operators currently has revenues because, while they both have operational satellites, they are not providing commercial service. However, given that as of December 31, 2008, these MSS operators had assets of $1.341 billion and $664 million, respectively, we expect that both of these companies will have annual revenue of over $15 million once they are able to offer commercial services.[FN10] Consequently, we find that neither

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

MSS operator is a small business. Small businesses often do not have the financial ability to become MSS system operators due to high implementation costs associated with launching and operating satellite systems and services.

**\*31 10. *Wireless Telecommunications Carriers (except Satellite)*.** Since 2007, the Census Bureau has placed wireless firms within this new, broad, economic census category.[FN11] Prior to that time, such firms were within the now-superseded categories of "Paging" and "Cellular and Other Wireless Telecommunications."[FN12] Under the present and prior categories, the SBA has deemed a wireless business to be small if it has 1,500 or fewer employees.[FN13] Because Census Bureau data are not yet available for the new category, we will estimate small business prevalence using the prior categories and associated data. For the category of Paging, data for 2002 show that there were 807 firms that operated for the entire year.[FN14] Of this total, 804 firms had employment of 999 or fewer employees, and three firms had employment of 1,000 employees or more.[FN15] For the category of Cellular and Other Wireless Telecommunications, data for 2002 show that there were 1,397 firms that operated for the entire year.[FN16] Of this total, 1,378 firms had employment of 999 or fewer employees, and 19 firms had employment of 1,000 employees or more.[FN17] Thus, we estimate that the majority of wireless firms are small.

11. **AWS.** The AWS licenses have not been issued and the Commission has no definite plans to issue these licenses. Presumably some of the businesses which will eventually obtain AWS licenses will be small businesses. However, we have no means to estimate how many of these licenses will be small businesses.

12. **Sprint Nextel.** Sprint Nextel as a new entrant to the band will occupy spectrum from 1990-1995 MHz. The Third Report and Order grants Sprint Nextel a waiver of the deadline by which it must relocate the BAS, CARS, and LTTS incumbents from the 1990-2025 MHz portion of the band. Sprint Nextel belongs to the SBA category Wireless Telecommunications Carriers (except satellite).[FN18] Businesses in this category are considered small if they have fewer than 1500 employees.[FN19] As of December 31, 2009 Sprint Nextel had about 40000 employees.[FN20] Consequently, we find that Sprint

Nextel is not a small business.

**D. Description of Projected Reporting, Recordkeeping, and Other Compliance Requirements for Small Entities.**
13. The Report and Order clarifies the existing obligation of new entrants to reimburse the party who relocates BAS incumbents for a portion of the relocation costs. It specifies that an AWS entrant incurs a cost sharing obligation upon grant of the long-form application for its license and an MSS entrant incurs an obligation when it certifies that its satellite is operational for purposes of meeting its operational milestone. The reimbursement obligation continues until the December 9, 2013 band sunset date. The Report and Order also specifies when payment of relocation cost is due.

**E. Steps Taken to Minimize the Significant Economic Impact on Small Entities, and Significant Alternatives Considered.**
**\*32 14.** The RFA requires an agency to describe any significant alternatives that it has considered in reaching its proposed approach, which may include the following four alternatives (among others): (1) the establishment of differing compliance or reporting requirements or timetables that take into account the resources available to small entities; (2) the clarification, consolidation, or simplification of compliance or reporting requirements under the rule for small entities; (3) the use of performance, rather than design, standards; and (4) an exemption from coverage of the rule, or any part thereof, for small entities.[FN21]

15. Most of the decisions in the Report and Order address cost sharing obligations between the MSS entrants, future AWS entrants, and Sprint Nextel for relocating the BAS incumbents. Of these new entrants only the future AWS entrants may be small entities. Because no licensing scheme for the AWS spectrum has been determined, we are unable to determine how many (if any) of these future licensees may be small entities. It is also difficult to determine how the impact of the cost sharing rules on them may be reduced.

16. All of the new entrants benefit from the clarity that the Report and Order brings to the cost sharing rules. The new entrants can now be certain how they incur a cost sharing obligation, what expenses are eligible for cost sharing, when they must make pay-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

ment, and when the obligation will end if they do not
incur a cost sharing obligation (*i.e.* they do not enter
the band by the sunset date). In this way the cost
sharing requirements adopted in the Report and Order
benefit those future AWS entrants who may be small
entities.

17. Under the cost sharing rules, Sprint Nextel may
receive cost sharing from the other new entrants to
the band. One possible alternative to lessen the im-
pact on new entrants who are small entities would be
to reduce the amount that small entities are required
to reimburse other entrants for the BAS relocation.
This would in effect require Sprint Nextel to subsi-
dize the small entities. This would be unfair because
Sprint Nextel did not volunteer to subsidize the small
entities, the small entities would likely be direct
competitors of Sprint Nextel, and Sprint Nextel has
spent a large sum of money on the BAS transition.
Sprint Nextel is only receiving 5 megahertz of the 35
megahertz of spectrum and up to this point has
shouldered the entire cost of the BAS transition. Not
requiring the future AWS entrants who are small en-
tities to pay their share of the relocation cost would
also harm the Commission's future relocation poli-
cies. In the future licensees are not likely to volunteer
to relocate incumbents if they are forced to subsidize
other licensees.

18. Another alternative would be to let the small enti-
ties pay their cost sharing obligation on the install-
ment plan.[FN22] Allowing use of installment pay-
ments would in effect make the party who relocated
the incumbents a creditor of the small entity. This
would be more costly for the party who relocated the
incumbents because they will receive payment later.
It would also subject the relocating party to increased
risk of non-payment. There is also no record as to
what specific installment plan could be adopted.

**\*33** 19. Because of these drawbacks, we do not be-
lieve either of these alternatives is appropriate. Fur-
thermore, because no AWS licenses have been issued
no small entities currently have a cost sharing obliga-
tion for the BAS transition. When AWS licenses are
issued at some future date, the potential licensees will
know for certain that they face a cost sharing liability
because of the refinement of the cost sharing rules
adopted in this Report and Order.

**F. Federal Rules that May Duplicate, Overlap or**

**Conflict with the Proposed Rules.**

20. None.

FN1. *See* 5 U.S.C. § 603. The RFA, *see* 5 U.S.C. §§
601-612, has been amended by the Small Business
Regulatory Enforcement Fairness Act of 1996
(SBREFA), Pub. L. No. 104-121, Title II, 110 Stat.
857 (1996).

FN2. *See* Improving Public Safety Communications
in the 800 MHz Band, WT Docket No. 02-55, ET
Docket No. 00-258 and ET Docket No. 95-18, *Report
and Order and Order and Further Notice of Pro-
posed Rulemaking*, 24 FCC Rcd 7904 Appendix C
(2009).

FN3. *See Id.* at ¶ 1.

FN4. *See* 5 U.S.C. § 604.

FN5. 5 U.S.C. § 603(b)(3).

FN6. 5 U.S.C. § 601(6).

FN7. 5 U.S.C. § 601(3) (incorporating by reference
the definition of "small business concern" in 15
U.S.C. § 632). Pursuant to the RFA, the statutory
definition of a small business applies "unless an
agency, after consultation with the Office of Advo-
cacy of the Small Business Administration and after
opportunity for public comment, establishes one or
more definitions of such term which are appropriate
to the activities of the agency and publishes such
definition(s) in the Federal Register." 5 U.S.C. §
601(3).

FN8. Small Business Act, 15 U.S.C. § 632 (1996).

FN9. 13 C.F.R. § 121.201, NAICS Code 517410.

FN10. TerreStar Corp., SEC Form 10-K 2008 Annual
Report, filed March 12, 2009 at F-2; ICO Global
Communications (Holdings) Limited, SEC Form 10-
K 2008 Annual Report, filed March 31, 2009 at 52.
ICO's subsidiary which controls its satellite covering
the United States is currently in bankruptcy. ICO
Global Communications (Holdings) Limited, Form 8-
K, filed May 15, 2009.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN11. U.S. Census Bureau, 2007 NAICS Definitions, "517210 Wireless Telecommunications Categories (Except Satellite)"; http://www.census.gov/naics/2007/def/ND517210.HTM#N517210.

FN12. U.S. Census Bureau, 2002 NAICS Definitions, "517211 Paging"; http://www.census.gov/epcd/naics02/def/NDEF517.HTM.; U.S. Census Bureau, 2002 NAICS Definitions, "517212 Cellular and Other Wireless Telecommunications"; http://www.census.gov/epcd/naics02/def/NDEF517.HTM.

FN13. 13 C.F.R. § 121.201, NAICS code 517210 (2007 NAICS). The now-superseded, pre-2007 C.F.R. citations were 13 C.F.R. § 121.201, NAICS codes 517211 and 517212 (referring to the 2002 NAICS).

FN14. U.S. Census Bureau, 2002 Economic Census, Subject Series: Information, "Establishment and Firm Size (Including Legal Form of Organization," Table 5, NAICS code 517211 (issued Nov. 2005).

FN15. Id. The census data do not provide a more precise estimate of the number of firms that have employment of 1,500 or fewer employees; the largest category provided is for firms with "1000 employees or more."

FN16. U.S. Census Bureau, 2002 Economic Census, Subject Series: Information, "Establishment and Firm Size (Including Legal Form of Organization," Table 5, NAICS code 517212 (issued Nov. 2005).

FN17. Id. The census data do not provide a more precise estimate of the number of firms that have employment of 1,500 or fewer employees; the largest category provided is for firms with "1000 employees or more."

FN18. 13 C.F.R. § 121.201, NAICS Code 517210.

FN19. Id.

FN20. Sprint Nextel Corp., SEC Form 10-K 2009 Annual Report, filed Feb. 26, 2010 at 12.

FN21. See 5 U.S.C. § 603(c).

FN22. We rejected requiring the MSS entrants to pay their obligation under an installment plan. See ¶ 66, supra.

## STATEMENT OF COMMISSIONER MIGNON L. CLYBURN APPROVING IN PART; CONCURRING IN PART

*34 Re: Improving Public Safety Communications in the 800 MHz Band, WT Docket No. 02-55; Amendment of Section 2.106 of the Commission's Rules to Allocate Spectrum at 2 GHz for use by the Mobile Satellite Service, ET Docket No. 95-18

While I approve of most of the findings in this item, I respectfully concur. In my opinion, the Commission has a strong institutional interest in ensuring that its relocation and cost reimbursement policies are correctly applied to the specific factual issues in this case. Therefore, while I respect that my colleagues may reasonably conclude otherwise, I believe that the public interest would have been better advanced by having the Commission decide the particular issue of whether ICO Global is liable to Sprint Nextel.

51 Communications Reg. (P&F) 839, 2010 WL 3806390 (F.C.C.)
END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.