ARNALL GOLDEN GREGORY LLP
171 17th Street N.W.
Suite 2100
Atlanta, Georgia 30363
Telephone: (404) 873-8500
Facsimile: (404) 873-8121
Darryl S. Laddin (DL-5130)
Frank N. White
Matthew T. Covell

*Counsel for Sprint Nextel Corporation*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| TERRESTAR NETWORKS, INC. *et al.*, | : | Case No. 10-15446 (SHL) |
| | : | (Jointly Administered) |
| Debtors. | : | |
| | : | |

---------------------------------------------------------------x

| | | |
|---|---|---|
| | : | |
| SPRINT NEXTEL CORPORATION, and | : | |
| OFFICIAL COMMITTEE OF UNSECURED | : | Adv. Pro. No. 10-05461 |
| CREDITORS OF TERRESTAR NETWORKS, | : | |
| INC., *et al.*, | : | |
| | : | |
| Plaintiff and Plaintiff-Intervenor, | : | |
| | : | |
| v. | : | |
| | : | |
| U.S. BANK NATIONAL ASSOCIATION, | : | |
| in its capacity as Indenture Trustee and Collateral | : | |
| Agent for the 15.0% Senior Secured Payment-In- | : | |
| Kind Notes due 2014, AD HOC GROUP OF | : | |
| NOTEHOLDERS OF 15% SECURED NOTES, | : | |
| and TERRESTAR NETWORKS, INC., *et al.,* | : | |
| | : | |
| Defendant and Defendant-Intervenors. | : | |

---------------------------------------------------------------x

**MEMORANDUM OF LAW IN SUPPORT OF**
**PLAINTIFF SPRINT NEXTEL CORPORATION'S**
**MOTION FOR PARTIAL SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ...................................................................................................... 1

II. STATEMENT OF UNDISPUTED, MATERIAL FACTS ............................................. 3

    A. The Parties ........................................................................................................ 3

    B. The Debtors' FCC Licenses and Related Obligations ........................................... 3

    C. The Liens Provided to the Senior Secured Noteholders ...................................... 5

    D. Sprint Nextel's Claims Against the Debtors ........................................................ 6

    E. The Bankruptcy Cases ....................................................................................... 14

III. ARGUMENT AND CITATION OF AUTHORITIES .................................................. 16

    A. Count I: Under Existing Law, An FCC Licensee May Not Grant A Lien On Its FCC License ............................................................................................. 17

    B. Count II: As A Matter of Undisputed Fact and Established Law, Any Purported Lien on Proceeds of the Debtors' FCC Licenses Has Not Attached, And Cannot Attach, To Proceeds Or Value Generated By The Licenses Post-Petition ........................................................................................ 20

        1. If the Debtors propose an alternate plan of reorganization, there will be no "proceeds" to which a purported lien can attach, under the express terms of the Security Agreement ......................................... 21

        2. No lien can attach to "proceeds" of the FCC Licenses under applicable New York UCC law ............................................................ 22

        3. Section 552 of the Code prevents any pre-petition lien from attaching to any post-petition proceeds of the FCC Licenses ................. 28

    C. Count IV: To The Extent Any Pre-Petition Lien Granted To U.S. Bank Attaches Post-Petition to Proceeds or Value Of The FCC Licenses, Then Any Such Lien Is Subordinate To The Claim of Sprint Nextel .......................... 32

IV. CONCLUSION ...................................................................................................... 34

**<u>TABLE OF AUTHORITIES</u>**

**<u>Cases</u>**

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986) ........................................... 16, 17

Astoria Federal Sav. and Loan Ass'n v. Solimino, 501 U.S. 104 (1991) ..................... 12

Badillo v. Tower Ins. Co. of New York, 92 N.Y.2d 790 (1999) ................................. 24

Brandoff v. Empire Blue Cross & Blue Shield, 707 N.Y.S.2d 291 (N.Y.Civ.Ct. 1999).............. 24

Butner v. United States., 440 U.S. 48 (1979) ............................................... 23

Capital Nat'l Bank of N.Y. v. McDonald's Corp., 625 F. Supp. 874 (S.D.N.Y. 1986) .............. 23

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) ............................................... 17

Craner v. Marine Midland Bank (In re Craner), 110 B.R. 111, 118 (Bankr. N.D.N.Y. 1988), <u>rev'd in part on other grounds</u>, 110 B. R. 124 (N.D.N.Y. 1989)................................. 29

D'Amico v. City of New York, 132 F.3d 145 (2d Cir. 1998) ..................................... 17

Diener v. Diener, 696 N.Y.S.2d 755 (N.Y.Sup.Ct. 1999) ........................................ 24

Eastern Milk Producers Cooperative Assoc., Inc. v. Marine Midland Bank, 486 N.Y.S.2d 497 (N.Y. App. Div. 1985) ...................................................................... 24

First Nat'l Bank of Spearville v. Klenke (In re Klenke), Adv. Pro. No. 01-13051, 2004 WL 2192517 (Bankr. D. Kan. Feb. 3, 2004) ..................................................... 30

Globalnet Financial.com, Inc. v. Frank Crystal & Co., 449 F.3d 377 (2d Cir. 2006) ................. 17

In re Cheskey, 9 F.C.C.R. 986, 1994 WL 54752 (Feb. 24, 1994) ................................ 26

In re Crystal Apparel, Inc., 220 B.R. 806 (Bankr. S.D.N.Y. 1998)............................. 16

In re Delco Oil, Inc., 365 B.R. 246 (Bankr. M.D. Fla. 2007) ................................. 25

In re Fraden, 317 B.R. 24 (Bankr. D. Mass. 2004).......................................... 30

In re Jones, Case No. 09-09415 (Bankr. W.D. Mich. April 22, 2010) ........................ 23

In re Keneco Fin. Group, Inc., 131 B.R. 90 (Bankr. N.D. Ill. 1991) ........................... 29

In re Kids Creek Partners, 210 B.R. 547 (Bankr. N.D. Ill. 1997), <u>aff'd</u>, 1997 WL 627652 (N.D. Ill. Oct. 2, 1997).................................................................... 30

In re Ledis, 259 B.R. 472 (Bankr. D. Mass. 2001) ......................................... 25

In re Media Prop., Inc., 311 B.R. 244 (Bankr. W.D. Wis. 2004) .............................. 18

In re Merkley, 94 F.C.C.2d 829, 1983 WL 182883 (July 11, 1983) ........................... 18

In re Mintz, 192 B.R. 313 (Bankr. D. Mass. 1996) ......................................... 25

In re Ridgely Commc'ns, Inc., 139 B.R. 374 (Bankr. D. Md. 1992)............................ 19

In re Smith, 94 B.R. 220 (Bankr. M.D. Ga. 1988)........................................... 19

In re Tak Communications, Inc., 985 F.2d 916 (7th Cir. 1993) .............................. 28, 33

In re UAL Corp., 351 B.R. 916 (Bankr. N.D. Ill. 2006)................................................ 25

In re Welch, 3 F.C.C.R. 6502, 1988 WL 489137 (Nov. 14, 1988)............................... 18

Kidd Communications v. FCC, 427 F.3d 1 (D.C. Cir 2005) ......................................... 18

KMA I v. Pu (In re Food Mgmt. Corp.), Adv. Pro. No. 06-08470 (ASH), 2008 WL
    2788738 (Bankr. S.D.N.Y. July 16, 2008)............................................................... 25

Lamie v. U.S. Trustee, 540 U.S. 526 (2004) ................................................................ 29

Law Research Serv., Inc. v. Martin Lutz Appellate Printers, Inc., 498 F.2d 836 (2d Cir.
    1974)........................................................................................................................ 23

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986)................... 16

McDaniel v. 162 Columbia Heights Housing Corps., 863 N.Y.S.2d 346 (N.Y.Sup.Ct.
    2008)........................................................................................................................ 24

MLQ Investors, L.P. v. Pac. Quadracasting, Inc., 146 F.3d 746 (9th Cir. 1998) .................. 19, 33

Nat'l Labor Relations Bd. v. Donna-Lee Sportswear Co., Inc., 836 F.2d 31 (1st Cir. 1987)....... 12

New Jersey Div. of Taxation v. United Trust Bank (In re Chris-Don, Inc.), 367 F. Supp.
    2d 696 (D.N.J. 2005)............................................................................................... 30

Nobelman v. American Savings Bank, 508 U.S. 324 (1993) ....................................... 23

Opals on Ice Lingerie v. Body Lines Inc., 320 F.3d 362 (2d Cir. 2003) ............................... 16, 17

Orix Credit Alliance, Inc. v. Mills (In re Beach Television Partners), 38 F.3d 535 (11th
    Cir. 1994)................................................................................................................. 19

Radice Corp. v. First Nat'l Bank of Boston (In re Radice Corp.), 88 B.R. 422 (Bankr.
    S.D. Fla. 1988)........................................................................................................ 30

Spectrum Scan LLC v. Valley Bank and Trust Co.  (In re Tracy Broadcasting
    Corporation), 438 B.R. 323 (Bankr. Colo. 2010) ................................. 18, 26, 27, 31

Stathos v. Murphy, 276 N.Y.S.2d 727 (N.Y. App. Div. 1966) .................................... 23

Stephens Indus., Inc. v. McClung, 789 F.2d 386 (6th Cir. 1986)................................. 18

Teledesic LLC v. FCC, 275 F.3d 75 (D.C. Cir. 2001)................................................. 34

Vankirk v. Boyer (In re Barnes), 258 B.R. 712 (Bankr. N.D. Ind. 2000), rev'd on other
    grounds, 276 F.3d 927 (7th Cir. 2002)................................................................... 29

Woodman v. WWOR-TV, Inc., 411 F.3d 69 (2d Cir. 2005) ....................................... 16

**Rules and Statutes**

11 U.S.C. § 506(a)(1)................................................................................................... 32

11 U.S.C. § 552(a) ....................................................................................................... 28

11 U.S.C. § 552(b)(1) .................................................................................................. 29

47 U.S.C. § 337(f)......................................................................................................... 6

Fed. R. Bankr. P. 7056................................................................................................. 16

Fed. R. Civ. P. 56(e) ................................................................................ 17

N.Y. U.C.C. § 9-101(64) .......................................................................... 24

N.Y.U.C.C. § 9-102(64) ........................................................................... 24

N.Y.U.C.C. § 9-203(b)(2) ......................................................................... 32

**Articles and Reports**

Alan P. Solow & Randall L. Klein, Section 552 - Post-Petition Liens on Future Income
    Streams, 1995 ANN. SURV. BANKR. L. 49 ........................................... 19

Erwin G. Krasnow & John Wells King, Financing a Station in Tough Times,
    RADIOWORLD.COM, March 30, 2009 .................................................. 19

Frank Montero, Security Interests in FCC Licenses: A Key to Unlocking Capital
    Sources?, CommLawBlog, Nov. 7, 2008 ............................................. 19

New York State Law Revision Commission, Report on the Proposed Revised Article 9
    (Secured Transactions) of the Uniform Commercial Code (2001) ......................... 32

Timothy F. Boyce, Collateralizing Nonassignable Contracts, Licenses, and Permits:  Half
    a Loaf is Better Than No Loaf, 52 BUS. L. 559 (Feb. 1997) ............................ 25

Plaintiff Sprint Nextel Corporation ("**Sprint Nextel**") submits this Memorandum of Law in support of its accompanying Motion for Summary Judgment on three of the four counts of its Complaint for Declaratory Relief in this proceeding, Counts I, II and IV.[1] In support of its Motion, Sprint Nextel respectfully shows the Court as follows:

## I.     INTRODUCTION

In this adversary proceeding, Sprint Nextel seeks a declaration that any security interests granted by Debtor Terrestar Networks, Inc. ("**TSN**") and certain of its affiliates in licenses, authorizations, waivers, permits and other related regulatory approvals (collectively, the "**FCC Licenses**") granted by the Federal Communications Commission (the "**FCC**"), or in the proceeds or value derived from the FCC Licenses, are invalid and/or unenforceable.[2]

Prior to filing for bankruptcy protection, TSN and its affiliates purported to grant a security interest in the FCC Licenses and any proceeds thereof to Defendant U.S. Bank National Association ("**U.S. Bank**") as Collateral Agent for certain Senior Secured Noteholders (as defined herein). Established law, however, prohibits the grant of a security interest in the FCC Licenses. In addition, and as a matter of applicable UCC law, any purported pre-petition lien on the proceeds of the FCC Licenses has never attached to any such proceeds (because such proceeds have never existed), and in any event cannot attach to any proceeds or value derived from the FCC Licenses after the filing of bankruptcy cases by TSN and its affiliates, by operation of section 552 of the Bankruptcy Code. The FCC Licenses, and any proceeds or value

---

[1]     Sprint Nextel does not seek entry of summary judgment at this time as to Count III of its Complaint. If the Court grants judgment in favor of Sprint Nextel as a matter of law on Counts I and II or Count IV, as requested in its Motion, and thereby concludes that any purported liens are invalid, unenforceable and/or subject to subordination in any event, it need never address Count III, which seeks invalidation of such liens on equitable grounds.

[2]     In this regard, this proceeding is an express challenge to the stipulations and admissions contained in ¶ 4 of the Final Order (I) Authorizing Debtors to Obtain Post-Petition Financing; (II) Authorizing the Debtors to Use Cash Collateral; and (III) Granting Adequate Protection to Pre-Petition Secured Parties (the "**DIP Financing Order**") entered in the Bankruptcy Case on November 18, 2010.

thereof, are therefore unencumbered assets. Moreover, even if a security interest could be granted in and attach to the FCC Licenses or the proceeds thereof, that security interest is required, as a matter of federal regulation in the public interest, to be subordinated to obligations imposed by the FCC, including the sizeable reimbursement obligation owed to Sprint Nextel which is described in more detail below.

While Sprint Nextel is entitled to the requested relief as a matter of law, the Court is currently addressing this adversary proceeding in something of a procedural vacuum. The Debtors originally proposed a Joint Chapter 11 Plan (the "**Plan**") that proposed to transfer substantially all of the value of the Debtors' FCC Licenses, which the Debtors concede is their most significant asset, to the Senior Secured Noteholders, even though the Senior Secured Noteholders have no valid or enforceable security interest in the FCC Licenses. The Debtors' original Plan has since been withdrawn, and it is uncertain at this point whether the Debtors will propose an alternate plan of reorganization or seek to transfer substantially all of their assets to a purchaser pursuant to a sale under section 363 of the Code. Whichever course they ultimately choose to pursue, however, the Debtors will no doubt seek – as they did in the Plan – to confer substantially all of the value of their FCC Licenses to the Senior Secured Noteholders, despite the absence of a valid or enforceable security interest in the FCC Licenses.

Conferring substantially all of the value of the FCC Licenses to the Senior Secured Noteholders will directly and substantially harm Sprint Nextel, a significant unsecured creditor in these cases. As discussed in more detail below, Sprint Nextel has a reimbursement claim of more than $104 million against the Debtors. Because the FCC Licenses are unencumbered, Sprint Nextel is entitled to share in any distribution of value derived from the FCC Licenses on at least a *pari passu* basis with the Senior Secured Noteholders. Whether the Debtors ultimately

propose another plan of reorganization or pursue a section 363 sale of their assets, Sprint Nextel is entitled to a declaration that any purported pre-petition liens on the proceeds of the Debtors' FCC Licenses either (a) do not attach to proceeds or value generated by the FCC Licenses post-petition as a matter of law, or (b) are subordinate to the claim of Sprint Nextel.

## II.   STATEMENT OF UNDISPUTED, MATERIAL FACTS[3]

### A.   The Parties

Plaintiff Sprint Nextel is a wireless telecommunications carrier.  As described in more detail herein, Sprint Nextel is a significant unsecured creditor of the Debtors.  After Sprint Nextel filed its Complaint in this proceeding, the Official Committee of Unsecured Creditors of Terrestar Networks, Inc. duly appointed in the related Chapter 11 cases (the "**Committee**") intervened as an additional Plaintiff herein.

Defendant U.S. Bank is a national banking association chartered under the laws of the United States of America and is an insured depository institution as defined in section 3 of the Federal Depository Insurance Act, 12 U.S.C. § 1813.  After Sprint Nextel filed its Complaint in this proceeding, both the Debtors and the Senior Secured Noteholders (as defined herein) intervened as additional Defendants herein.

### B.   The Debtors' FCC Licenses and Related Obligations

Collectively, the Debtors and their affiliates, including parent TerreStar Corporation, are a provider of mobile satellite services ("**MSS**").  To provide MSS, the Debtors obtained various licenses and authorizations from the FCC.  The FCC Licenses include a license (the "**S-Band License**") to use 20 MHz of spectrum in the 2 GHz spectrum band (commonly known as the "**S-**

---

[3]      Record support for each of the factual assertions contained herein is set forth in the separate Plaintiff Sprint Nextel Corporation's Statement of Material Facts As To Which There Is No Genuine Issue To Be Tried, which is filed contemporaneously herewith pursuant to Local Bankruptcy Rule 7056-1(b).

**Band**").[4]

Starting in the late 1990s, the FCC began assigning certain portions of spectrum (or "band") for the use of MSS operators and their anticipated MSS systems; however, the band was already occupied by unrelated Broadcast Auxiliary Service ("**BAS**") entities (consequently known as "**BAS Incumbents**"). The BAS Incumbents, most of which were television broadcasters, used integrated transmitters, receivers, and related equipment for electronic newsgathering to provide programming such as breaking news, live sports, and real-time weather information. The FCC designated certain other spectrum to which the 2 GHz MSS Licenses would relocate the BAS Incumbents in order to clear the bands designated for MSS operations.

Pursuant to its longstanding spectrum management policy, the FCC held that MSS operators such as the Debtors had to bear the costs required to move the BAS Incumbents to the new band (this process is generally referred to as the "**BAS Relocation**"). The relocation of the BAS Incumbents to the new band would result in clearance of those portions of the spectrum where the BAS Incumbents previously operated so as to make that spectrum available for use by the entering MSS operators, like the Debtors.

To prevent "free riders" if a later entrant came into the band after the band had been cleared of BAS Incumbents by an earlier entrant, the FCC required that the later entrant pay a *pro rata* share of the costs expended to clear that portion of the spectrum. This arrangement was intended to comport with the FCC's long-standing spectrum management policy that the costs for moving incumbents into other portions of the band should be borne by any entrants that subsequently utilize and enjoy the benefit of that portion of the cleared spectrum. Indeed, in proceedings before the FCC in 1999, TerreStar's predecessor, TMI Communications and

---

[4] The S-Band License is currently held by Terrestar License, Inc. ("**TLI**"), a wholly-owned subsidiary of Debtor Terrestar Networks, Inc. ("**TSN**"). TLI has no ongoing operations and was formed solely to hold licenses and related regulatory approvals granted by the FCC.

Company, L.P., stated that "equity requires" that entities benefitting from the clearing of BAS Incumbents "should . . . share in the financial burdens of the relocation of [these] licensees."

The Debtors' independent obligation to relocate BAS Incumbents from the S-Band spectrum was described as follows in the annual report for the fiscal year ending December 31, 2007 of Debtor Terrestar Corporation:

> In the United States, our operations at the 2GHz MSS S-band are subject to successful relocation of existing broadcast auxiliary service ("BAS") licensees and other terrestrial licensees in the band. Costs associated with spectrum clearing could be substantial.

Thus, as acknowledged by Terrestar Corporation, the Debtors' operations and use of the S-Band spectrum pursuant to the FCC Licenses were and are completely dependent upon the completion of the BAS Relocation. Nonetheless, and as further detailed below, the Debtors have sat on their hands since the late 1990s, and have never undertaken any efforts of their own to clear BAS Incumbents from the S-Band spectrum.

### C.       The Liens Provided to the Senior Secured Noteholders

U.S. Bank is the Indenture Trustee under an Indenture (together with any amendments, supplements or modifications thereto, the "**Indenture**") dated as of February 14, 2007, among TSN, as issuer, the guarantors from time to time a party thereto, and U.S. Bank as Indenture Trustee, pursuant to which TSN issued $500,000,000 aggregate principal amount of its 15% Senior Secured PIK Notes due 2014 (the "**Senior Secured Notes**"). Pursuant to a security agreement dated February 14, 2007 (the "**Security Agreement**"), among TSN, as issuer, and TLI and Debtor TerreStar National Services Inc. ("**TNSI**"), as guarantors, in favor of U.S. Bank as Collateral Agent for the holders of the Senior Secured Notes (the "**Senior Secured Noteholders**"), TSN, TLI and TNSI purported to grant a lien upon certain of their assets. Both the Indenture and the Security Agreement are expressly "governed by, and [to be] construed in

accordance with, the laws of the state of New York."

In recognition of the prohibition against granting security interests in FCC licenses under

applicable law, the Security Agreement provides as follows:

> [S]uch security interest does not include at any time any FCC License to the
> extent (but only to the extent) that at such time the Collateral Agent may not
> validly possess a security interest directly in the FCC License pursuant to
> applicable Federal law . . . but such security interest does include at all times all
> proceeds of the FCC Licenses, and the right to receive all monies, consideration
> and proceeds derived from or in connection with the sale, assignment, transfer, or
> other disposition of the FCC Licenses.

In addition, the Offering Memorandum that was circulated to potential investors in the Senior

Secured Notes disclosed certain "Risk Factors," including the following:

> The ability of the collateral agent to foreclose on certain of the collateral securing
> the notes may be limited by U.S. . . . laws and certain agreements.  Current FCC
> policy prohibits the grant of a security interest in an FCC radio frequency license
> or authorization.   . . . As a result, even if we obtain our FCC . . . licenses,
> authorizations or approvals in principle, holders of the notes will not have a direct
> security interest in these licenses and authorizations.

> Your rights in the collateral may be adversely affected by the failure to perfect
> security interests in certain collateral acquired in the future.   Applicable law
> requires that certain property and rights acquired after the grant of a general
> security interest can only be perfected at the time such property and rights are
> acquired and identified.

### D.      Sprint Nextel's Claims Against the Debtors

Sprint Nextel is not an MSS licensee; rather it provides land-based mobile wireless

services.  In 2004, in circumstances unrelated to the BAS Relocation mandated by the FCC for

MSS providers, Sprint Nextel began to address certain complaints of interference between

commercial wireless providers, like Sprint Nextel, and public safety communications[5]

operations, largely due to the close proximity of their licensed operations.

---

[5]       "Public safety communications" is a term of art and is defined in 47 U.S.C. § 337(f).  Public safety
communications include communications among police officers, ambulances, fire departments or other first
responders.

By an order issued in 2004, the FCC addressed the increasing amounts of interference experienced by public safety communications systems in the 800 MHz spectrum band. *Improving Public Safety Communications in the 800 MHz Band,* Fifth Report and Order, Fourth Memorandum Opinion and Order, and Order, 19 FCC Rcd. 14969 (2004) ("***2004 Public Safety Order***"). The FCC's *2004 Public Safety Order* called for the reconfiguration of the 800 MHz band to create newly-designed, contiguous blocks of public safety spectrum placed with sufficient separation from other radio and cellular radio operations. To facilitate this reconfiguration, Sprint Nextel agreed to relinquish certain of its own 800 MHz spectrum and to accept certain other 800 MHz reconfiguration responsibilities in return for the FCC granting Sprint Nextel new spectrum in the 1.9 GHz band, adjacent to the MSS licensees, that was also occupied by the BAS Incumbents.

In connection with Sprint Nextel's reconfiguration responsibilities, the FCC reaffirmed the MSS licensees' independent obligation to relocate the BAS Incumbents. (*2004 Public Safety Order* at ¶¶ 250, 264 (noting that the "MSS licensees will retain the option of accelerating the clearing of [BAS markets] so that they could begin operations before [Sprint] Nextel has completed nationwide clearing" and, as a result, holding that each of the 2 GHz MSS licensees would have "its own relocation and reimbursement obligations to BAS incumbents").) In addition to reaffirming the longstanding obligation of the MSS licensees to relocate the BAS Incumbents in the *2004 Public Safety Order*, the FCC also obligated Sprint Nextel to relocate the BAS Incumbents.

Under nearly two decades of FCC rules and policies, subsequent entrants must reimburse the party that clears the band for a *pro rata* portion of the band relocation costs. These rules ensure that subsequent entrants into a band are not "free riders," unfairly forcing the initial

entrant to assume the entire cost of clearing the band.  In this case, the FCC did not know, as of 2004, which of the parties obligated to clear the BAS Incumbents would perform the work. Accordingly, the FCC sought to ensure that every beneficiary of the relocation paid its fair share to the party undertaking the relocation activities, whoever that happened to be.  If Sprint Nextel performed the laborious and costly work of relocating the BAS Incumbents, then each of the MSS licensees would have to pay its *pro rata* share.  Conversely, if the MSS licensees relocated the BAS Incumbents, then Sprint Nextel would be "obligated to reimburse MSS licensees for [its] *pro rata* share of the MSS licensees' relocation expenses."  (*2004 Public Safety Order* at ¶ 262.)

As it happened, only Sprint Nextel undertook to clear the BAS Incumbents from the S-Band.  Ultimately, Sprint Nextel cleared the entire 1990-2025 MHz channel block, thus clearing not only spectrum for its own use at 1190-1995 MHz, but also spectrum for use by the MSS licensees at 2000-2020 MHz.  Consistent with FCC rules and policies, Sprint Nextel sought reimbursement from the MSS licensees for their *pro rata* shares of Sprint Nextel's cost of clearing that spectrum for the MSS systems.  The FCC applied its longstanding reimbursement policies to the BAS relocation proceeding and granted Sprint Nextel's request.  In particular, the FCC ordered that Sprint Nextel could seek reimbursement from subsequently entering MSS operators for their share of Sprint Nextel's costs in clearing the BAS spectrum on a *pro rata* basis according to the amount of spectrum each MSS system is assigned.  (*2004 Public Safety Order* at ¶ 261.)

In fact, with respect to the Debtors in particular, the FCC had previously authorized the Debtors to construct, launch and operate MSS systems, but only on the express condition that they comply with BAS relocation and cost-sharing obligations.  *Amendment of Section 2.106 of*

*the Commission's Rules to Allocate Spectrum at 2 GHz for Use by the Mobile Satellite Service*, Second Report and Order and Second Memorandum Opinion and Order, 15 FCC Rcd. 12315, ¶ 71 (2000) ("Subsequently entering MSS licensees . . . will, <u>as a condition of their licenses</u>, compensate the first entrant on a *pro rata* basis, according to the amount of spectrum the subsequently entering licensees are authorized to use.") (emphasis added); <u>id.</u> at ¶¶ 67, 69 ("All MSS licensees who benefit from relocation of BAS are responsible for contributing, <u>as a condition of their licenses</u>.") (emphasis added).

In March 2006, Sprint Nextel provided notice to the FCC of its intent to seek reimbursement from the MSS licensees as provided for in the *2004 Public Safety Order.* Thereafter, Sprint Nextel also provided the MSS licensees with invoices for their *pro rata* shares of the BAS Relocation costs.

On June 25, 2008, after its prior demands for reimbursement were essentially ignored, Sprint Nextel commenced a lawsuit against TSN and another MSS licensee in the United States District Court for the Eastern District of Virginia (Case No. 1:08-cv-651) to enforce its right to reimbursement of *pro rata* costs incurred in the BAS Relocation (the "**Reimbursement Litigation**"). The Reimbursement Litigation was stayed after the Virginia District Court referred certain issues to the FCC, as the regulatory body with primary jurisdiction over the subject matter, for clarification.

On June 12, 2009, pursuant to the referral from the Virginia District Court, the FCC issued an order and a Further Notice of Proposed Rulemaking providing further rulings with respect to the BAS Relocation proceeding. *Improving Public Safety Communications in the 800 MHz Band; Consolidating the 800 and 900 MHz Industrial/Land Transportation and Business Pool Channels*, Report and Order and Order and Further Notice of Proposed Rulemaking, 24

FCC Rcd 7904 (2009) ("*2009 Public Safety Order*").

Among other preliminary conclusions in the *2009 Public Safety Order*, the FCC made the following findings:

- The FCC concluded that "MSS operators . . . will have an <u>obligation</u> to share, on a *pro rata* basis, in the costs associated with the relocation of BAS incumbents if they 'enter the band' prior to December 9, 2013." (*Id.* at ¶¶ 2 (emphasis added), 46.)

- "Successful completion of [BAS relocation] does not rest with any one party but requires the cooperation of the incumbents and all new entrants, acting in good faith, to assume responsibility for the relocation process so that all may benefit." (*Id.* at ¶ 4.)

- "When the decision was made to permit Sprint Nextel to use the 1990-1995 MHz band, no BAS licensees had yet been relocated and there was no evidence that any meaningful relocation negotiations had taken place between BAS licensees and MSS entrants. . . . Sprint Nextel remains the sole entity actively undertaking [BAS] relocations." (*Id.* at ¶¶ 10, 28.)

- "Sprint Nextel has made considerable progress in the BAS relocation process that has proven to be a more complex undertaking than any party may have initially anticipated." (*Id.* at ¶ 29.)

- The FCC rejected MSS licensee arguments that their reimbursement obligations arbitrarily terminated on June 26, 2008 (the originally anticipated benchmark for completing 800 MHz reconfiguration), stating such arguments ignore "the stated purposes and structure of the cost-sharing principles set forth in the *800 MHz R&O* and other decisions regarding the shared responsibilities of new entrants for BAS relocation." (*Id.* at ¶ 77.)

- "Nothing in the text of the relevant orders suggests that the Commission limited the time in which Sprint Nextel could seek reimbursements from MSS entrants to provide an independent benefit to MSS entrants, *e.g.,* to subsidize them or provide them certainty about their business costs. Thus, we find that the MSS entrants' cost sharing obligations must be interpreted in light of the unanticipated changed circumstances, and these obligations should not be tied to a deadline that is no longer relevant." (*Id.* at ¶ 80.)

After consideration of further briefing and argument by Sprint Nextel, the Debtors and the other interested MSS provider, on September 29, 2010, the FCC issued its final decision with respect to the referral from the Virginia District Court and the related rulemaking. *Improving*

*Public Safety Communications in the 800 MHz Band; Consolidating the 800 and 900 MHz Industrial/Land Transportation and Business Pool Channels*, Fifth Report and Order, Eleventh Report and Order, Sixth Report and Order, and Declaratory Ruling, FCC 10-179 (2010) ("***2010 Declaratory Ruling and Order***").

The *2010 Declaratory Ruling and Order* resolved all of the issues and arguments raised by the Debtors and the other MSS provider in the Reimbursement Litigation, which issues and arguments at least certain of the Defendants are expected to raise again in this proceeding. Specifically, the *2010 Declaratory Ruling and Order* affirmed many of the findings and tentative conclusions of the FCC's *2009 Order and FNPRM* and rejected arguments asserted by the Debtors and the other MSS operator in the S-Band to avoid the reimbursement obligation to Sprint Nextel. In particular, the FCC stated: "Terrestar's argument is based on a fundamental misreading of the Commission's orders. . . . [I]t was not reasonable for TerreStar to believe that it would escape all BAS relocation costs. We find that fairness as well as our well-established cost sharing principles dictate that all of the new entrants should bear the burden of the increased cost and complexity of the BAS transition and not just Sprint Nextel." (*2010 Declaratory Ruling and Order* at ¶ 27.)

The FCC further recognized that to allow MSS operators to evade their reimbursement obligations would be contrary to public policy, stating: "One of the important underlying principles of the relocation policy is that licensees that ultimately benefit from the spectrum cleared by the first entrant shall bear the cost of reimbursing the first entrant for the accrual of that benefit. We are concerned that were we to stray from the traditional application of the *Emerging Technologies* relocation policy, future licensees might be unwilling or unable to assume the burden and cost of clearing spectrum quickly if they were unsure of the likelihood

that they will be reimbursed by other new entrants." (*Id.* at ¶ 41.)

In the *2010 Declaratory Ruling and Order*, the FCC also made the following conclusions, which are preclusive and binding upon the parties to this proceeding:[6]

- MSS entrants must reimburse Sprint Nextel if they "enter the band" before December 9, 2013. (*Id.* at ¶ 42.)

- An MSS operator "enters the band" for purposes of triggering reimbursement obligations to Sprint Nextel when the MSS operator certifies under its required operational milestone that its satellite is operational. (*Id.*)

- In comments to the FCC, the Debtors conceded that they would be liable for 100% of their *pro rata* reimbursement costs if the FCC adopted December 9, 2013 as the cutoff date for the reimbursement obligation to Sprint Nextel [which the FCC did]. (*Id.* at ¶ 18.)

- When the FCC imposed the obligation to relocate BAS Incumbents on Sprint Nextel in 2004 "it explicitly kept in place the [independent] obligation for the MSS entrants to relocate the BAS incumbents and to share in the cost of Sprint Nextel's relocation efforts." (*Id.* at ¶ 22.)

- The entities directly liable for the reimbursement obligation to Sprint Nextel include not only the corporate entity holding the FCC system license, but all other entities directly involved in, in control of, or otherwise integrated into the operation of the MSS system as affiliates or part of a common enterprise. (*Id.* at ¶¶ 29, 33-36.)

- To allow MSS operators to evade their reimbursement obligations would be contrary to public policy: "One of the important underlying principles of the relocation policy is that licensees that ultimately benefit from the spectrum cleared by the first entrant shall bear the cost of reimbursing the first entrant for

---

[6]    The doctrines of *res judicata* and collateral estoppel apply to agency determinations when the agency is acting in an adjudicative capacity, and principles of judicial economy and fairness to successful litigants are equally applicable in the context of administrative proceedings. *See, e.g.*, Astoria Federal Sav. and Loan Ass'n v. Solimino, 501 U.S. 104, 107 (1991). In the present case, these issues have been heavily litigated by the Debtors and Sprint Nextel over many years, both before the FCC and in the Reimbursement Litigation, which was in turn referred to the FCC as the regulatory body with primary jurisdiction over the subject matter. The parties have had every opportunity before the FCC to file briefs, make arguments and otherwise be heard on every aspect of the dispute. (In Docket No. 02-55 alone, the Debtors made a total of 47 filings with the FCC. *See* TerreStar filings in FCC Docket No. 02-55 at http://tinyurl.com/5szmz4l. In Docket No. 00-258, which also culminated in the FCC's issuance of the *2010 Declaratory Ruling and Order*, the Debtors made another 59 filings with the FCC. *See* TerreStar filings in FCC Docket No. 00-258 at http://tinyurl.com/6cshnbj.) The FCC's findings and conclusions are therefore binding and conclusive as to Sprint Nextel, the Debtors and any other parties with derivative interests, including U. S. Bank and the Senior Secured Noteholders. *See, e.g.,* Nat'l Labor Relations Bd. v. Donna-Lee Sportswear Co., Inc., 836 F.2d 31, 34-35 (1st Cir. 1987) (collateral estoppel applies both to parties to original proceeding and "privies of those parties" whose interests "cannot be disassociated" from the interests of an original party).

the accrual of that benefit. We are concerned that were we to stray from the traditional application of the *Emerging Technologies* relocation policy, future licensees might be unwilling or unable to assume the burden and cost of clearing spectrum quickly if they were unsure of the likelihood that they will be reimbursed by other new entrants." (*Id*. at ¶ 41.)

• The FCC rejected arguments by the MSS providers that they should not be required to reimburse Sprint Nextel because they had been harmed by delays in completion of the BAS Relocation. In rejecting this argument, the FCC concluded that Sprint Nextel has diligently pursued the BAS Relocation and that the MSS providers had not been harmed by any delay. The FCC stated further: "Given the unanticipated complexities of the BAS transition, we do not believe it is appropriate to penalize the party who has undertaken the difficult task of band clearing at the expense of those who will receive the benefit of the cleared spectrum – particularly when the BAS relocation had been moribund for the four years that MSS entrants had the sole responsibility to clear BAS. In the absence of Sprint Nextel, the MSS entrants most likely would have experienced similar complexities and delays in relocating BAS incumbents while also having to shoulder a financial obligation far more burdensome than any cost sharing obligation they may have to Sprint Nextel." (*Id*. at ¶¶ 26, 57-58.)

• To preclude new entrants from evading the payment of the reimbursement obligation by entering into transactions with third parties, if a new entrant seeks to assign its license to a third party, the assignor and assignee will be jointly and severally liable for the reimbursement obligation. (*Id*. at ¶ 63.)

The Debtors certified that their satellite was operational on or about July 20, 2009, thereby triggering their reimbursement obligation to Sprint Nextel pursuant to, *inter alia*, the FCC's definitive *2010 Declaratory Ruling and Order*. Sprint Nextel completed the BAS Relocation on July 15, 2010, and shouldered the entire cost of the BAS Relocation effort, approximately $750 Million.

By completing the BAS Relocation, Sprint Nextel allowed the Debtors to avoid substantial upfront costs, subject to their reimbursement obligation to Sprint Nextel. Sprint Nextel now occupies little more than 14% of the cleared S-Band spectrum formerly occupied by the BAS Incumbents, while the Debtors and another MSS provider collectively occupy more than 58% of that spectrum. Nonetheless, Sprint Nextel contends that the Debtors' *pro rata* share of the BAS Relocation Costs required to be reimbursed to Sprint Nextel, specific to their portion

of the S-Band spectrum, is approximately $104 Million, or less than 14% of the total cost of the BAS Relocation.[7]

The Debtors and their lenders, including the Senior Secured Noteholders, have long been aware of the potential need to reimburse Sprint Nextel for costs associated with the BAS Relocation. Beginning with the annual report for the fiscal year ending December 31, 2005, the annual reports filed by Terrestar Corporation or its predecessors in interest have consistently disclosed the potential reimbursement obligation owed to Sprint Nextel. For instance, the annual report filed by Terrestar Corporation (then known as Motient Corporation) for fiscal year 2005 states as follows:

> To the extent that [Sprint] Nextel complies with its band clearing obligations, 2 GHz MSS entrants commencing operations after Nextel has cleared the band would not have to clear the band themselves, but could still have obligations to reimburse Nextel for certain of its band clearing costs. . . . We cannot predict what these band-clearing costs will be to TMI and/or TerreStar, if any, but they could range from $0 to in excess of $100 million.

Similar statements have been made in the annual reports filed for subsequent years.

### E.     The Bankruptcy Cases

On October 19, 2010 (the "**Petition Date**"), the Debtors each filed a petition for relief under chapter 11 of the Bankruptcy Code, thereby commencing their respective chapter 11 cases. The Debtors are managing their properties and operating their businesses as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. The chapter 11 cases are being jointly administered for procedural purposes.

On November 18, 2010 the Court entered the DIP Financing Order. The DIP Financing

---

[7]     The specifics of Sprint Nextel's reimbursement claims against the Debtors for their pro rata share of the spectrum clearing costs are set forth in Sprint Nextel's Claim Nos. 49, 50, 51, 52, 66, 67, 68, 69, 70, 79, 80, 81 and 82 (the "Sprint POCs") filed in the Debtor's Chapter 11 cases. The Debtors have filed an objection to the Sprint POCs that is being litigated simultaneously with this proceeding.

Order expressly recognizes that Sprint Nextel has standing to bring this adversary proceeding to challenge the liens on the FCC Licenses and proceeds thereof purportedly granted to U.S. Bank as Collateral Agent for the Senior Secured Noteholders.

On November 5, 2010, the Debtors filed a Disclosure Statement for the Debtors' Joint Chapter 11 Plan (as amended on December 28, 2010, the "**Disclosure Statement**") and the Plan itself. The Plan proposed to distribute substantially all of the Debtors' aggregate value, in the form of 97% of their New Common Stock and Rights Offering Preferred Stock, to the Senior Secured Noteholders. The distribution scheme created by the Plan was premised on the existence of valid, perfected security interests in the FCC Licenses and any proceeds thereof.

In the Disclosure Statement, the Debtors acknowledged that their 20 MHz portion of the S-Band spectrum, for which they have paid not a penny to date, "is among [their] most critical assets." In fact, based largely on a valuation methodology that was expressed as a multiple of megahertz population, the Debtors stated that the value of the S-Band spectrum that they are entitled to utilize under their FCC Licenses represents between $1.02 Billion and $1.28 Billion – or some 95% – of their overall reorganization value of between $1.07 Billion and $1.37 Billion.

On February 16, 2011, the Debtors voluntarily withdrew the Plan. Based on statements by the Debtors during recent conferences with this Court, Sprint Nextel understands that the Debtors are currently in the process of determining whether to propose an alternate plan of reorganization or seek to sell substantially all of their assets to a purchaser under section 363 of the Code. Whichever course they ultimately choose to pursue, however, the Debtors will no doubt seek – as they did in the Plan – to confer substantially all of the value of their FCC Licenses to the Senior Secured Noteholders, notwithstanding the fact that there is no valid or enforceable security interest in the FCC Licenses to justify such a result.

Sprint Nextel disputes the existence, validity and enforceability of the liens on the FCC Licenses and proceeds thereof purportedly granted to U.S. Bank as Collateral Agent for the Senior Secured Noteholders. Because Sprint Nextel has direct reimbursement claims against each entity that comprises the Debtors' MSS system, including the entity that holds the FCC Licenses, Sprint Nextel's recovery in this Chapter 11 case will increase significantly if the liens in the FCC Licenses or the proceeds thereof are declared invalid or subordinate to the claims owed to Sprint Nextel.

### III.    ARGUMENT AND CITATION OF AUTHORITIES

Summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Bankr. P. 7056. *See also, e.g.*, Woodman v. WWOR-TV, Inc., 411 F.3d 69, 75 (2d Cir. 2005); Opals on Ice Lingerie v. Body Lines Inc., 320 F.3d 362, 367-68 (2d Cir. 2003); In re Crystal Apparel, Inc., 220 B.R. 806, 812 (Bankr. S.D.N.Y. 1998). The substantive law governing the case will determine those facts that are "material;" only factual disputes that might affect the result of the proceeding under the governing law are material. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); In re Crystal Apparel, Inc., 220 B.R. at 812. Disputes about material facts are "genuine" only if the evidence is such that a reasonable fact finder could return a verdict for the non-moving party. Anderson, 477 U.S. at 248.

In opposing summary judgment, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the materials facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Rather, the non-moving party must produce specific facts indicating that there is a genuine issue for trial. Id. at 587; Anderson, 477 U.S. at 248; Globalnet Financial.com, Inc. v. Frank Crystal & Co., 449 F.3d 377, 382 (2d Cir. 2006);

D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir. 1998); Fed. R. Civ. P. 56(e) . Conclusory statements, conjecture or speculation by the non-moving party will not defeat summary judgment. Opals on Ice Lingerie, 320 F.3d at 370 n.3. In that regard, summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

In the present case, there is no dispute between the parties that the Senior Secured Noteholders are creditors of the Debtors. Rather, the central issue in this proceeding is whether the Senior Secured Noteholders are *secured* creditors or *unsecured* creditors of those entities, at least with respect to any proceeds or value derived from the FCC Licenses.

A.   **Count I: Under Existing Law, An FCC Licensee May Not Grant A Lien On Its FCC License.**

In Count I of its Complaint in this proceeding, Sprint Nextel seeks a declaration that any liens granted by the Debtors in favor of the Senior Secured Noteholders do not and cannot attach to the FCC Licenses themselves. The Security Agreement grants liens on the Debtors' assets in favor of the Senior Secured Noteholders, but with the explicit exception that "such security interest does not include at any time any FCC License to the extent (but only to the extent) that at such time the Collateral Agent may not validly possess a security interest directly in the FCC License pursuant to applicable Federal law." Fundamentally then, the question of whether a lien has ever existed on the FCC Licenses is entirely a function of what is permitted under "applicable Federal law."

At the same time, federal non-bankruptcy law is explicit on this point: a licensee may not grant a lien on its FCC License. Section 301 of the Federal Communications Act makes clear that the Government maintains control of the airwaves by giving permission "for the use of such

channels, but not the ownership thereof." 47 U.S.C. § 301. Similarly, Section 310 of the Act prohibits the "transfer[,] assign[ment], or dispos[al] of [an FCC license] in any manner, voluntarily or involuntarily, directly or indirectly, or by transfer of control of any corporation holding such permit or license, to any person except upon application to the [FCC] . . . ." 47 U.S.C. § 310(d).

The prohibition on "assigning" interests in FCC licenses is more than simple agency policy; it reflects that, as a matter of law, there is no underlying property interest in such licenses that can be assigned. *See* Spectrum Scan LLC v. Valley Bank and Trust Co. (In re Tracy Broadcasting Corporation), 438 B.R. 323, 327-328 (Bankr. Colo. 2010) (quoting Kidd Communications v. FCC, 427 F.3d 1, 5 (D.C. Cir 2005) ("[A]n FCC broadcast license itself may not be subject to a security interest. This is settled law. An FCC license 'as distinguished from a station's physical assets, is not subject to mortgage, security interest or lien.'")); In re Merkley, 94 F.C.C.2d 829, 1983 WL 182883 at *2 (July 11, 1983) (a broadcast license "is not an owned asset or vested property interest so as to be subject to a mortgage, lien, pledge, attachment, seizure, or similar property right"); *see also* In re Media Prop., Inc., 311 B.R. 244, 247 (Bankr. W.D. Wis. 2004) ("47 U.S.C. § 301 and 47 U.S.C. § 304 provide that a broadcast license…does not convey a property interest."); In re Welch, 3 F.C.C.R. 6502, 1988 WL 489137 at *3-4 (Nov. 14, 1988) (discussing history of prohibition on property interests in licenses originating in 1927 predecessor to current law).

Moreover, given that there is no underlying property right in an FCC license, courts have consistently concluded that a licensee cannot legally grant a security interest in the license itself to a lender. *See* Stephens Indus., Inc. v. McClung, 789 F.2d 386, 390 (6th Cir. 1986) (allowing sale of assets without regard to purported security interest in FCC license because it is not an

owned asset or a vested property interest); <u>In re Smith</u>, 94 B.R. 220, 221-22 (Bankr. M.D. Ga. 1988) (allowing trustee to assign FCC license over purportedly-secured creditor's objection). Indeed, the courts have consistently upheld the FCC's control over FCC licenses and its prohibition on a licensee encumbering them in favor of creditors. *See e.g.*, <u>MLQ Investors, L.P. v. Pac. Quadracasting, Inc.</u>, 146 F.3d 746, 748 (9th Cir. 1998) ("[T]he FCC may prohibit security interests in licenses themselves because the creation of such an interest could result in foreclosure and transfer of the license without FCC approval. Such approval is necessary to regulate the airwaves in the public interest."); <u>Orix Credit Alliance, Inc. v. Mills (In re Beach Television Partners)</u>, 38 F.3d 535, 537 (11th Cir. 1994) ("courts typically have held that security interests in broadcast licenses are invalid"); <u>In re Ridgely Commc'ns, Inc.</u>, 139 B.R. 374, 376 (Bankr. D. Md. 1992) ("The general policy of the FCC is that a lender/creditor may not perfect a security interest in a broadcast license.").

The prohibition on encumbering an FCC license is also widely recognized in the broadcasting and commercial lending industries. *See* Alan P. Solow & Randall L. Klein, <u>Section 552 - Post-Petition Liens on Future Income Streams</u>, 1995 ANN. SURV. BANKR. L. 49 ("Traditionally, the FCC has prohibited security interests in FCC licenses based on its desire to control who may become a holder of a FCC license."); *see also* Erwin G. Krasnow & John Wells King, <u>Financing a Station in Tough Times</u>, RADIOWORLD.COM, March 30, 2009, available at http://www.radioworld.com/article/77280 ("it is true that the FCC prohibits taking a security interest in the actual license"); Frank Montero, <u>Security Interests in FCC Licenses: A Key to Unlocking Capital Sources?</u>, CommLawBlog, Nov. 7, 2008, available at http://tinyurl.com/4mgbk65 ("For decades the Federal Communications Commission has refused, as a matter of policy, to allow lenders and equity investors to take security interests in

the FCC licenses….").

In the present case, too, the Debtors conceded in the Offering Memorandum that was circulated to potential investors, and the Senior Secured Noteholders have thus always been aware, that "[c]urrent FCC policy prohibits the grant of a security interest in an FCC radio frequency license or authorization," and therefore "holders of the notes will not have a direct security interest in [the Debtors'] licenses and authorizations."

In short, there can be no legitimate dispute in this case that "applicable Federal law" prevented in 2007, and prevents now, any of the Debtors from granting any security interests in, or liens on, their FCC Licenses.  Accordingly, Sprint Nextel is entitled to summary judgment on Count I of its Complaint in this proceeding, and a declaration that, as a matter of law, any purported pre-petition liens granted in favor of the Senior Secured Noteholders do not attach to the Debtors' FCC Licenses.

 **B. Count II: As A Matter of Undisputed Fact and Established Law, Any Purported Lien on Proceeds of the Debtors' FCC Licenses Has Not Attached, And Cannot Attach, To Proceeds Or Value Generated By The Licenses Post-Petition.**

In Count II of its Complaint in this proceeding, Sprint Nextel requests a declaration that any pre-petition security interest granted in favor of the Senior Secured Noteholders also cannot attach to any proceeds or value generated by the FCC Licenses post-petition.

In pertinent part, the Security Agreement for the Senior Secured Notes provides as follows:

> [S]uch security interest does not include at any time any FCC License to the extent (but only to the extent) that at such time the Collateral Agent may not validly possess a security interest directly in the FCC License pursuant to applicable Federal law . . . but such security interest does include at all times all proceeds of the FCC Licenses, and the right to receive all monies, consideration and proceeds derived from or in connection with the sale, assignment, transfer, or other disposition of the FCC Licenses.

Thus, while the Security Agreement effectively acknowledges that the Debtors could not grant a lien upon the FCC Licenses themselves, it does purport to provide a lien on any proceeds of those licenses.

For a number of separate and independent reasons, however, this provision of the Security Agreement cannot give the Senior Secured Noteholders an enforceable post-petition lien on any proceeds or other value generated by the FCC Licenses in this case. This is the case, too, regardless of whether the Debtors propose an alternate plan of reorganization or pursue a sale of their assets under section 363 of the Code.

      1.      **If the Debtors propose an alternate plan of reorganization, there will be no "proceeds" to which a purported lien can attach, under the express terms of the Security Agreement.**

First, and if the Debtors ultimately propose an alternate plan of reorganization, the relevant provision of the Security Agreement will not be implicated, and will not otherwise apply to any existing set of circumstances. The provision expressly purports to grant a security interest only in "all monies, consideration and proceeds derived from or in connection with *the sale, assignment, transfer, or other disposition* of the FCC Licenses" (emphasis added). But if the Debtors propose another plan that provides for the bulk of the stock in the reorganized Debtors to be held by the Senior Secured Noteholders, no "sale, assignment, transfer, or other disposition of the FCC Licenses" will have occurred in the Debtors' bankruptcy cases. Consequently, no "proceeds" of the FCC Licenses subject to any interest that is purported to be granted to the Senior Secured Noteholders in the Security Agreement will exist in this case, or can possibly serve as a basis for the grant of virtually all of the equity in the reorganized Debtors to the Senior Secured Noteholders.

Nor can this grant of virtually all of the equity in the reorganized Debtors be justified

because the Senior Secured Noteholders have a post-petition security interest in some other form of value derived from the FCC Licenses. On its face, the Security Agreement does not even purport to grant an interest in any other FCC License-related value. Rather, the lien that is purported to be granted in that document attaches only to "proceeds" that derived from a "sale, assignment, transfer, or other disposition of the FCC Licenses," which – in the event the Debtors propose another plan – will not occur.

On its face, therefore, the Security Agreement does not even purport to grant any security interest in favor of the Senior Secured Noteholders that would apply in the event that the Debtors propose an alternate plan of reorganization that grants equity to the Senior Secured Noteholders. In that event, and for this reason alone, Sprint Nextel is entitled to summary judgment on Count II of its Complaint in this proceeding, and a declaration that, as a matter of undisputed fact, any purported pre-petition liens granted in favor of the Senior Secured Noteholders cannot attach to any post-petition proceeds or other value derived from the Debtors' FCC Licenses.

   2.     **No lien can attach to "proceeds" of the FCC Licenses under applicable New York UCC law.**

Second, and whether the Debtors ultimately propose an alternate plan of reorganization or a sale of their assets under section 363 of the Code, no lien can attach to "proceeds" of the FCC Licenses under established and applicable New York law. Indeed, even if a lien on proceeds of an FCC license could be characterized as a lien on a general intangible, the lien does not attach at the time the security interest was granted, and in instances such as this one, can never attach.

Under New York law, which expressly governs the Security Agreement at issue in this

case,[8] a right must be "sufficiently choate" for a lien to attach to a general intangible. Capital Nat'l Bank of N.Y. v. McDonald's Corp., 625 F. Supp. 874, 879 (S.D.N.Y. 1986) ("[T]he assignment of a truly future claim or interest does not work a present transfer of property. It does not because it cannot; no property yet exists.") (quoting Stathos v. Murphy, 276 N.Y.S.2d 727, 730 (N.Y. App. Div. 1966)). In Capital Nat'l Bank, the court noted that at the time the security interest was granted "there was no reason to believe" the legal claims at issue would actually arise, and as such could not "constitute . . . collateral." Capital Nat'l Bank, 625 F. Supp. at 879. Where the future right to payment is inchoate, the security interest in the general intangible does not attach until the right accrues. Law Research Serv., Inc. v. Martin Lutz Appellate Printers, Inc., 498 F.2d 836, 838 (2d Cir. 1974) ("Under New York law . . . the assignment of an existing right creates an immediate lien in favor of the assignee that is valid against later lien creditors of the assignor. The assignment of a future right, on the other hand, creates a lien that attaches only at such time as the right accrues.").

The UCC, adopted by the State of New York on July 1, 2001, defines Proceeds (except as used in Section 9-609(b)) as the following property:

> whatever is acquired upon the sale, lease, license, exchange, or other disposition of collateral;

> whatever is collection on, or distributed on account of, collateral;

> rights arising out of collateral;

---

[8]    In making determinations regarding interests in property, it is well-established that Bankruptcy Courts are required to apply relevant state law. *See, e.g.*, Nobelman v. American Savings Bank, 508 U.S. 324, 329 (1993) ("In the absence of a controlling federal rule, we generally assume that Congress has 'left the determination of property rights in the assets of a bankrupt's estate to state law . . . .'"); Butner v. United States., 440 U.S. 48, 54-57 (1979) ("Property interests are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding."); In re Jones, Case No. 09-09415 (Docket No. 31) (Bankr. W.D. Mich. April 22, 2010) ("[U]nder well-established precedent, *state* law defines property rights and generally supplies the rule of decision in bankruptcy proceedings . . . .") (emphasis in original).

to the extent of the value _of collateral_, claims arising out of the loss, nonconformity, or interference with the use of, defects or infringement of rights in, or damage to, _the collateral_; or

to the extent of the value _of collateral_ and to the extent payable to the debtor or the secured party, insurance payable by reason of the loss or nonconformity of, defects or infringement of rights in, or damage to, _the collateral_.

N.Y.U.C.C. § 9-102(64) (emphasis added).

Thus, under the New York UCC, there are no "Proceeds" (a) unless there is collateral, and (b) until that collateral is disposed of. N.Y. U.C.C. § 9-101(64); _see also_ Official Comment # 13(d) to § 9-102(64) (To be proceeds, "[i]t is necessary only that the property be traceable, directly or indirectly, to the original collateral"); Official Comment # 6 to § 9-322 to the UCC Article 9 revision (under UCC § 9-203, "a security interest in proceeds of original collateral does not attach and is not perfected until the proceeds come into existence and the debtor acquires rights in them"); Badillo v. Tower Ins. Co. of New York, 92 N.Y.2d 790, 794 (1999) ("The UCC also protects the rights of a secured creditor by according it an interest in property that the debtor receives as replacement for the encumbered property.") (emphasis added); Eastern Milk Producers Cooperative Assoc., Inc. v. Marine Midland Bank, 486 N.Y.S.2d 497, 498 (N.Y. App. Div. 1985) (proceeds of dairy cattle included money derived from sale of milk); McDaniel v. 162 Columbia Heights Housing Corps., 863 N.Y.S.2d 346, 351 (N.Y.Sup.Ct. 2008) ("since plaintiff does not possess a security interest . . . the fact that a security interest . . . continues in proceeds upon the disposition of collateral pursuant to UCC-9-315 is of no moment"); Diener v. Diener, 696 N.Y.S.2d 755, 756 (N.Y.Sup.Ct. 1999) (referencing the Black's Law Dictionary definition of proceeds as "money or articles or other thing of value arising or obtained by the sale of property"); Brandoff v. Empire Blue Cross & Blue Shield, 707 N.Y.S.2d 291, 295 (N.Y.Civ.Ct. 1999) (contemplating proceeds as requiring a "disposition of collateral").

Even bankruptcy courts, which sometimes ascribe a broader meaning to "proceeds" than exists under state law, limit the term's scope to property that "arises when collateral is converted from one form into another."  <u>In re UAL Corp.</u>, 351 B.R. 916, 925 (Bankr. N.D. Ill. 2006).  For example, Judge Hardin highlighted the bounds of "proceeds" in <u>KMA I v. Pu (In re Food Mgmt. Corp.)</u>:

> Further, the Wolfson letter does not even purport to create a lien on any existing property - it is merely an instruction to pay Pu "out of [the] <u>proceeds</u> from the abovementioned closing" (emphasis added).  But, there was no closing of any kind between the Gianopouloses and any company controlled by Mr. Patel, and accordingly there never were any "proceeds."  Consequently, there was no property to which a lien could attach.  Even assuming that there could be a lien on non-existent future property that never came into existence (an obviously impossible assumption), the supposititious "lien" created thereby was never perfected.

Adv. Pro. No. 06-08470 (ASH), 2008 WL 2788738 at *4 (Bankr. S.D.N.Y. July 16, 2008); *see also* <u>In re Delco Oil, Inc.</u>, 365 B.R. 246, 250 (Bankr. M.D. Fla. 2007) ("The concept of 'proceeds' is only implicated when one asset is disposed of and another is acquired as its substitute.") (internal citation and quotations omitted); <u>In re Ledis</u>, 259 B.R. 472, 478 (Bankr. D. Mass. 2001) ("the existence of 'proceeds'…only arises in the wake of the debtor selling, exchanging, or otherwise disposing of collateral with a resultant conversion of that collateral"); <u>In re Mintz</u>, 192 B.R. 313, 319-20 (Bankr. D. Mass. 1996) (concluding that there must be a "disposition" of collateral property for proceeds to exist); Timothy F. Boyce, <u>Collateralizing Nonassignable Contracts, Licenses, and Permits:  Half a Loaf is Better Than No Loaf</u>, 52 BUS. L. 559, 571 (Feb. 1997) ("no court . . . has recognized a right to receive future proceeds as a separate item of collateral").

As is clear from the governing New York UCC and the cases cited herein, for there to be a valid and perfected security interest in proceeds -- indeed, for the debtor to have a property

interest in proceeds at all -- there must first be property eligible to be encumbered as collateral, and then there must be an actual disposition of that collateral. In the present case, however, neither of those conditions is met to date, and both conditions cannot be met, regardless of which course – alternate plan of reorganization or section 363 asset sale – the Debtors ultimately elect to pursue.

If the Debtors propose an alternate plan, no sale or other disposition of the FCC Licenses will occur, and thus there will be no existing "proceeds" under the UCC's definition (or under the terms of the Security Agreement itself) to which a post-petition lien in favor of the Senior Secured Noteholders can attach. Under applicable New York law, even if the lien provided to the Senior Secured Noteholders could be characterized as a lien upon a general intangible consisting of proceeds or value generated by the FCC Licenses, and even if the FCC Licenses themselves qualified as "collateral," that lien could not attach until proceeds were actually generated and the general intangible actually existed. In the context of FCC licenses, that does not occur until a transfer of the license is actually completed. *See* <u>In re Cheskey</u>, 9 F.C.C.R. 986, 1994 WL 54752 at * 2 (Feb. 24, 1994) ("The creditor has no rights over the license itself, *nor can it take any action under its security interest until there has been a transfer which yields proceeds subject to the security interest.*") (emphasis added). This point was made as well by the court in <u>Spectrum Scan LLC v. Valley Bank and Trust Co. (In re Tracy Broadcasting Corporation)</u>, 438 B.R. 323 (Bankr. Colo. 2010) when it explained as follows:

> The Debtor's right to receive value for a transfer of its License did not exist prior to the filing of its Chapter 11 case because any such "right" was too remote and was subject to two contingencies. *See Sims v. Jamison*, 67 F.2d 409 (9th Cir. 1933) (if future earnings can be said to have potential existence, they are the subject of an agreement for a lien; but the lien does not attach until the wages come into existence). First, the Debtor would have to have an agreement to transfer the License, and second, the transfer would have to be approved by the FCC. Since neither contingency had occurred pre-petition (and, indeed, neither

has occurred to date), the Debtor did not have a sufficient property interest in this contingency in order to transfer a security interest in it to the Bank.

Tracy Broadcasting, 438 B.R. at 330.

If, on the other hand, the Debtors pursue a sale of their assets under section 363, any purported lien on "proceeds" of the FCC Licenses still will not attach under applicable New York law because the FCC Licenses themselves are not encumbered "collateral," as they are required to be in order for the first condition for lien perfection to be met. *See* N.Y. U.C.C. § 9-101(64) and other authorities cited *supra*. As the court in Tracy Broadcasting aptly explained, "In the most simple analysis, anything received by the Debtor on account of a transfer of the [FCC] License post-petition would not be 'proceeds' under the UCC because the License itself could not be pledged as 'collateral.'". Tracy Broadcasting, 438 B.R. at 329.

In fact, all of the reasoning adopted by the Tracy Broadcasting court is directly applicable here. Even if the lien granted to the Senior Secured Noteholders in the proceeds of the FCC Licenses can be construed as a lien on a general intangible with priority over the reimbursement obligation owed to Sprint Nextel, that lien could not attach unless and until a sale of the FCC Licenses occurs, proceeds are generated and the general intangible exists. The Debtors admitted as much, and the Senior Secured Noteholders were made abundantly aware of this fact, in the Offering Memorandum that was circulated to potential investors in the Senior Secured Notes. *See* Offering Memorandum at p. 38 ("Applicable law requires that certain property and rights acquired after the grant of a general security interest can only be perfected at the time such property and rights are acquired and identified.").

At the same time, and even if the Debtors actually complete an asset sale, under New York UCC law, any pre-petition lien in favor of the Senior Secured Noteholders cannot attach to any proceeds or economic value generated by the Debtors' FCC licenses in any event because

the FCC Licenses are not, and cannot be, encumbered "collateral" in the first instance. As a result, the FCC licenses held by the Debtors, including the S-Band License, are unencumbered assets, and Sprint Nextel is entitled to share in any value generated by those licenses on at least a *pari passu* basis with the Senior Secured Noteholders. Indeed, the facts of this case highlight the soundness of the Seventh Circuit's decision in In re Tak Communications, Inc., 985 F.2d 916 (7th Cir. 1993), where the court pointed to the FCC's consistent and unequivocal prohibition on security interests in FCC licenses and found that "[c]redit cannot be extended in reliance upon the license as an asset from which the licensee's obligations may be satisfied." Tak, 985 F.2d at 918.

For this additional reason, Sprint Nextel is entitled to summary judgment on Count II of its Complaint in this proceeding, and a declaration that any pre-petition security interest granted in favor of the Senior Secured Noteholders cannot attach to any proceeds or value generated by the FCC Licenses in the course of these Chapter 11 cases.

**3.** **Section 552 of the Code prevents any pre-petition lien from attaching to any post-petition proceeds of the FCC Licenses.**

Third, and even if the Debtors elect to pursue a sale of assets under section 363, as a matter of settled bankruptcy law, any *pre-petition* lien purportedly granted by the Security Agreement in the present case can not attach to any *post-petition* proceeds or value derived from the FCC Licenses.

Section 552 of the Bankruptcy Code provides that "property acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case." 11 U.S.C. § 552(a). The exception to this rule applies only if the security interest created by the applicable security agreement "extends [both] to property of the debtor acquired before the commencement

of the case *and* to proceeds . . . of such property . . . ."  11 U.S.C. § 552(b)(1) (emphasis added).

Consequently, under the plain language of the statute,[9] a pre-petition secured lender has a lien on

post-petition proceeds generated by the sale of property only if the lender *also* had a lien on the

property that was sold.

Courts are therefore constrained by section 552(b)(1) to ensure that a creditor had a valid

lien on the pre-petition property from which post-petition proceeds arose – that is, the underlying

collateral – before finding that the post-petition proceeds of that property are encumbered.  *See*

Craner v. Marine Midland Bank (In re Craner), 110 B.R. 111, 118 (Bankr. N.D.N.Y. 1988),

rev'd in part on other grounds, 110 B. R. 124 (N.D.N.Y. 1989) ("Code § 552(b) is likewise

unavailing to Marine because it too only refers to pre-petition collateral that generates post-

petition proceeds.  This 'surviving' security interest does not extend to the post-petition proceeds

of property in which the creditor had no security interest pre-petition."); Vankirk v. Boyer (In re

Barnes), 258 B.R. 712 (Bankr. N.D. Ind. 2000), rev'd on other grounds, 276 F.3d 927 (7th Cir.

2002).  In Vankirk, the Bankruptcy Court explained the operation of section 552 as follows:

> The court does not accept the suggestion that even if Plaintiff's employee's lien
> cannot attach to the license it may, nonetheless, attach to the proceeds the trustees
> received when the license was sold.  Section 552 of the Bankruptcy Code
> addresses the postpetition effect of a security interest and it contemplates that
> property acquired by the estate after the date of the petition is not subject to liens
> arising out of agreements entered into prior to the case. 11 U.S.C. § 552(a).
> While there is an exception to this general rule, which will allow a lien to attach
> to the proceeds of property, for that to occur the lien must extend to both the
> property of the debtor acquired before the commencement of the case and to the
> proceeds … of such property." 11 U.S.C. § 552(b)(1).  Consequently, unless it
> first has a lien upon the property sold, a creditor will not obtain a lien upon the
> sale proceeds.

Id. at 719 n.5.  *See also* In re Keneco Fin. Group, Inc., 131 B.R. 90, 93 (Bankr. N.D. Ill. 1991)

---

[9]    Lamie v. U.S. Trustee, 540 U.S. 526, 533-35 (2004) (the Bankruptcy Code must be interpreted according to
its plain meaning).

("Thus, Section 552(b) provides that post-petition proceeds of collateral will be subject to a creditor's security interest only if the creditor has a valid pre-petition security interest in the underlying collateral."); Radice Corp. v. First Nat'l Bank of Boston (In re Radice Corp.), 88 B.R. 422, 425 (Bankr. S.D. Fla. 1988) ("Thus, by definition, a security interest in proceeds cannot be created in the absence of any lien or security interest in the underlying collateral.").

Thus, where a lender does not have a valid security interest in the property at issue – as is the case with the FCC Licenses here, as a matter of law – its pre-petition lien cannot attach to post-petition proceeds generated by that property. *See also* New Jersey Div. of Taxation v. United Trust Bank (In re Chris-Don, Inc.), 367 F. Supp. 2d 696, 700 01 (D.N.J. 2005) (reversing bankruptcy court decision and holding that creditor did not have a lien on proceeds of sale of liquor license because the license was not "property" under New Jersey law); In re Fraden, 317 B.R. 24, 39 (Bankr. D. Mass. 2004) (when state law prevents a valid lien on lottery winnings, a lien on proceeds of a winning lottery ticket is not valid post-petition); In re Kids Creek Partners, 210 B.R. 547 (Bankr. N.D. Ill. 1997), aff'd, 1997 WL 627652 (N.D. Ill. Oct. 2, 1997) (creditor could not claim security interest in post-petition proceeds from sale of real property because creditor lacked pre-petition security interest in property itself under applicable law); First Nat'l Bank of Spearville v. Klenke (In re Klenke), Adv. Pro. No. 01-13051, 2004 WL 2192517 at *6 (Bankr. D. Kan. Feb. 3, 2004) ("Because the [property in question] was not received on account of any sale, transfer or disposition of a prepetition asset or entitlement, it is not proceeds of any prepetition collateral in which [the creditor] had a security interest and is therefore not saved by the § 552(b)(1) exception.").

With respect to spectrum licenses granted by the FCC, again, this precise issue was addressed in the Tracy Broadcasting decision by the Bankruptcy Court for the District of

Colorado. In that case, as in this one, a lender to the debtor claimed that a security interest obtained pre-petition attached to any post-petition "proceeds" of the debtor's broadcast license issued by the FCC. An unsecured judgment creditor filed an adversary proceeding seeking a declaration to the contrary. Tracy Broadcasting, 438 B.R. at 325. The court framed the question presented as "a question of law: does the Bank's security interest extend to 'proceeds' received by the Trustee upon a future transfer of the Debtor's interest in the FCC license, where there was no contract for transfer of the license in existence at the time the Chapter 11 petition was filed?" Id.

In the end, the Tracy Broadcasting court answered this question in the negative, concluding that, by operation of section 552(a), the secured lender's pre-petition lien could not attach to any post-petition value generated by an FCC license. Id. at 330-331 ("[T]he Court concludes that § 552(a) of the Bankruptcy Code prohibits the Bank's security interest from encumbering any value that the estate may receive from any future transfer of the License.") In fact, while the Tracy Broadcasting case (like this case, at least at present) did not involve a sale of the FCC license that was specifically contemplated or proposed by the Debtor, the Court specifically ruled that, under section 552, any purported lien in the license could not attach even if a sale was completed in the course of the bankruptcy case: "If such an agreement to transfer the License occurred and was approved by the FCC post-petition, the Bank's security agreement could attach to any fruits of such transfer, *but for* § 552(a)'s prohibition on security interests in after-acquired property." Tracy Broadcasting, 438 B.R. at 330 (emphasis in original).[10]

---

[10]     Apart from the prohibition against security interests in FCC Licenses under 47 U.S.C. § 310, the attachment and perfection of security interests to be addressed under section 552 of the Bankruptcy Code in this case are governed by New York law. In the course of considering certain amendments to the UCC that were never enacted in that state, however, the New York State Law Revision Commission expressly alluded to the effect of section 552 of the Code in cases involving proceeds of property that is legally ineligible to be encumbered as collateral. The Commission noted that secured parties often wish to take liens in the proceeds of government-issued licenses in order to "capture the value of a going concern" in the event of a sale, but that such parties have a "current

For this additional reason, Sprint Nextel is entitled to summary judgment on Count II of its Complaint, and a declaration that, as a matter of law, any purported pre-petition liens granted in favor of the Senior Secured Noteholders cannot attach to any post-petition proceeds or other value derived from the Debtors' FCC Licenses.

**C.**     **Count IV: To The Extent Any Pre-Petition Lien Granted To U.S. Bank Attaches Post-Petition to Proceeds or Value Of The FCC Licenses, Then Any Such Lien Is Subordinate To The Claim of Sprint Nextel.**

In the alternative to Counts I and II of its Complaint,[11] Sprint Nextel seeks a declaration in Count IV of its Complaint that, to the extent any pre-petition lien granted to the Senior Secured Noteholders attaches post-petition to proceeds or value of the FCC Licenses, then any such lien must be subordinated to the reimbursement claim of Sprint Nextel.

Under Article 9 of the Uniform Commercial Code as adopted by the State of New York, a secured party can obtain no greater interest in collateral than the debtor itself holds in the collateral.  N.Y.U.C.C. § 9-203(b)(2).  *See also* id., Official Comment No. 6 ("a security interest attaches only to whatever rights a debtor may have, broad or limited as those rights may be").  Similarly, under section 506(a)(1) of the Bankruptcy Code, 11 U.S.C. § 506(a)(1), a claim is secured only to the extent of the estate's interest in the applicable property.

In the present case, the FCC authorized the Debtors to construct, launch and operate MSS systems, and the Debtors obtained their FCC Licenses, only *on the express condition* that they complete the BAS Relocation themselves, or alternately, reimburse Sprint Nextel for their *pro*

---

inability" to do so "in bankruptcy."  New York State Law Revision Commission, Report on the Proposed Revised Article 9 (Secured Transactions) of the Uniform Commercial Code (2001) at 21, 103 (available at http://tinyurl.com/665bpkb).

[11]     If the Court grants summary judgment on Counts I and II in favor of Sprint Nextel, and thereby concludes that any purported liens are invalid and/or unenforceable in any event, it need not address whether Sprint Nextel is entitled to summary judgment on its claim in Count IV for subordination of any such liens.

*rata* share of the costs incurred by Sprint Nextel to complete the BAS Relocation.[12] Accordingly, to the extent that the Debtors could grant a lien in any interest they have in the FCC Licenses or the proceeds thereof, that lien must also be conditioned upon satisfaction of the reimbursement obligation owed to Sprint Nextel.

In addition, applicable law recognizes that security interests in FCC Licenses are prohibited, because to allow such interests would interfere with the FCC's regulation of such licenses in furtherance of the public interest. *See, e.g.*, MLQ Investors, L.P. v. Pac. Quadracasting, Inc., 146 F.3d 746, 748 (9th Cir. 1998) ("[T]he FCC may prohibit security interests in licenses themselves because the creation of such an interest could result in foreclosure and transfer of the license without FCC approval. Such approval is necessary to regulate the airwaves in the public interest."); Tak Communications, 985 F.2d at 918-919. Allowing the Senior Secured Noteholders in this case to enforce liens in the FCC Licenses or the proceeds thereof, without requiring that such liens be subordinate to the conditions and obligations that the FCC – in furtherance of the public interest – has imposed upon the Debtors as the holders of those licenses, would similarly interfere with the FCC's regulation of licenses and its overriding public policy – *i.e*., encouraging first entrants into a band of spectrum through assurances that subsequent entrants will honor reimbursement obligations and not be "free riders."

The sanctity of these reimbursement obligations, in fact, is essential to the FCC's regulatory mandate. As the D.C. Circuit has noted, "the FCC is charged with regulating and

---

[12]     *Amendment of Section 2.106 of the Commission's Rules to Allocate Spectrum at 2 GHz for use by the Mobile Satellite Service*, Second Report and Order and Second Memorandum Opinion and Order, 15 FCC Rcd. 12315, ¶ 71 (2000) ("Subsequently entering MSS licensees . . . will, as a condition of their licenses, compensate the first entrant on a *pro rata* basis, according to the amount of spectrum the subsequently entering licensees are authorized to use.") (emphasis added); *Amendment of Section 2.106 of the Commission's Rules to Allocate Spectrum at 2 GHz For Use by the Mobile-Satellite Service,* Second Report and Order and Second Memorandum Opinion and Order, 15 FCC Rcd. 19403, ¶¶ 67, 69, 71 (2000) ("All MSS licensees who benefit from relocation of BAS are responsible for contributing, as a condition of their licenses.") (emphasis added).

overseeing radio spectrum," including making "efforts to reallocate one portion of the spectrum to accommodate an ascendant and promising technology." Teledesic LLC v. FCC, 275 F.3d 75, 79 (D.C. Cir. 2001). Without such a cost-sharing requirement, no new entrant will want to take the lead in clearing a band, thereby delaying and even blocking Congressional and FCC efforts to introduce new wireless services. In its *2010 Declaratory Ruling and Order,* in fact, the FCC stated that it is expressly in the public interest for Sprint Nextel to be reimbursed for its costs incurred in clearing the spectrum band occupied by the Debtors. *2010 Declaratory Ruling and Order* at ¶ 41 (Otherwise, "[f]uture licensees might be unwilling or unable to assume the burden and cost of clearing spectrum quickly if they were unsure of the likelihood that they will be reimbursed by other new entrants."). *See also, e.g.*, id. at ¶ 79 ("The express purpose of this Report and Order and Declaratory Ruling is to further the policy goals of promoting more efficient use of spectrum and permitting the introduction of new services."); Teledesic, 275 F.3d at 85 (the FCC has consistently held to a "policy of placing the cost of involuntary [spectrum] relocation . . . on new entrants" in order to protect incumbent licensees but also encourage development of new technologies); *2009 Public Safety Order* at ¶ 2 (questions of band-clearance cost-sharing "relate to [the FCC's] fundamental goals of completing the relocation of [incumbent] operations from the 1990-2025 MHz band and providing for the operation of new services on those frequencies"). To the extent that the Senior Secured Noteholders do have a security interest in the proceeds of the FCC Licenses, therefore, that security interest must be subordinated to the reimbursement obligation owed to Sprint Nextel pursuant to applicable FCC orders in furtherance of its regulatory mandate in the public interest.

Accordingly, and in the alternative to Counts I and II, Sprint Nextel is entitled to summary judgment on Count IV of its Complaint in this proceeding, and a declaration that, to the

extent any pre-petition lien granted to the Senior Secured Noteholders can attach post-petition to proceeds or value of the FCC Licenses, any such lien must in any event be subordinated to the reimbursement claim of Sprint Nextel.

## IV. <u>CONCLUSION</u>

For all of the foregoing reasons, Sprint Nextel respectfully prays:

(A)     that its Motion be granted;

(B)     that the Court enter an order of summary judgment declaring that any purported pre-petition liens on the Debtors' FCC Licenses or the proceeds or other value thereof either (i) do not attach to proceeds or value generated by the FCC Licenses post-petition as a matter of law, or (ii) are subordinate to the reimbursement claim of Sprint Nextel; and

(C)     that the Court grant Sprint Nextel such other and further relief as it deems just, equitable and proper.

Dated:  March 11, 2011

ARNALL GOLDEN GREGORY LLP

/s/ Darryl S. Laddin
Darryl S. Laddin (DL-5130)
Frank N. White
Matthew T. Covell
171 17th Street N.W.
Suite 2100
Atlanta, Georgia 30363
Telephone: (404) 873-8500
Facsimile: (404) 873-8501

Attorneys for Sprint Nextel Corporation