Jonathan S. Henes
Joseph Serino, Jr.
Hunter Murdock
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022-4611
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

*and*

Patrick J. Nash, Jr. (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (212) 446-2200
*Counsel to the Ad Hoc Group of Holders of
15% Senior Secured Notes*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| TERRESTAR NETWORKS INC., *et al.*, | Case No. 10-15446 (SHL) |
| Debtors. | Jointly Administered |
| SPRINT NEXTEL CORPORATION and OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF TERRESTAR NETWORKS, INC., *et al.*, | Adv. Pro. No. 10-05461 (SHL) |
| Plaintiff and Plaintiff-Intervenor, | |
| v. | |
| U.S. BANK NATIONAL ASSOCIATION, in its capacity as Indenture Trustee and Collateral Agent for the 15.0% Senior Secured Payment-In-Kind Notes due 2014, AD HOC GROUP OF NOTEHOLDERS OF 15% SENIOR SECURED NOTES, and TERRESTAR NETWORKS, INC., *et al.*, | |

|  | |
|---|---|
| Defendant and Defendant-Intervenors. | ) |
| | ) |
| | ) |

**MEMORANDUM OF LAW IN SUPPORT OF THE AD HOC GROUP OF 15% SENIOR SECURED NOTEHOLDERS' MOTION FOR SUMMARY JUDGMENT ON COUNTS ONE AND TWO OF PLAINTIFFS' COMPLAINTS AND IN OPPOSITION TO PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...........................................................................1

STATEMENT OF FACTS ................................................................................4

    I.      BACKGROUND ...............................................................................4

    II.    SENIOR SECURED NOTE ISSUANCE ................................................5

    III.   SPRINT NEXTEL CLAIM................................................................7

SUMMARY JUDGMENT STANDARD.........................................................9

ARGUMENT ..................................................................................................9

    I.      U.S. BANK'S SECURITY INTEREST IN THE VALUE OF THE FCC
         LICENSES IS VALID AND ENFORCEABLE ...................................10

    II.    THE VALUE OF THE FCC LICENSES SHOULD BE ALLOCATED
         TO THE SENIOR SECURED NOTEHOLDERS .................................14

         (a)    U.S. Bank's Lien On The Value Of The FCC Licenses Attached
               Prepetition And Survived Commencement Of This Proceeding...............14

         (b)    The Senior Secured Noteholders May Properly Be Granted Credit
               For The Value of the FCC Licenses In The Event Of A
               Reorganization Of Debtors. ......................................................20

    III.   U.S. BANK'S SECURITY INTEREST IN THE VALUE OF THE FCC
         LICENSES IS NOT IMPAIRED BY SPRINT NEXTEL'S CLAIM ...................22

CONCLUSION ..............................................................................................27

**Cases**

*Airadigm Comm'ns, Inc. v. FCC,*
372 B.R. 894 (Bankr. W.D. Wis. 2006)..................................................................................24

*Bogus v. Am. Nat'l Bank of Cheyenne,*
401 F.2d 458 (10th Cir. 1968) .............................................................................................17

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986)................................................................................................................9

*FCC v. NextWave Personal Commc'ns,*
537 U.S. 293 (2003)..............................................................................................................24

*FDIC v. Morque,*
372 N.W.2d 872 (N.D. 1985)................................................................................................17

*Freightliner Mkt. Dev. Corp. v. Silver Wheel Freightlines, Inc.,*
823 F.2d 362 (9th Cir. 1987) ...............................................................................................17

*Harriet's Speakeasy & Landmark Rest. v. North Side Dep. Bank (In re Kluchman),*
59 B.R. 13 (W.D. Pa. 1985)..................................................................................................17

*Hidden Valley Golf Course, Inc. v. Tittabawassee Inv. Co. (In re Tittabawassee Inv. Co.),*
831 F.2d 104 (6th Cir. 1987) ...............................................................................................17

*In re Application for Consent to Assignment of PCS Licenses KNLH651 and KNLH563 from Northstar Tech., LCC to Bannana Commc'ns, LLC,*
23 F.C.C.R. 9122 (June 9, 2008) .........................................................................................24

*In re Barnett,*
124 F.2d 1005 (2d Cir. 1942)...............................................................................................17

*In re Chateaugay Corp.,*
201 B.R. 48 (Bankr. S.D.N.Y. 1996) ...................................................................................21

*In re Cheskey,*
9 F.C.C.R. 986 (1994)................................................................................................13, 18, 19

*In re DBSD North America,*
No. 09-13061 (REG) (Bankr. S.D.N.Y. Sep. 11, 2009) ......................................................24

*In re Ion Media Networks, Inc.,*
419 B.R. 585 (Bankr. S.D.N.Y. 2009) ...................................................................11, 13, 20

*In re Mark IV Indus.,*
438 B.R. 460 (Bankr. S.D.N.Y. 2010) ...................................................................................9

*In re New DBSD Satellite Servs.,*
   25 F.C.C.R. 13664 (Sep. 29, 2010) ........................................................................24

*In re O.P.M. Leasing Servs.,*
   23 B.R. 104 (Bankr. S.D.N.Y. 1982) ...................................................................25

*In re Ridgely Commc'ns, Inc.,*
   139 B.R. 374 (Bankr. D. Md. 1992) ...............................................11, 12, 13, 19

*In re Rural Tel. Cos.,*
   F.C.C.R. 20802 (Oct. 6. 2003) ...........................................................................18

*In re Taddeo,*
   9 B.R. 299, 305 (Bankr. S.D.N.Y. 1981) ...........................................................18

*In re Tak Commc'ns, Inc.,*
   985 F.2d 916 (7th Cir. 1993) ..............................................................................13

*In re Thomas Commc'ns, Inc.,*
   166 B.R. 846, 849 (S.D. W. Va. 1994) ........................................................11, 12

*In re Tracy Broadcasting,*
   No. 10-CV-02522 (D. Colo., filed Oct. 15, 2010) ..............................................18

*In re Weiss,*
   376 B.R. 867 (Bankr. N.D. Ill. 2007) .................................................................21

*Lake Region Credit Union v. Crystal Pure Water, Inc.,*
   502 N.W.2d 524 (N.D. 1993) .............................................................................17

*Law Research Serv., Inc. v. Martin Lutz Appellate Printers, Inc.,*
   498 F.2d 836 (2d Cir. 1974) ...............................................................................17

*Lipper Holdings, LLC v. Trident Holdings, LLC,*
   1 A.D.3d 170 (1st Dep't 2003) ...........................................................................21

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
   475 U.S. 574 (1986) .............................................................................................9

*Matter of Hollinrake,*
   93 B.R. 183 (Bankr. S.D. Iowa 1988) ................................................................25

*McCarthy v. Dun & Bradstreet Corp.,*
   482 F.3d 184 (2d Cir. 2007) .................................................................................9

*MLQ Investors, L.P. v. Pac. Quadracasting, Inc.,*
   146 F.3d 746, 749 (9th Cir. 1998) ................................................................passim

*NLRB v. Bildisco & Bildisco,*
   465 U.S. 513 (1984) ...........................................................................................21

*O'Neill v. Dorothy (In re O'Neill's Shannon Village)*,
   750 F.2d 679 (8th Cir. 1984) ...................................................................17

*Orix Credit Alliance v. Mills (In re Beach Television Partners)*,
   38 F.3d 535 (11th Cir. 1994) ..............................................................11, 13

*PBR Commc'ns Sys. v. Jefferson Bk (In re PBR Commc'ns Sys.)*,
   172 B.R. 132 (Bankr. S.D. Fla. 1994)....................................................11, 13

*Queen of the North, Inc. v. LeGrue*,
   582 P.2d 144 (Alaska 1978)..................................................................17

*Rushmore State Bk. v. Kurylas, Inc.*,
   424 N.W.2d 649 (S.D. 1988) ................................................................17

*S.E.C. v. First Jersey Securities*,
   101 F.3d 1450 (2d Cir. 1996)................................................................23

*Sims v. Johnson*,
   67 F.2d 411 (9th Cir. 1933) .................................................................19

*Spectrum Scan v. Valley Bk. and Tr. (In re Tracy Broadcasting)*,
   438 B.R. 323 (Bankr. D. Colo. 2010) ..................................................18, 19

*Sprint Nextel v. New ICO Satellite Services G.P.*,
   Case No. 1:08cv651 (E.D.Va. filed June 25, 2008)................................22

*State St. Bk. and Tr. Co. v. Arrow Commc'ns, Inc.*,
   833 F. Supp. 41 (D. Mass. 1993) .......................................................11, 13

*Tomb v. Lavalle*,
   298 Pa.Super. 75, 444 A.2d 666 (1981) ...............................................17

*United States v. Estate of Romani*,
   523 U.S. 517 (1998)...........................................................................17

*Urban Communicators PCS Ltd. P'ship v. Gabriel Capital*,
   394 B.R. 325 (S.D.N.Y. 2008)........................................................passim

*Wells Fargo Foothill v. Kepler (In re Media Properties)*,
   311 B.R. 244 (Bankr. W.D. Wis. 2004)............................................passim

**Statutes**

11 U.S.C. 506(a) ........................................................................................24

11 U.S.C. 506(b) ........................................................................................15

11 U.S.C. 552 .............................................................................4, 14, 15, 18

11 U.S.C. 552(a) ........................................................................................14

11 U.S.C. 552(b)..............................................................................14, 16

N.Y. U.C.C. § 9..........................................................................3, 6, 16, 18

N.Y. U.C.C. § 9-102(42)..........................................................................10

N.Y. U.C.C. § 9-102(64)..........................................................................21

N.Y. U.C.C. § 9-203..............................................................................14, 18

N.Y. U.C.C. § 9-203(b)(2)........................................................................24

N.Y. U.C.C. § 9-204(42)..........................................................................15

N.Y. U.C.C. § 9-408................................................................................17

**Rules**

Fed. R. Civ. P. 56......................................................................................9

Defendant-in-Intervention the Ad Hoc Group of Noteholders of 15% Senior Secured Notes (the "**Ad Hoc Group**") respectfully submits this memorandum of law in support of its motion for summary judgment, pursuant to Federal Rule of Civil Procedure 56 made applicable by Federal Rule of Bankruptcy Procedure 7056, seeking dismissal of Counts One and Two asserted by Plaintiff Sprint Nextel Corporation ("**Sprint Nextel**") in its adversary Complaint, dated December 17, 2010 (the "**Sprint Complaint**") along with Counts One and Two asserted by Plaintiff-in-Intervention the Official Committee of Unsecured Creditors of TerreStar Networks, Inc. (the "**Official Committee**") in its adversary Complaint, dated January 20, 2011 (the "**Official Committee Complaint**"), and in opposition to Plaintiffs' respective motions for summary judgment.

## PRELIMINARY STATEMENT

Sprint Nextel, a purported unsecured creditor of Debtors, commenced this adversary proceeding in order to avoid or subordinate the lien held on Debtors'[1] FCC licenses (the "**FCC Licenses**") by U.S. Bank National Association in its capacity as Indenture Trustee and Collateral Agent for the 15.0% Senior Secured Payment-In-Kind Notes due 2014 ("**U.S. Bank**"). The Official Committee subsequently filed a follow-on complaint seeking the same relief for its own benefit. In Count One of each Complaint, the Plaintiffs assert that U.S. Bank's security interest in Debtors' FCC Licenses was invalid at its inception because the Federal Communications Act purportedly prohibits encumbrances on FCC Licenses. In Count Two of each Complaint,

---

[1] The FCC granted the FCC Licenses to TerreStar License, Inc. ("**TSL**") which is a debtor in these jointly administered chapter 11 proceedings. As no party has suggested that the identity of the licensee is germane to the outcome of these instant cross-motions, the FCC Licenses are described as belonging to "Debtors." This convention is applied for ease of use and does not reflect a determination by the Ad Hoc Group that any particular debtor is responsible for the actions or debts or any other debtor or that debtors are jointly subject to "enterprise liability" as that term is used by the FCC or otherwise.

Plaintiffs argue, in the alternative, that U.S. Bank's security interest in what they describe as the "proceeds" from the transfer of FCC Licenses is invalid because such "proceeds" did not come into existence prior to commencement of this bankruptcy proceeding. In Count Four of its Complaint, Sprint Nextel asserts that any security interest U.S. Bank may have in the FCC Licenses is subordinate to Sprint Nextel's claim. All parties agree that Counts One and Two of the Sprint and Official Committee Complaints are ripe for summary judgment. By contrast, Count Four of the Sprint Nextel Complaint presents numerous questions of fact that make summary judgment inappropriate.[2]

The basic facts in this litigation are not in dispute. In order to induce the Senior Secured Noteholders to purchase the 15% Senior Secured Notes and thus enable Debtors to execute their capital intensive business strategy, the Security Agreement executed in connection with issuance of the Senior Secured Notes granted U.S. Bank the broadest lien permitted by law on any and all proceeds or other economic value received from or on account of the FCC Licenses along with the rest of Debtors' general intangibles. The Security Agreement was made available to the public, including the Plaintiffs, on February 15, 2007, and the security interest granted thereby was perfected by a promptly filed UCC Financing Statement. Plaintiffs acknowledge that the Security Agreement represents the deal that was struck between Debtors and the Senior Secured Noteholders and do not claim to have questioned its validity prior to commencement of these chapter 11 proceedings.

Plaintiffs instead ask this Court to disregard the Security Agreement — the very heart of the bargain the Senior Secured Noteholders struck with Debtors when they purchased the notes — so that Plaintiffs may better collect on their unsecured claims. In support of this request,

---

[2]    The Ad Hoc Group anticipates moving for summary judgment on Sprint Nextel and the Official Committee's remaining claims following the close of discovery in this matter.

Plaintiffs do not offer any suggestion as to why they did not simply stop extending credit to Debtors after issuance of the Senior Secured Notes if they did not want to be bound by the collateral grant contained in the Security Agreement. Rather, they offer legal theories with respect to Counts One and Two of their respective Complaints, along with Count Four of the Sprint Complaint, which have consistently been rejected by courts within this circuit and elsewhere:

*First*, Count One of both Plaintiffs' Complaints asserts that U.S. Bank's lien on the FCC Licenses was invalid at its inception because the Federal Communications Act purportedly prohibits encumbrances on FCC Licenses. What Plaintiffs ignore in their Complaints and briefing is the undisputed fact that a security interest may be granted ***in the economic value*** of an FCC license, such as the one granted by the Security Agreement. The FCC, along with every single court to consider this issue within the past fifteen years, has endorsed this proposition. These authorities, which include recent decisions by Bankruptcy Judge Peck and District Judge Sweet, have all expressly rejected the exact theory that Plaintiffs plead in Count One of their Complaints. This is because there is a distinction between the "public" right to an FCC license and a "private" right to the economic value associated with the ownership or transfer of an FCC license. While no party can take an interest in an FCC license superior to the "public" right held by the FCC itself, it is uncontroverted that a secured lender may have an enforceable security interest in the "private" right to the economic value associated with an FCC license.

*Second*, Count Two of both Plaintiffs' Complaints alternatively assert that U.S. Bank's security interest in what they describe as the "proceeds" from the transfer of FCC licenses is unperfected because such "proceeds" did not come into existence pre-petition. Plaintiffs' theorize that either Article 9 of the New York Uniform Commercial Code (the "**NYUCC**") or

3

Section 552 of the Bankruptcy Code bar the Senior Secured Noteholders from enjoying the benefit of their bargain with Debtors for this reason. This argument also fails. Debtors expressly granted U.S. Bank a security interest in all economic value received from or on account of the FCC Licenses as well as Debtors' general intangibles. The courts to consider Plaintiffs' argument that liens of this sort are ineffective have nearly all agreed with District Judge Sweet that a security interest in the economic value generated by the disposition of an FCC License will attach at the time that it is granted and thus survives commencement of a bankruptcy proceeding.

***Third***, without citing any relevant case law, Sprint Nextel asserts in Count Four of its Complaint that Sprint Nextel has an interest in the FCC Licenses that is superior to that held by the Senior Secured Noteholders. Sprint Nextel's argument in this regard also fails. Neither the FCC nor TerreStar ever granted Sprint Nextel a security interest in the FCC Licenses and the relevant law addressing the issue rejects Sprint Nextel's contention that the Court should conjure such an interest out of thin air. In addition to these legal deficiencies, summary judgment on this claim is not warranted because it is equitable in nature and fact intensive, and discovery has not yet closed in this matter.

<u>**STATEMENT OF FACTS**</u>[3]

## I.    BACKGROUND

Plaintiff Sprint Nextel and Debtors are competitors in the North American market for wireless and voice and data service. Debtors' sole current product offering in this market is an innovative hybrid terrestrial / satellite smartphone (the "**Genus Phone**") which operates on

---

[3]    Record support for each of the factual assertions contained herein is set forth in the separate Defendant Ad Hoc Group of Noteholders' Statement of Material Facts As To Which There Is No Genuine Issue To Be Tried and Response to Plaintiffs' Statement of Material Facts As To Which There Is No Genuine Issue To Be Tried ("**7056-1 Stmt**"), which is filed contemporaneously herewith pursuant to Local Bankruptcy Rule 7056-1.

AT&T Wireless's terrestrial network while in the range of a traditional AT&T Wireless cell tower and otherwise operates on Debtors' own TerreStar-1 Satellite. In this manner, Genus Phone users are assured of uninterrupted coverage for their Genus Phone via the TerreStar-1 Satellite wherever they travel throughout North America, but may also use AT&T Wireless's terrestrial network while within its range. Debtors have also developed plans to build out their own terrestrial wireless network, although no efforts have been made to implement these plans in light of Debtors' current liquidity situation.

Development and deployment of the TerreStar-1 Satellite and Genus Phone was a lengthy and expensive process. Debtors first sought authorization from the FCC to offer mobile satellite services ("**MSS**") in December 2002 when Debtors, along with Bell Canada subsidiary TMI Communications ("**TMI**"), jointly asked the FCC to transfer to Debtors a "letter of intent authorization" that had been previously granted by the FCC to TMI. That transfer authorization was initially granted by the FCC in June 2004. By 2007, Debtors were still a development stage company that had never generated any revenue from its operations and were unable to execute their business strategy without substantial additional financing.

## II. SENIOR SECURED NOTE ISSUANCE

In order to meet these capital needs, pursuant to an indenture dated February 14, 2007, Debtors issued $500,000,000 principal amount of its 15% Senior Secured PIK Notes due 2014 (the "**Senior Secured Notes**").[4] These funds were earmarked to pay off existing debt, general corporate purposes, and to pay for build out of Debtors' planned terrestrial and satellite networks. The Senior Secured Notes issuance was supported by a Security Agreement (the "**Security Agreement**") granting U.S. Bank a broad security interest in many of Debtors' assets

---

[4] On February 7, 2008, Debtors announced the sale of an additional $50,000,000 in Senior Secured Notes to EchoStar Corporation.

for the benefit of the holders of the Senior Secured Notes. This security interest was particularly significant as Debtors had no short term plans for generating revenue which could be used to repay the Senior Secured Notes. Among other things, the Security Agreement granted U.S. Bank a Security Interest in:

> . . . all FCC License Rights . . . including all FCC Licenses, including, without limitation, the right to receive monies, proceeds, or other consideration in connection with the sale, assignment, transfer, or other disposition of any FCC Licenses, the proceeds from the sale of any FCC Licenses or any goodwill or other intangible rights or benefits associated therewith, including without limitation all right of each Grantor to (A) transfer, assign or otherwise dispose of its rights, title and interests, if any, under or in respect of such FCC Licenses, (B) exercise any rights, demands and remedies against the lessor, licensor or other parties thereto, and (C) all rights of such Grantor to receive proceeds of any insurance, indemnities, warranties, guaranties or claims for damages in connection therewith; provided, that such security interest does not include at any time any FCC License to the extent (but only to the extent) that at such time the Collateral Agent may not validly possess a security interest directly in the FCC License pursuant to applicable Federal law, including the Communications Act of 1934, as amended, and the rules, regulations and policies promulgated thereunder, as in effect at such time, but such security interest does include at all times all proceeds of the FCC Licenses, and the right to receive all monies, consideration and proceeds derived from or in connection with the sale, assignment, transfer, or other disposition of the FCC Licenses.[5]
>
> . . . .
>
> all Accounts, Instruments, Documents, Chattel Paper (whether tangible or electronic), Inventory, Equipment, Goods, Letter of Credit Rights, Payment Intangibles, Software and other General Intangibles[6].

(*See* Security Agreement § 3.)

---

[5] Plaintiffs acknowledge that the FCC licenses at issue in this litigation are "FCC Licenses" described in the Security Agreement. (*See* Sprint Complaint, at ¶¶ 1-2; Official Committee Complaint, at ¶ 2.) "FCC License Rights" are defined in the Security Agreement to mean "any right, title or interest in, to or under any FCC License, whether directly or indirectly held, including, without limitation, any rights owned, granted, approved or issued directly or indirectly by the FCC or held, leased, licensed or otherwise acquired from or through any party." (Security Agreement § 1.03.)

[6] "General Intangibles" are defined in the Security Agreement as having the meaning "ascribed thereto in Article 9 of the NYUCC." (*Id.,* at § 1.02.)

Contemporaneously with execution of the Security Agreement, U.S. Bank filed a UCC Financing Statement with the Delaware Secretary of State asserting an interest in all of Debtors' personal property. The next day, Debtors publicly filed with the SEC a copy of the Security Agreement, an Indenture, and a Funding Agreement for the Senior Secured Notes along with a press release announcing successful completion of the financing. Copies of these documents remain on the SEC's publicly accessible EDGAR website to this day.

## III. SPRINT NEXTEL CLAIM[7]

In 2004, in an effort to clear up interference caused by Sprint Nextel[8] and others to public safety users of the 800 MHz band, the FCC proposed that Sprint Nextel relinquish certain of its FCC licenses on the 800 MHz band and relocate certain of its operations and the operations of other 800 MHz band users to less congested frequencies. *See Improving Public Safety Communications in the 800 MHz Band, Fifth Report and Order, Fourth Memorandum Opinion and Order, and Order*, 19 F.C.C.R. 14969 (2004) ("**2004 Report & Order**"). In exchange for relinquishing this 800 MHz spectrum, the 2004 Report & Order provided that Sprint Nextel would get new spectrum on the 1.9 GHz band. To compensate the FCC for the difference between the value of Sprint Nextel's relinquished 800 MHz spectrum and the new 1.9 GHz spectrum that Sprint Nextel would be obtaining, the FCC conditioned this spectrum swap on

---

[7] Discovery in this matter is still open. As of the date hereof, Sprint Nextel is still in the process of responding to Defendants' document requests and no depositions have yet been taken of Sprint Nextel. Accordingly, the Ad Hoc Group sets forth herein a brief description of Sprint Nextel's claim sufficient for purposes of the instant cross-motions without prejudice to its right to set forth a more complete factual basis for the denial of Sprint Nextel's equitable claims (Count Three and Count Four of Sprint Nextel's Complaint) once discovery has been completed.

[8] Sprint Nextel Corporation was formed on August 12, 2005, following the merger of Sprint and Nextel Communications. For the sake of convenience, the name "Sprint Nextel" is used throughout this memorandum.

Sprint Nextel paying a $2.801 billion anti-windfall fee to the FCC, less any costs it incurred relocating existing users of the 800 MHz band and relocating the existing users of the 1.9 GHz band (the "**BAS Incumbents**"). Sprint Nextel was also granted the right to seek *pro rata* reimbursement of its 1.9 GHz relocation costs from future users of the 1.9 GHz spectrum who first commenced operations within the thirty-six months that Sprint Nextel predicted it would take to complete all transition activities relating to the 2004 Report & Order. Sprint Nextel, however, would not be entitled to "double dip" by crediting expenses reimbursed by these users against its anti-windfall payment obligation.

Sprint Nextel publicly stated that it understood that it was under no obligation to accept any spectrum swap proposal made by the FCC, such as the one set forth in the 2004 Report & Order, unless it was to Sprint Nextel's liking. Sprint Nextel did, however, accept the 2004 Report & Order, which placed full responsibility for the timely completion of the BAS Incumbent relocation effort (the "**BAS Relocation**") on Sprint Nextel. The 2004 Report & Order contemplated that Sprint Nextel would complete the BAS Relocation by May 2007. After being granted several extensions by the FCC and then being threatened with enforcement action, Sprint Nextel completed the BAS Relocation in July 2010, years late and, according to Sprint Nextel, massively over budget. These delays were germane to Debtors' business as TerreStar's authorization to operate its satellite was initially subject to an FCC requirement that a substantial portion of the BAS Relocation first be completed.

Following completion of the BAS Relocation, Sprint Nextel submitted an accounting for expenses it purportedly incurred in connection with the BAS Relocation to an outside "Transition Administrator" for review as was required by the FCC. The Transition Administrator, however, has not yet made any determination concerning the reasonableness of

the expenses that Sprint Nextel purportedly incurred or the accuracy of its accounting. Debtors commenced these jointly administered chapter 11 proceedings on October 19, 2010. On December 8, 2010, Sprint filed proofs of claim against the Debtors in the amount of approximately $104 million for expenses related to the BAS Relocation. Debtors promptly objected to these claims on a variety of grounds. (*See* Dkt. No. 329.) On December 17, 2010, Sprint Nextel commenced this adversary proceeding seeking to avoid or subordinate U.S. Bank's security interest in the value of the FCC Licenses.

## SUMMARY JUDGMENT STANDARD

Summary judgment shall be rendered if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-25 (1986); *In re Mark IV Indus.*, 438 B.R. 460 (Bankr. S.D.N.Y. 2010); Fed. R. Civ. P. 56. A material fact is one that "might affect the outcome of the suit under the governing law." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007). Once the moving party has made an initial showing that no evidence supports the nonmoving party's case, the party opposing the motion must come forward with competent evidence of the existence of a genuine fact issue. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). Mere conclusory allegations or unsupported speculations are insufficient to defeat a motion for summary judgment. *See id.* If the opposing party fails to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted. *Celotex*, 477 U.S. at 322-23.

## ARGUMENT

Plaintiffs cannot and do not deny that the Security Agreement unambiguously covers all proceeds and economic value associated with the FCC Licenses along with Debtors' general intangibles. (*See* Security Agreement § 3.) Nor do Plaintiffs deny that U.S. Bank properly

perfected these interests granted by the Security Agreement.[9]   Instead, in a series of misplaced arguments Plaintiffs contend that the Federal Communications Act prohibits U.S. Bank from having any interest in the FCC Licenses or, alternatively, that U.S. Bank's security interest did not attach prepetition and thus does not include whatever value is realized on account of the FCC Licenses after the petition date.   But, as discussed below, the uncontested facts, the clear weight of the legal authority, the Federal Communications Act, and the express policy of the FCC itself demonstrate that Plaintiffs are wrong as a matter of law and that the Ad Hoc Group is entitled to summary judgment dismissing Counts One and Two of Plaintiffs' Complaint.   Finally, while Sprint Nextel seeks summary judgment on Count Four of its Complaint, it is clear that such relief is not warranted.   At best, Count Four presents a fact-laden question concerning equitable relief that is not ripe for summary judgment while discovery is ongoing.   At worst, Count Four of Sprint's Complaint fails as matter of law.

## I.   U.S. BANK'S SECURITY INTEREST IN THE VALUE OF THE FCC LICENSES IS VALID AND ENFORCEABLE

Plaintiffs take the position in Count One of their Complaints that the Security Agreement does not grant U.S. Bank an enforceable security interest in the FCC Licenses because of various Federal Communications Act provisions which purportedly prohibit the granting of any such interests.   This argument proves too much and, accordingly, is misplaced.   Indeed, courts reviewing similar security agreements have uniformly held that a creditor may – as U.S. Bank

---

[9]   U.S. Bank's UCC Financing Statement asserted an interest in all "personal property" of Debtors.   (*See* 7056-1 Stmt., at ¶ 6.)   A UCC Financing Statement asserting an interest in all "personal property" of a borrower perfects an interest in the borrower's general intangibles. *See* N.Y. U.C.C. § 9-102(42) ("General intangible" is a subset of "personal property" under the UCC); Del. Code Ann. tit. 6, § 9-102(42) (same); Va. Code Ann. § 8.9A-102 (same); *see also Urban Communicators PCS Ltd. P'ship v. Gabriel Capital,* 394 B.R. 325, 334 (S.D.N.Y. 2008) (interest in the economic value of an FCC license is subject to perfection as a general intangible) (citation omitted).

has here – perfect a security interest in the proceeds or other economic value generated by an FCC license. *See In re Ion Media Networks, Inc.*, 419 B.R. 585, 602 (Bankr. S.D.N.Y. 2009); *Urban Communicators,* 394 B.R. at 334; *see also MLQ Investors, L.P. v. Pac. Quadracasting, Inc.*, 146 F.3d 746 (9th Cir. 1998) (holding that a creditor may have a valid security interest in the proceeds of an FCC license); *Orix Credit Alliance v. Mills (In re Beach Television Partners)*, 38 F.3d 535, 537 (11th Cir. 1994) (same); *Wells Fargo Foothill v. Kepler (In re Media Properties),* 311 B.R. 244, 249 (Bankr. W.D. Wis. 2004) (same); *In re Thomas Commc'ns, Inc.*, 166 B.R. 846 (S.D. W. Va. 1994) (same); *State St. Bk. and Tr. Co. v. Arrow Commc'ns, Inc.*, 833 F. Supp. 41, 48-9 (D. Mass. 1993) (same); *PBR Commc'ns Sys. v. Jefferson Bk (In re PBR Commc'ns Sys.)*, 172 B.R. 132, 134 (Bankr. S.D. Fla. 1994) (same); *In re Ridgely Commc'ns, Inc.*, 139 B.R. 374, 379 (Bankr. D. Md. 1992) (same).

*Ridgely,* the leading decision addressing the validity of liens in the value of FCC licenses, squarely rejects Plaintiffs' argument that Debtors' pledge of the value generated by the FCC Licenses was ineffective. In *Ridgely,* the debtor owned and operated two commercial radio stations and granted its secured lender a first priority lien on all of the stations' tangible and intangible property. 139 B.R. at 375. Following commencement of a chapter 11 proceeding, both stations were sold to third parties along with their FCC licenses. *Id.* The secured lender moved to have the proceeds of the sales distributed for its own benefit. The debtor objected to the distribution on the grounds that the secured lender purportedly could not hold a valid lien on the debtor's FCC licenses, and thus the proceeds from the radio station sales attributable to those FCC licenses were not part of the secured lender's collateral package. *Id.* The *Ridgely* court ruled for the secured creditor, finding that it had an enforceable security interest in the "private" economic right held by the debtor in the value generated by its FCC licenses as opposed to the

"public" right to control allocation of the airwaves which is held solely by the FCC. *Id.*, at 379. Accordingly, the *Ridgely* court held that "a creditor may perfect a security interest in a debtor's [FCC] broadcasting license, limited to the extent of the licensee's proprietary rights in the license vis-a-vis private third parties." *Id.*.

The holding in *Ridgley* is hardly isolated or aberrational. For example, the court in *Media Properties* held that prepetition security interests in FCC licenses validly extend to all attributes of the license not specifically reserved to the FCC. 311 B.R. at 249-50. More specifically, the court found that the attributes not reserved to the FCC include "all rights of the licensee against third parties, which is more than just proceeds of a sale." *Id.*, at 249. The court in *Thomas* similarly recognized that a security interest could be granted in all rights in an FCC license apart from the right to approve the transfer of such license. 166 B.R. at 849 ("Upon the [FCC]'s approval of the transfer of the broadcasting licenses, the only thing left for resolution is a determination of which party is entitled to the proceeds realized from the transfer.") (citation omitted). In other words, the security interest extends to all economic value attributable to the FCC Licenses.

The *Ridgely*, *Thomas*, and *Media Properties* decisions correctly set forth the law in this district concerning the validity of security interests in the economic value of FCC licenses. For example, in *Urban Communicators*, a dispute arose concerning the validity of a secured lender's interest in debtors' FCC license to offer PCS cellular telephone service. *Id.*, at 334. District Judge Sweet, citing to *Ridgely* and its progeny, held that "a creditor may perfect a security interest in a borrower's FCC broadcasting license to the extent that the creditor seeks to protect its interest in the proceeds of the borrower's license." *Id.* More recently, in *Ion Media*,

Bankruptcy Judge Peck expressly recognized that "FCC licenses . . . are subject to an enforceable dedication of their economic value . . ." 419 B.R. at 602.

Notably, all of these decisions are also consistent with the latest guidance from the FCC itself. In *In re Cheskey*, the FCC adopted the rationale of the cases holding that a licensee may grant a security interest in the proceeds of an FCC license. 9 F.C.C.R. 986, 987 (1994). In doing so, the FCC expressly rejected the Seventh Circuit's statement in *In re Tak Commc'ns,* that the Commission has a policy prohibiting a licensee from giving a security interest to a creditor in the proceeds of the sale of licenses. *Id.*, at 987 n.8 (*citing In re Tak Commc'ns, Inc.*, 985 F.2d 916, 918 (7th Cir. 1993)). The FCC stated that "the court erred in *Tak*" and emphasized that the ruling in *Tak* "cannot bind the [FCC] to a policy which it does not have." 9 F.C.C.R. at 987 n.8; *see also MLQ Investors*, 146 F.3d at 748 (concluding that *Tak* was not persuasive because the FCC had explicitly repudiated that decision in *Cheskey*); *Beach Television Partners*, 38 F.3d at 537 (FCC's *Cheskey* decision vindicated *Ridgley* and fatally undercut the *Tak Commc'ns* holding); *State St.*, 833 F. Supp. at 46-47 (finding *Tak Commc'ns* to be "overbroad" and endorsing *Ridgely*); *PBR Commc'ns,* 172 B.R. at 136 (upholding *Ridgley* and rejecting *Tak Commc'ns*).

This approach makes perfect sense. As the FCC explained in *Cheskey*, permitting a security interest in the economic value of a license does not interfere with the FCC's statutory duty to approve every license applicant. 9 F.C.C.R. at 987 (noting that a security interest in the economic value of an FCC license "does not raise the same concerns"). In other words, while the FCC needs to regulate who actually owns and operates a license so as to control what ultimately is broadcast, the FCC has no interest in the distribution of the economic value associated with any disposition of FCC licenses as between private parties. Thus, in light of the

facts that the Security Agreement unambiguously grants U.S. Bank a broad security interest in any economic value generated by the FCC Licenses, this interest was undeniably perfected, and every court to consider the issue in recent years, together with the FCC itself, has endorsed the validity of such interests, summary judgment should enter in the Ad Hoc Group's favor on Count One of both Plaintiffs' Complaints.

## II. THE VALUE OF THE FCC LICENSES SHOULD BE ALLOCATED TO THE SENIOR SECURED NOTEHOLDERS

### (a) U.S. Bank's Lien On The Value Of The FCC Licenses Attached Prepetition And Survived Commencement Of This Proceeding.

As an alternative to Count One, Count Two of the Complaints alleges that even if the Federal Communications Act permitted Debtors to grant U.S. Bank a security interest in the economic value of the FCC Licenses, such security interest is invalid under the NYUCC, and, pursuant to Section 552 of the Bankruptcy Code, did not survive the commencement of this proceeding. According to Plaintiffs, this is purportedly so because Debtors did not have a sufficient *prepetition* interest in the economic value of the FCC Licenses for a lien to attach under Section 9-203 of the NYUCC. Plaintiffs relatedly argue that Section 552 of the Bankruptcy Code prohibits the enforcement of U.S. Bank's liens on the economic value of the FCC Licenses because any "proceeds" from the FCC Licenses will purportedly be new property acquired by the estate *postpetition*. Neither argument has any merit, and the Ad Hoc Group is entitled to summary judgment on Count Two.

Broadly speaking, NYUCC § 9-203 requires that a grantor must have "rights in the collateral" to grant a security interest. Likewise, Section 552(a) creates a general rule that "property acquired by the estate or by the debtor after the commencement of the case" will not be subject to prepetition liens. Section 552(b), however, creates an exception to this rule which allows liens in property acquired *prepetition* to extend to proceeds or other value *generated* by

such property **postpetition** if the liens expressly so provide. Here, the Security Agreement plainly grants U.S. Bank an interest in collateral to which the Debtors then had "rights" (*i.e.,* the economic value of the FCC Licenses) for purposes of NYUCC § 9-203 and that was intended to extend to proceeds or other value generated postpetition by the collateral in the exact manner contemplated by Section 552(b). (*See* Security Agreement § 3.)

*Urban Communicators*, discussed above, is on point. There, similar to the Plaintiffs here, a party sought to avoid the effect of a security interest in the proceeds of an FCC license on the grounds that such proceeds purportedly did not exist prepetition because the FCC license was not sold until after commencement of the chapter 11 proceeding. 394 B.R. at 334. In rejecting this argument, District Judge Sweet held that because "the [FCC] licensee's rights in the [FCC] license proceeds include[ed] a limited right to pledge those proceeds as collateral," a creditor's security interest attaches to the proceeds of an FCC license at the time the security interest is granted. *Id.,* at 335 (citation omitted). This is because the economic value of, and right to, proceeds from FCC licenses are "general intangibles" that are "subject to perfection prior to sale." *Id.* Put another way, "[the secured creditor's] liens on the Debtors' general intangibles encompassed . . . the sale value of the [FCC] Licenses." *Id.,* at 337 (*citing* UCC § 9-102(42).)

In *Media Properties*, the court similarly recognized that the kind of security interest in the economic value of FCC licenses permitted by law attaches when granted and survives commencement of a bankruptcy proceeding. 311 B.R. at 250. In *Media Properties,* the debtor granted its secured creditor a continuing security interest in all of its assets, including its FCC license. *Id.,* at 246. Following commencement of a chapter 11 proceeding, all of debtor's assets, including its FCC license, were sold to a third party and the secured creditor moved to distribute the proceeds. *Id.* The trustee, much like the Plaintiffs here, objected on the grounds that such a

distribution to the secured creditor was purportedly barred by Section 552 because no "proceeds" of the FCC license existed prepetition. *Id.*, at 246-47. The court rejected this argument and held that the secured creditor's lien on debtor's general intangibles created a lien on the proceeds from the sale of the FCC license which attached at the time the lien was granted. *Id.*, at 249-50. Accordingly, the court held that Section 552(b) permitted the secured creditor to take the "proceeds" generated by the sale of the FCC licenses in which it had a security interest. *Id.*, at 250.

Likewise, in *MLQ Investors,* the Ninth Circuit held that a creditor's security interest in the proceeds of an FCC license attaches when the lien is created. The debtors in *MLQ Investors* granted their creditor a lien on their FCC broadcast license and the IRS subsequently filed a lien on that same license for unpaid taxes. 146 F.3d at 747. The debtors' shareholder argued that the IRS lien was first in time because the creditor's lien on the proceeds of the FCC license could not attach prior to the FCC license being sold. *Id.* The Ninth Circuit rejected this argument, holding that a creditor can obtain and perfect a security interest in the economic value of an FCC license prior to its sale. *Id.*, at 749. As in *Urban Communicators* and *Media Properties*, the court reasoned that the debtors' economic interest in the FCC licenses was a "general intangible" under the UCC and thus subject to perfection prior to sale. *Id.* The *MLQ Investors* Court rejected the very argument that Plaintiffs make here regarding the effectiveness of prepetition liens under Article 9 of the UCC. *Id.* ("The fact that in the present case the actual dollar proceeds from the sale of the licenses were generated only after the sale-and thus after the tax lien filing, as well-is immaterial."). The court also expressly recognized that the proceeds from the sale of the FCC License did not constitute "after acquired property." *Id.*, at 749 n.1.

These decisions are also consistent with the broader body of law interpreting the UCC in New York and elsewhere as well as FCC policy. A lien is sufficiently choate to attach under the UCC when "the identity of the lienor, the property subject to the lien, and the amount of the lien are established." *United States v. Estate of Romani*, 523 U.S. 517, 523 (1998).[10] Plaintiffs are simply incorrect in their implicit assertion that under New York law any conceivable impediment to liquidation of the collateral defeats a lien as an unperfected interest in future rights. For example, in *Law Research Serv., Inc. v. Martin Lutz Appellate Printers, Inc.*, the Second Circuit, applying New York law, held that a security interest in a judgment attaches when granted even though the judgment is subject to appeal. 498 F.2d 836, 838 (2d Cir. 1974). The *Law Research* decision noted that the Second Circuit had upheld the validity of security interests subject to even greater contingencies, for example holding "that the assignment of monies to become due under the contract created a present lien even though the rights were contingent on performance by both of the contracting parties." *Id.*, at 839 (*citing In re Barnett*, 124 F.2d 1005 (2d Cir. 1942).) Further, any doubts after *Law Research* and its progeny were definitively resolved in 2001, when Section 9-408 of the NYUCC was adopted which "makes ineffective any attempt to

---

[10] Despite Plaintiffs' suggestion to the contrary, interests in licenses do in fact meet this standard. *E.g., Harriet's Speakeasy & Landmark Rest. v. North Side Dep. Bank (In re Kluchman)*, 59 B.R. 13, 16 (W.D. Pa. 1985) (liquor license); *Hidden Valley Golf Course, Inc. v. Tittabawassee Inv. Co. (In re Tittabawassee Inv. Co.)*, 831 F.2d 104 (6th Cir. 1987) (liquor license); *O'Neill v. Dorothy (In re O'Neill's Shannon Village)*, 750 F.2d 679, 682 (8th Cir. 1984) (liquor license); *Freightliner Mkt. Dev. Corp. v. Silver Wheel Freightlines, Inc.*, 823 F.2d 362, 369 (9th Cir. 1987) (public carrier operation authorities); *Lake Region Credit Union v. Crystal Pure Water, Inc.*, 502 N.W.2d 524, 527-28 (N.D. 1993) ("It is also generally held that, absent a specific prohibition in the state liquor laws, a liquor license or permit is a general intangible subject to a security interest under the U.C.C.") (*citing FDIC v. Morque*, 372 N.W.2d 872, 875 n. 6 (N.D. 1985) (liquor license); *Bogus v. Am. Nat'l Bank of Cheyenne*, 401 F.2d 458, 460-461 (10th Cir. 1968) (liquor license); *Queen of the North, Inc. v. LeGrue*, 582 P.2d 144, 148-149 (Alaska 1978) (liquor license); *Tomb v. Lavalle*, 298 Pa.Super. 75, 444 A.2d 666, 667-668 (1981) (liquor license); *Rushmore State Bk. v. Kurylas, Inc.*, 424 N.W.2d 649, 655 (S.D. 1988) (liquor license).

restrict the assignment of a general intangible. . . in a rule of law, including a statute or governmental rule or regulation." *See* NYUCC § 9-408, cmt. 1.

And, as noted, the FCC itself has ruled, pursuant to a policy preference for ensuring licensees' access to capital, that security interests may be granted in the economic value of FCC licenses. *See, e.g., In re Rural Tel. Cos.*, 8 F.C.C.R. 20802 (Oct. 6. 2003), at ¶79 (*citing In re Cheskey,* 9 F.C.C.R. 986, 987 (1994)). This policy takes precedent over conflicting state law. *See, e.g., In re Taddeo*, 9 B.R. 299, 305 (Bankr. S.D.N.Y. 1981) (in bankruptcy "state law cannot be applied where to do so would frustrate or debilitate federally enacted policy.") (collecting cases).

Against the uniform weight of these and other authorities, the sole outlying decision applying Section 552 and Article 9 of the UCC in the manner suggested by Plaintiffs is unavailing. In *Spectrum Scan v. Valley Bk. and Tr. (In re Tracy Broadcasting)*, a Colorado bankruptcy court held that a debtor does not have "sufficient rights" in an FCC license to grant an enforceable prepetition security interest pursuant to UCC § 9-203 and thus Section 552 bars a secured creditor from asserting its security interest in the value of an FCC license postpetition. 438 B.R. 323, 328-331 (Bankr. D. Colo. 2010).[11] As *Tracy* effectively holds that any security interest in the economic value of an FCC license will be wiped out by the commencement of a bankruptcy, it directly conflicts with the relevant precedent in this district (*Urban Communicators* and *Ion Media*) along with *Ridgely, Media Properties,* and their progeny. *See MLQ Investors,* 146 F.3d at 749 (ruling that a lien on the proceeds from the sale of FCC licenses may be perfected prior to sale and that "a contrary outcome would mean that the distinction

---

[11] The *Tracy* decision is now on appeal for *de novo* review by the district court. *See In re Tracy Broadcasting,* No. 10-CV-02522 (D. Colo., filed Oct. 15, 2010).

between private and public interests in FCC license proceeds, outlined in *In re Ridgely* and *In re Cheskey*, would have no meaning, and the private interests would be devoid of value.").

Moreover, the only case *Tracy* cites for its central conclusion is a 1933 Ninth Circuit decision regarding the validity of purported security interests in crops not yet planted by a farmer. *See Tracy*, 438 B.R. at 330 (*citing Sims v. Johnson*, 67 F.2d 411 (9th Cir. 1933)). *Sims*, decided in the midst of the Great Depression, held that prepetition liens on crops that had not yet been planted could be discharged in bankruptcy, and noted that the same rule applied for the wages of laborers that had not yet been earned. *Sims*, 67 F.2d at 411. The anti-peonage rule set forth in *Sims* is not even remotely relevant to the determination at bar here regarding the economic value generated by an asset which can be liquidated without significant effort and is held by a sophisticated debtor. Inexplicably, in relying on the Ninth Circuit's *Sims* ruling, the *Tracy* Court disregarded the Ninth Circuit's decision in *MLQ Investors*, which not only came 65 years after Sims but expressly dealt with FCC licenses, not crops. And, as noted, contrary to *Sims, MLQ Investors* makes clear that a lien on the proceeds or value of FCC licenses may indeed be perfected prior to any sale or transfer of the licenses. *See MLQ Investors*, 146 F.3d at 749. The precedential value of *Sims* is further called into doubt in a case like this involving liens on FCC licenses because, unlike *Urban Communicators*, *Media Properties*, and *MLQ Investors*, it was decided decades before "general intangibles" were added as a category of collateral under the UCC. *Id.*; *see also* 8 Hawkland UCC Series § 9-106:1 (Reuters 2010 ed.) (describing history of "general intangibles" to UCC).

Accordingly, as *Tracy* was improperly decided and directly conflicts with the manifest weight of the authorities within this district and elsewhere, as well as FCC policy, summary judgment should issue in the Ad Hoc Group's favor on Count Two of both Plaintiffs'

Complaints. To rule otherwise would effectively invalidate every lien ever granted on an FCC license by anyone, disrupt the settled exceptions of investors everywhere, and preclude future financings of often costly FCC licenses.

(b)   **The Senior Secured Noteholders May Properly Be Granted Credit For The Value of the FCC Licenses In The Event Of A Reorganization Of Debtors.**

Without citing to a single case or statute, Sprint Nextel, but not the Official Committee, makes the additional argument that the Senior Secured Noteholders are not entitled to any value attributable to the FCC Licenses in the event that Debtors are successfully reorganized as no "proceeds" from the FCC Licenses would have been generated. (*See* Sprint Nextel's Memorandum of Law in Support of its Motion for Summary Judgment (Dkt. No. 39) ("Sprint Mem."), at 21-22.) This exact same argument was considered and rejected in a recent decision in this district. *See Ion Media,* 419 B.R. at 600. In *Ion Media,* the plan of reorganization called for the senior secured noteholders to exchange their notes for equity in the reorganized entity reflecting the value of their security interest in the debtors' FCC licenses. *Id.* Bankruptcy Judge Peck approved this arrangement, over the objection of a junior creditor group, concluding that ". . . sale of the Debtors' FCC Licenses would yield proceeds that are subject to an enforceable lien in favor of the [senior secured noteholders] . . . . The Court agrees that the Plan, predicated on a debt for equity exchange, is not generating sales proceeds in the sense that term is used, but is satisfied that in the context of asserting rights to the value of the FCC Licenses this is not a relevant distinction." *Id.,* at 600 n.21. The *Ion Media* decision is both legally sound and consistent with the policy considerations behind the Bankruptcy Code.

The distinction that Sprint Nextel urges between a sale and a reorganization would create the absurd result under which the Secured Noteholders would be entitled to the value of the FCC Licenses in the event of a sale or liquidation, but not in the event of a reorganization. Such a

result would be contrary to the plain meaning of the Security Agreement which clearly evidences an intent by the parties to allocate all value, however realized, on account of the FCC Licenses to the Senior Secured Noteholders. (*See* 7056-1 Stmt., at ¶ 12 (Security Agreement grants U.S. Bank a security interest in not only the "proceeds"[12] of the FCC Licenses, but also all "goodwill or other intangible rights or benefits associated therewith" along with all of Debtors' "general intangibles.")); *see also Lipper Holdings, LLC v. Trident Holdings, LLC*, 1 A.D.3d 170, 171 (1st Dep't 2003) (a court should not interpret a contract in a manner that would be "absurd, commercially unreasonable, or contrary to the reasonable expectations of the parties.") (internal citations omitted). Such a result would also be contrary to the fundamental purposes of the Bankruptcy Code, which is intended to foster reorganizations rather than liquidations. *See In re Chateaugay Corp.*, 201 B.R. 48, 72 (Bankr. S.D.N.Y. 1996), *aff'd in part*, 213 B.R. 633 (S.D.N.Y. 1997) ("Public policy, as evidenced by chapter 11 of the Bankruptcy Code, strongly favors the reorganization and rehabilitation of troubled companies and concomitant preservation of jobs and going concern values."); *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 528 (1984) ("[t]he fundamental purpose of reorganization is to prevent a debtor from going into liquidation"). Accordingly, the Senior Secured Noteholders are entitled to all value attributable to the FCC Licenses in the event that their claims against the estate are satisfied in kind as part of a successful reorganization of Debtors.

---

[12] Despite Sprint Nextel's argument to the contrary, the value of the FCC Licenses distributed in a reorganization of Debtors would, in fact, constitute "proceeds" in the same manner as cash realized through a sale. *See* NY UCC § 9-102(64) (defining "proceeds" as "whatever is collected on, or distributed on account of" collateral); *In re Weiss*, 376 B.R. 867, 878 (Bankr. N.D. Ill. 2007) (The definition of "proceeds" under the UCC is "so broad that there is very little difference between the right to proceeds and the right to the full business interest.")

## III. U.S. BANK'S SECURITY INTEREST IN THE VALUE OF THE FCC LICENSES IS NOT IMPAIRED BY SPRINT NEXTEL'S CLAIM

For its Fourth Cause of Action, Sprint Nextel alleges that the security interest held by U.S. Bank in the value of the FCC Licenses "must be subordinated to the reimbursement obligation owed to Sprint Nextel" because of an FCC ruling issued in 2000 which held, generally, that MSS licensees were obligated to relocate BAS Incumbents or reimburse a *pro rata* share of such relocation costs under certain circumstances. (Sprint Mem., at 33-4.)[13] From this directive, Sprint Nextel makes the untenable leap to the conclusion that the FCC intended to carve out a property interest in the value of the FCC Licenses that is enforceable by Sprint Nextel and superior to the claims of U.S. Bank. (*Id.*)

As a factual matter, Sprint Nextel grossly misstates the FCC's rulings on the issue. In 2008, eight years after issuance of the 2000 FCC ruling which Sprint Nextel claims supports the position it takes in Count Four of its Complaint, Sprint Nextel commenced an action against TerreStar and 1.9 GHz spectrum entrant DBSD, Inc. ("DBSD") seeking "reimbursement" for amounts Sprint Nextel purportedly planned on expending in connection with the BAS Relocation. *See Sprint Nextel v. New ICO Satellite Services G.P.*, Case No. 1:08cv651 (E.D.Va., filed June 25, 2008). That court subsequently stayed the litigation and referred the matter to the FCC. On September 29, 2010, the FCC issued an order in response to that referral purporting to

---

[13] Sprint Nextel makes much of the fact that this FCC ruling issued in 2000 states that MSS entrants are obligated to comply with the FCC's rules regarding BAS relocation "as a condition of their license." (*See* Sprint Mem., at 33 n.12.) Sprint Nextel's position on this issue is peculiar, to say the least. Sprint Nextel's current use of its multibillion dollar allotment of 1.9 GHz spectrum is subject to the condition that the BAS Relocation have been completed in a timely manner. *See* 2004 Report & Order, at ¶ 252 ("We will require [Sprint] Nextel, *as a condition on [Sprint] Nextel's 1.9 GHz licenses*, to follow a relocation procedure based on its proposed BAS relocation plan and relocate all BAS licensees in the 1990-2025 MHz band *within thirty months* . . . ."). It is undisputed that Sprint Nextel did not complete the BAS Relocation within the allotted thirty months. (*See* Sprint Mem., at 13.)

clarify certain general principals concerning BAS Relocation expenses, but, in its words "not []

adjudicati[ng] the claims that Sprint Nextel, DBSD, and TerreStar have raised in that court

proceeding."[14] *See Improving Public Safety Communications in the 800 MHz Band;*

*Consolidating the 800 and 900 MHz Industrial/Land Transportation and Business Pool*

*Channels,* Fifth Report and Order, Eleventh Report and Order, Sixth Report and Order, and

Declaratory Ruling, 25 F.C.C.R. 13874 (Sept. 29, 2010) ("**2010 Report & Order**").

The 2010 Report & Order does, however, respond to Sprint Nextel's argument that it has

some manner of vested interest in DBSD and TerreStar's FCC licenses:

> Sprint Nextel argues that failure of an MSS entrant to pay its [BAS Relocation] cost
> sharing obligation in a timely fashion should automatically result in the suspension of its
> right to operate and suspension of its license if the failure to pay continues . . . . We will
> adopt no specific policies or procedures as to how we should proceed if later new entrants
> fail to reimburse an earlier entrant for the cost of relocating BAS incumbents as required.
> Instead, we will address complaints regarding failure to make required payments that are
> filed before the Commission through *our* existing enforcement mechanisms.

(*Id.,* at ¶ 73) (emphasis added). The 2010 Report & Order goes on to note that that "[t]he

Commission's actions are not designed to protect the claim of Sprint Nextel . . . [a]ny benefit to

individual industry participants will be wholly incidental to the Commission's stated [public

policy] purpose . . . . "). (*Id.,* at ¶ 81.) Consistent with that purpose, on the same day that the

FCC issued the 2010 Report & Order, it also denied a request by Sprint Nextel to condition the

approval of a transfer of DBSD's MSS license on payment of a portion of Sprint Nextel's

---

[14] Outrageously, Sprint Nextel suggests in its briefing that the 2010 Report & Order is *res
judicata* as to Sprint Nextel's entitlement to be reimbursed for funds it claims to have
expended in connection with the BAS Relocation. (Sprint Mem., at 12 n.6.) For *res judicata*
to apply to an agency decision, however, the decision must be a "final judgment on the
merits" which the language quoted above clearly shows is not the case. *See S.E.C. v. First
Jersey Securities,* 101 F.3d 1450, 1463 (2d Cir. 1996). Further, Sprint Nextel does not
suggest that the FCC issued any type of ruling regarding the issue at hand in this proceeding:
the relative priority of the parties' claims against Debtors' estate. (*See* Sprint Mem., at 12
n.6.)

purported BAS Relocation expenses. *See In re New DBSD Satellite Servs.*, 25 F.C.C.R. 13664 (Sep. 29, 2010). So at its most basic level, Sprint Nextel's demand for summary judgment on Count Four of its Complaint fails because the FCC never granted Sprint Nextel the property interest[15] it is now seeking to assert in the FCC Licenses.

Sprint Nextel fares no better with respect to the statutory and case law on this issue. Sprint Nextel cites to NYUCC § 9-203(b)(2) and Section 506(a) of the Bankruptcy Code for the unremarkable proposition that a secured creditor may have no greater interest in property than the debtor itself holds. (Sprint Mem., at 33-4.) But Sprint Nextel cites no case law applying either statute or suggesting that payment obligations imposed by the FCC somehow impair a license holder's "interest" in the value of such licenses for purposes of these statutes or otherwise. (*Id.*) Instead, Sprint Nextel argues that the Court must respect the "sanctity of these obligations" in support of the FCC's "regulatory mandate." (*Id.*) Aside from being wholly conclusory, this argument fails as a matter of law. *See FCC v. NextWave Personal Commc'ns*, 537 U.S. 293, 303 (2003) (payment obligation imposed by the FCC are a "debt" subject to discharge in the ordinary manner and not entitled to special priority as a regulatory action); *see also* Order on the Motion of Sprint Nextel Corporation to Stay Issues Related to the Allowance and Treatment of its Claims Pending Resolution of its Motion to Withdraw Reference, *In re DBSD North America,* No. 09-13061 (REG) (Bankr. S.D.N.Y. Sep. 11, 2009), at A-8 (". . .

---

[15] Sprint Nextel's argument that the FCC granted Sprint Nextel this property interest by implication is not well taken. The FCC is a sophisticated actor and is aware of how to grant and retain security interests in the value of FCC licenses when it so desires. *See, e.g., Urban Communicators,* 394 B.R. at 329 (FCC filed UCC Financing Statement in its own favor when it sold wireless communication license subject to payment of future licensing fees); *Airadigm Commc'ns, Inc. v. FCC,* 372 B.R. 894, 898 (Bankr. W.D. Wis. 2006) (same); *In re Application for Consent to Assignment of PCS Licenses KNLH651 and KNLH563 from Northstar Tech., LCC to Bannana Commc'ns, LLC,* 23 F.C.C.R. 9122 (June 9, 2008) (FCC declined to recognize security interest in wireless license where secured creditor failed to timely file UCC Financing Statement documenting interest in license).

Sprint can't seriously suggest that the public interest *requires* [that Sprint Nextel's BAS Relocation claims be granted priority in DBSD's bankruptcy].") (emphasis in the original).

Moreover, as Sprint Nextel is now seeking to assert a property interest in the FCC Licenses which has never been expressly granted to it by anyone, its Fourth Cause of Action could best be characterized as seeking an "equitable lien" on the FCC Licenses. *See, e.g., In re O.P.M. Leasing Servs.*, 23 B.R. 104 (Bankr. S.D.N.Y. 1982). But that claim too fails as a matter of law or, at a minimum, raises a host of factual disputes precluding summary judgment.

In *O.P.M.*, a lessee of office equipment sought a declaration that it had an equitable lien on certain leased office equipment after it began to make monthly payments to a third party for maintenance when the debtor-lessor defaulted on its obligation to maintain the equipment. *Id.*, at 109. Essentially, the lessee's theory was that it "should" have a security interest in the office equipment given that it paid maintenance costs that were the obligation of debtor-lessor and enhanced the value of the debtor-lessor's equipment. *Id.*, at 118-19. The Bankruptcy Court rejected this argument, holding that the equitable lien doctrine is only applicable in instances where there is an unambiguous agreement to grant such a lien and the debtor acted in some manner that prevented the grantee from perfecting that security interest. *Id.*

Here, Sprint Nextel is similarly situated to the lessee in *O.P.M.*, alleging that it acted prepetition in a manner that increased the value of the FCC Licenses, but failing to cite to any specific agreement or ruling granting it an interest in such licenses. Thus, as in *O.P.M.*, the equitable lien doctrine is inapplicable here, thereby requiring denial of summary judgment as to Sprint Nextel's Count Four. Alternatively, the foregoing analysis illustrates that Sprint Nextel's claim for an equitable lien at best raises numerous questions of fact preclude summary judgment. *See generally, Matter of Hollinrake*, 93 B.R. 183, 192 (Bankr. S.D. Iowa 1988). Indeed, as

noted, Sprint Nextel has not yet responded to all discovery demands or even sat for depositions in this case.

## CONCLUSION

For the foregoing reasons, the Ad Hoc Group respectfully requests that this Court dismiss Counts One and Two asserted by Sprint Nextel and the Official Committee in their Complaints with prejudice and that summary judgment as to these claims be entered in favor of Defendants. The Ad Hoc Group further respectfully requests that this Court deny Sprint Nextel's motion for summary judgment on Count Four of its Complaint, and grant any other and further relief as is just to the Ad Hoc Group.

Dated: March 25, 2011

/s Jonathan Henes
Jonathan S. Henes
Joseph Serino, Jr.
Hunter Murdock
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022-4611
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

*and*

Patrick J. Nash, Jr. (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (212) 446-2200
*Counsel to the Ad Hoc Group of Holders of
15% Senior Secured Notes*