ARNALL GOLDEN GREGORY LLP
171 17th Street N.W.
Suite 2100
Atlanta, Georgia 30363
Telephone: (404) 873-8500
Facsimile: (404) 873-8121
Darryl S. Laddin (DL-5130)
Frank N. White
Matthew T. Covell

*Counsel for Sprint Nextel Corporation*

# UNITED STATES BANKRUPTCY COURT
# SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x

In re:                                                       :        Chapter 11
                                                             :
TERRESTAR NETWORKS, INC. *et al.*,                           :        Case No. 10-15446 (SHL)
                                                             :        (Jointly Administered)
                            Debtors.                         :
                                                             :
---------------------------------------------------------------x
                                                             :
SPRINT NEXTEL CORPORATION, and                               :
OFFICIAL COMMITTEE OF UNSECURED                              :
CREDITORS OF TERRESTAR NETWORKS,                             :        Adv. Pro. No. 10-05461
INC., *et al.*,                                              :
                                                             :
             Plaintiff and Plaintiff-Intervenor,             :
                                                             :
v.                                                           :
                                                             :
U.S. BANK NATIONAL ASSOCIATION,                              :
in its capacity as Indenture Trustee and Collateral          :
Agent for the 15.0% Senior Secured Payment-In-               :
Kind Notes due 2014, AD HOC GROUP OF                         :
NOTEHOLDERS OF 15% SECURED NOTES,                            :
and TERRESTAR NETWORKS, INC., *et al.*,                      :
                                                             :
             Defendant and Defendant-Intervenors.            :
---------------------------------------------------------------x

## COMBINED REPLY BRIEF IN SUPPORT OF PLAINTIFF SPRINT NEXTEL
## CORPORATION'S MOTION FOR PARTIAL SUMMARY JUDGMENT
## AND RESPONSE IN OPPOSITION TO DEFENDANTS' CROSS-MOTIONS
## <u>FOR SUMMARY JUDGMENT</u>

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ................................................................................................ 1

II.  ARGUMENT AND CITATION OF AUTHORITIES ..................................................... 4

A.  The Responding Defendants Have Not Even Attempted To Rebut  Sprint Nextel's Showing That It Is Entitled To Summary Judgment  On Count I ........... 4

B.  The Responding Defendants Also Have Not Rebutted Sprint Nextel's Showing That It Is Entitled To Summary Judgment On Count II ........................ 6

1.  Under established UCC law, any purported security interest  in the proceeds or value of the Debtors' FCC Licenses has  never attached ................................................................................................. 8

2.  Under section 552(b)(1) of the Code, any purported security interest in the proceeds or value of the Debtors' FCC Licenses cannot attach or be given effect now that the Debtors have filed for bankruptcy protection .......................................................................... 9

a.  UCC § 9-408, on which both Defendants rely,  only undermines their position in this case .......................................... 10

b.  Proceeds cannot serve as both original  "collateral" or "property" and the  "proceeds" or "value" thereof ..................... 13

3.  The authorities on which the Defendants rely are inapplicable,  and do not support the conclusions urged by the Defendants,  because they neither addressed nor decided the UCC and section  552 arguments presented in this case ............................................................ 15

4.  The only cited decision truly analogous to this case is Tracy Broadcasting, which supports the entry of summary  judgment in favor of Sprint Nextel ............................................................... 20

C.  The Responding Defendants Have Failed To Address Or Rebut The Specific Basis for Sprint Nextel's Showing That It Is Entitled To Summary Judgment On Count IV ....................................................................... 23

D.  U.S. Bank Is Not Entitled To Summary Judgment On Count III ........................ 29

III.  CONCLUSION ................................................................................................. 34

# TABLE OF AUTHORITIES

## Cases

In re Beach Television Partners, 38 F.3d 535 (11th Cir. 1994) .................................................... 17

In re Brazelton Cedar Rapids Group LC, 264 B.R. 195 (Bankr. N.D. Iowa 2001) ..................... 30

In re Cheskey, 9 F.C.C.R. 986 (1994) ............................................................................ 4, 8, 16

In re Crouch, 51 B.R. 331 (Bankr. D. Or. 1985) ...................................................................... 31

In re Ion Media Networks, Inc., 419 B.R. 585 (Bankr. S.D.N.Y. 2009) ............................... 18, 19

In re Media Properties, Inc., 311 B.R. 244 (Bankr. W.D. Wisc. 2004) ..................................... 4, 21

In re PBR Communications Systems, Inc., 172 B.R. 132 (Bankr. S.D. Fla. 1994) ..................... 17

In re Ridgely Communications, 139 B.R. 374 (Bankr. D. Md. 1992) ............................... 2, 15, 16

In re Thomas Communications, Inc., 166 B.R. 846 (S.D. W.Va. 1994) ................................. 4, 17

In re Trans-Texas Petroleum Corp., 33 B.R. 67 (Bankr. N.D. Tex. 1983) ................................. 31

In re WPAL-FM, 24 F.C.C. Rcd. 2894 (Media Bur. 2009) ........................................................ 4

Milliken v. Bradley, 433 U.S. 267 (1977) ................................................................................ 30

MLQ Investors, L.P. v. Pacific Quadracasting, Inc., 146 F.3d 746 (9th Cir. 1998) ....... 2, 4, 15, 16

Nat'l Labor Relations Bd. v. Donna-Lee Sportswear Co., Inc., 836 F.2d 31 (1st Cir. 1987) ....... 27

Sims v. Johnson, 67 F.2d 409 (9th Cir. 1933) ......................................................................... 21

Spectrum Scan LLC v. Valley Bank and Trust Co. (In re Tracy Broadcasting
    Corporation), 438 B.R. 323 (Bankr. Colo. 2010) ......................................................... 3, 20, 21

State Street Bank and Trust Co. v. Arrow Communications, Inc., 833 F. Supp. 41 (D.
    Mass. 1993) ...................................................................................................................... 17

Teledesic LLC v. FCC, 275 F.3d 75 (D.C. Cir. 2001) ......................................................... 27, 28

United Virginia Bank v. Slab Fork Coal Co., 784 F.2d 1188 (4th Cir. 1986) ............................. 31

Urban Communicators PCS Ltd. Partnership v. Gabriel Capital, L.P., 394 B.R. 325
    (S.D.N.Y. 2008) ............................................................................................................ 17, 18

West Suburban Bank of Darien v. CCGK Investors (In re CCGK Investors), 145 B.R.
    908 (Bankr. N.D. Ill. 1992) ............................................................................................... 30

## Rules and Statutes

11 U.S.C. § 506(a)(1) ............................................................................................................ 24

11 U.S.C. § 552(a) ................................................................................................................ 10

11 U.S.C. § 552(b)(1) ......................................................................................................... 6, 10

47 U.S.C. § 310(d) ................................................................................................................ 10

3052513v4

N.Y.U.C.C. § 9-102(64) ................................................................................. 6

N.Y.U.C.C. § 9-203(a) ................................................................................. 8

N.Y.U.C.C. § 9-203(b)(2) ........................................................................... 24

N.Y.U.C.C. § 9-315(c) ................................................................................. 8

N.Y.U.C.C. § 9-408 ................................................................................... 12

UCC § 9-322 ............................................................................................. 8

UCC § 9-408 ................................................................................. 10, 11, 12

## Articles and Reports

E. Smith, ARTICLE 9 IN REVISION: A PROPOSAL FOR PERMITTING SECURITY INTERESTS IN
NONASSIGNABLE CONTRACTS AND PERMITS, 28 Loy. L.A. L. Rev. 335 (1994) ............... 12, 15

H.R. Rep. No. 95-595 (1977) ...................................................................... 31

New York State Law Revision Commission, Report on the Proposed Revised Article 9
(Secured Transactions) of the Uniform Commercial Code (2001) ......................... 12

S. Rep. No. 95-989 (1978) ......................................................................... 30

Winston & Strawn LLP Restructuring and Insolvency Practice Briefing, BANKRUPTCY
COURT APPLIES SECTION 552 TO INVALIDATE LENDER'S SECURITY INTEREST IN
PROCEEDS OF FCC LICENSE (2011) ............................................................. 22

Plaintiff Sprint Nextel Corporation ("Sprint Nextel") submits this combined Reply Brief in support of its pending Motion for Partial Summary Judgment and Response in opposition to the cross-motions for summary judgment filed by two of the Defendants, U.S. Bank and the Senior Secured Noteholders.[1]  In support of its Motion, and in opposition to the Defendants' cross-motions, Sprint Nextel respectfully shows the Court as follows:

## I.    INTRODUCTION

Sprint Nextel's Motion requests that the Court grant summary judgment in its favor on three of the four counts of its Complaint for Declaratory Relief in this proceeding, Counts I, II and IV.  The Committee, which intervened as a co-Plaintiff in the case, has filed its own motion for summary judgment on Counts I and II.

Despite the fact that they affirmatively intervened as co-Defendants in the case, the Debtors have decided to take no position with respect to the Plaintiffs' motions for summary judgment.[2]  (See Debtors' Statement in Response to Plaintiffs' Motions for Summary Judgment [Docket No. 49] filed on March 25, 2011.)  Oppositions to the Plaintiffs' motions have been filed by Defendants U.S. Bank and the Senior Secured Noteholders.  In addition, these Defendants have filed cross-motions for summary judgment.  The motion filed by the Senior Secured Noteholders requests summary judgment as to Counts I and II only, while the motion filed by U.S. Bank seeks summary judgment on all four counts of the Complaint, including – despite the fact that discovery has not been completed in the case – the fact-intensive, vigorously disputed and purely equitable Count III.

---

[1]    Capitalized terms that are not otherwise defined herein shall have the meanings ascribed to them in Sprint Nextel's opening Memorandum of Law in support of its Motion for Partial Summary Judgment.

[2]    The Committee is thus the only estate fiduciary in the associated Chapter 11 cases to take a position on the issues presented in this proceeding, and has joined Sprint Nextel in requesting that the Court grant the declaratory relief requested in Counts I and II of the Complaint.

The responses and cross-motions filed by U.S. Bank and the Senior Secured Noteholders are most notable, however, for the extent to which they skirt the issues raised in the Plaintiffs' summary judgment motions rather than attempting to address them. The Plaintiffs' showing that they are entitled to summary judgment on Count I of the Complaint, which deals solely with the validity of purported security interests in the FCC Licenses themselves, is entirely unchallenged by the Defendants. Rather, the responses filed by both Defendants dive immediately into a discussion of whether the Senior Secured Noteholders have valid and enforceable liens on the proceeds or economic value to be derived from the FCC Licenses. But that separate issue is the subject of Count II of the Complaint, not Count I. Moreover, the distinction between these two counts – one of which deals with the so-called "original collateral" (the FCC Licenses) and the other of which deals specifically with the proceeds or economic value thereof – is critical to a proper understanding and legally correct analysis of the issues presented by the Plaintiffs' motions. The responding Defendants are no doubt aware that this is the case, and have deliberately conflated the issues presented by Counts I and II in an effort to blur this critical distinction, as it must in order for the Defendants to have any hope of overcoming the Plaintiffs' summary judgment motions or prevailing on their own.

In addition, and even as to Count II, the responding Defendants rely entirely on an outmoded and largely inapplicable line of cases originating with the decisions in In re Ridgely Communications, 139 B.R. 374 (Bankr. D. Md. 1992), and MLQ Investors, L.P. v. Pacific Quadracasting, Inc., 146 F.3d 746 (9th Cir. 1998). In neither these supposedly "seminal" decisions nor the more recent decisions (including decisions in this district) that rely upon them, however, did the parties apparently raise, or the courts endeavor to analyze, the arguments under the Uniform Commercial Code ("UCC") and section 552 of the Bankruptcy Code that the

- 2 -

Plaintiffs have raised in their summary judgment motions here. <u>Ridgely</u>, <u>MLQ Investors</u> and their progeny thus have no significant relevance or precedential value in this case. In fact, the only case involving a set of facts, issues and legal arguments that mirrors those in this proceeding is the decision in <u>Spectrum Scan LLC v. Valley Bank and Trust Co. (In re Tracy Broadcasting Corporation)</u>, 438 B.R. 323, 327-328 (Bankr. Colo. 2010). The sound reasoning and well-founded conclusions of the court in <u>Tracy Broadcasting</u>, meanwhile, squarely dictate that summary judgment on Count I and II of the Complaint in this case be granted in the Plaintiffs' favor.

With respect to Sprint Nextel's request for summary judgment on Count IV, the responding Defendants similarly attempt to evade the issues presented by variously mischaracterizing both the relief that Sprint Nextel has requested and the basis for that relief. In so doing, the Defendants succeed at nothing more than knocking down "straw men" of their own creation, leaving Sprint Nextel's actual claim and request for relief – which is based specifically upon provisions of the UCC and the Bankruptcy Code – largely unchallenged.

Finally, U.S. Bank's request for entry of summary judgment on Count III of the Complaint is simply premature. As the Court has expressly noted during conferences with the parties, and as all of the other parties (including the Senior Secured Noteholders) apparently agree, Count III – seeking relief under the "equities of the case" exception of section 552(b)(1) of the Code based on an extensive, complex and vigorously disputed set of facts – is not ripe for determination on summary judgment until all discovery has been completed in this case. In addition, U.S. Bank's motion as to Count III is based on an overly restrictive application of the "equities of the case" exception that is not found or supported anywhere on the face of section 552(b)(1). For these reasons alone, U.S. Bank's motion for summary judgment on Count III

- 3 -

must be denied.

## II.    ARGUMENT AND CITATION OF AUTHORITIES

**A.    The Responding Defendants Have Not Even Attempted To Rebut Sprint Nextel's Showing That It Is Entitled To Summary Judgment On Count I.**

As an initial matter, Sprint Nextel has amply demonstrated that it is entitled to summary judgment on Count I of the Complaint in this proceeding. The only matter at issue in Count I is whether the Senior Secured Noteholders have a valid or enforceable security interest in *the FCC Licenses themselves*. And, as a matter of settled law, the answer to that question plainly is in the negative. (*See* discussion and authorities cited in Sprint Nextel's opening Memorandum of Law at pp. 17-20.)

Indeed, this indisputable conclusion is confirmed even by authorities on which U.S. Bank and the Senior Secured Noteholders otherwise rely heavily in their responses. *See* In re Media Properties, Inc., 311 B.R. 244, 247 (Bankr. W.D. Wisc. 2004) (In and of itself, "a broadcast license issued by the [FCC] does not convey a property interest."); In re Thomas Communications, Inc., 166 B.R. 846, 847 (S.D. W.Va. 1994) ("FCC policy prohibits a licensee from giving a security interest in a license"); MLQ Investors, 146 F.3d. at 748 ("[T]he FCC may prohibit security interests in licenses themselves because the creation of such an interest could result in foreclosure and transfer of the license without FCC approval."); In re Cheskey, 9 F.C.C.R. 986, 987 n. 8 (1994) ("The creditor has no rights over the [FCC] license itself").[3] *See also, e.g.*, In re WPAL-FM, 24 F.C.C. Rcd. 2894, 2897 (Media Bur. 2009) (the FCC "has

---

[3] In addition, the Defendants have at all times been well aware of, and knowingly accepted, their inability to obtain a viable security interest in the FCC Licenses themselves. As noted by Sprint Nextel in its opening Memorandum of Law (at p. 6), the Offering Memorandum that was circulated to potential investors in the Senior Secured Notes disclosed certain "Risk Factors," including the fact that "[c]urrent FCC policy prohibits the grant of a security interest in an FCC radio frequency license or authorization. . . . As a result, . . . holders of the notes will not have a direct security interest in these licenses and authorizations."

repeatedly observed that 'a license, as distinguished from a station's physical assets, is not subject to a mortgage, security interest, or lien, pledge, attachment, seizure, or similar property right.'").

In addition, the Defendants have at all times been well aware of, and knowingly accepted, their inability to obtain a viable security interest in the FCC Licenses themselves. As noted by Sprint Nextel in its opening Memorandum of Law (at p. 6), the Offering Memorandum that was circulated to potential investors in the Senior Secured Notes disclosed certain "Risk Factors," including the fact that "[c]urrent FCC policy prohibits the grant of a security interest in an FCC radio frequency license or authorization. . . . As a result, . . . holders of the notes will not have a direct security interest in these licenses and authorizations."

In their responses, neither of the Defendants even addresses this issue squarely, much less attempts to rebut it. Rather, and for calculated reasons that readily become apparent when the appropriate analysis is conducted (see discussion below), the responses filed by both Defendants, while purporting to address Count I, instead delve immediately into a discussion of the Senior Secured Noteholders' purported security interests in the proceeds or economic value to be derived from the FCC Licenses. (*See* U.S. Bank's Memorandum of Law [Docket No. 55] at pp. 9-14; Senior Secured Noteholders' Memorandum of Law [Docket No. 51] at pp. 10-14.) The validity and enforceability of the purported liens on the proceeds or economic value of the FCC Licenses, however, are the subjects of *Count II* of the Complaint, not Count I. Accordingly, and as a result of their decision to conflate and blur the distinction between Counts I and II, Sprint Nextel's demonstration that it is entitled to summary judgment on Count I stands entirely unchallenged by the Defendants. For this reason, and by virtue of the showing in its opening Memorandum of Law, Sprint Nextel's motion for summary judgment as to Count I should be

granted, and the Defendants' cross-motions as to Count I should be denied.

**B.  The Responding Defendants Also Have Not Rebutted Sprint Nextel's Showing That It Is Entitled To Summary Judgment On Count II.**

Sprint Nextel further submits that the conflation of Counts I and II in the responses filed by U.S. Bank and the Senior Secured Noteholders is deliberate, because doing so, and hoping that the Court will lose sight of the critical distinction between the two counts in this particular case, is the only way in which they can hope to overcome Sprint Nextel's entitlement to summary judgment as to Count II.

Sprint Nextel's motion as to Count II is based largely on its contentions that, as a matter of applicable UCC and bankruptcy law, any purported liens on the proceeds or economic value of the Debtors' FCC Licenses – assuming *arguendo* that such liens can be granted by an FCC licensee in the first instance – have never previously attached in these cases, because no sale or other disposition of the FCC Licenses has ever occurred, and cannot attach or be given any effect now because the Debtors have filed for bankruptcy protection.  In this context, the distinction between the original "collateral" or "property" subject to the purported security interest – that is, the FCC Licenses themselves – and the purported security interest in the proceeds or value to be derived from that "collateral" or "property" is critical.  Both the UCC and section 552(b)(1) of the Bankruptcy Code refer to and deal with these concepts separately, as they must, because the requirements for attachment and validity differ for each and, under section 552(b)(1), are dependent upon one another.  *See* N.Y.U.C.C. § 9-102(64) (distinguishing between "collateral" and the "[p]roceeds" or "value" derived therefrom); 11 U.S.C. § 552(b)(1) (distinguishing between a security interest in "property of the debtor acquired *before* the commencement of the case" and a security interest in any "proceeds, products, offspring, or profits of such property

acquired by the estate *after* the commencement of the case") (emphasis added).[4]

In their responses to Sprint Nextel's Motion, both of the Defendants point to authorities for the general proposition that an FCC licensee is permitted to grant a security interest in the proceeds or value of its license, and that such a grant is permissible, under FCC policies and federal law, because it implicates a "private economic right" between contracting parties rather than a "public right" in which the FCC has a regulatory interest. (*See* U.S. Bank's Memorandum of Law at pp. 10-14; Senior Secured Noteholders' Memorandum of Law at pp. 10-14.) But the Defendants then act as if the establishment of this general proposition is the end of the inquiry.

In the present case, however, it is only the beginning of the relevant analysis. Given the statutory basis for the relief that Sprint Nextel has requested in Count II of its Complaint, at least two additional questions are required to be addressed:

(1) Has any purported security interest in the proceeds or value of the Debtors' FCC Licenses that was granted to the Senior Secured Noteholders ever attached under the UCC, given that no sale or other disposition of the FCC Licenses has ever occurred?; and

(2) Under section 552(b)(1) of the Bankruptcy Code, can any purported security interest in the proceeds or value of the Debtors' FCC Licenses that was granted to the Senior Secured Noteholders ever attach or be given effect now that the Debtors have filed for bankruptcy protection?

In its opening Memorandum of Law, Sprint Nextel has already demonstrated, as a matter of law, that both of these questions must be answered in the negative. Moreover, none of the authorities on which the Defendants rely supports a contrary conclusion, because in none of those cases was either of these questions even presented or addressed, much less decided by the

---

[4]     The Security Agreement at issue in this case also refers to the FCC Licenses and any "monies, proceeds, or other consideration in connection with the sale, assignment, transfer, or other disposition" thereof as distinct and separate items subject to the purported security interests granted therein. (*See* Security Agreement at § 3.)

courts.

**1.** **Under established UCC law, any purported security interest in the proceeds or value of the Debtors' FCC Licenses has never attached.**

Separate and apart from the question of whether the Debtors were permitted to grant a security interest in any proceeds or value of their FCC Licenses – which is the primary focus of the Defendants' responses – is the question of whether, under the facts present in this case, any such security interest has ever *attached*. The latter question is governed by the UCC as enacted in the state of New York. And as Sprint Nextel has already demonstrated, under established New York law, a security interest in the proceeds of an item of collateral, even if treated as a general intangible, does not attach and is not perfected unless and until a sale or disposition of the collateral occurs and generates such proceeds. (*See* discussion and authorities cited in Sprint Nextel's opening Memorandum of Law at pp. 22-28.) In addition to the numerous New York authorities cited in Sprint Nextel's opening Memorandum of Law, this established principle is confirmed in the UCC itself. *See, e.g.*, N.Y.U.C.C. § 9-203(a) (a security interest does not attach to an item of collateral until "it becomes enforceable against the debtor with respect to the collateral"); Official Comment # 6 to § 9-322 to the UCC Article 9 revision (under UCC § 9-203, "a security interest in proceeds of original collateral does not attach and is not perfected until the proceeds come into existence and the debtor acquires rights in them"). *See also* N.Y.U.C.C. § 9-315(c) (a security interest in proceeds is perfected only if the security interest in the original collateral is perfected, which in this case, did not occur as a matter of law). With respect to proceeds derived from an FCC license in particular, the principle is also confirmed by authorities on which the Defendants otherwise rely in their responses. *See* Cheskey, 9 F.C.C.R. at 987 ("The creditor has no rights over the license itself, nor can it take any action under its security interest until there has been a transfer which yields proceeds subject to the security interest.").

Again, *the Defendants have at all times been well aware of, and knowingly accepted, this fact*. Also among the "Risk Factors" identified in the Offering Memorandum that was circulated to potential investors in the Senior Secured Notes was the disclosure that their "rights in the collateral may be adversely affected by the failure to perfect security interests in certain collateral acquired in the future. Applicable law requires that certain property and rights acquired after the grant of a general security interest can only be perfected at the time such property and rights are acquired and identified." (*See* Sprint Nextel's opening Memorandum of Law at p. 6.) If the Defendants' characterization of the law of attachment were correct, there would have been no need for disclosure of this "Risk Factor" in the Offering Memorandum.

In the present case, it is undisputed that no "sale, assignment, transfer, or other disposition" of the Debtors' FCC Licenses, *see* Security Agreement at § 3, has ever occurred, or is even currently proposed, and thus no proceeds or economic value has been generated to date. Consequently, and as a matter of applicable New York law, any security interest that the Debtors granted in the proceeds or value to be derived from a sale or disposition of the FCC Licenses has never attached.

      **2.** **Under section 552(b)(1) of the Code, any purported security interest in the proceeds or value of the Debtors' FCC Licenses cannot attach or be given effect now that the Debtors have filed for bankruptcy protection.**

Given that any security interest that the Debtors granted in the proceeds or value of their FCC Licenses has never attached to date, the next inquiry is whether any such interest can attach or be given effect now that the Debtors have filed for bankruptcy protection. That question is governed by section 552 of the Bankruptcy Code. Section 552 provides that "property acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of

- 9 -

the case." 11 U.S.C. § 552(a).

The exception to this rule applies where the security interest created by the applicable security agreement "extends [both] to property of the debtor acquired before the commencement of the case *and* to proceeds . . . of such property . . . ." 11 U.S.C. § 552(b)(1) (emphasis added). Only if the security interest is valid and enforceable as to property of the debtor "acquired *before the commencement of the case*," however, is the interest also valid and enforceable with respect to the proceeds derived from such property "acquired by the estate *after the commencement of the case*." Id. Courts are therefore required by section 552(b)(1) to ensure that a creditor had a valid lien on the pre-petition property from which post-petition proceeds arose – that is, the underlying, original collateral – in order to find that the post-petition proceeds of that property are encumbered. (*See* discussion and authorities cited in Sprint Nextel's opening Memorandum of Law at pp. 28-31.)

Under section 552(b)(1), as Sprint Nextel has demonstrated, the Senior Secured Noteholders cannot have a valid or enforceable lien on any proceeds or value of the FCC Licenses that are generated post-petition (in whatever form such proceeds or value may take) because, as a matter of federal law, they had no valid or enforceable lien on the underlying, original collateral, the FCC Licenses themselves. *See, e.g.*, 47 U.S.C. § 310(d). (*See also* discussion and authorities cited in Sprint Nextel's opening Memorandum of Law at pp. 17-20.)

### a. UCC § 9-408, on which both Defendants rely, only undermines their position in this case.

The Defendants' reliance on UCC § 9-408, which they characterize as invalidating any statutory, regulatory or other governmental restriction on the assignment of a general intangible as security (*see* U.S. Bank's Memorandum of Law at p. 20; Senior Secured Noteholders' Memorandum of Law at p. 18), is unavailing for a number of reasons. In fact, an analysis of the

- 10 -

treatment of § 9-408(c) in the governing state of New York serves only to demonstrate that the Defendants' entire position in this case is unfounded.

The Defendants contend that the Senior Secured Noteholders have a separate and valid lien on the "economic value" of the FCC Licenses, even though they cannot have a lien on the FCC Licenses themselves. Meanwhile, sub-section (c) of the revised UCC § 9-408 is the provision that overrides restrictions against security interests imposed by "rule of law, statute, or regulation" to which the Defendants refer, and that was included in Revised Article 9 to allow parties to obtain a security interest in the economic value of property that could not otherwise constitute lawful collateral.[5]  *See* UCC § 9-408, Official Comment # 7 and Example # 4 (describing how revised § 9-408(c) permits lenders to avoid the effects of section 552 in bankruptcy, because for the first time it permits a debtor to grant a security interest in the "going business" value of a franchise, license or other form of property that otherwise cannot be pledged as collateral as a matter of law; as a result, "the security interest would attach to the proceeds of any sale of the franchise while a bankruptcy is pending") and Official Comment # 8 (revised section § 9-408(c) "mak[es] available previously unavailable property as collateral").  *See also*

---

[5]        Sub-section (c) of the revised UCC § 9-408 provides as follows:

(c) [Legal restrictions on assignment generally ineffective.]

A rule of law, statute, or regulation that prohibits, restricts, or requires the consent of a government, governmental body or official, person obligated on a promissory note, or account debtor to the assignment or transfer of, or creation of a security interest in, a promissory note, health-care-insurance receivable, or general intangible, including a contract, permit, license, or franchise between an account debtor and a debtor, is ineffective to the extent that the rule of law, statute, or regulation:

> (1) would impair the creation, attachment, or perfection of a security interest; or

> (2) provides that the the assignment or transfer or creation, attachment, or perfection of the security interest may give rise to a default, breach, right of recoupment, claim, defense, termination, right of termination, or remedy under the promissory note, health-care-insurance receivable, or general intangible.

UCC § 9-408(c).

3052513v4

E. Smith, Article 9 in Revision: A Proposal for Permitting Security Interests in Nonassignable Contracts and Permits, 28 Loy. L.A. L. Rev. 335 (1994); New York State Law Revision Commission, Report on the Proposed Revised Article 9 (Secured Transactions) of the Uniform Commercial Code at 21, 103 (2001) ("The rights created by Revised Section 9-408 in general intangibles are limited, but they have commercial importance. Many businesses have as an important component a license or franchise, and these licenses and franchises are, by their terms or by law, often non-assignable. . . . A secured party often wants to take a security interest in an entire business enterprise in order to have the opportunity to capture the value of a going concern in the event of a foreclosure sale. [Because of section 552 of the Code, t]his current inability to capture the value of a going concern is also present in bankruptcy.").

In the present case, however, and for at least two reasons, § 9-408(c) of Revised Article 9 offers no support to the Defendants. First, when New York enacted the revised Article 9, sub-section (c) of § 9-408 was specifically excluded. In other words, *the revised UCC § 9-408(c) has never been enacted in the state of New York. See* N.Y.U.C.C. § 9-408.[6] Second, and even if the provision had been enacted in New York, it would be a provision of state law that expressly "does not" – and under the supremacy clause of the U.S. Constitution cannot – "override federal law to the contrary." UCC § 9-408, Official Comment # 9. Accordingly, under the version of UCC § 9-408 that has been enacted in New York, and that controls in this case, *borrowers remain legally unable to grant a separate, limited security interest in the economic value of an item of property that is otherwise non-assignable as a matter of federal law.*

---

[6] The New York version of § 9-408 does contain a sub-section (c), but that sub-section is actually sub-section (d) of the revised UCC § 9-408. When sub-section (c) of the revised UCC section was omitted from the version of the statute enacted in New York, sub-section (d) of the revised section became sub-section (c) of the New York version. *Compare* UCC § 9-408 *with* N.Y.U.C.C. § 9-408.

**b.** **Proceeds cannot serve as both original "collateral" or "property" and the "proceeds" or "value" thereof.**

Finally, and in what amounts to a last ditch effort to end-run the requirements of section 552(b)(1), the Defendants seek to characterize the proceeds or value to be derived from the FCC Licenses, as opposed to the FCC Licenses themselves, as an item of original collateral to which the Senior Secured Noteholders' purported security interest attached and was perfected prior to the Debtors' bankruptcy petition.  (*See* U.S. Bank's Memorandum of Law at pp. 18-19; Senior Secured Noteholders' Memorandum of Law at pp. 14-15.)  This effort, Sprint Nextel submits, is the impetus for the Defendants' calculated conflation of Counts I and II of the Complaint in their responses.  For a number of reasons, however, the Defendants' contention is this regard is unsustainable.

First, "proceeds" cannot qualify simultaneously as both the original "collateral" and the "proceeds" of that collateral under applicable UCC provisions such as §§ 9-102(64) and 9-315, or as both the original "property" and the "proceeds of such property" under section 552(b)(1). In other words, there can be no "proceeds" except upon the sale or disposition of a separate and distinct item of original "collateral" or "property."  In this case, the original "collateral" or "property" in which the Debtors granted a purported security interest prior to the Debtors' bankruptcy filing was the FCC Licenses themselves (which interest, as a matter of federal law, was not valid or enforceable).  Any purported security interest in the proceeds or value to be derived from the FCC Licenses – even one granted by the Debtors pre-petition – is, by definition, a separate item that is purportedly subject to that interest, to which different requirements for attachment apply under the UCC, and to which different requirements for validity and effect after a bankruptcy filing are imposed by section 552(b)(1).

- 13 -

Second, and as reiterated above, any purported security interest in proceeds does not attach unless and until the original collateral is sold or otherwise disposed of and such proceeds are generated. Indisputably, this has never occurred in this case. Thus, any purported security interest in the proceeds or value to be derived from the FCC Licenses that the Debtors granted prior to their bankruptcy filing did not attach pre-petition and has not attached to date.

Third, and even if the Court accepts the proposition that the Senior Secured Noteholders' purported security interest in the proceeds or value to be derived from the FCC Licenses can qualify as original "collateral" or "property" in this case and attached pre-petition, that interest still cannot satisfy the threshold requirement for post-petition enforceability under section 552(b)(1), because it nonetheless is not an interest in collateral or property that the Debtors acquired *before the commencement of the case*. As section 552(b)(1) expressly provides, only a valid interest in "property of the debtor acquired before the commencement of the case" can in turn trigger a valid and enforceable interest in proceeds "acquired by the estate after the commencement of the case." Here, however, it is undisputed that no proceeds or value derived from the FCC Licenses was acquired by the Debtors before they filed for bankruptcy. All the Debtors acquired and possessed pre-petition were the FCC Licenses themselves, which as a matter of law could not be the object of a valid or enforceable security interest. Consequently, any interests granted to the Senior Secured Noteholders in this case cannot satisfy the requirements of section 552(b)(1), and cannot afford them a valid and effective security interest in any proceeds or value that may be derived from the FCC Licenses in the course of this Chapter 11 case.

### 3. The authorities on which the Defendants rely are inapplicable, and do not support the conclusions urged by the Defendants, because they neither addressed nor decided the UCC and section 552 arguments presented in this case.

In support of their position, both of the responding Defendants rely on a line of court decisions, including decisions in this district, that essentially originated with In re Ridgely Communications, 139 B.R. 374 (Bankr. D. Md. 1992), and MLQ Investors, L.P. v. Pacific Quadracasting, Inc., 146 F.3d 746 (9th Cir. 1998). In none of these cases, however, was the court faced with the underlying facts or legal arguments that are present here. The cases support the fundamental proposition that an FCC licensee may grant a security interest in the proceeds or value to be derived from its license.[7] But insofar as any applicability to this case is concerned, that is as far as they go. In none of these cases did the parties apparently raise, or the courts endeavor to analyze, whether the security interest had ever attached under the UCC, or whether section 552(b)(1) of the Code prevented the interest from attaching or being given any effect after a bankruptcy filing by the licensee. Ridgely, MLQ Investors and their progeny thus have no meaningful application or precedential value in this case.

In Ridgely, which U.S. Bank characterizes as the "seminal" case (U.S. Bank's Memorandum of Law at p. 10), the bankruptcy court addressed a challenge to the secured creditors' purported lien in the proceeds of an FCC license, ultimately concluding that "[t]he right of the licensee . . . (and the only right recognized by the Court in this case) is the right of

---

[7]    Even with respect to this threshold proposition, the Ridgely opinion and its progeny have been criticized as being contrary to the UCC as it is currently enacted in New York. *See* E. Smith, ARTICLE 9 IN REVISION: A PROPOSAL FOR PERMITTING SECURITY INTERESTS IN NONASSIGNABLE CONTRACTS AND PERMITS, 28 Loy. L.A. L. Rev. 335, 344 (1994) ("To say that a secured party, however, may perfect its security interest today in a right to receive proceeds tomorrow -- without perfecting its security interest today in the underlying collateral -- proves too much under the current version of Article 9. If accepted, the argument would permit a secured party, for example, to perfect a security interest today in a right to receive ongoing payments under a promissory note where the secured party had failed to perfect its security interest in the promissory note by taking possession of it. That is certainly not the law today."). *See also* discussion and authorities cited in Sprint Nextel's opening Memorandum of Law at pp. 22-28.

- 15 -

the creditor to claim proceeds received by the debtor licensee from a private buyer in exchange for the transfer of the license to that buyer." Ridgely, 139 B.R. at 379. In Ridgely, however, there was no issue raised, and no analysis by the court concerning, whether and when the creditors' interest in the license had attached under the UCC. Id. at 376. In addition, the challenging parties in Ridgley apparently never raised, and the court certainly did not address, whether section 552(b)(1) prevented the creditors' security interest from being given any effect after the licensee's bankruptcy filing.[8]

The purported relevance of MLQ Investors to this case is even more attenuated. MLQ Investors is not even a bankruptcy case, and so clearly no challenge to the post-bankruptcy effectiveness of a security interest under section 552(b)(1) of the Code was raised or addressed in that decision. Moreover, as in Ridgely, there was no dispute as to whether any purported security interest in the license had ever attached. MLQ Investors, 146 F.3d at 747. The MLQ Investors court was required to determine when the secured lender's interest in the FCC license had been perfected, in order to determine its priority in relation to a tax lien filed by the IRS. In so doing, however, the MLQ Investors court simply presumed that the interest had been perfected prior to the sale of the license without performing any analysis of the question under the UCC or otherwise. Id. at 749.

Similarly, In re Cheskey, 9 F.C.C.R. 986 (1994), is a decision by the FCC that specifically addressed the threshold issue of whether the grant of a security interest in the proceeds of the sale of an FCC license, as opposed to the FCC license itself, violated FCC policy. Id. at 987. But again, the FCC was not presented with, and therefore never decided in that case, any questions concerning the timing or requirements for attachment of a security

---

[8]  The Ridgely decision was also motivated in large part by the court's perception that an "apparent injustice" would result in that case if the debtor's insiders were able to claim the bulk of the proceeds of the sale of the FCC license from a fully secured creditor. See Ridgely, 139 B.R. at 380. No such injustice is threatened in this case.

interest under the UCC, or whether an interest in an FCC license could be given any post-bankruptcy effect under section 552(b)(1).

The remaining authorities on which the Defendants rely uniformly follow this pattern. Like <u>MLQ Investors</u>, <u>State Street Bank and Trust Co. v. Arrow Communications, Inc.</u>, 833 F. Supp. 41 (D. Mass. 1993), is not a bankruptcy case, and so clearly no issue under section 552(b)(1) of the Code was raised or addressed in that decision. Moreover, as in both <u>Ridgely</u> and <u>MLQ Investors</u>, there was no dispute as to whether any purported security interest in the license had attached. <u>Id.</u> at 41. Similarly, while all three of the 1994 cases cited by the Defendants, <u>In re Thomas Communications, Inc.</u>, 166 B.R. 846, 847 (S.D. W.Va. 1994), <u>In re PBR Communications Systems, Inc.</u>, 172 B.R. 132 (Bankr. S.D. Fla. 1994) and <u>In re Beach Television Partners</u>, 38 F.3d 535 (11th Cir. 1994), are bankruptcy decisions, all three cases also follow the template established by <u>Ridgely</u>. In each of these cases, the court – expressly following <u>Ridgely</u> and its progeny – reached the threshold conclusion that an FCC licensee may grant a security interest in the proceeds or value to be derived from its license. But also in each case, the FCC license at issue had already been sold and proceeds generated, *see* <u>Thomas</u>, 166 B.R. at 847, <u>PBR Communications</u>, 172 B.R. at 134, <u>Beach Television Partners</u>, 38 F.3d at 536, so there was no dispute or analysis by the court concerning whether the security interest in the license had ever attached. In each case, too, the party challenging the security interest apparently never raised, and thus the court never addressed, whether section 552(b)(1) of the Code prevented the security interest from being given any effect after the licensee's bankruptcy filing.

The opinion by Judge Sweet in <u>Urban Communicators PCS Ltd. Partnership v. Gabriel Capital, L.P.</u>, 394 B.R. 325 (S.D.N.Y. 2008), also does not support a ruling in favor of the Defendants in this case. In <u>Urban Communicators</u>, a bankruptcy appeal, the court was asked to

- 17 -

determine whether a security interest in the proceeds of the sale of an FCC license had attached before the license was sold. The court's conclusion on that question in the affirmative, however, involved no analysis under the UCC whatsoever. Rather, the court in <u>Urban Communicators</u> simply followed the decisions in <u>Ridgely</u> and <u>MLQ Investors</u>, which likewise involved no analysis of when such security interests attach under the UCC, and <u>Cheskey</u>, which never even addressed the issue of attachment. *See* <u>Urban Communicators</u>, 394 B.R. at 334-335. In addition, and despite being a bankruptcy case, <u>Urban Communicators</u> is yet another decision in which the party challenging the security interest apparently never raised, and thus the court never addressed, whether section 552(b)(1) prevented the security interest from being given effect after the FCC licensee's bankruptcy filing. Ultimately, Judge Sweet's decision in <u>Urban Communicators</u> turned on his observation that the party challenging the security interest at issue has "failed to distinguish <u>MLQ Investors</u> or present any contrary authority." <u>Id.</u> at 335. But of course, <u>MLQ Investors</u> is readily distinguishable from the present case, given that it never addressed analogous facts or the UCC or section 552(b)(1) issues that are raised here, and Sprint Nextel and the Committee have provided the Court with ample authority to support a conclusion contrary to the decision in <u>MLQ Investors</u>.

Finally, the reliance by both of the Defendants on the decision by Judge Peck in <u>In re Ion Media Networks, Inc.</u>, 419 B.R. 585 (Bankr. S.D.N.Y. 2009) is disingenuous. On its face, <u>Ion Media</u> involved a challenge to the validity of purported liens on the proceeds of the sale of FCC licenses. The party challenging the liens in that case, however, was a junior secured creditor that had executed an intercreditor agreement with the senior secured creditor claiming under the liens. Moreover, the junior creditor had expressly agreed in the intercreditor agreement that it would not object to the debtor's plan of reorganization (the challenge to the liens was presented

in an objection to confirmation of the plan, as well as in an adversary proceeding), that it would not challenge the validity of the liens, and that the junior creditor's interests were, in any event, of lesser priority than the interests held by the senior creditor. Id. at 588-590. On this highly unusual set of facts, the court in Ion Media rejected the junior creditor's challenge to the liens, but entirely on the basis of the junior creditor's lack of standing in light of its execution of the intercreditor agreement. Id. at 590 ("Cyrus lacks standing to object to the Plan and is in breach of [the intercreditor] agreement by virtue of its objections"), 593-597. But, having concluded that the junior creditor lacked standing and, in any event, held an interest of lesser priority than the senior creditor as a matter of contract, the Ion Media court never reached the merits of the junior creditor's challenges to the liens at issue. Id. at 592 ("This decision on standing and plan confirmation answers the above questions and makes it unnecessary to separately rule with respect to the Adversary Proceeding."). The court made it clear, in fact, that its decision was based on the priorities and allocations to which the parties had agreed in the intercreditor agreement, "regardless of the actual validity of liens in these [FCC] licenses," which issue the court never addressed. Id. at 595. See also id. at 602 ("It does not matter whether the FCC Licenses are or are not subject to a valid lien, because they are subject to an enforceable dedication of their economic value" to the senior creditor in the intercreditor agreement).

The Ion Media decision, therefore, is a case in which the court *never addressed the merits* of a challenge to the validity or enforceability in bankruptcy of a security interest in the proceeds of an FCC license. The decision contains no discussion or analysis of attachment of such an interest under the UCC, not does it consider whether such a lien can be given effect in bankruptcy under section 552(b)(1). The Ion Media case thus lacks any applicability to, or any precedential value in connection with, the issues and arguments raised in this case. For the

Defendants to suggest otherwise, much less to assert that <u>Ion Media</u> is authority supportive of their positions in this case, is simply misleading. In fact, U.S. Bank goes so far as to contend that the decisions in <u>MLQ Investors</u>, <u>Urban Communicators</u>, <u>Ion Media</u> and <u>Ridgely</u> have "rejected" the Plaintiffs' arguments in this case under section 552(b)(1) (U.S. Bank's Memorandum of Law at p. 16), when it fact none of those decisions addresses or even mentions section 552.

4.  **The only cited decision truly analogous to this case is _Tracy Broadcasting_, which supports the entry of summary judgment in favor of Sprint Nextel.**

The only cited case (by any party) involving a set of facts, issues and legal arguments that mirrors those in this proceeding is the decision in <u>Spectrum Scan LLC v. Valley Bank and Trust Co. (In re Tracy Broadcasting Corporation)</u>, 438 B.R. 323, 327-328 (Bankr. Colo. 2010). In <u>Tracy Broadcasting</u>, as in this case, a bankruptcy court was faced with a challenge (by the Chapter 11 Trustee) to the enforceability of a creditor's purported lien in the proceeds of the debtor's FCC license, but the FCC license had never been sold or otherwise disposed of, either before or to that point during the debtor's bankruptcy case. In addition, just as in this case, the party challenging the validity of the lien in <u>Tracy Broadcasting</u> contended that under the UCC, any purported lien on the proceeds of the FCC license had never attached because the license had never been sold, and that under section 552(b)(1) of the Bankruptcy Code, such a lien could never attach to proceeds generated post-petition because, as a matter of established federal law, the FCC license could not have been the subject of a valid pre-petition lien. Meanwhile, just as in this case, the creditor seeking to enforce the security interest contended that its interest in proceeds to be derived from the FCC license implicated only a "private" proprietary right, as opposed to a "public right" regulated by the FCC, and as such was a permissible interest that attached prior to the debtor's bankruptcy filing. <u>Id.</u> at 324-327. In this context, which is substantively and uniquely identical to the facts and argument presented in this case, the <u>Tracy</u>

- 20 -

<u>Broadcasting</u> court correctly concluded that, under the UCC and section 552(b)(1), the creditor had no enforceable security interest in any proceeds of the FCC license that might be generated post-petition.  (*See* discussion of the <u>Tracy Broadcasting</u> decision in Sprint Nextel's opening Memorandum of Law at pp. 26-27, 30-31.)

In this regard, <u>Tracy Broadcasting</u> is not an aberrant or "outlying" decision, as the Defendants contend, but rather the only decision in which the facts and legal arguments present in this case have been previously presented to and decided by another court.  In fact, and contrary to an assertion by U.S. Bank, the court's decision in <u>Tracy Broadcasting</u> expressly acknowledged the relevant aspects of prior decisions like <u>Ridgely</u>, <u>MLQ Investors</u> and <u>Cheskey</u>, and based on those authorities accepted the threshold presumption that "it is possible, at least in the absence of a bankruptcy, for a debtor to grant a security interest in its right to receive proceeds upon an FCC-approved transfer of its license." <u>Id.</u> at 328.[9]  Based on the specific facts present and the legal arguments made by the party challenging the security interest at issue, however, the <u>Tracy Broadcasting</u> court proceeded, as this Court should, to determine whether the presumed security interest had ever previously attached under the UCC,[10] and whether it could possibly attach or have any effect under section 552(b)(1) now that the debtor was in bankruptcy, ultimately answering both of those questions in the negative. <u>Id.</u> at 330-331.  In this regard, the

---

[9]    The <u>Tracy Broadcasting</u> court also carefully considered, but ultimately rejected as unsound, the reasoning of the bankruptcy court in <u>In re Media Properties, Inc.</u>, 311 B.R. 244 (Bankr. W.D. Wisc. 2004), another case on which the Defendants rely, and another decision that simply followed <u>Ridgely</u> and <u>MLQ Investors</u> without conducting an independent analysis of whether the security interest at issue had attached under the UCC when the debtor filed for bankruptcy protection.  *See* <u>Tracy Broadcasting</u>, 438 B.R. at 330.

[10]    Both of the responding Defendants purport to disparage the <u>Tracy Broadcasting</u> decision because it cites a Depression-era case, <u>Sims v. Johnson</u>, 67 F.2d 409 (9th Cir. 1933), for the proposition that a security interest in proceeds does not attach under the UCC unless and until the underlying collateral is sold and proceeds are generated. <u>Tracy Broadcasting</u>, 438 B.R. at 330.  But this criticism has no legitimate basis.  The <u>Tracy Broadcasting</u> court just as easily could have cited a host of more contemporary authorities for this proposition, including the general UCC, New York and FCC authorities cited by Sprint Nextel at page 8 above and on pages 22-26 of its opening Memorandum of Law.

Tracy Broadcasting decision is unusual, and stands apart from the various cases on which the Defendants rely, only because *it is the only authority that is directly on point in this proceeding.* As one recent commentary has noted, "Tracy Broadcasting Corp. is significant as it is the first case to consider the effect of Bankruptcy Code Section 552 on the validity of a pledge of the proceeds of an FCC license, undercutting those bankruptcy cases that have approved such an interest but not considered the effect of Section 552." Winston & Strawn LLP Restructuring and Insolvency Practice Briefing, BANKRUPTCY COURT APPLIES SECTION 552 TO INVALIDATE LENDER'S SECURITY INTEREST IN PROCEEDS OF FCC LICENSE (2011) (attached as Exhibit A hereto) at p. 2. On this basis, and by virtue of its thorough analysis and sound reasoning, Sprint Nextel submits that Tracy Broadcasting is the most relevant, instructive and compelling authority that the Court can possibly consider in addressing the issues and arguments that are presented in this case.

Finally, U.S. Bank contends that, if this Court follows Tracy Broadcasting, "banks would never lend a licensee monies in exchange for a security interest in an FCC license again, crippling a business that often requires significant financing at early stages." (U.S. Bank's Memorandum of Law at p. 24.) This alarmist assertion is not only unfounded, but belied by the undisputed facts in this very case.

The Defendants do not even attempt to deny that the Offering Memorandum circulated to potential investors in the Senior Secured Notes expressly disclosed, among various "Risk Factors," that federal law prohibited the grant of a security interest in the FCC Licenses themselves, and that any security interest in after-acquired property such as proceeds likely would not attach unless and until that property is acquired. Just as the Senior Secured Noteholders were therefore fully aware of, and knowingly accepted, the possibility of these

outcomes when they invested in the Senior Secured Notes and provided financing to the Debtors here, other lenders will be willing to assume those risks, and to make other accommodations for them – including alteration of interest rates and other terms – when they provide financing to FCC licensees.

In addition, this is an unusual case, in which an unsecured creditor (Sprint Nextel), by virtue of the BAS Relocation and related FCC policies and orders, has a direct claim against the special purpose subsidiary (Terrestar License, Inc.) that holds the Debtors' FCC Licenses. FCC licensees commonly form these special purpose entities as a financing technique, based on the general recognition that a security interest cannot be granted in the license itself. In the ordinary bankruptcy case, however, trade and other general unsecured creditors will have claims only against operating debtor entities, and thus would have no ability to reach proceeds of a sale of an FCC license by the special purpose entity, even if the secured lender's liens were invalidated. At the same time, and even with its liens invalidated, the secured lender will still have the only unsecured claim against the special purpose entity, and will therefore be the only creditor able to benefit from the value of the license. Following Tracy Broadcasting in this case thus should have no chilling effect whatsoever on the financing of FCC licensees as a general matter.

For all of these reasons, and by virtue of the showing in its opening Memorandum of Law, Sprint Nextel's motion for summary judgment as to Count II should be granted, and the Defendants' cross-motions as to Count II should be denied.

C. **The Responding Defendants Have Failed To Address Or Rebut The Specific Basis for Sprint Nextel's Showing That It Is Entitled To Summary Judgment On Count IV.**

With respect to Sprint Nextel's request for summary judgment on Count IV of its Complaint, the responding Defendants essentially attempt to evade Sprint Nextel's showing by mischaracterizing both the relief that Sprint Nextel has requested and the basis for that relief.

U.S. Bank characterizes Count IV as a claim for equitable subordination based on allegations of "unfair[ness]." (U.S. Bank's Memorandum of Law at p. 27.) Alternately, the Senior Secured Noteholders assert that Sprint Nextel is asking this Court to grant Sprint Nextel an equitable security or property interest in the Debtors' FCC Licenses. (Senior Secured Noteholders' Memorandum of Law at pp. 4, 22-25.)

Neither of these characterizations of Count IV is accurate. In fact, and on its face, Count IV – which is pleaded in the alternative to Counts I and II – is an entirely legal cause of action based on a set of facts that is not disputed, and on established principles of UCC and bankruptcy law – *i.e.*, that a secured party can obtain no greater interest in collateral than the debtor itself holds in the collateral. *See* N.Y.U.C.C. § 9-203(b)(2); id., Official Comment No. 6 ("a security interest attaches only to whatever rights a debtor may have, broad or limited as those rights may be"); 11 U.S.C. § 506(a)(1) (a claim is secured only to the extent of the estate's interest in the applicable property).

In the present case, therefore, Sprint Nextel is not asking the Court to grant it any sort of property interest. Rather, and based on the foregoing provisions of the UCC and the Bankruptcy Code, it is asking the Court to find that *the Senior Secured Noteholders'* property interests – that is, the purported liens on the Debtors' FCC Licenses and any proceeds or value thereof – are subject to a specific condition. The FCC authorized the Debtors to construct, launch and operate MSS systems, and the Debtors obtained their FCC Licenses, only *on the express condition* that they complete the BAS Relocation themselves, or alternately, reimburse Sprint Nextel for their *pro rata* share of the costs incurred by Sprint Nextel to complete the BAS Relocation.[11]

---

[11]    While not specifically material to Sprint Nextel's request for summary judgment on Counts I, II and IV, two factual assertions by the Senior Secured Noteholders are patently inaccurate and require correction. The Senior Secured Noteholders first contend in their response that, once Sprint Nextel undertook to clear BAS Incumbents from the S-Band spectrum, the FCC "placed full responsibility for the timely completion of the BAS Incumbent

Accordingly, to the extent that the Debtors could grant a lien in any interest they have in the FCC Licenses or the proceeds thereof, that lien must also be conditioned upon satisfaction of the reimbursement obligation owed to Sprint Nextel. (*See* discussion and authorities cited in Sprint Nextel's opening Memorandum of Law at pp. 32-35.)

Insofar as they attempt to address Sprint Nextel's actual contentions at all, apart from opposing equitable claims that Sprint Nextel has never asserted, the Defendants' arguments are unavailing. First, U.S. Bank contends that Sprint Nextel is merely "argu[ing]" that the FCC conditioned the Debtors' use of their FCC Licenses on fulfillment of their reimbursement obligations to Sprint Nextel in connection with the BAS relocation. (U.S. Bank's Memorandum of Law at p. 28.) But, as Sprint Nextel has already demonstrated, the placement of that condition by the FCC is indisputably a matter of public record.[12]

---

relocation effort . . . on Sprint Nextel." (Senior Secured Noteholders' Memorandum of Law at p. 8.) This is demonstrably false. As the FCC has repeatedly confirmed, notwithstanding any efforts undertaken by Sprint Nextel and any reimbursement obligations associated therewith, the Debtors and other providers of MSS services have always continued to have an independent obligation to clear the BAS Incumbents from the spectrum. *See, e.g., 2004 Public Safety Order* at ¶¶ 250, 264 (noting that each MSS licensee continues to have "its own relocation . . . obligations to BAS incumbents"); *2009 Public Safety Order* at ¶ 4 ("Successful completion of [BAS relocation] does not rest with any one party but requires the cooperation of the incumbents and all new entrants, acting in good faith, to assume responsibility for the relocation process so that all may benefit."); *2010 Declaratory Ruling and Order* at ¶ 22 (when the FCC imposed the obligation to relocate BAS Incumbents on Sprint Nextel in 2004 "it explicitly kept in place the [independent] obligation for the MSS entrants to relocate the BAS incumbents and to share in the cost of Sprint Nextel's relocation efforts."). Elsewhere, the Senior Secured Noteholders assert that Sprint Nextel did not complete the BAS relocation "in a timely manner," as was an express condition of its own FCC licenses, because the effort was not completed within the 30-month period originally allotted by the FCC. (Senior Secured Noteholders' Memorandum of Law at p. 22 n. 13.) This, too, is incorrect. As the Senior Secured Noteholders are well aware, the FCC twice extended the deadline by which the BAS relocation was required to be completed, most recently to August 9, 2010, *2010 Declaratory Ruling and Order* at ¶ 7, and the Senior Secured Noteholders do not dispute that Sprint Nextel timely completed the relocation on July 15, 2010.

[12]     *Amendment of Section 2.106 of the Commission's Rules to Allocate Spectrum at 2 GHz for use by the Mobile Satellite Service,* Second Report and Order and Second Memorandum Opinion and Order, 15 FCC Rcd. 12315, ¶ 71 (2000) ("Subsequently entering MSS licensees . . . will, <u>as a condition of their licenses</u>, compensate the first entrant on a *pro rata* basis, according to the amount of spectrum the subsequently entering licensees are authorized to use.") (emphasis added); *Amendment of Section 2.106 of the Commission's Rules to Allocate Spectrum at 2 GHz For Use by the Mobile-Satellite Service,* Second Report and Order and Second Memorandum Opinion and Order, 15 FCC Rcd. 19403, ¶¶ 67, 69, 71 (2000) ("All MSS licensees who benefit from relocation of BAS are responsible for contributing, <u>as a condition of their licenses</u>.") (emphasis added).

Second, both Defendants assert that the FCC's conclusion in the *2010 Declaratory Ruling and Order* that Sprint Nextel is entitled to be reimbursed by the Debtors and another MSS licensee for their *pro rata* portions of the BAS relocation costs was not a definitive or binding conclusion by the FCC, because the FCC stated in that Order that it was not "adjudicating the claims" or entering a "judgment for or against Sprint Nextel on its particular reimbursement claims" asserted against the Debtors and another MSS licensee in the Reimbursement Litigation in Virginia. (U.S. Bank's Memorandum of Law at p. 28; Senior Secured Noteholders' Memorandum of Law at pp. 22-23.) In this regard, however, the Defendants miss the relevant point entirely. A grant of summary judgment for Sprint Nextel on Count IV does not require an "adjudication" or "judgment" on the "particular reimbursement claims" that it asserted in the Reimbursement Litigation – that is, Sprint Nextel's claims for recovery of reimbursement costs from the Debtors in a specific, liquidated sum.[13] It requires merely a conclusion that Sprint Nextel is entitled to be reimbursed in some amount. And with respect to that threshold issue, both the record before the FCC and the *2010 Declaratory Ruling and Order* on its face indicate that the FCC was acting in a judicial or adjudicatory capacity, and that the *2010 Declaratory Ruling and Order* – while not purporting to award Sprint Nextel any quantified damages as sought in the Reimbursement Litigation – contains the FCC's final findings of fact, ruling and decision on Sprint Nextel's entitlement to be reimbursed for BAS relocation costs, as well as its final and express rejection of the MSS licensee's various arguments to the contrary.

Third, U.S. Bank contends that the findings and conclusions set forth in the *2010 Declaratory Ruling and Order* are not preclusive as to U.S. Bank because it did not participate in the related proceedings before the FCC. (U.S. Bank's Memorandum of Law at p. 29 n. 16.) In

---

[13] As Sprint Nextel has already noted, the specific amount of its claims is set forth in various proofs of claim filed in the Debtors' Chapter 11 cases, and will be adjudicated by this Court in connection with claim objections that are being litigated simultaneously with this proceeding.

3052513v4

the present case, however, the Debtors participated fully in the FCC proceedings, and U.S. Bank's interest are entirely derivative of the Debtors' interests, existing solely pursuant to the Indenture and the Security Agreement. The FCC's findings and conclusions are therefore as binding and conclusive as to U. S. Bank as they are to the Debtors. *See, e.g.,* <u>Nat'l Labor Relations Bd. v. Donna-Lee Sportswear Co., Inc.</u>, 836 F.2d 31, 34-35 (1st Cir. 1987) (collateral estoppel applies both to parties to original proceeding and "privies of those parties" whose interests "cannot be disassociated" from the interests of an original party).

Finally, both Defendants repeatedly remind the Court in their responses, and based on the <u>Ridgely</u> and <u>MLQ Investors</u> line of cases, that a security interest in rights ancillary to an FCC License is subject to invalidation if the interest threatens to undermine a "public right" as to which the FCC has a regulatory obligation. And in the <u>Ridgely</u> and <u>MLQ Investors</u> line of cases, no party contended that the challenged security interest in the proceeds or value of an FCC license posed such a threat, or otherwise implicated the FCC's regulatory mandate. In this case, however, and as the FCC has expressly stated, any decision not to subordinate the Senior Secured Noteholders' security interest to the Debtors' reimbursement obligations to Sprint Nextel *will* have an adverse effect on a critical public interest that the FCC is charged to protect – *i.e.*, encouraging first entrants into a band of spectrum through assurances that subsequent entrants will honor reimbursement obligations and not be "free riders." *See, e.g.*, *2004 Public Safety Order* at ¶¶ 260-262.

Giving effect to these reimbursement obligations is essential to the FCC's regulatory mandate. *See* <u>Teledesic LLC v. FCC</u>, 275 F.3d 75, 79 (D.C. Cir. 2001) ("[T]he FCC is charged with regulating and overseeing radio spectrum," including making "efforts to reallocate one portion of the spectrum to accommodate an ascendant and promising technology.") Without

assurances that cost-sharing requirements will be effectuated, no new entrant will want to take the lead in clearing a band, thereby delaying and even blocking Congressional and FCC efforts to introduce new wireless services.

In its *2010 Declaratory Ruling and Order,* in fact, the FCC stated that it is expressly in the public interest for Sprint Nextel to be reimbursed for its costs incurred in clearing the spectrum band occupied by the Debtors. *2010 Declaratory Ruling and Order* at ¶ 41 (Otherwise, "[f]uture licensees might be unwilling or unable to assume the burden and cost of clearing spectrum quickly if they were unsure of the likelihood that they will be reimbursed by other new entrants."). *See also, e.g.*, <u>id.</u> at ¶ 79 ("The express purpose of this Report and Order and Declaratory Ruling is to further the policy goals of promoting more efficient use of spectrum and permitting the introduction of new services."); <u>id.</u> at fn. 176 ("[W]e emphasize that we intend to use the full realm of enforcement mechanisms available to us in order to ensure that reimbursement obligations are satisfied."); <u>Teledesic</u>, 275 F.3d at 85 (the FCC has consistently held to a "policy of placing the cost of involuntary [spectrum] relocation . . . on new entrants" in order to protect incumbent licensees but also to encourage development of new technologies); *2009 Public Safety Order* at ¶ 2 (questions of band-clearance cost-sharing "relate to [the FCC's] fundamental goals of completing the relocation of [incumbent] operations from the 1990-2025 MHz band and providing for the operation of new services on those frequencies").

To the extent that the Senior Secured Noteholders do have a security interest in the proceeds of the FCC Licenses, therefore, that security interest must be subordinated to the reimbursement obligation owed to Sprint Nextel pursuant to applicable FCC orders, and in furtherance of its regulatory mandate in the public interest. In other words, any "private right" that the Debtors pledged to the Senior Secured Noteholders must be conditioned upon, and not

permitted to undermine, the "public right" in which the FCC has an express regulatory interest. For all of these reasons, for the reasons set forth in Sprint Nextel's opening Memorandum of Law, and in the alternative to Counts I and II, summary judgment on Count IV in this proceeding should be granted in favor of Sprint Nextel and against the Defendants (including the cross-movant on Count IV, U.S. Bank), and to the extent that any pre-petition lien granted to the Senior Secured Noteholders can attach post-petition to proceeds or value of the FCC Licenses, the Court should declare that lien to be subordinate to the reimbursement claim of Sprint Nextel.

### D. U.S. Bank Is Not Entitled To Summary Judgment On Count III.

Only U.S. Bank has requested entry of summary judgment on Count III of the Complaint in this proceeding. In Count III, which also is pleaded in the alternative to Counts I and II of its Complaint, Sprint Nextel seeks a declaration under section 552(b)(1) of the Code that "the equities of the case" prevent any purported liens on the proceeds of the FCC Licenses from attaching to proceeds or value generated by the FCC Licenses post-petition. Neither Sprint Nextel nor the Committee has sought summary judgment as to Count III, however, because by definition, adjudication of a claim based on "the equities of the case" requires a fact-intensive inquiry, and fact discovery is still in its relatively early stages in this case. In short, Count III is not yet ripe for decision on summary judgment, and even co-Defendants the Senior Secured Noteholders have declined to seek summary judgment on Count III.

The sole basis for U.S. Bank's motion on Count III is that the facts pleaded on the face of the Complaint do not describe the scenario in which the "equities of the case" exception applies most commonly – namely, where a secured creditor's collateral has appreciated in value as a result of the use of unencumbered assets of the debtor's estate. (*See* U.S. Bank's Memorandum of Law at pp. 25-27.) But the "equities of the case" exception does not apply only in this singular situation. Certainly, nothing on the face of section 552(b)(1) supports such a limited

application of the principle. In fact, section 552(b)(1) is nothing if not broadly worded, and does not purport to list or limit the "equities" that a court is permitted to consider in this regard. In fact, even U.S. Bank does not contend that the exception applies *only* where the value of a secured creditor's collateral is enhanced by use of other estate assets, but just that this is the situation in which the exception "principal[ly]" or "generally" applies. (Id. at 25, 26.)

By its very nature, too, the "equities of the case" exception is exceptionally broad, and affords this Court a great deal of discretion to consider relevant facts and craft fair and appropriate relief. *See, e.g.,* Milliken v. Bradley, 433 U.S. 267, 281 (1977) ("…breadth and flexibility are inherent in equitable remedies"); In re Brazelton Cedar Rapids Group LC, 264 B.R. 195, 200 (Bankr. N.D. Iowa 2001) ("…bankruptcy courts have broad equitable powers to disallow and subordinate claims when equitable considerations warrant."); West Suburban Bank of Darien v. CCGK Investors (In re CCGK Investors), 145 B.R. 908, 910 (Bankr. N.D. Ill. 1992) ("[b]ankruptcy proceedings are equity proceedings and bankruptcy courts have broad equitable powers").

The legislative history of section 552 further confirms that the "equities of the case" exception can apply to unsecured creditors as well, and specifically to the facts that Sprint Nextel has alleged in its Complaint. In the course of considering enactment of the exception in section 552, Congress clarified that the provision is intended to permit pre-petition security interests to attach to post-petition proceeds derived from property (a) if the other requirements of section 552(b)(1) – including a valid, perfected and enforceable lien in the original property itself – are satisfied (which they are not in this case); but (b) "except to the extent that where the estate acquires the proceeds *at the expense of other creditors holding unsecured claims*, the expenditure resulted in an improvement in the position of the secured party." S. Rep. No. 95-989 at 89

(1978). *See also* H.R. Rep. No. 95-595, at 376-377 (1977) (pre-petition security interests meeting section 552(b)(1) requirements can attach to post-petition proceeds of encumbered property "except to the extent that the estate acquired the proceeds to the prejudice of other creditors holding unsecured claims").

Accordingly, as the Fourth Circuit has explained, the "equities of the case" exception under section 552(b)(1) "gives the bankruptcy court considerable latitude in applying pre-petition security interests to post-petition proceeds." United Virginia Bank v. Slab Fork Coal Co., 784 F.2d 1188, 1191 (4th Cir. 1986). The exception has also been applied by courts specifically in favor of creditors. *See* In re Crouch, 51 B.R. 331, 332 (Bankr. D. Or. 1985) (proceeds from the sale of crops would be distributed first to claimants who directly contributed to production of the crops that generated that cash collateral, with any remaining surplus being retained by the Government pursuant to its lien); In re Trans-Texas Petroleum Corp., 33 B.R. 67 (Bankr. N.D. Tex. 1983) (equities of the case required that unsecured creditor, notwithstanding contrary state law, be permitted to trace and identify funds that had been commingled with funds constituting collateral of secured lender).

In the present case, and under the facts that Sprint Nextel contends will be supported by irrefutable proof by the time discovery in this proceeding closes, it would be patently inequitable for the purported liens in favor of the Senior Secured Noteholders to attach post-petition to the proceeds or other value of the FCC Licenses, at least as between the Senior Secured Noteholders and Sprint Nextel. By virtue of their purported security interests, the Senior Secured Noteholders claim an entitlement to essentially all of the value of the Debtors' business (whether realized as equity obtained under a plan of reorganization or proceeds generated by a section 363 sale), effectively to the exclusion of Sprint Nextel and other unsecured creditors. By the

Debtors' own admission, however, some 95% of their value as a business enterprise (between $1.02 Billion and $1.28 Billion) is attributable to the value of the 20 MHz portion of the S-Band spectrum that they are entitled to utilize under the FCC Licenses.

At the same time, neither the Debtors nor the Senior Secured Noteholders has ever paid or contributed *even a single penny* to the clearing of the BAS Incumbents from the S-Band spectrum, the very effort that (a) has permitted the Debtors even to operate their business, and (b) accounts for 95% of the Debtors' enterprise value of over $1 Billion, to which the Senior Secured Noteholders claim an exclusive interest. Rather, Sprint Nextel, and only Sprint Nextel, has undertaken that band clearing effort and borne the associated expense, of which the *pro rata* portion attributable to the Debtors' portion of the spectrum is in excess of $104 Million.

Moreover, and even well before the FCC's *2010 Declaratory Ruling and Order*, both the Debtors and the Senior Secured Noteholders were well aware (a) that they could be obligated to reimburse Sprint Nextel for the Debtors' *pro rata* portion of S-Band clearing costs, (b) that the costs associated with that obligation could be "substantial" and "in excess of $100 Million," and (c) that applicable U.S. law could prohibit the Senior Secured Noteholders from obtaining and/or perfecting the types of security interests that might be relied upon in order to mitigate the impact of, among other things, the reimbursement obligation to Sprint Nextel associated with the FCC Licenses. In fact, in proceedings before the FCC in 1999, TerreStar's predecessor, TMI Communications and Company, L.P., stated that "equity requires" that entities benefitting from the clearing of BAS Incumbents "should . . . share in the financial burdens of the relocation of [these] licensees."

In contrast to the Debtors and the Senior Secured Noteholders, in terms of known risks and expectations, Sprint Nextel undertook to clear the BAS Incumbents from the Debtors'

portion of the S-Band spectrum based on repeated assurances from the FCC that it would be entitled to reimbursement for the expenses associated with that effort.

In short, and if (as Sprint Nextel fully expects) the facts ultimately developed in discovery fail to rebut the allegations in its Complaint, it would be grossly inequitable for the Senior Secured Noteholders – and for all intents and purposes, the Senior Secured Noteholders *alone* – to reap the benefits of the years of effort, and tens of millions of dollars in expenditures, that have been borne entirely by Sprint Nextel. In effect, what the Debtors and the Senior Secured Noteholders propose to accomplish here is for the Debtors, and in turn the Senior Secured Noteholders, to obtain and exploit their portion of the S-Band spectrum – an asset essential to their ability to operate and admittedly worth in excess of $1 Billion -- *entirely for free*, while Sprint Nextel recovers only pennies on the dollar for the over $104 Million that it spent, based on repeated assurances by the FCC that it would be reimbursed, in order literally to bring that asset into existence and afford it any value whatsoever to the Debtors or the Senior Secured Noteholders.[14] One can scarcely imagine a more unjust, inequitable and patently unfair result occurring in a Chapter 11 case.

Based on all of the foregoing, and contingent upon the proof established at the close of discovery, the "equities of the case" exception under section 552(b)(1) applies to the present case. Therefore, even if the Court determines (notwithstanding that the other requirements of section 552(b)(1) are not satisfied) that the Senior Secured Noteholders have a valid and applicable lien that can attach post-petition to the proceeds or other value of the FCC Licenses,

---

[14] In contrast, while the Senior Secured Noteholders have certainly contributed some measure of value to the Debtors themselves, in the form of the consideration paid in exchange for the Senior Secured Notes, those contributions have served only to afford the Debtors some operating capital, and have had no bearing or effect on the value of the Debtor's portion of the S-Band spectrum. Yet it is that portion of the S-Band spectrum, cleared of the BAS Incumbents entirely at Sprint Nextel's expense, that enables the Debtors to conduct any business whatsoever, and that admittedly accounts for some 95% of the Debtors' post-confirmation value as a business enterprise.

3052513v4

the equities dictate that such a lien should not attach to any such proceeds or value in this particular case, at least as between the Senior Secured Noteholders and Sprint Nextel. Accordingly, U.S. Bank's request for entry of summary judgment on Count III of Sprint Nextel's Complaint – a request that is premature in any event – must be denied.

### III.    CONCLUSION

For all of the foregoing reasons, and for the reasons set forth in its opening Memorandum of Law, Sprint Nextel respectfully prays:

(A)    that its Motion for Partial Summary Judgment be granted;

(B)    that the Defendants' Cross-Motions for Summary Judgment be denied;

(C)    that the Court enter an order declaring that any purported pre-petition liens on the Debtors' FCC Licenses or the proceeds or other value thereof either (i) do not attach to proceeds or economic value generated by the FCC Licenses post-petition as a matter of law, or (ii) are subordinate to the reimbursement claim of Sprint Nextel; and

(D)    that the Court grant Sprint Nextel such other and further relief as it deems just, equitable and proper.

Dated:  April 8, 2011

ARNALL GOLDEN GREGORY LLP

/s/ Darryl S. Laddin
Darryl S. Laddin (DL-5130)
Frank N. White
Matthew T. Covell
171 17th Street N.W.
Suite 2100
Atlanta, Georgia 30363
Telephone: (404) 873-8500
Facsimile: (404) 873-8501

Attorneys for Sprint Nextel Corporation

3052513v4

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that I caused true, correct and complete copies of the COMBINED REPLY BRIEF IN SUPPORT OF PLAINTIFF SPRINT NEXTEL CORPORATION'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND RESPONSE IN OPPOSITION TO DEFENDANTS' CROSS-MOTIONS FOR SUMMARY JUDGMENT to be served by ECF notification, by e-mail and by Federal Express, as and where indicated below, upon the following:

<u>**Service by ECF notification and E-Mail:**</u>

*<u>Counsel to the Official Committee of Unsecured Creditors:</u>*

OTTERBOURG, STEINDLER, HOUSTON & ROSEN, P.C.
Scott L. Hazan (shazan@oshr.com)
David M. Posner (dposner@oshr.com)

*<u>Counsel to U.S. Bank National Association:</u>*

CARTER LEDYARD & MILBURN LLP
Franklin Ciaccio (ciaccio@clm.com)
Gerald W. Griffin (griffin@clm.com)
Bryce C. Bernards (bernards@clm.com)

*<u>Counsel to the Debtors:</u>*

AKIN GUMP STRAUSS HAUER & FELD LLP
Ira S. Dizengoff (idizengoff@akingump.com)
Stephen M. Baldini (sbaldini@akingump.com)
Arik Preis (apreis@akingump.com)
Joseph L. Sorkin (jsorkin@akingump.com)
James P. Chou (jchou@akingump.com)

*Counsel to the Ad Hoc Group of Noteholders of 15% Senior Secured Notes:*

KIRKLAND & ELLIS LLP
Jonathon S. Henes (jonathan.henes@kirkland.com)
Joseph Serino, Jr. (joseph.serino@kirkland.com)
Stephen E. Hessler (stephen.hessler@kirkland.com)
Christopher T. Greco (christopher.greco@kirkland.com)
Hunter Murdock (hunter.murdock@kirkland.com)

**Service by Federal Express:**

Susan D. Golden
Office of the United States Trustee
33 Whitehall Street
New York, NY 10004

This 8th day of April, 2011.

/s/ Darryl S. Laddin
ARNALL GOLDEN GREGORY LLP
Attorneys for Sprint Nextel Corporation