**Hearing Date and Time: April 21, 2011 at 2:00 p.m. (ET)**

Scott L. Hazan
David M. Posner
Stanley L. Lane, Jr.
OTTERBOURG, STEINDLER, HOUSTON & ROSEN, P.C.
230 Park Avenue
New York, New York 10169
Telephone: (212) 661-9100
Facsimile: (212) 682-6104

*Counsel to the Official Committee Of Unsecured Creditors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | : | |
| TERRESTAR NETWORKS INC., *et al.*, | : | Chapter 11 |
| | : | Case No. 10-15446 (SHL) |
| Debtors. | : | (Jointly Administered) |
| SPRINT NEXTEL CORPORATION and THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF TERRESTAR NETWORKS INC., *et al.*, | : | Adv. Pro. No. 10-05461-SHL |
| Plaintiffs, | : | |
| v. | : | |
| U.S. BANK NATIONAL ASSOCIATION, in its capacity as Indenture Trustee and Collateral Agent for the 15.0% Senior Secured Payment-In-Kind Notes due 2014, AD HOC GROUP OF NOTEHOLDERS OF 15% SENIOR SECURED NOTES, and TERRESTAR NETWORKS INC., *et al.*, | : | |
| Defendants. | : | |

# MEMORANDUM OF LAW IN FURTHER SUPPORT OF THE MOTION FOR SUMMARY JUDGMENT OF INTERVENOR-PLAINTIFF, THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF TERRESTAR NETWORKS INC, et al., AND IN OPPOSITION TO DEFENDANTS' CROSS-MOTIONS FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .......... ii

INTRODUCTION .......... 1

ARGUMENT .......... 4

A. U.S. Bank and the Senior Secured Lenders Lack Valid Pre-Petition Liens in the FCC Licenses .......... 4

B. Defendants' Position Should Be Rejected Because It Reads 11 U.S.C. § 552(a) Out of Existence .......... 11

C. Tracy Broadcasting Reached the Correct Conclusion and Is Valid Law .......... 12

CONCLUSION .......... 13

TABLE OF AUTHORITIES

Page

Cases

Hollinrake v. Fed. Land Bank of Omaha (In re Hollinrake), 93 B.R. 183 (S.D. Iowa 1988) ........ 3

In re Airadigm Communications, Inc., 519 F.3d 640 (7th Cir. 2008) ........ 12

In re Beach Television Partners, 38 F.3d 535 (11th Cir. 1994) ........ 10

In re Bill Welch, 3 F.C.C.R. 6502 (1988) ........ 5

In re Cheskey, 9 F.C.C.R. 986 (1994), affirmed on other grounds, 13 F.C.C.R. 10656 (Apr. 21, 1998) ........ 5, 12

In re Merkley, 94 F.C.C.2d 829, 1983 FCC LEXIS 483 (1983) ........ 6

In re Ridgely Communications, Inc., 139 B.R. 374 (Bankr. D. Md. 1992) ........ 7-8, 12

In re SRJ Enterprises, 150 B.R. 933 (Bankr. N.D. Ill. 1993) ........ 11

In re Tak Communications, Inc., 985 F.2d 916 (7th Cir. 1993) ........ 12

In re WPAL-FM, Ridgeville, SC, 47 Comm. Reg. (P&F), 485, 24 FCC Rcd, 2894, 2009 FCC LEXIS 935 (Media Bur. 2009) ........ 5-6

Ion Media Networks, Inc. v. Cyrus Select Opportunities Master Fund Ltd. (In re Ion Media Networks, Inc.), 419 B.R. 585 (Bankr. S.D.N.Y. 2009) ........ 10-11

IRS v. Subranni (In re Atlantic Business & Community Development Corp.), 994 F.2d 1069 (3d Cir. 1993) ........ 10

Kidd Communs. v. FCC, 427 F.3d 1 (D.C. Cir 2005) ........ 6

MLQ Investors, L.P. v. Pacific Quadracasting, 146 F.3d 746 (9th Cir. 1998), cert. denied, 525 U.S. 1121 (1999) ........ 12

Spectrum Scan LLC v. Valley Bank & Trust Co. (In re Tracy Broadcasting Corp.), 438 B.R. 323 (Bankr. D. Colo. 2010) ........ passim

Stephens Indus., Inc. v. McClung, 789 F.2d 386 (6th Cir. 1986) ........ 12

Urban Communicators PCS Ltd. P'ship v. Gabriel Capital, L.P., 394 B.R. 325 (S.D.N.Y. 2008) ........ 9

Wells Fargo Foothill, Inc. v. Kepler (In re Media Props., Inc.), 311 B.R. 244 (Bankr. W.D. Wis. 2004) ........ 6, 9

Statutes

11 U.S.C. § 552 .......... passim

47 U.S.C. § 301 .......... 2, 4

47 U.S.C. § 310 .......... 4

NY UCC § 9-102 .......... 6-7

NY UCC § 9-203 .......... 8

NY UCC § 9-315 .......... 4

NY UCC § 9-408 .......... 2

Intervenor-Plaintiff, the Official Committee of Unsecured Creditors of TerreStar Networks Inc., *et al*. (the "Committee"), submits this Memorandum of Law in further support of its Motion for Summary Judgment on the first two claims of its Intervenor-Complaint for Declaratory Relief in this proceeding, and in opposition to the cross-motions for summary judgment of defendant U.S. Bank as Collateral Agent for certain Senior Secured Noteholders (the "Senior Secured Noteholders") and defendant-intervenor Ad Hoc Group of Holders of 15% Senior Secured Notes (the "Ad Hoc Group").

## INTRODUCTION

As the authorities in the Committee's opening Memorandum of Law make clear, U.S. Bank National Association ("U.S. Bank") (and the Senior Secured Noteholders for whom it acts as agent) did not, and could not, have a perfected security interest in the FCC Licenses (as defined herein) held by debtor TerreStar License Inc. ("TSLI"), or in the proceeds or economic value to be derived from the FCC Licenses. Furthermore, it is undisputed that as of the date of the commencement of the Bankruptcy Case (the "Petition Date"), the Debtors had no pending agreement for the sale or transfer of the FCC Licenses, and had not received FCC approval for a sale. No proceeds of the FCC Licenses or value generated by (or from) the FCC Licenses were realized by the Debtors prior to the Petition Date. These pertinent facts have not changed since the Committee first moved for summary judgment.

Further, the Senior Secured Noteholders were precluded from obtaining a valid security interest in the licenses, reservations of spectrum, letters of intent, authorizations, waivers, permits and other related regulatory approvals (collectively, the "FCC Licenses") originally

granted by the Federal Communications Commission (the "FCC") to TSLI, a debtor herein,[1] and any proceeds and/or value derived from such FCC Licenses, because the Debtor TSNI and certain of its affiliates (collectively, "TSN") never had any legal right to encumber the FCC Licenses. FCC licenses are a privilege that confers no property right in the holder thereof, and 47 U.S.C. § 301, *et seq.* (the "Communications Act") unambiguously prohibits the transfer of control or assignment of any FCC licenses and *any* rights in the FCC licenses without prior approval from the FCC. Nor is the Senior Secured Noteholders' claimed security interest saved by the safe harbor of New York's Uniform Commercial Code (the "UCC") § 9-408 because the Communications Act constitutes contrary federal law. As a result, this Court should determine and declare that the Senior Secured Noteholders and U.S. Bank do not have a security interest in the FCC Licenses because their purported security interest could not attach to the FCC Licenses.

Likewise, when the undisputed material facts are considered in the light of 11 U.S.C. § 552(a), it is clear that as a matter of law, defendants' do not possess a valid security interest in the prospective post-petition proceeds (the "Proceeds") that would result from the FCC Licenses' contemplated transfer or sale. Pursuant to 11 U.S.C. § 552(a), the Senior Secured Noteholders and U.S. Bank cannot possess a valid post-petition security interest in property that is only first acquired by the Debtors post-petition. Nor can the Senior Secured Noteholders and U.S. Bank benefit from the limited exceptions to 11 U.S.C. § 552(a)'s general rule, as set forth in 11 U.S.C. § 552(b). The Senior Secured Noteholders and U.S. Bank did not have a valid pre-petition security interest in the FCC Licenses and, therefore, did not have a pre-petition security interest that could extend to the prospective proceeds of the sale of the FCC Licenses.

[1] TerreStar Networks Inc. ("TSNI"), together with Motient Communications Inc., Motient Holdings Inc., Motient License Inc., Motient Services Inc., Motient Ventures Holding Inc., MVH Holdings Inc., TSLI, TerreStar National Services Inc., TerreStar Networks Holdings (Canada) Inc., TerreStar Networks (Canada) Inc., and/or 0887729 B.C. Ltd. are collectively referred to herein as the "Debtors".

In opposing the Committee's motion, U.S. Bank and the Ad Hoc Group deliberately ignore an entire line of case law and legal authority that holds that a secured creditor may qualify for the post-petition security interest exception set forth in 11 U.S.C. § 552(b) only if, among other things, the secured creditor has a security interest that has been perfected in the subject collateral under applicable non-bankruptcy law. Pursuant to applicable nonbankruptcy law -- New York's Uniform Commercial Code -- U.S. Bank and the Senior Secured Noteholders cannot, and do not, have a valid security interest in any proceeds of the FCC Licenses.

Accordingly, the Committee is entitled, as a matter of law, to the relief it requests on its first two pleaded Claims, namely a declaration that (a) the FCC Licenses and any prospective proceeds thereof are unencumbered and that the Senior Secured Noteholders do not (and cannot) possess a security interest in the FCC Licenses (First Claim); and (b) U.S. Bank and the Senior Secured Noteholders do not (and cannot) possess a security interest in any prospective proceeds of, or value to be derived from, the FCC Licenses (Second Claim). Further, the Court should deny U.S. Bank and the Ad Hoc Group's cross-motions for summary judgment on the first two Counts of the Committee's Complaint.[2] The documentary record and the pertinent law mandate the relief sought by the Committee on its motion.

---

[2] At this time, the Committee does not seek entry of summary judgment as to the Third Claim of its Complaint. If the Court grants judgment in favor of the Committee as a matter of law on the First and Second Claims, and thereby concludes that any purported liens are invalid and/or unenforceable, the Court will not need to address the Third Claim which seeks invalidation of such liens on equitable grounds. The Committee reiterates that an equities determination is fact intensive and must be "made on a case by case basis" thereby making the determination of such a claim by summary judgment inappropriate in most cases. See Hollinrake v. Fed. Land Bank of Omaha (In re Hollinrake), 93 B.R. 183, 192 (S.D. Iowa 1988). Accordingly, U.S. Bank's cross-motion for summary judgment dismissing the Third Claim of the Committee's Complaint should also be denied. Likewise, the Court should deny U.S. Bank's cross-motion for summary judgment dismissing the Third Claim of the Complaint of Plaintiff Sprint Nextel Corporation ("Sprint Nextel").

The Committee repeats that it joins in the summary judgment motion to the extent that Sprint Nextel seeks summary judgment on the First and Second Claims of its Complaint. The Committee does not join in Sprint Nextel's motion on the Fourth Claim of the Sprint Nextel Complaint which seeks subordination of U.S. Bank's claims to those asserted by Sprint Nextel.

## ARGUMENT

A. U.S. Bank and the Senior Secured Lenders Lack Valid Pre-Petition Liens in the FCC Licenses

FCC licensees do not have ownership rights over their licenses, and the Communications Act prohibits the transfer of a license (or any right thereunder) without the approval of the FCC. The Communications Act allows for the licensing of radio frequencies merely "to provide for the use of such channels, but not the ownership thereof." 47 U.S.C. § 301. Similarly, Section 310 of the Communications Act prohibits the "transfer[,] assign[ment], or dispos[al] of [an FCC license] in any manner, voluntarily or involuntarily, directly or indirectly, or by transfer of control of any corporation holding such permit or license, to any person except upon application to the [FCC] . . . ." 47 U.S.C. § 310(d).

Notwithstanding the strictures of the Communications Act, U.S. Bank and the Ad Hoc Group contend that U.S. Bank as collateral agent and the Senior Secured Noteholders possess a security interest in a "private property interest" in the FCC Licenses that is separate and distinct from an interest in the FCC Licenses themselves. U.S. Bank argues that the Debtors' "private property interest" that existed on the Petition Date included the right to "pledge" this separate interest "to a lender as security for a loan" and the "right to profit of a sale of the Licenses." U.S. Bank Memorandum of Law at 9. This argument cannot stand without rendering meaningless the statutory prohibition against granting a security interest in the FCC Licenses themselves. For a license such as the FCC Licenses, a right one expects to acquire in the future is, for purposes of both UCC § 9-315 and 11 U.S.C. § 552, no right at all. A license holder does not acquire proceeds or private property interests until it receives such from a third party through an agreement to purchase the license (and the license holder has a contract to enforce or seek

damages under), or the third party actually purchases the license and owes the license holder money.

Defendants cannot properly rely upon In re Bill Welch, 3 F.C.C.R. 6502 (1988) or In re Cheskey, 9 F.C.C.R. 986 (1994) ("Cheskey I"), affirmed on other grounds, 13 F.C.C.R. 10656 (Apr. 21, 1998) ("Cheskey II"), for the proposition that the FCC prohibition against a security interest in an FCC license has been relaxed or changed. The issue in Welch was whether the holder of certain cellular service authorizations could sell them to a third party for profit, that is, whether the licensee had the right to profit from a sale. Welch did not concern whether a lender could obtain a security interest in the authorizations, or even whether a creditor could be assigned the sales proceeds. The issues of whether liens or other security interests could be granted in the cellular service authorizations was not addressed at all. Any contention that Welch reversed the FCC's longstanding policy prohibiting a security interest in a license must therefore be rejected.

In Cheskey I (decided in 1994), the FCC policy prohibiting a security interest in an FCC license remained unchanged. Four years later, in Cheskey II, the FCC reiterated its long-standing prohibition against a security interest in the license itself, stating: "Lenders may not be granted direct security interests in licenses themselves." Cheskey II, 13 F.C.C.R. 10656, 1998 WL 187928 (April 21, 1998).

Subsequent to Cheskey II and Welch, the FCC has not wavered. Indeed, as recently as 2009, the Media Bureau wrote:

> It is well established that a broadcast license does not confer a property right, but rather is a valuable privilege to utilize the airwaves, subject to certain limitations, including restrictions on the right to assign licenses. As the Commission has stated, '[t]he extraordinary notion that a station license issued by this

> Commission is a mortgageable chattel in the ordinary commercial sense is untenable.' Rather the Commission has repeatedly observed that a 'license, as distinguished from a station's physical assets, is not subject to a mortgage, security interest, or lien, pledge, attachment, seizure, or similar property right.

In re WPAL-FM, Ridgeville, SC, 47 Comm. Reg. (P&F) 485, 24 FCC Rcd, 2894, 2009 FCC LEXIS 935 (Media Bur. 2009) (footnotes omitted).

Every court that has considered the issue has agreed that a creditor's security interest cannot attach to an FCC license itself. As Spectrum Scan LLC v. Valley Bank & Trust Co. (In re Tracy Broadcasting Corp.), 438 B.R. 323, 327-328 (Bankr. D. Colo. 2010) observed: "'[A]n FCC broadcast license itself may not be subject to a security interest. This is settled law. An FCC license 'as distinguished from a station's physical assets, is not subject to mortgage, security interest or lien.'"); see Kidd Communs. v. FCC, 427 F.3d 1, 5 (D.C. Cir 2005); In re Merkley, 94 F.C.C.2d 829, 1983 FCC LEXIS 483 at *2 (1983) (an FCC license "is not an owned asset or vested property interest so as to be subject to a mortgage, lien, pledge, attachment, seizure, or similar property right"); see also Wells Fargo Foothill, Inc. v. Kepler (In re Media Props., Inc.), 311 B.R. 244, 247 (Bankr. W.D. Wis. 2004) ("47 U.S.C. § 301 and 47 U.S.C. § 304 provide that a broadcast license…does not convey a property interest").

Moreover and contrary to defendants' assertion, a limited "private right" in an FCC license between a licensee and a third party (discussed more fully below) is not a general intangible. General intangibles are defined under the New York UCC as: "any personal property, including things in action, other than accounts, chattel paper, commercial tort claims, deposit accounts, documents, goods, instruments, investment property, letter-of-credit rights, letters of credit, money, and oil, gas, or other minerals before extraction. The term includes payment intangibles and software." NY UCC 9-102(a)(42). A private right under an FCC license is

outside the scope of this statutory definition. See NY UCC § 9-102(64) (distinguishing between "collateral" and the "[p]roceeds" or "value" derived therefrom).

U.S. Bank contends that "general intangibles" is broad enough to include the Debtors' "private property right to sell the FCC Licenses for profit to a third-party, subject to FCC approval, when the FCC issued the Licenses." U.S. Bank's Memorandum of Law at 21. However, the "private rights" that would constitute general intangibles cannot include the right to sell the license, since this is tantamount to a security interest in the license itself. Accordingly, defendants' reasoning avoids the central question: if the Senior Secured Noteholders lack a security interest in the FCC Licenses, but nonetheless allegedly possess a security interest in the Debtor's "private property interest" to proceeds arising from the sale of the FCC Licenses, how could the purported interest in general intangibles attach to the FCC Licenses absent a pending sale? Simply stated, they cannot. See Tracy Broadcasting, 438 B.R. at 330.

U.S. Bank and the Ad Hoc Group's reliance on In re Ridgely Communications, Inc., 139 B.R. 374 (Bankr. D. Md. 1992), is misplaced because Ridgely Communications did not adequately consider Article 9 of the UCC or 11 U.S.C. § 552. The Ridgely court read FCC precedent as allowing two separate categories of FCC license rights: (1) rights between licensees and the FCC, which it named "public rights"; and (2) rights between a licensee and a third party, which it named "private rights." Id. at 377. According to the Ridgely court, "[i]t is this distinction which permits a licensee to receive a profit from the transfer of a license to third part [ies]." Id.

Ridgely involved a party that sold all of its assets, including its FCC license. The issue before the Ridgely court was whether the proceeds from the sale of the FCC license should be distributed to a creditor who claimed a security interest in the FCC license. 139 B.R. at 375. On

these specific facts, the court held that a creditor could perfect a security interest in a debtor's right to proceeds from the sale of an FCC license, stating:

> [t]he right of the licensee crucial to this decision (and the only right recognized by the Court in this case) is the right of the creditor to claim proceeds received by the debtor licensee from a private buyer in exchange for the transfer of the license to that buyer. The right to receive such proceeds is a private right of the licensee that constitutes a proprietary interest in which a creditor may perfect a security interest.

Id. at 379.

In reaching its decision, Ridgely determined that inasmuch as liquor licenses and other kinds of governmental licenses are generally considered "general intangibles" under the UCC, the "private right" the creditor held in the FCC license should also be considered a general intangible. Id. From this determination, the Ridgley court reasoned that, because the creditor had a security interest in general intangibles, the creditor was entitled to a postpetition lien on "proceeds" realized from the sale of an FCC license even though it had no interest in the license itself.

Ridgely's reasoning is flawed. First, Ridgely failed to consider adequately Article 9 of the UCC and its interplay with the Communications Act. Ridgely offered no analysis of whether a licensee's limited "private right" in a FCC license is the type of property interest constituting a "general intangible" under Article 9 of the UCC. Second, Ridgely may have ignored 11 U.S.C. § 552. Had the Ridgely court properly considered the UCC, it would have had to consider the debtor's rights in the FCC License and the debtor's rights in its general intangibles under § 9-203. That the collateral at issue is labeled as a general intangible does not change the analysis. See Tracy Broadcasting, 438 B.R. at 330.

Urban Communicators PCS Ltd. P'ship v. Gabriel Capital, L.P., 394 B.R. 325 (S.D.N.Y. 2008), does not bolster defendants' position. In Urban Communicators, the debtor and a third-party purchaser negotiated the terms for a sale of certain FCC licenses post-petition. Urban Communicators did not involve the issue of whether the security interest attached to the proceeds, but rather when it attached. There, the court concluded in general terms that a creditor *may*, under certain circumstances and subject to the presentation of contrary authority, obtain a security interest in proceeds from the sale of an FCC license. Id. at 335. Here, unlike in Urban Communicators, significant contrary authority exists, especially given that this is a case where the existence of lien proceeds is in dispute and the case is a non-consensual case. Here, no sale of the FCC Licenses is pending, and the Plan has been withdrawn. No security interest existed in the proceeds of the FCC Licenses (or in the value to be derived from any such proceeds) prior to the Petition Date; and no such security interest presently exists. Significantly, defendants do not deny that notwithstanding the withdrawal of the Plan, a live and present controversy exists.

In re Media Properties, Inc., 311 B.R. 244 (Bankr. W.D. Wis. 2004), involved the essential element that the FCC approve the transfer of the subject license to a third party, which is an element that does not exist in this case. Additionally, Media Properties makes clear that the creditor's security interest that the court allowed to encumber the FCC license's proceeds in that case, did not include the creditor's right to take possession of the FCC license. 311 B.R. at 249 (citing State St. Bank & Trust Co. v. Arrow Communications, 833 F. Supp. 41, 48-49 (D. Mass. 1993)). Moreover, in Tracy Broadcasting, the court expressly rejected the analysis of Media Properties: "The Court disagrees with the analysis of the Media Properties case. The Debtor's right to receive value for a transfer of its License did not exist prior to the filing of its Chapter 11

case because any such 'right' was too remote and was subject to two contingencies." 438 B.R. at 330.

In In re Beach Television Partners, 38 F.3d 535 (11th Cir. 1994), the court addressed the sale of the debtor's FCC licenses to third parties, with prior FCC approval, in the context of a Chapter 7 liquidation (which had previously proceeded under Chapter 11). As in the other cases described above, Beach Television addressed the sale of FCC licenses under circumstances where the sale appeared to have been approved (or at least not objected to) by all interested parties. 38 F.3d at 536. The policy-driven nature of the court's determination, was marked by a desire to allow a sale to proceed and a creditor to obtain funds to which it was purportedly due, thereby distinguishing Beach Television from this case and making it inapplicable.

IRS v. Subranni (In re Atlantic Business & Community Development Corp.), 994 F.2d 1069 (3d Cir. 1993), also has no bearing here. In In re Atlantic Business the court determined that the IRS possessed a tax lien in proceeds arising from a license sale approved by the FCC. The court observed "that the fear that a secured creditor would act contrary to the regulatory scheme is attenuated when the government asserts the interest and the risk of influence antithetical to the public is reduced, if not eliminated." 994 F.2d at 1074. Further, the court noted that the "IRS's lien now attaches only to the proceeds of a transfer the FCC has approved." Id. By contrast, the defendants are looking to exercise a purely private interest, and the FCC has not approved any sale or transfer of the FCC Licenses. (Indeed, the Debtor's proposed Plan has been withdrawn).

Ion Media Networks, Inc. v. Cyrus Select Opportunities Master Fund Ltd. (In re Ion Media Networks, Inc.), 419 B.R. 585 (Bankr. S.D.N.Y. 2009), does not compel an outcome different from that urged by the Committee. In Ion Media Networks, the Court held that the

objecting junior creditor lacked standing to object to the asserted lien under the pertinent intercreditor agreement because he had waived his right to object. 419 B.R. at 589. Indeed, in Ion Media Networks, the Official Committee of Unsecured Creditors supported confirmation of the plan. By contrast, here the Plan has been withdrawn and the Committee has statutory and consensual standing to object to the disposition of the FCC Licenses and their "proceeds."

**B.     Defendants' Position Should Be Rejected
        Because It Reads 11 U.S.C. § 552(a) Out of Existence**

The proposition urged by the defendants -- namely, that a debtor's "right to pursue tangible recovery" is a form of a property right separate and apart from the underlying property that can be encumbered independently as a "general intangible" -- would effectively write 11 U.S.C. § 552(a) out of existence. As noted, the "right to pursue tangible recovery" is an attribute of all property; it is inherent in the right to ownership. The inevitable result of defendants' argument therefore would be that any creditor with a security interest in general intangibles would be entitled to claim post-petition proceeds in any type of personal property, notwithstanding the absence of an enforceable security interest in any of the underlying property giving rise to the proceeds.

In re SRJ Enterprises, 150 B.R. 933 (Bankr. N.D. Ill. 1993), cited by U.S. Bank, is similarly of no assistance to defendants. In determining when a debtor's market share, goodwill and going concern value arose, SRJ Enterprises determined that the "value . . . existed pre-petition at the time the Debtor filed for relief." In re SRJ Enterprises, 150 B.R. at 935. In other words, SRJ determined that the source of the debtor's right to general intangibles, the "market share value," existed pre-petition, and was a present right of the debtor that could be measured and determined prior to the bankruptcy filing. This is an entirely different situation from the case at bar where U.S. Bank and the Senior Secured Noteholders are claiming a security interest in the

proceeds from a contract that did not exist pre-petition, did not exist as of the time of the execution of the Security Agreement and still does not exist even today. The mere notion that someday the Debtors may sell the FCC Licenses does not give rise to a "general intangible" that can be encumbered.

## C. Tracy Broadcasting Reached the Correct Conclusion and Is Valid Law

Both defendants attempt to discredit Tracy Broadcasting by asserting that it was wrongly decided, and that it ignored pertinent case law regarding the rights purportedly attendant to an FCC License. Indeed, the Ad Hoc Committee's critique of Tracy Broadcasting is tantamount to a tautology, namely that Tracy Broadcasting is wrong because it was wrongly decided and is on appeal. However, the Tracy Broadcasting Court thoughtfully examined precedent, carefully reviewed the Bankruptcy Code and the Uniform Commercial Code, and parsed statutory language. Tracy Broadcasting expressly acknowledged Ridgely, Cheskey I and MLQ Investors, L.P. v. Pacific Quadracasting, 146 F.3d 746 (9th Cir. 1998), cert. denied, 525 U.S. 1121 (1999), but also noted that "there are Circuit Court cases which seem to reject any security interest in any aspect of an FCC license. See, In re Tak Communications, Inc., 985 F.2d 916 (7th Cir. 1993); In re Airadigm Communications, Inc., 519 F.3d 640, 653 (7th Cir. 2008); Stephens Indus., Inc. v. McClung, 789 F.2d 386 (6th Cir. 1986)." Tracy Broadcasting, 438 B.R. at 328.

Further, Tracy Broadcasting emphasized that a bankruptcy is different, and that even if Ridgely, Cheskey I and MLQ Investors correctly enunciated general principles of law, the presence of a bankruptcy and 11 U.S.C. § 552(a) nonetheless limited any rights in proceeds. According to the court in Tracy Broadcasting:

> the question is: did the Debtor have sufficient "rights in the collateral or the power to transfer rights in the collateral to a secured party," such as would be necessary for any security

> interest to attach under § 9-203 of the UCC, prior to filing its Chapter 11 case?
>
> The answer is no. The Court disagrees with the analysis of the Media Properties case. The Debtor's right to receive value for a transfer of its License did not exist prior to the filing of its Chapter 11 case because any such "right" was too remote and was subject to two contingencies.

438 B.R. at 330.

The mere fact that Tracy Broadcasting is on appeal to a United States District Court does not divest Tracy Broadcasting of its precedential value. Defendants do not (and cannot) overcome the statutory hurdle posed by 11 U.S.C. § 552(a). Under these circumstances, it is clear that defendants' protestations notwithstanding, Tracy Broadcasting was correctly decided and represents the current state of the law on these issues. It should therefore serve as a compelling predicate for this Court to grant the relief sought by the Committee on its first two claims in this Adversary Proceeding.

## CONCLUSION

For all of the foregoing reasons, the Committee respectfully prays:

(a) that its Motion be granted;

(b) that the Court enter an order of summary judgment on the First Claim in the Committee's Complaint declaring (i) that a present, justiciable controversy exists regarding whether the liens purportedly granted pursuant to the Security Agreement granted enforceable security interests in the FCC Licenses, and (ii) that U.S. Bank and the Senior Secured Noteholders, on whose behalf U.S. Bank acts as agent, do not have a valid security interest in the FCC Licenses;

(c) that the Court enter an order of summary judgment on the Second Claim in the Committee's Complaint declaring (i) that a present, justiciable controversy exists regarding whether the pre-petition liens in the proceeds of the FCC Licenses purportedly granted pursuant to the Security Agreement attach to any proceeds or value derived from the FCC Licenses after the filing of the Bankruptcy Case, and (ii) that the pre-petition liens in the proceeds of the FCC Licenses purportedly granted pursuant to the Security Agreement do not attach to any proceeds or value derived from the FCC Licenses after the filing of the Bankruptcy Case;

(d) that the Court deny the defendants' respective cross-motions as they pertain to the First and Second Counts of the Committee's Complaint; and

(e) that the Court grant the Committee such other and further relief as the Court deems just, equitable and proper.

Dated: New York, New York
April 8, 2011

Respectfully submitted,

**OTTERBOURG, STEINDLER, HOUSTON & ROSEN, P.C.**

By: _/s/ David M. Posner_
Scott L. Hazan
David M. Posner
Stanley L. Lane, Jr.
Members of the Firm

230 Park Avenue
New York, New York 10169
Telephone: (212) 661-9100
Facsimile: (212) 682-6104

*Counsel to the Official Committee Of Unsecured Creditors*