**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------------x

In re:                                                                                  Chapter 11

TERRESTAR NETWORKS, INC., *et al.*                              Case No. 10-15446 (SHL)

            Debtors.                                                        (Jointly Administered)

------------------------------------------------------------------------x

SPRINT NEXTEL CORPORATION, and OFFICIAL
COMMITTEE OF UNSECURED CREDITORS OF
TERRESTAR NETWORKS, INC., *et al.*,

            Plaintiff, and Plaintiff-Intervenor,                   Adv. Pro. No. 10-05461

            - against -

U.S. BANK NATIONAL ASSOCIATION, in its
capacity as Indenture Trustee and Collateral
Agent for the 15.0% Senior Secured Payment-
In-Kind Notes due 2014, AD HOC GROUP OF
NOTEHOLDERS OF 15% SECURED NOTES, and
TERRESTAR NETWORKS, INC., *et al.*,

            Defendant, and Defendant-Intervenors.

------------------------------------------------------------------------x

## <u>MEMORANDUM OF DECISION</u>

A P P E A R A N C E S:

ARNALL GOLDEN GREGORY LLP
Attorneys for Sprint Nextel Corp.
By:     Darryl S. Laddin, Esq.
            Frank N. White, Esq.
            Matthew T. Covell, Esq.
171 17th Street, NW
Atlanta, GA 30363

OTTERBOURG, STEINDLER, HOUSTON & ROSEN, P.C.
Attorneys for the Official Committee of Unsecured Creditors
By:     Scott Hazan, Esq.
            David M. Posner, Esq.
            Stanley L. Lane, Jr., Esq.
230 Park Avenue
New York, NY 10169

CARTER LEDYARD & MILBURN LLP
Attorneys for U.S. Bank, N.A.
By:    Franklin Ciaccio, Esq.
       Gerald Griffin, Esq.
       Bryce Bernards, Esq.
2 Wall Street
New York, NY 10005

KIRKLAND & ELLIS LLP
Attorneys for Ad Hoc Group of Holders of 15% Senior Secured Notes
By:    Jonathan S. Henes, Esq.
       Joseph Serino, Jr., Esq.
       Hunter Murdock, Esq.
       Christopher T. Greco, Esq.
601 Lexington Avenue
New York, NY 10022

By:    Patrick J. Nash, Jr., Esq.
300 North LaSalle
Chicago, IL 60654

**SEAN H. LANE**
**UNITED STATES BANKRUPTCY JUDGE**

Before the Court are cross motions for partial summary judgment in the above-captioned

adversary proceeding filed by Sprint Nextel ("Sprint") in the Chapter 11 case of TerreStar

Networks, Inc. ("TerreStar") and the jointly administered debtors, Case No. 10-15446

(collectively, the "Debtors").  Debtor TerreStar is a mobile satellite services provider whose

business requires a Federal Communications Commission ("FCC") license to use 20 MHz of a 2

GHz S-Band spectrum (the "S-Band License").  Pursuant to certain FCC declaratory rulings,

Plaintiff Sprint filed claims against the Debtors in the amount of $104 million for the Debtors'

alleged share of Sprint's costs to clear the bandwidth that TerreStar now uses.  To satisfy its

admittedly unsecured obligation, Sprint asserts that a lien on TerreStar's license assets held by

the 15% senior secured noteholders (the "Noteholders")—facially superior in priority to Sprint's

claim—should either be (a) declared invalid; or (b) subordinated to Sprint's claim.  The pending

2

summary judgment motions all relate to the validity of the Noteholders' lien in relation to Sprint's claim.

Sprint's complaint has four counts, each alleging a different theory for its position. In Count I, Sprint maintains that the Noteholders' lien cannot attach to the S-Band License itself, and the lien is, therefore, invalid. Count II argues that even if the Noteholders' lien might be permissible as to the economic value associated with the license, the lien is not effective because (a) it could not attach under Article 9 of the New York Uniform Commercial Code (the "NYUCC") until after a sale of the license assets occurred; and (b) such lien is not permitted under Bankruptcy Code Section 552, which prohibits liens on property acquired after the bankruptcy filing. Count III of Sprint's complaint argues that, assuming there is a valid lien on the S-Band License, the lien should be invalidated or subordinated to Sprint's claim for reimbursement under the equities of the case provision of Bankruptcy Code Section 552(b)(1). Finally, Count IV contends that the Noteholders' lien should be subordinated to Sprint's claim pursuant to Bankruptcy Code Section 506(a)(1) and Article 9 of the NYUCC because the FCC conditioned TerreStar's license upon reimbursement to Sprint for clearing the bandwidth that TerreStar now uses.

Sprint seeks summary judgment on Counts I, II, and IV. The Official Committee of Unsecured Creditors appointed in the Debtors' Chapter 11 cases (the "Committee") supports Sprint's motion on Counts I and II, but maintains that the remaining counts are not ripe for summary judgment because discovery is incomplete. Defendant U.S. Bank, National Association ("U.S. Bank"), the indenture trustee and collateral agent for the Noteholders, opposes Sprint's motion and has cross moved for summary judgment on all four counts. An ad hoc committee representing the Noteholders in the Debtors' Chapter 11 cases joins U.S. Bank's motion on Counts I and II.

3

U.S. Bank and the Noteholders acknowledge the case law holding that a security interest may not be granted in an FCC license itself but argue that it is nonetheless well established that a lien may exist on the economic value of an FCC license. They maintain that the security agreement here grants a security interest in all economic value relating to TerreStar's S-Band License and that such a lien is not barred by Article 9 of the NYUCC or Section 552 of the Bankruptcy Code.

For the reasons set forth below, the Court concludes that Defendants U.S. Bank and the Noteholders have a valid lien on the economic value of the S-Band License, and nothing in Article 9 of the NYUCC or Section 552 invalidates this lien. Accordingly, the Court grants summary judgment to U.S. Bank and the Noteholders on Counts I and II, and denies summary judgment to Sprint and the Committee. As for Count III, the Court concludes that this equitable claim is fact dependent and not ripe for summary judgment until after the completion of discovery. Finally, the Court declines to grant Sprint priority over the Noteholders' lien based on relevant FCC rulings and, therefore, denies Sprint's motion on Count IV while granting the motion of U.S. Bank.

## BACKGROUND

The Debtors are providers of mobile satellite services ("MSS"), which require various licenses and authorizations from the FCC. Starting in the late 1990's, the FCC began assigning certain portions of spectrum (or "band") for the use of MSS operators and their anticipated MSS systems. In June 2004, the FCC transferred a license to use 20 MHz of a 1990-2025 MHz spectrum, the S-Band License, to TerreStar.

On February 14, 2008, TerreStar issued $500,000,000 in 15% Notes with a maturity date of 2014. Wholly-owned subsidiaries TerreStar National Services Inc. and TerreStar License Inc.

served as guarantors of the 15% Notes.  As noted above, the collateral agent and indenture

trustee for the 15% Noteholders was U.S. Bank.

The Security Agreement for these 15% Notes was governed by the laws of New York

and secured by:

> [A]ll FCC License Rights . . . including all FCC Licenses, including, without
> limitation, the *right to receive monies, proceeds, or other consideration in
> connection with the sale, assignment, transfer, or other disposition of any FCC
> Licenses, the proceeds from the sale of any FCC Licenses or any goodwill or
> other intangible rights or benefits associated therewith*, including without
> limitation all right of each Grantor to (A) transfer, assign or otherwise dispose of
> its rights, title and interests, if any, under or in respect of such FCC Licenses, (B)
> exercise any rights, demands and remedies against the lessor, licensor or other
> parties thereto, and (C) all rights of such Grantor to receive proceeds of any
> insurance, indemnities, warranties, guaranties or claims for damages in
> connection therewith . . . .

Security Agreement [Dkt. No. 52, Exhibit C] § 3(f) (emphasis added).

The Security Agreement was, however, careful to carve out the FCC license itself from

the lien:

> [S]uch security interest does not include at any time any FCC License to the
> extent (but only to the extent) that at such time the Collateral Agent may not
> validly possess a security interest directly in the FCC License pursuant to
> applicable federal law, including the Communications Act of 1934, as amended,
> and the rules, regulations and policies promulgated thereunder, as in effect at
> such time, but such security interest does include at all times all proceeds of the
> FCC Licenses, and the right to receive all monies, consideration and proceeds
> derived from or in connection with the sale, assignment, transfer, or other
> disposition of the FCC Licenses . . . .

Security Agreement [Dkt. No. 52, Exhibit C] § 3(f) (emphasis added).  The Security Agreement

also pledged as collateral all "General Intangibles," as defined by Article 9 of the NYUCC.  *Id.*

at §§ 1.02, 3(a).

Consistent with the Security Agreement, the Offering Memorandum for the 15% Notes

recognized that the lien does not cover the S-Band License itself because the FCC retains the

authority to determine who may hold a license:

> The ability of the collateral agent to foreclose on certain of the collateral securing the notes may be limited by U.S. . . . laws and certain agreements. Current FCC policy prohibits the grant of a security interest in an FCC radio frequency license or authorization. . . . As a result, even after we obtain our FCC . . . licenses, authorizations or approvals in principle, *holders of the notes will not have a direct security interest in these licenses and authorizations*. [An investor's] ability to foreclose on, or to exercise certain rights or remedies with respect to, certain of the collateral requires prior approval from the FCC to the extent it would result in an assignment or transfer of control of our FCC authorizations (whether as a matter of law or fact).

TerreStar Networks Inc. $500,000,000 15% Senior Secured PIK Notes due 2014, Offering Memorandum [Dkt. No. 52, Exhibit A], at 42 (emphasis added). U.S. Bank perfected its security interest by filing a Uniform Commercial Code Financing Statement with the Delaware Secretary of State and the relevant agreements with the Securities and Exchange Commission.

The spectrum for which TerreStar holds the S-Band License was previously used for other purposes and was made available to TerreStar only after that bandwidth was cleared by Sprint, a wireless telecommunications carrier. Sprint relinquished its license to the 800 MHz spectrum in exchange for the license to the 1990-1995 MHz spectrum pursuant to an agreement with the FCC. *See* Improving Public Safety Communication in the 800 MHz Band, 19 FCC Rcd. 14969 ¶¶ 11-12 (2004) (the "800 MHz Order"). Before Sprint could operate in the 1990-1995 MHz spectrum, however, the FCC required Sprint to move the Broadcast Auxiliary Service ("BAS") incumbents already occupying the 1950-2025 MHz spectrum. According to the FCC, Sprint's new license to the 1990-1995 MHz spectrum was worth $2.801 billion more than the license to the 800 MHz spectrum. *See* Improving Public Safety Communications in the 800 MHz Band, 25 FCC Rcd. 13874 ¶ 7 n.13 (2010) (citing 800 MHz Order ¶ 297; Improving Public Safety Communications in the 800 MHz Band, 19 FCC Rcd. 25120 ¶ 31 (2004)) ("The Commission valued the 1.9 GHz spectrum that Sprint is receiving as worth $ 4.86 billion, and the spectrum Sprint is giving as worth $ 2.059 billion. . . . [t]he difference [of which is] $ 2.801

6

billion . . . .").  In the 800 MHz Order, the FCC recognized that Sprint could either (a) credit move costs against Sprint's $2.801 billion windfall; or (b) seek pro rata reimbursements from other MSS licensees who would subsequently occupy the cleared 1995-2025 MHz spectrum. *See* 800 MHz Order ¶¶ 261, 329-330.  The FCC emphasized that Sprint was not entitled to "double dip" by receiving compensation from both MSS licensees and the FCC.  Improving Public Safety Communications in the 800 MHz Band, 25 FCC Rcd. 13874 ¶ 6 (citing 800 MHz Order ¶¶ 261, 329-330).  If Sprint failed to obtain reimbursement from the relevant MSS licensees, however, Sprint will be entitled to credit from the FCC against any windfall.

Relatedly, the FCC issued an "Emerging Technologies" policy designed to prevent later licensees from receiving a free ride on prior spectrum clearing done by other licensees.  That policy provided that "[a]ll MSS licensees who benefit from relocation of BAS are responsible for contributing, as a condition of their licenses."  Amendment of Section 2.106 of the Commission's Rules to Allocate Spectrum at 2 GHz for Use by the Mobile-Satellite Service, 15 FCC Rcd. 12315 ¶ 69 (2000) (the "2000 Ruling").  In the 2000 Ruling, the FCC used the term "condition" but did not address whether an MSS licensee would be stripped of its license if a licensee failed to honor its reimbursement obligations.  *See id.*  Motient Corporation, the predecessor company to TerreStar's parent company, recognized in its 2005 annual report that, as an MSS licensee, it could "have obligations to reimburse [Sprint] Nextel for certain of its band clearing costs. . . . [in a] range from $0 to in excess of $100 million."  Motient Corporation Form 10-K: For the Fiscal Year Ended December 31, 2005 [Dkt. No. 40, Exhibit M], at 16.[1]

With reimbursement obligations to Sprint remaining unpaid, Sprint filed suit against TerreStar and other MSS licensees in June 2008 in the United States District Court for the Eastern District of Virginia, seeking pro rata reimbursement of BAS relocation costs.  *Sprint*

---

[1]  TerreStar's parent company, TerreStar Corporation, is the successor company to Motient Corporation.

*Nextel Corporation v. ICO Satellite Service G.P., et al.*, Civil Action No. 1:08-cv-651 (E.D. Va. 2008). At the MSS licensees' request, the district court held the case in abeyance and asked the FCC to clarify the BAS relocation cost sharing rules, including providing guidance on when an operator is considered to have entered the band and triggered a reimbursement obligation to Sprint. *Id.* at Dkt. No. 33.

In response to the district court's request, the FCC issued an order and report entitled Improving Public Safety Communications in the 800 MHz Band, 24 FCC Rcd. 7904 (2009) (the "2009 Ruling"). In the 2009 Ruling, the FCC "tentatively conclud[ed] that MSS operators . . . will have an obligation to share, on a *pro rata* basis, in the costs associated with the relocation of BAS incumbents if they 'enter the band' prior to the BAS sunset date of December 9, 2013." *Id.* ¶ 2 (emphasis in original). Notably, the 2009 Ruling used the term "obligation" rather than "condition" to describe the requirement of other MSS licensees to reimburse Sprint. *Id.*

On September 29, 2010, the FCC issued a declaratory ruling to provide additional guidance on FCC policy as to the Sprint reimbursement obligation. Improving Public Safety Communications in the 800 MHz Band, 25 FCC Rcd. 13874 ¶ 1 (2010) (the "2010 Declaratory Ruling"). In the 2010 Declaratory Ruling, the FCC found that MSS licensees have a reimbursement obligation to Sprint. *Id.* ¶ 6. More specifically, the FCC concluded that if an MSS licensee certifies that its satellite is operational before the sunset date of December 9, 2013, the MSS licensee becomes obligated to reimburse Sprint for its pro rata share of the relocation costs based on the amount of spectrum used. *Id.* ¶ 42. In so ruling, the FCC rejected the argument of TerreStar and fellow MSS licensee, New DBSD Satellite Services G.P. ("DBSD"), that Sprint's delay in BAS relocation eliminated their reimbursement obligations. *Id.* ¶¶ 26-27. The FCC also responded to Sprint's claim that an MSS licensee's use of the license was conditioned on reimbursement:

> Sprint Nextel argues that failure of an MSS entrant to pay its [BAS relocation] cost sharing obligation in a timely fashion should automatically result in the suspension of its right to operate and suspension of its license if the failure to pay continues . . . . We will adopt no specific policies or procedures as to how we should proceed if later new entrants fail to reimburse an earlier entrant for the cost of relocating BAS incumbents as required. Instead, we will address complaints regarding failure to make required payments that are filed before the Commission through our existing enforcement mechanisms.

*Id.* ¶ 73. As for liability between corporate affiliates, the FCC articulated its view that the reimbursement obligation should be viewed as going to the enterprise as a whole rather than only to the specified licensee. *Id.* ¶¶ 33-34 (citing, *inter alia*, *Gen. Tel. Co. of the S.W. v. United States*, 449 F.2d 846, 854 (5th Cir. 1971)).[2] Notwithstanding the guidance provided on these issues, the FCC recognized that Sprint's ultimate recovery against these MSS licensees "will be governed by the proceedings in the bankruptcy court, rather than by this Commission or in the district court case initiated by Sprint Nextel." *Id.* ¶ 29.

Although scheduled to complete the BAS relocation by May 2007, Sprint actually did not complete the task until July 2010. Costs incurred for the relocation were submitted to a "Transition Administrator" to review for reasonableness, a process that remains ongoing.

TerreStar and its affiliates filed for Chapter 11 on October 19, 2010. Sprint filed proofs of claims for $104 million against each of the Debtors for reimbursement costs relating to the BAS relocation. The Committee, comprised of six of TerreStar's largest unsecured creditors, was appointed on October 29, 2010. Sprint commenced this adversary proceeding against U.S. Bank on December 17, 2010.

On July 7, 2011, TerreStar sold substantially all of its assets—including the S-Band License—to Gamma Acquisition L.L.C., an affiliate of Dish Network Corporation, for $1.375

---

[2]  The FCC's comments about enterprise liability were directed to DBSD and its affiliated companies, which had filed for bankruptcy in the Southern District of New York. The question of enterprise liability as applied to TerreStar and its affiliates is the subject of separate motions in this case.

billion pursuant to Section 363 of the Bankruptcy Code. Under the applicable sales agreement, TerreStar's license transfer was subject to FCC approval. Under the Security Agreement, there is a $1.5 billion obligation under the 15% Notes in principal, interest, and make-whole premiums.

## DISCUSSION

### A.  SUMMARY JUDGMENT STANDARD

Summary judgment shall be granted where the movant demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-26 (1986); *Mark IV Indus. v. N.M. Envtl. Dep't* (*In re Mark IV Indus.*), 438 B.R. 460, 464-65 (Bankr. S.D.N.Y. 2010). A material fact is one that "might affect the outcome of the suit under governing law." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007) (citation and internal quotation marks omitted). After the movant makes an initial showing that no evidence supports the nonmoving party's case, that opposing party must come forward with competent evidence that a genuine issue of fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). Mere conclusory allegations or unsupported speculations do not defeat a motion for summary judgment. *See id.* If the nonmoving party fails to establish the existence of an element essential to its case on which it will bear the burden of proof at trial, summary judgment is granted for the movant. *Celotex*, 477 U.S. at 322-23.

### B.  A VALID SECURITY INTEREST EXISTS IN THE ECONOMIC VALUE OF AN FCC LICENSE

The Federal Communications Act of 1934, which governs licenses, originally contemplated only radio broadcasting but it now covers television and other modern forms of mobile personal communication. *See* 47 U.S.C. § 151 *et seq.*; *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367,

387-88 (1969) ("[Maintaining orderly radio usage and addressing] the chaos which ensued from permitting anyone to use any frequency at whatever power level he wished, . . . made necessary the enactment of the . . . Communications Act of 1934.") (citations and footnotes omitted). Congress has granted the FCC the authority to regulate the use of the public airwaves in the United States, which includes the exclusive right to grant a license to use the airwaves and to approve any transfer of a license by a licensee.  *See* 47 U.S.C. §§ 301, 310(d); *see also* 47 C.F.R. § 73.1150(a).  In order to grant a license or approve its transfer, the FCC must determine that the transfer will serve the public interest; thus, the right to use the airwaves is a public right granted by the FCC to a licensee that may not be assigned without express FCC permission.  *See* 47 U.S.C. § 310(d).

To understand the arguments presented by the parties, it is necessary to briefly summarize the evolution of the law regarding whether, and to what extent, a lien may be placed on an FCC license or any value associated with it.[3]  The case law makes clear that, while a lien cannot exist on the license itself, a security interest may attach to the economic value of an FCC license.

---

[3]  It is unclear whether Sprint maintains that no lien of any kind is permissible on the value associated with an FCC license, or simply that the lien here is impermissible under the circumstances presented in this case:

> THE COURT:  Well, do you—are you telling me that the FCC policy is different than what I understand it to be, that you can have a lien on the economic value of the license?
> MR. LADDIN:  I don't think the FCC has—I don't believe that the FCC itself has actually decided that you can't have that language.
> THE COURT:  So you're saying the FCC policy is essentially open to debate, and I don't know what it is?
> MR. LADDIN:  At best.  I mean, that's correct. . . .

Transcript of Oral Argument, April 21, 2011 [Dkt. No. 68], at 71-72.  There has been similar confusion regarding the scope of relief requested in Count I.  The Court does not understand U.S. Bank or the Noteholders to seek to enforce the lien against the license itself.  *See, e.g.*, Ad Hoc Reply at 3 ("[N]o party can take an interest in an FCC license superior to the 'public' right held by the FCC itself.")  Accordingly, this Court construes Count I as seeking a declaration that U.S. Bank and the Noteholders are not entitled to obtain any value based upon the lien in the Security Agreement.

Prior to 1992, the FCC took the position that a lien could not be placed on an FCC license in any manner:

> [A] broadcast license, as distinguished from the station's plant or physical assets, is not an owned asset or vested property interest so as to be subject to a mortgage, lien, pledge, attachment, seizure, or similar property right. . . . [S]uch hypothecation endangers the independence of the licensee who is and who should be at all times responsible for and accountable to the Commission in the exercise of the broadcasting trust.

*In re Ridgely Communications, Inc.*, 139 B.R. 374, 376 (Bankr. D. Md. 1992) (citing *In re Merkley*, 94 F.C.C.2d 829, 830-31 (1983)) (internal quotation marks omitted).

In 1992, the question of whether a lien could be placed on an FCC license arose in two federal court cases that reached opposite conclusions.  The first of these cases was *Ridgely Communications*.  In *Ridgely*, the debtor, who owned and operated two commercial radio stations, granted its secured lender a first priority lien on all of its tangible and intangible property.  *Ridgely*, 139 B.R. at 375.  Following its Chapter 11 filing, the debtor sold its assets, including its FCC license, to third parties.  *Id.*  The secured lender demanded the sale proceeds, and the debtor objected by asserting that the lien was invalid as to the FCC license and resulting sale proceeds.  *Id.* at 375-76.  In siding with the secured lenders, the court in *Ridgely* distinguished between a debtor's "private" right to receive economic value generated by its FCC license as opposed to the FCC's "public" right to assign FCC licenses.  *Id.* at 378-79.[4]  The court observed that the FCC's primary concern was "with preserving its regulatory authority over licensees and over the transfer of broadcast licenses."  *Id.* at 376 n.1.  Concluding that the perfection of the creditor's private right on the economic value of the license did not disrupt the

---

[4]  In its decision, the *Ridgely* court took note of an FCC decision in *In re Bill Welch*, 3 FCC Rcd. 6502 (1988), which recognized a licensee's proprietary interest, however limited, in its license.  *Ridgely*, 139 B.R. at 376-77.  The *Ridgely* court also relied upon a decision from this Court, *Shimer v. Fugazy* (*In re Fugazy Express*), 114 B.R. 865, 873 (Bankr. S.D.N.Y. 1990), *aff'd* 124 B.R. 426 (S.D.N.Y. 1991), which concluded that a broadcast licensee possessed proprietary rights in the license, notwithstanding that the license was subject to a regulatory scheme. *Ridgely*, 139 B.R. at 377.

FCC's public right to regulate the license, the court held that "a creditor may perfect a security interest in a debtor's F.C.C. broadcasting license, limited to the extent of the licensee's proprietary rights in the license vis-a-vis private third parties." *Id.* at 379. The *Ridgely* court was careful to note that the security interest in the debtor's private right does not allow creditors to "initiate an involuntary transfer of the license to the creditor[] or to compel the initiation of a transfer or assignment of a license to a private third party. These are rights of the licensee vis-a-vis the F.C.C. and may not be abrogated by private agreement." *Id.* The court further concluded that, under the UCC, the security interest was in a licensee's "general intangibles," which may be perfected prepetition and prior to a sale of the license post-petition. *Id.*

The second case was *In re Tak Commc'ns, Inc.*, 138 B.R. 568 (W.D. Wis. 1992), *aff'd*, 985 F.2d 916, 916-17 (7th Cir. 1993), in which secured lenders held a lien on all of the debtor's tangible and intangible assets, including its FCC broadcasting licenses. After the debtor filed for Chapter 11, the lenders initiated an adversary proceeding to declare their liens valid. *Tak*, 985 F.2d at 916-17. In stark contrast to *Ridgely*, the *Tak* court held that the lien was invalid because the "FCC has consistently and unequivocally refused to recognize such interests," citing a 1965 FCC ruling precluding creditors from holding a security interest in FCC licenses. *Id.* at 918 (citing *In re Twelve Seventy, Inc.*, 1 F.C.C.2d 965, 967 (1965) ("Credit cannot be extended in reliance upon the license as an asset from which the licensee's obligations may be satisfied . . . .")) (internal quotation marks omitted). The *Tak* court did, however, recognize that "[w]hether to permit such [security] interests is . . . a matter for the FCC rather than the courts to decide." *Id.* at 919.

To resolve the direct conflict between these two decisions, the FCC issued a declaratory ruling in 1994 that adopted *Ridgely* and rejected *Tak*. *In re Cheskey*, 9 FCC Rcd. 986, 987 ¶ 9 n.8 (1994). In *Cheskey*, the FCC expressly embraced the public and private distinction

articulated in *Ridgely*: "If a security interest holder were to foreclose on the collateral license, by operation of law, the license could transfer hands without the prior approval of the Commission. In contrast, giving a security interest in the proceeds of the sale of a license does not raise the same concerns." *Id.* at 987 ¶ 8. Citing *Ridgely*, the FCC also referred to proceeds of a sale as the "licensee's propriety rights in the license vis-a-vis private third parties." *Id.* at 987 ¶ 9 n.7. Noting the *Tak* court's deference to FCC policy, the FCC in *Cheskey* explicitly concluded that "the court erred in *Tak*. . . . The court's ruling cannot bind the Commission to a policy which it does not have." *Id.* at 987 ¶ 9 n.8.

Since the FCC's issuance of *Cheskey*, it appears to be settled law that a creditor may perfect a lien in the private economic value of an FCC license to the extent that such lien does not violate the FCC's public right to regulate license transfers. *MLQ Investors, L.P. v. Pacific Quadracasting*, 146 F.3d 746, 748 (9th Cir. 1998) (adopting *Ridgely*'s public-private distinction and permitting a security interest in the private rights in an FCC license); *Urban Communicators PCS Ltd. P'shp v. Gabriel Capital, L.P.*, 394 B.R. 325, 334-35 (S.D.N.Y. 2008) (same); *In re Ion Media Networks, Inc.*, 419 B.R. 585, 602 (Bankr. S.D.N.Y. 2009) ("FCC Licenses . . . are subject to an enforceable dedication of their economic value . . . ."); *In re Beach Television Partners*, 38 F.3d 535, 537 (11th Cir. 1994) (holding that "[a] security interest in the proceeds of an FCC-approved sale of a broadcast license in no manner interferes with the FCC's authority and mandate under the Act to regulate the use of broadcast frequencies."); *Wells Fargo Foothill, Inc. v. Kepler (In re Media Props.)*, 311 B.R. 244, 250-51 (Bankr. W.D. Wis. 2004) ("After those prerogatives exclusive to the FCC are carved out, there remains an interest in the license which may be subjected to a security interest which would continue in proceeds of those interests by operation of law.") (citation omitted); *In re Thomas Communications, Inc.*, 166 B.R. 846, 849 (S.D. W. Va. 1994) (holding that "creditors in this case could possess a security interest in the

proceeds from the sale of broadcast licenses issued by the FCC"); *State St. Bank and Trust Co. v. Arrow Commc'ns, Inc.*, 833 F. Supp. 41, 49 (D. Mass. 1993) (holding that the creditors "secured interest in the general intangibles of [debtor's broadcast stations], including the license, is superior to the unsecured interest . . . when the proceeds are distributed."); *PBR Communications Sys. v. Jefferson Bank* (*In re PBR Communications Sys.*), 172 B.R. 132, 135 (Bankr. S.D. Fla. 1994) (citation omitted) (stating that "*Ridgely* . . . recognize[s] the validity of a security interest in a broadcast license [and] the enforceability of a security interest in the proceeds of an FCC approved sale."); Clark & Clark, *The Law of Secured Transactions Under the Uniform Commercial Code* ¶ 2.04(3) (2010) (In *Cheskey*, "the FCC decided to modify its written policy to make clear that, although a security interest may not be taken in the sale of the license to an FCC-approved third-party, it may be taken in the proceeds of sale to an FCC-approved third party.").[5]

Judge Peck of this Court addressed this topic in *Ion Media*. In that case, the plan of reorganization called for senior secured noteholders to exchange their notes—secured by the value of the debtors' FCC licenses—for equity in the reorganized entity. *See Ion Media*, 419 B.R. at 593, 600. A junior creditor group commenced an adversary proceeding claiming that the liens on the licenses themselves were invalid and, therefore, that the licenses were unencumbered by the senior secured noteholders security interest. *Id.* at 602. In approving the plan, Judge Peck declared that the junior creditors' argument was a "red herring" because the senior secured noteholders had contracted for a security interest in all the economic value of the FCC licenses to the extent allowed by law. *Id.* Judge Peck's explanation echoed the distinctions first set forth by

---

[5] Notably, Sprint characterizes *Ridgely*, *MLQ*, and the decisions in this District that rely upon them—*Urban Communicators* and *Ion Media*—as "outmoded and largely inapplicable." Combined Reply Brief in Support of Plaintiff Sprint Nextel Corporation's Motion for Partial Summary Judgment and Response in Opposition to Defendants' Cross–Motions for Summary Judgment [Dkt. No. 58], at 2. This Court disagrees.

the court in *Ridgely*: "It does not matter whether the FCC licenses are or are not subject to a valid lien, because they are subject to an enforceable dedication of their economic value to the First Lien Lenders." *Id.* Judge Peck further clarified that there was no difference between a sale and a plan for purposes of the lien on the economic value of the licenses: "the Plan, predicated on a debt for equity exchange, is not generating sale proceeds in the sense that term is used, but is satisfied that in the context of asserting rights to the value of the FCC Licenses this is not a relevant distinction." *Id.* at 600 n.21.[6]

Applying the reasoning of all these cases to the current dispute, this Court concludes that the Noteholders have a valid lien on the economic value associated with TerreStar's S-Band License, even if they cannot hold a lien on the FCC license itself. The Security Agreement here gives the broadest grant possible over the right to receive economic value from an FCC License: "the right to receive monies, proceeds, or other consideration in connection with the sale, assignment, transfer, or other disposition of any FCC Licenses, the proceeds from the sale of any FCC Licenses or any goodwill or other intangible rights or benefits associated therewith . . . ." Security Agreement [Dkt. No. 52, Exhibit C] § 3(f).[7] Despite this broad grant on the economic

---

[6] Sprint's motion papers distinguish between a reorganization and a sale, arguing there would be no proceeds generated for which a purported lien could attach if a reorganization occurred. *See* Memorandum of Law in Support of Sprint Nextel Corporation's Motion for Summary Judgment [Dkt. No. 39], at 21-22. This Court explicitly rejected such a distinction in *Ion Media*. In any event, such a distinction is now irrelevant given that, subsequent to the filing of Sprint's motion papers, the debtors conducted a Section 363 sale of their assets which yielded proceeds of $1.375 billion. *See* Order (A) Approving Asset Purchase Agreement and Authorizing the Sale of Assets of Debtor Outside the Ordinary Course of Business; (B) Authorizing the Sale of Assets Free and Clear of All Liens, Claims, Interests and Encumbrances; (C) Authorizing the Assumption and Sale and Assignment of Certain Executory Contracts and Unexpired Leases; and (D) Granting Related Relief, Case No. 10-15446-SHL, dated July 7, 2011 [Dkt. No. 668], at 1, 9-10.

[7] The Security Agreement here is notably similar to the agreement in *Ion Media*:

The plain language of the Transaction Documents specifies that the First Lien Lenders and the Second Lien Lenders expressly contracted in the Transaction Documents for separate security interests in all economic value of the FCC Licenses and in all non-monetary aspects of the FCC Licenses themselves to the extent allowed by law. *See* Security Agreement at § 2.1(f) (including FCC Licenses in definition of 'Collateral'); § 5.7 (clarifying that the grant of security interest in the FCC Licenses is 'to the extent that a security interest in such licenses is permitted under applicable law'). This grant of a security interest in the economic value of the FCC Licenses is

value of the license, the lien in this Security Agreement is consistent with the FCC's public regulatory role recognized in *Cheskey* and its progeny because it "does not include at any time any FCC License to the extent (but only to the extent) that at such time the Collateral Agent may not validly possess a security interest directly in the FCC License pursuant to applicable federal law . . . ." *Id.* § 3(f); *see also Ion Media*, 419 B.R. at 602.

Sprint relies upon the Offering Memorandum circulated to potential investors in the Senior Secured Notes as evidence that U.S. Bank and the Noteholders knew they did not have a security interest in the S-Band License. However, Sprint overlooks the fact that the Offering Memorandum limits the lien to the economic value of the license and explicitly carves out any lien on the license itself:

> [H]olders of the notes will not have a direct security interest in these licenses and authorizations. [An investor's] ability to foreclose on, or exercise certain rights or remedies with respect to, certain of the collateral requires prior approval from the FCC to the extent it would result in an assignment or transfer of control of our FCC authorizations (whether as a matter of law or fact).

Offering Memorandum [Dkt. No. 52, Exhibit A], at 42. Thus, the language of the Offering Memorandum simply mirrors the position taken by U.S. Bank and the Noteholders in the current dispute before this Court, namely, that the Security Agreement created a valid lien on the economic value of TerreStar's S-Band License but not on the license itself.

## C. THE LIEN ON THE ECONOMIC VALUE OF AN FCC LICENSE ATTACHED PREPETITION AND IS NOT BARRED BY SECTION 552 OF THE BANKRUPTCY CODE

Relying heavily on a decision from the bankruptcy court in Colorado, *Spectrum Scan LLC v. Valley Bank & Trust Co.* (*In re Tracy Broad. Corp.*), 438 B.R. 323 (Bankr. D. Colo.

---

further confirmed by the utilization of special purpose subsidiaries to hold the FCC Licenses, the concomitant pledges of the equity interests in each FCC License Subsidiary by the Debtors to the Secured Parties, and the Intercreditor Agreement's restrictions on Second Lien Lender actions.

*Ion Media*, 419 B.R. at 602.

2010), *appeal docketed*, No. 10-CV-02522 (D. Colo., Oct. 15, 2010), Sprint contends that the

Noteholders' lien is invalid under Article 9 of the NYUCC and Bankruptcy Code Section 552.

Specifically, Sprint claims that the Noteholders' lien did not attach because there was no sale or

transfer of the underlying assets before the bankruptcy, and thus honoring the lien would violate

Section 552's prohibition against liens on property acquired after the commencement of the

bankruptcy case.  This Court rejects these arguments as contrary to the clear weight of authority

and inconsistent with the well-established policy of permitting liens on the economic value of

FCC licenses.

Other than the decision in *Tracy*, courts have uniformly recognized that an FCC license is

a general intangible and that a lien on such an intangible may be perfected prepetition before any

proceeds or other consideration is generated and prior to any transfer, sale, or other disposition of

the license.  *MLQ*, 146 F.3d at 749; *Urban Communicators*, 394 B.R. at 335; *Media Properties*,

311 B.R. at 247.  The Committee asserts that these decisions are inapplicable to the case at hand,

but the Court rejects the Committee's overly narrow reading of these cases.

In *MLQ*, a lender secured by the proceeds of an FCC license filed suit against a

defaulting debtor and guarantor to seek sale of the license and to obtain the resulting proceeds.

*MLQ*, 146 F.3d at 747.  Prior to the commencement of that suit, but after perfection of that

lender's security interest, the IRS filed a lien on the same FCC license for unpaid taxes.  *Id.*  The

debtor maintained that the lender's lien on the proceeds was invalid since it could not be

perfected until after proceeds were generated, whereas the IRS lien existed before the post-

petition sale for proceeds occurred.  *Id.* at 749.

The Ninth Circuit disagreed.  It held that a lender may perfect a security interest in the

proceeds of an FCC license and that such interest may be perfected prior to sale of the license.

*Id.*  Invoking *Ridgely*, the *MLQ* court relied upon the distinction between the private right to

grant liens on the economic value of an FCC license and the public right to regulate the license itself. *Id.* The *MLQ* court also found that under the UCC, government licenses are "general intangibles" or "personal property interests in which security interests may be perfected," *id.* (citing *Ridgely*, 139 B.R. at 379), and are distinguishable from a security interest in after-acquired property under the Uniform Commercial Code, *id.* at 749 n.1.[8] The Ninth Circuit concluded that:

> [There is] no reason why the proceeds should not be considered 'general intangibles,' therefore subject to perfection prior to sale. Indeed, a contrary outcome would mean that the distinction between private and public interests in FCC license proceeds, outlined in *In re Ridgely* and *In re Cheskey*, would have no meaning, and the private interests would be devoid of value. A security interest in proceeds that could not be perfected until after foreclosure and sale of the license would, in almost every circumstance, be primed by IRS liens and claims of other creditors. The fact that in the present case the actual dollar proceeds from the sale of the licenses were generated only after the sale-and thus after the tax lien filing, as well-is immaterial. '[N]early all forms of security must be reduced to cash before they pay off the debt secured thereby.'

*Id.* at 749 (citing Peter F. Coogan, *Tax Liens and the UCC*, 81 HARV. L.REV. 1369, 1385 (1968)). The court in *MLQ* considered and rejected the *Tak* decision, noting that it was based upon the FCC's prior position that liens on broadcast licenses were impermissible, a view that the FCC had subsequently and explicitly rejected. *Id.* at 748.

In *Urban Communicators*, the Southern District of New York followed *MLQ* in concluding that liens on FCC licenses attach and may be perfected prepetition. 394 B.R. at 334-35 (affirming holding of the bankruptcy court). In that case, a lender sought the sale proceeds

---

[8] *See also Ridgely*, 139 B.R. at 379 (citing, *inter alia*, *Freightliner Mkt. Dev. Corp. v. Silver Wheels Freightlines, Inc.*, 823 F.2d 362, 369 (9th Cir. 1987) (distinguishing rights between government and licensee from rights between licensee and private third party and holding that Federal and state transportation operating authorities are "general intangibles"); *In re O'Neill's Shannon Village*, 750 F.2d 679, 682-83 (8th Cir. 1984) (liquor license is "general intangible" under U.C.C. § 9-106); *First Pennsylvania Bank, N.A. v. Wildwood Clam, Inc.*, 535 F. Supp. 266, 268 (E.D. Pa. 1982) (commercial clamming license is "general intangible"); *In re Genuario*, 109 B.R. 550 (Bankr. D.R.I. 1989) (liquor license is "general intangible"); *In re Cleveland Freight Lines, Inc.*, 14 B.R. 777, 780 (Bankr. N.D. Ohio 1981) (certificate of public convenience and necessity is "general intangible" and security interest attaches to proceeds of sale of certificate)).

from an FCC license, and the debtor objected.  *Id.* at 332.  The relevant security agreement

provided that:

> to the extent the Holding Company may be prohibited from granting a security
> interest in the FCC Licenses pursuant to the Communications Act or the rules and
> regulations of the FCC this security interest shall not encumber the FCC Licenses
> as opposed to the proceeds that may be derived therefrom.

*Id.* at 328 (internal quotation marks omitted).  Like *MLQ*, the debtor argued that the lien was on

sale proceeds from the licenses and could attach only after the license yielded proceeds.  *Id.* at

334.  The district court in *Urban Communicators* rejected this argument and adopted the *MLQ*

public-private distinction to validate the lien on proceeds—or economic value—of the license.

*Id.* at 334-35.  It echoed the Ninth Circuit's decision in *MLQ* that "a creditor may perfect a

security interest in a borrower's FCC broadcasting license to the extent that the creditor seeks to

protect its interest in the proceeds of the borrower's license."  *Id.* at 334.  Also following *MLQ*,

the court found the lien on proceeds from the FCC license to be on a "general intangible" and

that it attached when the security interest was created.[9]  *See id.* at 334-35 (acknowledging the

*MLQ* court's conclusion that "the licensee's rights in the license proceeds includ[e] a limited

right to pledge those proceeds as collateral").[10]

Similarly, the *Media Properties* court held that a prepetition security interest in an FCC

license validly extended to all attributes of the license not specifically reserved to the FCC.  *In re*

*Media Properties, Inc.*, 311 B.R. 244, 249-50 (Bankr. W.D. Wis. 2004).  In that case, a lender

---

[9]  The Committee asserts that *Urban Communicators* addressed only "when" a lien may attach to the FCC license,
not "whether" a lien may attach.  *See* Memorandum of Law in Further Support of the Motion for Summary
Judgment of Intervenor-Plaintiff, the Official Committee of Unsecured Creditors of TerreStar Networks, Inc., *et al.*
and in Opposition to Defendants' Cross-Motions for Summary Judgment [Dkt. No. 60], at 9.  However, the decision
in *Urban Communicators* addressed "when" a lien may attach by discussing "whether" a lien may attach when an
FCC license is pledged as collateral pre-petition.

[10]  Notably, Section 9-408 of the NYUCC "makes ineffective any attempt to restrict the assignment of a general
intangible . . . in a rule of law, including a statute or governmental rule or regulation."  *See* N.Y. U.C.C. LAW § 9-
408, cmt.2.

asserted a first priority lien in the sale proceeds of an FCC license. *Id.* at 246. The security

agreement there pledged "all of the tangible and intangible personal property and fixtures of the

Debtor . . . and excepting only any FCC License of Debtor to the extent that a Lien thereon

would cause or permit the revocation or loss of such FCC License . . . ." *Id.* The trustee argued

that (1) the lender's security interest was only in the prepetition proceeds, but none existed; and

(2) the sale proceeds were after-acquired property under Section 552 in which the creditor could

not perfect an interest. *Id.* In rejecting those arguments, the court in *Media Properties*

concluded that the lien covered all private attributes of the license not explicitly reserved to the

FCC:

> It seems clear that since [*Tak*,] the FCC and the courts considering the issue have
> found the glass to be at least half full. A creditor can . . . take a security interest in
> all rights of the licensee against third parties, which is more than just proceeds of
> a sale. After those prerogatives exclusive to the FCC are carved out, there
> remains an interest in the license which may be subjected to a security interest
> which could continue in proceeds of those interests by operation of law. UCC
> Section 9-203(g). Thus, when the license is sold, the existing security is
> liquidated. Such a security interest avoids the effects of 11 U.S.C. § 552.

*Id.* at 249-50. Thus, the court reasoned that although there were no proceeds when the lien was

granted, the proceeds were generated from sale of a general intangible in which the creditor had

a prepetition interest.[11]

Against the backdrop of this authority, Sprint relies upon *Tracy Broadcasting*, 438 B.R.

at 328-31, in which the court invalidated a lien on the proceeds of an FCC license. In *Tracy*, an

unsecured creditor sought a judgment declaring that a secured lender's lien on general

---

[11] Sprint and the Committee argue that the lien must attach to prepetition proceeds and cannot be effective here
because no such proceeds exist. *See* Combined Reply Brief in Support of Plaintiff Sprint Nextel Corporation's
Motion for Partial Summary Judgment and Response in Opposition to Defendants' Cross–Motions [Dkt. No. 58], at
13-14; *see also* Memorandum of Law in Further support of the Motion for Summary Judgment of Intervenor-
Plaintiff, the Official Committee of Unsecured Creditors of TerreStar Networks, Inc., et al. and in Opposition to
Defendants' Cross-Motions for Summary Judgment [Dkt. No. 60], at 11-12. Their position ignores that the Security
Agreement here includes a broad grant in the economic interest of the S-Band License and general intangibles, not
simply to proceeds. *See* Security Agreement § 3.

intangibles did not attach to the post-petition proceeds of the debtor's FCC license.  *Id.* at 325.

The *Tracy* court held that the debtor did not have rights in the FCC license itself, and thus could

not grant an enforceable prepetition security pursuant to UCC § 9-203.  The Court further

concluded that, because no lien may be placed on the license itself, Section 552 barred the

secured creditor from asserting its security interest in the proceeds of an FCC license post-

petition.  *Id.* at 330-31.

The *Tracy* decision is, however, problematic.  As a threshold matter, the *Tracy* court

reached its conclusion based on the faulty assumption that "there has been no definitive ruling

from the FCC itself, and there are Circuit Court cases which seem to reject any security interest

in any aspect of an FCC License."  *Id.* at 328.  For this proposition, the court in *Tracy* cites *Tak*,

which *Cheskey* explicitly rejected as inconsistent with FCC policy and which the Ninth Circuit

rejected in *MLQ*.  The other case relied upon by the *Tracy* court is a 1933 decision from the

Ninth Circuit, *see id.* at 330 (citing *Sims v. Jamison*, 67 F.2d 409, 411 (9th Cir. 1933) (addressing

validity of purported security interest in crops not yet planted)), the same Circuit Court of

Appeals that explicitly rejected this result in *MLQ*.  Indeed, the *Sims* decision was issued before

"general intangibles" was added as a category of collateral under the UCC.  *See* 8 Hawkland

UCC Series § 9-106:1 (Reuters 2010 ed.) (describing history of "general intangibles" in relation

to the UCC).[12]

Thus, the *Tracy* decision is fundamentally at odds with the case law set forth above that

permits liens on the economic value of an FCC license.  It ignores the sound reasoning of the

---

[12]  Sprint argues that "this is an unusual case, in which an unsecured creditor (Sprint Nextel) . . . has a direct claim
against the special purpose subsidiary [TSL] . . . that holds the Debtors' FCC Licenses  . . . . Following *Tracy
Broadcasting* in this case thus should have no chilling effect whatsoever on the financing of FCC licensees as a
general matter."  Combined Reply Brief in Support of Plaintiff Sprint Nextel Corporation's Motion for Partial
Summary Judgment and Response in Opposition to Defendants' Cross–Motions [Dkt. No. 58], at 23.  However, the
reasoning of *Tracy* would invalidate liens on FCC licenses generally and not merely those where a special purpose
subsidiary has been used.

court in *Ridgely*, which recognized the distinction between the public and private rights associated with an FCC license. By ignoring that distinction, the reasoning in *Tracy* would place two problematic conditions on the attachment of a lien against the economic value of a broadcast license—a sale and FCC approval—that would make it difficult, if not impossible, for such a lien to survive the filing of a bankruptcy, notwithstanding the wealth of authority that such liens are permissible and the FCC's conclusion that such liens are desirable.[13]  As recognized in the decisions in *MLQ*, *Urban Communicators*, *Media Properties* and others, the arguments made by Sprint, if accepted, would unsettle expectations by invalidating such liens in the bankruptcy context or permitting all other creditors to come before the liens, thus severely diminishing or eliminating their value.[14]

### D.  REMAINING COUNTS OF THE COMPLAINT

Counts III and IV of Sprint's complaint offer two additional legal theories to challenge the priority of the Noteholders' lien.  U.S. Bank seeks summary judgment on both counts, whereas Sprint seeks summary judgment only on Count IV.

In Count III, Sprint asserts that the FCC could not have issued the S-Band License to TerreStar but for Sprint's relocation of the BAS incumbents pursuant to the 800 MHz Order. Given that Sprint conferred the benefit upon TerreStar before the Noteholders secured their lien

---

[13]  At oral argument, Sprint's counsel asserted the holding of *Tracy* still allows a debtor to proceed with a pre-package reorganization where—before filing—the parties in interest first agree to transfer the license and then the debtor receives FCC approval for this arrangement.  The narrow nature of this hypothetical demonstrates, however, the severe limitations on financing that would be imposed if the holding of *Tracy* were applied to all FCC license holders.

[14]  As the discussion above makes clear, these three decisions are flatly inconsistent with Sprint's contention that a lien on the value of an FCC license is an impermissible lien on after-acquired property under Section 552(a).  But even assuming that Section 552(a)'s prohibition regarding liens on after-acquired property applied, which it does not, the lien would still be valid because it falls within the exception set forth in Section 552(b).  Section 552(b) provides that a valid prepetition lien in property can extend to value generated by such property post-petition when expressly provided for in the security agreement.  Consistent with this exception, Section 3 of the Security Agreement in this case gives a broad grant in the economic value of the FCC licenses beyond the proceeds to everything except the license itself and, therefore, the lien here is akin to the one found enforceable in *Media Properties*.  *See* Security Agreement § 3; *Media Properties*, 311 B.R. at 249-50.

on TerreStar's S-Band License, Sprint claims that the lien should be invalidated or subordinated

to Sprint's reimbursement claim under Section 552(b)(1)'s "equities of the case" doctrine.

Section 552(b)(1) provides that:

> [I]f the debtor . . . entered into a security agreement before the commencement of
> the case and if the security interest . . . extends to property of the debtor acquired
> before the commencement of the case and to proceeds, products, offspring, or
> profits of such property, then such security interest extends to such proceeds,
> products, offspring, or profits acquired by the estate after the commencement of
> the case . . ., *except to any extent that the court, after notice and a hearing and
> based on the equities of the case, orders otherwise*.

11 U.S.C. § 552(b)(1) (emphasis added).  As a general matter, the "equities of the case provision

is intended to prevent secured creditors from receiving windfalls and to allow bankruptcy courts

broad discretion in balancing the interests of secured creditors against the general policy of the

Bankruptcy Code, which favors giving debtors a fresh start."  *In re Patio & Porch Sys. Inc.*, 194

B.R. 569, 575 (Bankr. D. Md. 1996) (citations and internal quotation marks omitted).

U.S. Bank concedes that the factual record is incomplete on Count III.  *See* U.S. Bank's

Memorandum of Law in Opposition to Plaintiffs' Motions for Summary Judgment and in

Support of Its Cross Motion for Summary Judgment [Dkt. No. 55], at 25 ("Plaintiffs have not

moved for summary judgment on [Count III] because questions of equity are fact intensive and

the parties are in the early stages of discovery in this case.").  U.S. Bank nonetheless seeks

summary judgment based on a narrow legal argument, namely that the equities of the case

doctrine applies only where a secured creditor's collateral has appreciated in value through the

use of unencumbered assets from the debtors' estates.  *Id.* (citing, *inter alia*, *In re Bennett

Funding Group, Inc.*, 255 B.R. 616, 634 (N.D.N.Y. 2000) (observing that the primary rationale

for this doctrine is "to prevent a secured creditor from reaping benefits from collateral that has

appreciated in value as a result of the [debtor's] use of [unencumbered assets].")).  As its

collateral did not increase in value because of the use of unencumbered estate assets, U.S. Bank

24

contends that the equities of the case doctrine cannot apply regardless of the facts revealed in discovery. Sprint disagrees, arguing that the "equities of the case" doctrine is "exceptionally broad" and not limited to the narrow parameters U.S. Bank has identified.

"The bankruptcy court is a court of equity. 'Equity' has been defined as the spirit and habit of fairness, justness, and right dealing that should regulate the affairs of individuals." *Jaecksch v. GMAC (In re Jaecksch)*, 2007 Bankr. LEXIS 1829, at *5-6 (Bankr. N.D. Ga. April 4, 2007) (citation omitted). The phrase "equities of the case" is not defined in the Bankruptcy Code. *In re Compass Marine Corp.*, 1992 Bankr. LEXIS 1680, at *6 (Bankr. E.D. Pa. Oct. 28, 1992). Despite the seemingly broad grant given by Section 552(b)(1)'s language, this Court has described the "equities of the case" doctrine in fairly narrow terms. Most recently, this Court explained:

> The equities of the case doctrine is intended to ensure that secured creditors do not receive a windfall benefit when a trustee uses assets of the estate, for example, to finish uncompleted inventory, and it is also used to adjust recovery by a secured creditor in situations where there is an improvement or decline in the post-petition collateral, especially in situations where the change in value is brought about by a party in the bankruptcy.

*In re Barbara K Enters.*, 2008 Bankr. LEXIS 1917, at *32-33 (Bankr. S.D.N.Y. June 16, 2008) (citations omitted). Similarly, in *In re Photo Promotion Associates, Inc.*, 61 B.R. 936 (Bankr. S.D.N.Y. 1986), this Court observed that "[t]he equity exception is meant for the case where the trustee or debtor in possession uses other assets of the bankrupt estate (assets that would otherwise go to the general creditors) to increase the value of the collateral." *Photo Promotion Assocs.*, 61 B.R. at 939 (quoting *J. Catton Farms, Inc. v. First National Bank of Chicago*, 779 F.2d 1242, 1246 (7th Cir. 1985)) (internal quotation marks omitted).

Other courts have similarly described the narrow contours of the equities of the case doctrine. *See In re Cross Baking Co.*, 818 F.2d 1027, 1033 (1st Cir. 1987) ("[S]ection 552(b) is

designed to cover the situation where raw materials, for example, are converted into inventory, or inventory into accounts, at some expense to the estate, thus depleting the fund available for general unsecured creditors, but is limited to the benefit inuring to the secured party thereby.") (citation omitted); *Toso v. Bank of Stockton (In re Toso)*, 2007 Bankr. LEXIS 4889, at *41-43 (B.A.P. 9th Cir. Jan. 10, 2007) ("Equities of the case, as that phrase is used in § 552(b)(1), is anything but vague. . . . [T]he cases interpreting the equities of the case exception make clear its principal purpose is to prevent secured creditors from reaping unjust benefits from an increase in the value of collateral during a bankruptcy case resulting from the debtor's use of other assets of the estate, or from the investment of non-estate assets. . . . No circuit case law attributes a different meaning to this phrase.") (internal quotation marks omitted); *All Points Capital Corp. v. Laurel Hill Paper Co. (In re Laurel Hill Paper Co.)*, 393 B.R. 89, 93 (Bankr. M.D.N.C. 2008) ("The cases involving section 552(b)(1) appear to place the most weight on whether a debtor expended unencumbered funds of the estate, at the expense of the unsecured creditors, to enhance the value of the collateral.") (citations omitted); *In re S & Z International Management, Inc.*, 10 B.R. 580, 582 n.1 (Bankr. S.D. Fla. 1981) ("Subsection 552(b), does provide that the court, 'based on the equities of the case', may order 'otherwise', but the legislative history indicates that this is to make provision for an increase in the value of collateral created by the estate at the estate's expense, and which thus depletes the fund available for general unsecured creditors.").

Notwithstanding the narrow circumstances described by these decisions, some cases have observed that the doctrine *might* have broader application. *In re 680 Fifth Ave. Assocs.*, 154 B.R. 38, 41 (Bankr. S.D.N.Y. 1993) ("[T]here is no one scenario to which application of the equities doctrine is limited. Rather, the examples provided by the courts and treatises are but a few of what surely can be deemed a non-exhaustive list. The theme that rings true to all of the

examples, however, is that the exception offers a bankruptcy court, essentially a court of equity, considerable latitude in balancing the rights of competing creditor entities with the overall rehabilitative scheme of bankruptcy law. . . . [W]hile I may choose not to exercise that discretion, the Code vests me with the authority to do that which the debtors have requested.") (citation omitted); *see also Patio & Porch Sys.,* 194 B.R. at 575 ("552(b) grants the court broad equitable powers in determining the extent of the security interest Creditor may be allowed to maintain postpetition."); *In re Mullen*, 172 B.R. 473, 479 (Bankr. D. Mass. 1994) ("As demonstrated by the statements on the floor of both branches, Congress was concerned about the situation where the estate spends money and thereby causes an enhancement in proceeds or rents which improves the position of the secured party.  It had foremost in mind the conversion of raw materials to inventory or inventory to accounts.  But Congress obviously did not wish to limit the exception to those circumstances.  The standard for application of the exception—'the equities of the case'—gives the court the broadest possible charter.") (footnote omitted); *In re Cardinal Indus.*, 118 B.R. 971, 981 (Bankr. S.D. Ohio 1990) ("The legislative history to that section indicates that 'equities of the case' includes the situation where application of a pre-petition security interest to post-petition rents would be unfair to unsecured creditors because expenditures would be required of the estate to preserve the secured creditor's collateral or improve its position. . . . As enacted, the provision may be even broader than the version commented upon in the legislative history cited.") (citations omitted); *In re Trans-Texas Petroleum Corp.*, 33 B.R. 67, 69 (Bankr. N.D. Tex. 1983) ("552(b) grants this court discretion, on equitable grounds, to modify or alter the security interest defined by state law.") (citation omitted).

Applying these principles to the case at hand, the Court refuses to limit the doctrine, as a matter of law, as requested by U.S. Bank.  To be sure, the facts as described in these motions do

not appear to fall within the contours of the doctrine as most commonly understood.[15]   But the

Court is mindful that the factual record in this case is not yet fully developed and that the plain

language of Section 552(b) is not limited to the specific factual scenario set forth by U.S. Bank.

Accordingly, the Court denies U.S. Bank's motion for summary judgment on Count III as

premature.  *See Indergit v. Rite Aid Corp.*, 2010 U.S. Dist. LEXIS 32322, at *20-21 (S.D.N.Y.

March 31, 2010) ("[T]he incomplete nature of the record, and the parties' factual disputes . . .,

make it improper for this Court—at this time—to resolve Plaintiff's claims as a matter of law.");

*Park Ave. Bank, N.A. v. T.C. Ziraat Bankasi*, 1995 U.S. Dist. LEXIS 18433, at *3 (S.D.N.Y.

Dec. 13, 1995) ("Summary judgment is strongly disfavored prior to the parties having had an

adequate opportunity for discovery.").

In seeking summary judgment on Count IV, Sprint asserts that the Noteholders' lien

should be subordinated to Sprint's reimbursement claim by virtue of Article 9 of the NYUCC

and Section 506 of the Bankruptcy Code.  At first blush, neither section appears to provide for

the remedy that Sprint seeks.  The NYUCC allows secured parties no greater interest in collateral

than the debtor itself holds.  *See* N.Y. U.C.C. LAW § 9-203(b)(2).  Similarly, Section 506

---

[15]  Sprint's obligation to clear the bandwidth existed before the Security Agreement, and Sprint cleared the
bandwidth before the Debtors' bankruptcy was filed.  Plaintiff Sprint Nextel Corporation's Statement of Material
Facts as to Which There Is No Genuine Issue to Be Tried [Dkt. No. 40], at ¶¶ 13-14 (Security Agreement dated
February 14, 2007); *Id.* at ¶ 23 (FCC obligated Sprint to relocate BAS incumbents in 2004 Public Safety Order); *Id.*
at ¶ 41 (BAS relocation completed on July 15, 2010); *Id.* at  ¶ 46 (Debtor filed under Chapter 11 on October 19,
2010).  Thus, the factual record here is far different than in the handful of reported cases where parties have
successfully invoked the equities of the case doctrine to alter the rights of a secured creditor.  *See Toso*, 2007 Bankr.
LEXIS 4889, at *40-46 (holding that where the debtor used unencumbered funds of the estate to grow and maintain
his asparagus crop, "[t]he bankruptcy court did not abuse its discretion when it decided, under § 552(b)(1), that
[creditor's] security interest should not extend to Debtor's 2005 and 2006 asparagus crop based upon the 'equities of
the case.'"); *Photo Promotion Assocs.*, 61 B.R. at 940 ("Based on the equities of the case [doctrine], the plaintiff's
security agreement does not extend to the proceeds . . . from the sale of finished family portraits which were not in
existence at the commencement of this case and which were thereafter produced . . . as a result of the activities of
the trustee in bankruptcy, who paid for the creation of the finished portraits with [unencumbered] funds from the
estate."); *In re Delbridge*, 61 B.R. 484, 490-91 (Bankr. E.D. Mich. 1986) (applying the "equities of the case"
doctrine and holding that based on the contribution of unencumbered assets and effort by the debtor and his family,
a secured creditor was "entitled to a lien on [only] 20% of proceeds of the sale of milk from the debtor's post-
petition operations.").

provides only that "a secured claim [is secured] to the extent of the value of such creditor's interest in the estate's interest in such property . . . ." 11 U.S.C. § 506(a)(1).  Both sections address the extent to which an interest is secured, and neither mentions the subordination of liens.

Rather than rely on the text of these two provisions, Sprint's argument instead depends upon Sprint's contention that the Debtors' interest in the license—the collateral for the Noteholders' lien—was created subject to Sprint's reimbursement claim.  Citing relevant FCC rulings, Sprint asserts that the S-Band License's existence is a prerequisite to any encumbrance on the value of such license.  Most notably, Sprint cites the 2000 Ruling, which provides that use of the S-Band License is expressly conditioned on reimbursement to Sprint for clearing the bandwidth: "Subsequently entering MSS licensees . . . will, as a condition of their licenses, compensate the first entrant on a pro rata basis, according to the amount of spectrum the subsequently entering licensees are authorized to use."  Memorandum of Law in Support of Plaintiff Sprint Nextel Corporation's Motion for Partial Summary Judgment [Dkt. No. 39], at 33 n.12 (citing 2000 Ruling, ¶ 71).[16]

Sprint's argument is, however, defective in at least two ways.  First, the 2000 Ruling used the term "conditional" but has never explicitly conditioned use of the S-Band License on payment of full pro rata reimbursement to Sprint.  Indeed, the FCC's subsequent 2009 Ruling

---

[16]  U.S. Bank argues that Count IV is "nothing more than an equitable subordination claim based upon [Sprint's] alleged efforts in clearing the bandwidth," and thus is an equitable claim that is "inappropriate for summary judgment prior to the completion of discovery."  U.S. Bank's Memorandum of Law in Opposition to Plaintiffs' Motions for Summary Judgment and in Support of its Cross-Motion for Summary Judgment [Dkt. No. 55], at 29 (citing, *inter alia*, 11 U.S.C. § 510(c) (providing for equitable subordination)).  In response, Sprint categorically denies that Count IV lies in equity: "In fact, and on its face, Count IV . . . is an entirely legal cause of action based on a set of facts that is not disputed, and on established principles of UCC and bankruptcy law."  Combined Reply Brief in Support of Plaintiff Sprint Nextel Corporation's Motion for Partial Summary Judgment and Response in Opposition to Defendant's Cross-Motions for Summary Judgment [Dkt. No. 58], at 24 (citing 11 U.S.C. § 506(a)(1); N.Y. U.C.C. LAW § 9-203(b)(2)).  Given Sprint's position, the Court declines to consider Count IV as an equitable subordination claim and construes it as a legal argument premised upon NYUCC Article 9 and Code Section 506.

stated that MSS licensees, including TerreStar, have a reimbursement "obligation" to Sprint, not

that use of the S-Band License was conditioned on full pro rata reimbursement to Sprint.  *See*

2009 Ruling, ¶ 2.  When revisiting the issue again in its 2010 Declaratory Ruling, the FCC

refused Sprint's request to make full reimbursement a condition for use of the license:

> Sprint Nextel argues that failure of an MSS entrant to pay its [BAS] cost sharing
> obligation in a timely fashion should automatically result in the suspension of its
> right to operate and suspension of its license if the failure to pay continues . . . .
> We will adopt no specific policies or procedures as to how we should proceed if
> later new entrants fail to reimburse an earlier entrant for the cost of relocating
> BAS incumbents as required.  Instead, we will address complaints regarding
> failure to make required payments that are filed before the Commission through
> our existing enforcement mechanisms.

2010 Declaratory Ruling, ¶ 73.  If the FCC wished to expressly condition TerreStar's use of the

license on full reimbursement, the FCC had several opportunities to do so.  It did not.

Second, Sprint's argument ignores that it is the role of the Bankruptcy Court, not the

FCC, to determine the priority of Sprint's claim vis-à-vis other parties' claims.  As the FCC

specifically stated in the 2010 Declaratory Ruling: "the actions we take here are not an

adjudication of the claims that Sprint Nextel, DBSD, and TerreStar have raised in that court

proceeding."  *Id.* ¶ 82.  The FCC recognized, instead, that Sprint's recovery for any

reimbursement obligation "will be governed by the proceedings in the bankruptcy court, rather

than by this Commission or in the district court case initiated by Sprint Nextel."  *Id.* ¶ 29.  The

FCC further explained that "any proceedings by Sprint Nextel on a claim for monetary recovery

against a debtor in [a bankruptcy proceeding] . . . is a matter for the Bankruptcy Court and is not

addressed in this Report and Order and Declaratory Ruling."  *Id.* at ¶ 79.[17]  Indeed, the FCC

noted that it is "not seek[ing] to determine the pecuniary interest of any individual debtor or

---

[17]  As the DBSD Chapter 11 bankruptcy also was ongoing at the time of the 2010 Declaratory Ruling, this Court
also presumes that the FCC was aware that the priority of prepetition claims, such as Sprint's reimbursement claim,
was the subject of possible dispute.  *See* 2010 Declaratory Ruling, ¶ 29.

creditor." *Id.* There can be no dispute then that the FCC did not intend to determine the priority of Sprint's reimbursement claim in this bankruptcy.

The FCC's views on this subject are consistent with the Supreme Court's view that the FCC's role as regulator of the telecommunications industry is distinct from the bankruptcy court's role as arbiter of claims disputes in bankruptcy. *See FCC v. NextWave Personal Commc'ns*, 537 U.S. 293, 302-04 (2003). In *NextWave*, the Supreme Court held that the Bankruptcy Code prohibited the FCC from revoking a debtor's license based upon the debtor's failure to make payments to the FCC for the purchase of the license, even though such payment was an explicit condition of the license. *Id.* at 303-04. The FCC had argued that "regulatory conditions . . . are not properly classified as debts under the Bankruptcy Code," and that the "respondent's obligations are not dischargeable in bankruptcy because it is beyond the jurisdictional authority of bankruptcy courts to alter or modify regulatory obligations." *NextWave*, 537 U.S. at 302-03 (citations and internal quotation marks omitted). The Supreme Court disagreed, explaining that:

> Under the Bankruptcy Code, 'debt' means 'liability on a claim,' . . . and 'claim,' in turn, includes any 'right to payment,' . . . . We have said that 'claim' has 'the broadest available definition,' . . . and have held that the 'plain meaning of a 'right to payment' is nothing more nor less than an enforceable obligation, regardless of the objectives the State seeks to serve in imposing the obligation,' . . . . In short, a debt is a debt, even when the obligation to pay it is also a regulatory condition.

*NextWave*, 537 U.S. at 302-03 (citations omitted). The Supreme Court further observed that "where Congress has intended to provide regulatory exceptions to provisions of the Bankruptcy Code, it has done so clearly and expressly"; thus, "[a] preconfirmation debt is dischargeable unless it falls within an express exception to discharge." *NextWave*, 537 U.S. at 302-03.

Relatedly, Sprint asserts that public policy favors granting its motion on Count IV because recognizing the Noteholders' lien would interfere with regulation of FCC licenses.

31

Memorandum of Law in Support of Plaintiff Sprint Nextel Corporation's Motion for Partial

Summary Judgment [Dkt. No. 39], at 33 (citing *MLQ*, 146 F.3d at 748; *Tak*, 985 F.2d at 918-19).

But the FCC has not made such an argument in this proceeding.  Moreover, one could argue that

Sprint's position may be inconsistent with the FCC's efforts to encourage, as a matter of public

policy, the ability of licensees to obtain secured financing.  *See In the Matter of Facilitating the*

*Provision of Spectrum-Based Services to Rural Areas , et al.*, 19 F.C.C. Rcd. 19078 ¶¶ 47-49

(2004) ("[I]n order . . . to construct facilities and deploy innovative services to all Americans, . . .

licensees must have sufficient access to capital. . . . [T]he Commission . . . [sought] comment on

whether we could improve access to capital by allowing licensees to grant security interests to

creditors. . . . [L]icensees may be able to maximize their efficient use of spectrum by leveraging

the value of their retained spectrum usage rights to increase access to capital . . . .") (footnotes

and internal quotations omitted); *In the Matter of Principles for Promoting the Efficient Use of*

*Spectrum by Encouraging the Development of Secondary Markets*, 15 F.C.C. Rcd. 24178, ¶ 24

(2000) ("[To maximize] the efficient use of spectrum, . . . [the FCC] consider[ed] ways licensees

could leverage . . . their retained spectrum usage rights to increase access to capital.  Access to

capital, especially for smaller businesses, affects the licensee's ability to use its spectrum

resources under its license.").

## CONCLUSION

For the reasons set forth above, the Court (1) denies Sprint's request for summary

judgment on Counts I, II and IV; (2) denies the Committee's request for summary judgment on

Counts I and II; (3) grants the Noteholders' request for summary judgment on Counts I and II;

(4) grants the request of U.S. Bank for summary judgment on Counts I, II and IV; and (5) finds

that Count III is not yet ripe for summary judgment.  Defendants should settle an order on three

days' notice.

Dated:  New York, New York
        **August 19, 2011**


                                   ***/s/ Sean H. Lane***_____
                                   UNITED STATES BANKRUPTCY JUDGE